PILLSBURY WINTHROP SHAW PITTMAN LLP
Claire K. Wu (SBN 295966)
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017
Telephone: 213-488-3655
Facsimile: 213-629-1033
Email: claire.wu@pillsburylaw.com

Eric Fishman (Pro Hac Vice)
Andrew M. Troop (Pro Hac Vice)
Carolina A. Fornos (Pro Hac Vice)
31 West 52nd Street
New York, NY 10019
Telephone: 212-858-1000
Facsimile: 212-858-1500
Email: eric.fishman@pillsburylaw.com
        andrew.troop@pillsburylaw.com
        carolina.fornos@pillsburylaw.com

Attorneys for Defendants-Appellants
Bombardier Aerospace Corporation,
Bombardier Inc. and Learjet, Inc.

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JONATHAN D. KING,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>BOMBARDIER AEROSPACE CORPORATION, et al.,<br><br>Defendants - Appellants. | No. 24-2703<br><br>D.C. No. 2:22-cv-06637-JAK<br>Central District of California,<br>Los Angeles<br><br>**DEFENDANTS - APPELLANTS BOMBARDIER AEROSPACE CORPORATION, BOMBARDIER INC. AND LEARJET, INC.'S STATEMENT IN SUPPORT OF JURISDICTION** |

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................1

PROCEDURAL AND FACTUAL BACKGROUND ...............................3

A. The Bankruptcy Court Proceedings......................................................3

B. The Cavic and Yuntian Actions............................................................9

C. The District Court Order...................................................................11

LEGAL STANDARD..............................................................................12

ARGUMENT ...........................................................................................15

    1) The District Cout Order is Final and Immediately Appealable; No Fact Finding Is Required to Resolve the Issues on Appeal and Finally Dismiss the Adversary Proceeding Against Bombardier .................................15

    2) Even if the District Court Order Were Subject to the Four-Factor Finality Test, It Would Be Immediately Appealable ...............................................18

CONCLUSION .......................................................................................21

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re AFI Holding, Inc.*,
  530 F.3d 832 (9th Cir. 2008) ...................................................................13, 14

*Bullard v. Blue Hills Bank*,
  575 U.S. 496 (2015).............................................................................2, 3, 13

*In re Cherrett*,
  873 F.3d 1060 (9th Cir. 2017) .......................................................................16

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .......................................................................20

*In re Focus Media Inc.*,
  387 F.3d 1077 (9th Cir. 2004) ..................................................................20, 21

*In re Gugliuzza*,
  852 F.3d 884 (9th Cir. 2017) ..................................................................*passim*

*In re Hernandez*,
  820 F. App'x 593 (9th Cir. 2020).................................................................13

*King v. CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Co.*,
  Case No. 2:19-ap-01147-SK (Bankr. C.D. Cal.).......................................*passim*

*King v. Jetcraft Corp.*,
  Case No. 2:19-ap-01382-SK (Bankr. C.D. Cal.) ................................................1

*King v. Yuntian 3 Leasing Co. Designated Activity Co.*,
  Case No. 2:19-ap-01383-SK (Bankr. C.D. Cal.).......................................*passim*

*In re Landmark Fence Co.*,
  801 F.3d 1099 (9th Cir. 2015) ..................................................................14, 15

*Latman v. Burdette*,
  366 F.3d 774 (9th Cir. 2004), *as amended* (June 8, 2004), and *abrogated on
  other grounds by Law v. Siegel*, 571 U.S. 415 (2014).......................................21

ii

*In re Liu*,
No. 20-56102, 2022 WL 1153942 (9th Cir. Apr. 19, 2022)..........................14, 15

*Lundell v. Anchor Constr. Specialists, Inc.*,
223 F.3d 1035 (9th Cir. 2000) ...............................................................20

*Mililani Grp., Inc. v. O'Reilly Auto., Inc.*,
621 F. App'x 436 (9th Cir. 2015) ..........................................................16

*In re Perez*,
No. 21-CV-83 JLS (MSB), 2021 WL 1626335 (S.D. Cal. Apr. 27, 2021)........17

*In re Perl*,
811 F.3d 1120 (9th Cir. 2016) ...............................................2, 15, 16

*Shames v. Hertz Corp.*,
No. 07-CV-2174 H(BLM), 2008 WL 4370007 (S.D. Cal. Sept. 24, 2008).......17

*In re SK Foods*,
676 F.3d 798 (9th Cir. 2012) ................................................13, 15, 16

*In re Tarczynski*,
675 F. App'x 744 (9th Cir. 2017) .........................................................13

## Statutes and Codes

United States Code,
Title 11, Section 547 ............................................................................8
Title 11, Section 548 ............................................................................8
Title 11, Section 550 ............................................................................8
Title 15, Section 13(c) ..........................................................................5
Title 18, Section 1962(c) .......................................................................5
Title 28, Section 158(a)(1) ....................................................................17
Title 28, Section 158(d)(1)...........................................................*passim*

California Business and Professions Code
Section 17200................................................................................5, 11

Rules and Regulations

Federal Rules of Bankruptcy Procedure,
    Rule 2004 ...................................................................................4
    Rule 7012 ...................................................................................5
    Rule 7054 ...................................................................................1

Federal Rules of Civil Procedure,
    Rule 12(b)(6)..........................................................................5, 21
    Rule 54(b) ...........................................................................*passim*

Pursuant to the Court's May 3, 2024 Order (Dkt. No. 3), Defendants - Appellants Bombardier Aerospace Corporation ("BAC"), Bombardier Inc. and Learjet, Inc. (collectively, "Bombardier") submit their statement explaining why this Court has jurisdiction over their appeal of the Order entered by the United States District Court for the Central District of California (the "District Court") on March 26, 2024 (the "District Court Order"), pursuant to 28 U.S.C. § 158(d)(1).[1]

## **INTRODUCTION**

This Court has jurisdiction to consider Bombardier's appeal from the District Court Order affirming in part and reversing in part a final judgment ("Final Judgment") of the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court").[2] The Final Judgment fully resolved all claims asserted by the Trustee against Bombardier in the Adversary Proceeding and was certified for immediate appeal under Federal Rule of Civil Procedure 54(b) ("Rule 54(b)").[3]

---

[1] The "Trustee" is Plaintiff - Appellee Jonathan D. King, chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd. (together, "Zetta Jet"), and the "Adversary Proceeding" is the Trustee's adversary proceeding, styled *King v. Jetcraft Corp.*, Case No. 2:19-ap-01382-SK (Bankr. C.D. Cal.).

[2] The District Court Order and Final Judgment are attached as Exhibits A and B to the Declaration of Andrew M. Troop ("Troop Decl."), dated May 24, 2024, respectively. The Bankruptcy Court's Memorandum of Decision dismissing the Trustee's Adversary Proceeding as to Bombardier (the "Dismissal Order") is Exhibit C to the Troop Decl.

[3] Rule 54(b) applies here pursuant to Federal Rule of Bankruptcy Procedure 7054.

Under the United States Supreme Court's "pragmatic approach" to finality for bankruptcy appeals set forth in *Bullard v. Blue Hills Bank*, 575 U.S. 496 (2015), this Court has jurisdiction under 28 U.S.C. § 158(d)(1) if both the Final Judgment and District Court Order are final. There can be no dispute that the Final Judgment is "final" for purposes of § 158(d): the Final Judgment dismissed **with prejudice** all 17 claims (collectively alleging over $200 million in damages) against Bombardier; Bombardier was dismissed from the Adversary Proceeding; and the Bankruptcy Court certified the Final Judgment for immediate appeal under Rule 54(b). As stated by this Court in a factually analogous case, the Final Judgment "is as final as it will ever be." *In re Perl*, 811 F.3d 1120, 1126-27 (9th Cir. 2016). Because the District Court Order did not remand back to the Bankruptcy Court for further "fact-finding on a central issue" on appeal, it, too, is "final" for purposes of 28 U.S.C. § 158(d)(1), even though it affirmed in part and reversed in part the Final Judgment. *See id.* No further analysis is required for this Court to exercise jurisdiction.

But even if this Court were to apply the four-factor finality test set forth in *In re Gugliuzza*, 852 F.3d 884 (9th Cir. 2017), used when an issue on appeal is remanded for further factual development, this Court would still have appellate jurisdiction. Under that test, exercising jurisdiction would not result in piecemeal appeals, would support judicial efficiency, would preserve the Bankruptcy Court's role as factfinder, and would prevent irreparable harm to Bombardier if the appeal

were otherwise delayed. Indeed, in this case, *refusing* to exercise jurisdiction would result in piecemeal appeals and multiple "climb[s] up the appellate ladder and slide[s] down the chute" (*Bullard*, 575 U.S. at 504), precisely that which this Court's four-factor finality test is designed to prevent.

## PROCEDURAL AND FACTUAL BACKGROUND[4]

### A.    The Bankruptcy Court Proceedings

These proceedings stem from the September 15, 2017 bankruptcy of Zetta Jet – a private luxury jet charter business that failed after two years of operations allegedly due to the misconduct and mismanagement of its former Chief Executive Officer, Geoffrey Cassidy ("Cassidy").[5] The Trustee nonetheless has blamed all of Zetta Jet's significant contractual counterparties for its failure, including investors, sophisticated lenders, aircraft lessors, aircraft resellers, and Bombardier – the world's leading manufacturer of business aircraft.

---

[4] For the sake of brevity, Bombardier summarizes only those procedural and background facts relevant to this Court's exercise of jurisdiction. Bombardier respectfully directs this Court to the District Court Order for a full summary of the procedural and background facts underlying this appeal. *See* Troop Decl. Ex. A at 1-29.

[5] Zetta Jet commenced a case under chapter 11 of the Bankruptcy Code. Less than a month later, on October 11, 2017, the Trustee was appointed chapter 11 trustee in response to Cassidy's misconduct, and the case was converted to a chapter 7 liquidation at the Trustee's request on December 4, 2017.

The Trustee commenced the Adversary Proceeding on September 13, 2019, armed with tens of thousands of documents.[6] He asserted a total of 17 claims against various defendants, including Jetcraft Corporation, Jetcraft Global, Inc., Jetcoast 500-5 LLC, Orion Aircraft Holdings Ltd., and Jetcraft Asia Limited, Jahid Fazal-Karim ("Fazal-Karim"), FK Group LTD, and FK Partners Limited (all eight collectively, the "FK/Jetcraft Defendants") and the Bombardier entities (collectively with the FK/Jetcraft Defendants, the "Defendants").

At its core, the Adversary Proceeding alleges that Cassidy obtained two kickbacks of $500,000 in exchange for purchasing allegedly overpriced aircraft from Defendants for Zetta Jet's fleet, while saddling Zetta Jet with almost $500 million in unsustainable debt. Fazal-Karim allegedly made the two improper payments in connection with the sale of an aircraft owned by Jetcoast (an FK/Jetcraft Defendant) and in brokering an aircraft sale for a third-party called Orion. The Adversary Proceeding, however, attempts to impute these payments to Bombardier by alleging that (i) discrete aircraft sales by Bombardier, on the one hand, and the FK/Jetcraft Defendants, on the other, should be lumped together and viewed as a "package deal" and (ii) Fazal-Karim acted as Bombardier's agent.

---

[6] Before filing suit, the Trustee obtained extensive discovery pursuant to Federal Rule of Bankruptcy Procedure 2004. Bombardier alone produced over 30,000 documents in response to the Trustee's 34 broad requests for production.

As against Bombardier, the Trustee asserted claims for aiding and abetting Cassidy's breach of fiduciary duty; civil conspiracy; violation of California Business and Professions Code § 17200; unjust enrichment; constructive trust; fraud; avoidance and recovery of fraudulent transfers and obligations; avoidance and recovery of U.S. preference transfers; violation of the automatic stay; and disallowance of claims.

On December 16, 2019, Bombardier moved to dismiss all counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012. The Bankruptcy Court granted the motion and gave the Trustee leave to replead, except for the unjust enrichment claim, which the Bankruptcy Court dismissed with prejudice.

Rather than amending the Complaint, on December 4, 2020, the Trustee filed a motion to consolidate the Adversary Proceeding with a related adversary proceeding, styled *King v. CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Co.*, Case No. 2:19-ap-01147-SK (Bankr. C.D. Cal.) (the "Cavic Action"). The proposed consolidated complaint was against the original parties to the two adversary proceedings, plus several new parties, and added more than a dozen new causes of action, including violations of the Civil Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c), and the Robinson-Patman Act, 15 U.S.C. § 13(c). The Bankruptcy Court properly denied the Trustee's motion to

consolidate on April 5, 2021, finding it to be "ill advised" and procedurally improper.

More than one year after the initial dismissal, the Trustee filed his First Amended Adversary Complaint ("FAC") on July 28, 2021, asserting 33 claims against Defendants, 17 of which were against Bombardier. The FAC, while substantially longer than the Complaint, asserted most of the same tort and bankruptcy claims against Bombardier.

Unlike the original Complaint, however, the FAC attached the operative aircraft transaction documents, which showed, among other things, that the FK/Jetcraft Defendants were not authorized to take actions on behalf of Bombardier and that the various aircraft sales were not part of a package deal. Bombardier accordingly moved to dismiss the FAC on November 11, 2021.

On June 23, 2022, the Bankruptcy Court again granted Bombardier's motion, dismissing all claims against it with prejudice. Troop Decl. Ex. C. The Bankruptcy Court dismissed the tort claims because, *inter alia*, the alleged kickbacks – the predicate for each tort claim – were paid in connection with two aircraft sales (denominated Planes 1 and 10) that Bombardier "had no involvement with." *Id*. at 54. "[T]he FAC makes clear," the Bankruptcy Court explained, that "Jetcraft, not [Bombardier], paid Cassidy the [two $500,000] [k]ickbacks disguised to look like they were part of the price of Planes 1 and 10, which the Debtors bought from

6

Jetcoast and Orion, respectively" and that "the FAC contains no allegations that [Bombardier] had any relationship with or control over Jetcraft." *Id*.

The Bankruptcy Court also found that the aircraft transaction documents for Planes 2-5 incorporated an agency disclaimer that expressly advised Zetta Jet that "Fazal-Karim has no authority and will not have any authority to make any representations or warranties on behalf of [Seller BAC] or to legally bind [Seller BAC] under a contract for the sale of the subject Aircraft." *Id*. at 48, 81. "This disclaimer," the Bankruptcy Court opined, "provided Zetta [Jet] notice that Fazal-Karim could not make representations or warranties on BAC's behalf or legally bind it to contracts for Planes 2-5," defeated any agency claim, and thus required dismissal of all the agency-based tort claims. *Id*. at 48-49.

Further, the Bankruptcy Court rejected as conclusory the Trustee's allegations that the sale of Planes 1 and 10 (the Jetcraft sales) and the sale of Planes 2-6 and 12-15 (the Bombardier sales) should be considered a package sale to Zetta Jet. *First*, the Bankruptcy Court found that Zetta Jet did not buy Planes 12-15; the applicable purchase agreements show that BAC sold these aircraft to Yuntian 4 (an equipment lessor), not Zetta Jet. *Id*. at 52. *Second*, the Bankruptcy Court found that the Trustee previously admitted in another proceeding that Plane 6 was sold to third-party Glove Assets Investment Limited (an investor in Zetta Jet), not Zetta Jet. *Id*. at 49. *Third*, the Bankruptcy Court rejected the Trustee's attempt to link Bombardier sales of

7

Planes 2 to 5 to Jetcraft sales of Planes 1 and 10 because the transaction documents showed these sales were subject to separate contracts, involved different sellers, different buyers, different aircraft types, and different transaction structures. *Id*. at 36-53. Each of the transaction documents, moreover, contained an integration clause, had no references to any of the other contracts, and had no contingencies based on other purchases. *Id*. at 42. The Bankruptcy Court correctly held that there was nothing alleged in the FAC, other than conclusory statements, to show that any of the sales were part of a "package deal," and that the package deal contention was in defiance of the contracts themselves. *Id*.

The Bankruptcy Court also dismissed the FAC's claims to recover prepetition transfers from Bombardier under Sections 547, 548, and 550 of the Bankruptcy Code because that would require an impermissible extraterritorial application of these sections of the Bankruptcy Code. *Id*. at 67-75. The challenged transfers – aircraft purchase price payments – were initiated from Zetta Jet PTE, Ltd.'s Singapore bank account. *Id*. at 74.[7]

As it stands, the only surviving claims in the Adversary Proceeding are three bankruptcy claims and three tort claims against certain FK/Jetcraft Defendants. All

---

[7] On June 24, 2022, the Bankruptcy Court also entered its Memorandum of Decision granting in part and denying in part the FK/Jetcraft Defendants' respective motions to dismiss the FAC.

claims against Bombardier were dismissed with prejudice on grounds specific to Bombardier and unrelated to the surviving claims.

On September 7, 2022, the Bankruptcy Court entered the Final Judgment and certified the case for immediate appeal pursuant to Rule 54(b). *See* Troop Decl. Exs. B, D and E. In ruling, the Bankruptcy Court specifically noted that certifying the Final Judgment would help "streamline litigation" because "issues regarding choice of law, agency, and extraterritoriality of bankruptcy claims are controlling issues that affect multiple defendants and claims," including with respect to another adversary proceeding, styled *King v. Yuntian 3 Leasing Co. Designated Activity Co.*, Case No. 2:19-ap-01383-SK (Bankr. C.D. Cal.) (the "Yuntian Action"). *See* Troop Decl. Ex. D at 38:11-17, 45:10-15; *infra* Section B. The Bankruptcy Court also noted that its legal determination with respect to "[t]he agency relationship, or lack thereof, between [Bombardier] and Fazal-Karim is a dispositive issue" with respect to all the Trustee's tort claims against Bombardier. *Id.* at 39:2-5.

On September 15, 2022, the Trustee appealed the Final Judgment to the District Court.

## B. The Cavic and Yuntian Actions

The Trustee also filed two other adversary proceedings. In the Cavic Action, the Trustee asserted, among other things, that certain lease agreements with multiple sophisticated aircraft lessors should not be enforced as written but recharacterized

9

as "disguised financings." On October 7, 2020, the Bankruptcy Court granted motions to dismiss filed by BAC and Cavic Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CALI"), dismissing six of seven causes of action without prejudice. On July 28, 2021, the Trustee filed an amended adversary complaint and, on March 8, 2022, the Bankruptcy Court dismissed five of now six causes of action with prejudice. The remaining cause of action – a declaration that an aircraft purchase agreement was terminated – was not disputed by BAC or CALI and was asserted by the Trustee only as a predicate for his other (now dismissed) causes of action. As such, the remaining cause of action is moot. On March 25, 2022, the Trustee appealed that order to the District Court.

In the Yuntian Action, the Trustee asserted 15 bankruptcy claims against various other entities that leased aircraft to or invested in Zetta Jet, including avoidance, turnover, and recharacterization claims. On July 29, 2020, seven of the causes of action were dismissed without prejudice by the Bankruptcy Court. On March 29, 2021, the Trustee filed an amended adversary complaint, alleging ten claims. On August 17, 2021, the Bankruptcy Court dismissed seven of the ten causes of action with prejudice. The remaining three causes of action were subsequently settled and dismissed with prejudice. On September 22, 2021, the Trustee also appealed that dismissal to the District Court.

**C.**     <u>The District Court Order</u>

On March 26, 2024, the District Court issued the District Court Order – a 91-page decision simultaneously determining the appeals in the Adversary Proceeding, Cavic Action, and Yuntian Action. The District Court affirmed the Bankruptcy Court in nearly every respect in each of the appeals.

With respect to the Final Judgment in the Adversary Proceeding, the District Court affirmed the Bankruptcy Court's dismissal of the Trustee's claims for violation of California Business Professions Code § 17200, fraudulent misrepresentation, avoidance and recovery of fraudulent transfers and preferences, violation of the automatic stay, and disallowance of claims, and also affirmed the Bankruptcy Court's dismissal of the Trustee's unjust enrichment claim asserted in the initial complaint. Troop Decl. Ex. A at 91. The District Court also affirmed the Bankruptcy Court's denial of the Trustee's motion to consolidate the Adversary Proceeding and Cavic Action, affirmed the dismissal orders in the Cavic and Yuntian Actions, and affirmed all interlocutory orders of the Bankruptcy Court in all three proceedings. *Id.*

The District Court, however, reversed the Bankruptcy Court decision in the Adversary Proceeding on two purely legal issues.[8] *First*, it reversed dismissal of the

---

[8] The District Court also reversed the Bankruptcy Court on choice of law applicable to certain claims asserted by Zetta Jet USA, Inc., although this determination did not lead to reversal of any part of the Final Order. *See id.* at 77.

11

Trustee's claims for aiding and abetting breach of fiduciary duty, civil conspiracy, and fraudulent concealment, all on the ground that the FAC plausibly alleged an actual agency as between Bombardier and certain FK/Jetcraft Defendants and that the separately documented aircraft sales could be viewed as a package deal. *Id.* at 77-82. *Second*, it reversed in part the Bankruptcy Court's denial of the Trustee's motion to amend yet again, granting the Trustee leave to add a new breach of contract claim against BAC for its alleged failure to pay certain charter revenues (a claim unrelated to the gravamen of the FAC and the issues now on appeal), but otherwise the District Court denied the Trustee leave "to add any other parties, causes of action, or legal theories." *See id.* at 5, 91.

Bombardier now appeals the District Court Order to this Court. The Trustee has filed a protective cross-appeal but contends that this Court lacks jurisdiction to hear the appeal at this time.

## LEGAL STANDARD

Under 28 U.S.C. § 158(d)(1), this Court has jurisdiction over "appeals from all final decisions, judgments, orders, and decrees entered" by the district courts sitting in their bankruptcy appellate capacity. Section 158(d)(1) requires that both the bankruptcy court order and district court appellate order be final before this Court may exercise jurisdiction.

As the United States Supreme Court held in *Bullard*, the rules on appealability in bankruptcy cases are different from ordinary civil actions because "[a] bankruptcy case involves an aggregation of individual controversies, many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor." 575 U.S. at 501-02 (internal quotation marks and citation omitted). Accordingly, "Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case." *Id.* (citation omitted).

If a bankruptcy order is a final order, then a district court order that affirms or reverses that final order is immediately appealable under 28 U.S.C. § 158(d)(1). *See, e.g., In re Tarczynski*, 675 F. App'x 744, 745 (9th Cir. 2017) ("[W]hen the BAP affirms or reverses a final order of the bankruptcy court, the BAP's order is final.") (citation omitted); *In re Hernandez*, 820 F. App'x 593, 593 (9th Cir. 2020) ("We have jurisdiction under 28 U.S.C. § 158(d)(1) as the district court's order 'finally dispose[d] of a discrete dispute within the larger case.'") (alterations in original) (citations omitted).

To determine whether a bankruptcy court order is final, this Court uses the two-part finality test first articulated in *In re SK Foods*, 676 F.3d 798, 802 (9th Cir. 2012), which considers whether the bankruptcy court decision: "1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to

13

which it is addressed." (citing *In re AFI Holding, Inc.*, 530 F.3d 832, 836 (9th Cir. 2008)).

To determine whether the order of a district court (sitting as an appellate court) is final, this Court applies the same test and also considers whether the district court has remanded to the bankruptcy court a factual determination of a central issue on appeal. If there has been no such remand, and the district court order simply affirms or reverses legal determinations made by the bankruptcy court, the district court decision is also final. *See In re Gugliuzza*, 852 F.3d at 894 (holding that "[w]hen the district court (or BAP) affirms or reverses" a decision that "resolves and seriously affects substantive rights and . . . finally determines the discrete issue to which it is addressed," this Court "consider[s] it to be final and immediately appealable") (citations omitted).

Even when a district court order remands to the bankruptcy court for further fact-finding related to a central issue raised on appeal, the circuit court may still exercise jurisdiction over the appeal. In that case, this Court applies a four-factor test that considers: "(1) the need to avoid piecemeal litigation; (2) judicial efficiency; (3) the systemic interest in preserving the bankruptcy court's role as the finder of fact; and (4) whether delaying review would cause either party irreparable harm." *Id.* (citing *In re Landmark Fence Co.*, 801 F.3d 1099, 1103 (9th Cir. 2015)) (citation omitted); *accord In re Liu*, No. 20-56102, 2022 WL 1153942, at *1 (9th Cir. Apr.

19, 2022) (applying four-factor test "to determine whether an order remanding for fact-finding on a central issue is appealable"); *In re Perl*, 811 F.3d at 1126 ("A survey of our precedent reveals that the four-part finality test articulated in *In re Landmark Fence* is utilized almost exclusively when determining the finality of a case involving a remand to the bankruptcy court.") (citations omitted).

## ARGUMENT

**1)** **The District Cout Order is Final and Immediately Appealable; No Fact Finding Is Required to Resolve the Issues on Appeal and Finally Dismiss the Adversary Proceeding Against Bombardier**

The District Court Order is immediately appealable as of right under 28 U.S.C. § 158(d)(1).

As an initial matter, the *SK Foods* test (not the four-factor finality test) applies here. The District Court Order, by its plain terms, "**REVERSED IN PART** as to the first, second, and seventh causes of action," "**AFFIRMED IN PART** as to all other claims," and held that "[a]ll the interlocutory orders of the Bankruptcy Court are **AFFIRMED**." *See* Troop Decl. Ex. A at 5, 91. Notably, the District Court Order did not remand the case back down to the Bankruptcy Court for further factfinding on an issue central to the appeal, as required to trigger the four-factor finality test.[9]

---

[9] "Remand" appears only once in the 91-page District Court Order, in connection with a purely legal issue – Bombardier's legal defense to certain tort claims under the *in pari delicto* doctrine. *See id.* at 88 ("On remand, the Bankruptcy Court shall consider [*in pari delicto*] in light of the determinations in this Order regarding choice of law and agency."). The Bankruptcy Court did not address *in pari delicto* in the

*Compare Gugliuzza*, 852 F.3d at 900 (holding that district court decision reversing summary judgment and remanding for further fact-finding on issue relevant to the appeal was subject to four-factor test), *with In re Perl*, 811 F.3d at 1126 (BAP Order affirming bankruptcy court order holding that purchaser violated automatic stay was subject to two-part finality test).

The Final Judgment easily satisfies the *SK Foods* test.  It is a decision that "seriously affect[ed the parties'] substantive rights and . . . finally determine[d] the discrete issue[s] to which it is addressed" (*In re SK Foods*, 676 F.3d at 802) because it indisputably dismissed with prejudice 17 tort and bankruptcy claims asserted by the Trustee against Bombardier (collectively alleging over $200 million in damages) (citation omitted).  *See, e.g., Mililani Grp., Inc. v. O'Reilly Auto., Inc.*, 621 F. App'x 436, 436 (9th Cir. 2015) ("The judgment here is final as to O'Reilly because all claims against that party were dismissed with prejudice.").  Because the Bankruptcy Court dismissed all the Trustee's claims against Bombardier with prejudice, "[r]esolution of [those] issue[s] is as final as it will ever be." *In re Perl*, 811 F.3d at 1126-27; *see also In re Cherrett*, 873 F.3d 1060, 1064 (9th Cir. 2017) (BAP order affirming bankruptcy court denial of motion to dismiss was final under § 158(d)).

---

Dismissal Order underlying the Final Judgment and, thus, it was not a central issue raised on appeal.  Moreover, the District Court did not remand for further factfinding on *in pari delicto* – nor could it, as the appeal came before the District Court on a motion to dismiss which, by definition, does not involve factfinding by the court.

Although the Trustee still has claims against certain FK/Jetcraft Defendants in the Adversary Proceeding, all the claims against Bombardier were dismissed on grounds specific to Bombardier and unrelated to those surviving claims. *See, e.g.*, *Shames v. Hertz Corp.*, No. 07-CV-2174 H(BLM), 2008 WL 4370007, at *1 (S.D. Cal. Sept. 24, 2008) (in multi-defendant action, order granting motion to dismiss all claims against one defendant was final as to that defendant).

For these very reasons, the Bankruptcy Court certified the Final Judgment as immediately appealable pursuant to Rule 54(b). This, by itself, demonstrates finality as a matter of law. *See In re Perez*, No. 21-CV-83 JLS (MSB), 2021 WL 1626335, at *2 (S.D. Cal. Apr. 27, 2021) ("If there is a Rule 54(b) certification, [the order] is treated as a final order over which appellate jurisdiction exists 'as of right' under 28 U.S.C. § 158(a)(1)."); *In re Gugliuzza*, 852 F.3d at 893 (holding that § 158(a)(1) and § 158(d)(1) "are governed by the same constraints").

Like the Final Judgment, the District Court Order is also final for appellate purposes. It resolves discrete legal issues – whether the various counts in the FAC stated plausible claims – that seriously affect the parties' substantive rights. There is no open factual matter that must be decided before this Court considers the central issue on appeal: whether the District Court erred in holding that the FAC plausibly alleged an agency relationship between Bombardier and certain of the FK/Jetcraft Defendants notwithstanding that (i) the operative agreements have clear agency

17

disclaimers; (ii) the improper payments were made in transactions not involving Bombardier; and (iii) the transaction documentation shows the Bombardier sales were not linked to the Jetcraft sales.

Both the Final Judgment and the District Court Order are final for purposes of 28 U.S.C. § 158(d) and this Court thus has jurisdiction to hear this appeal.

### 2) **Even if the District Court Order Were Subject to the Four-Factor Finality Test, It Would Be Immediately Appealable**

As discussed above, finality of the District Court Order is not governed by the four-factor finality test. However, even if that test were applied, the District Court Order would still be immediately appealable.

*First*, exercising jurisdiction will avoid the risk of piecemeal litigation. For example, if this Court were to decline jurisdiction, the Adversary Proceeding would be remanded on the three reversed claims, which would then be subject to additional motion practice and, if not then resolved, trial. On appeal years from now, this Court could then reverse on any of the dismissed causes of action or any of the interlocutory orders (including the motion to consolidate), leading to another remand, redundant proceedings in the Bankruptcy Court, and still further appeals. Appellate review of the dismissed claims now avoids this kind of never-ending litigation; any post-appeal surviving claims would proceed together – one time – through the Bankruptcy Court.

18

*Second*, immediate review of the District Court Order would significantly advance judicial efficiency. If this Court reversed the District Court only as to the three claims that were reinstated, the entire litigation would be over, thereby avoiding years of costly and time-consuming litigation. Conversely, if this Court reinstates some or all of the dismissed causes of action, then, as explained above, all ultimately surviving claims could proceed together. This would be far more efficient than a scenario where the Court declines jurisdiction now, only later to revive some of the dismissed claims, which will then have to begin back at the starting line, causing multiple rounds of motion practice, discovery and proceedings, and wasting vast resources. It is precisely for these reasons – to help "streamline litigation" – that the Bankruptcy Court certified the Final Judgment under Rule 54(b). Troop Decl. Ex. D at 45:10-15; *id.*, Ex. E.

Hearing the instant appeal now would also serve judicial efficiency because there are overlapping and controlling legal issues between the Adversary Proceeding and Cavic Action (*e.g.*, denial of the Trustee's motions to consolidate and amend) and between the Adversary Proceeding and the Yuntian Action (*e.g.*, the extraterritorial reach of the Bankruptcy Code's fraudulent transfer and preference provisions). Because certain legal issues raised in connection with decisions issued in the Adversary Proceeding, Cavic Action and Yuntian Action are the same,

19

deciding the appeals simultaneously will promote judicial economy and ensure consistent results.

*Third*, this appeal comes up on a motion to dismiss and the appeal does not require any further factfinding by the Bankruptcy Court. Unlike *Gugliuzza*, where the district court reversed summary judgment (a decision, in part, based on factual determinations) and remanded for further fact-finding on appellant's intent to deceive, the District Court did not remand to the Bankruptcy Court for further factfinding on an issue central to the appeal. The Bankruptcy Court's role as factfinder will be preserved because this appeal concerns strictly legal issues. *See*, *e.g.*, *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1038-39 (9th Cir. 2000) (exercising jurisdiction where the central issue on appeal – "whether the bankruptcy court wrongly allocated to Lundell the burden of proving that he was not a general partner of West Coast" – was "a purely legal issue," the resolution of which "would both obviate the need for further factfinding and end the case").

*Fourth*, delaying review would cause Bombardier irreparable harm. Bombardier is an unsecured creditor in the bankruptcy proceedings below. Pursuit of these proceedings results in the wasting of the estate's assets, and forever diminishes the recoveries that Bombardier (and other unsecured creditors) could obtain. Loss is irreparable when it can never be redressed. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018); *In re Focus Media Inc.*,

20

387 F.3d 1077, 1086 (9th Cir. 2004) (depletion of estate assets which impairs bankruptcy proceedings constitutes irreparable harm incapable of redress). After prevailing on two motions to dismiss and enduring five years of scorched-earth litigation, further delay in this case is unwarranted and would be highly prejudicial to Bombardier. This factor too supports the Court exercising jurisdiction now.[10]

## CONCLUSION

Both the Final Judgment and District Court Order are final decisions regarding Bombardier's motion to dismiss the Trustee's FAC. Both the Bankruptcy and District Courts made purely legal determinations, based on factual allegations accepted as true, when ruling on Bombardier's Rule 12(b)(6) motion. If the Final Judgment is fully reinstated, it will completely and finally resolve the Adversary Proceeding as against Bombardier, dismissing with prejudice all claims asserted against it. For these reasons and others as developed above, Defendants-Appellants Bombardier Aerospace Corporation, Bombardier Inc. and Learjet, Inc. respectfully submit this Court has jurisdiction over the District Court Order pursuant to 28 U.S.C. § 158(d)(1).

---

[10] Regardless, the absence of irreparable harm is not dispositive where, as here, the other three factors weigh in favor of finality. *See Latman v. Burdette*, 366 F.3d 774, 781 n.5 (9th Cir. 2004), *as amended* (June 8, 2004), and *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014) ("Although we see no risk of irreparable harm to the parties from delaying appellate review . . . this factor alone does not preclude our review where the other three factors weigh in favor of our jurisdiction.") (citation omitted).

Dated: May 24, 2024   Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Andrew M.  Troop*

ERIC FISHMAN (*Pro Hac Vice*)
ANDREW M.  TROOP (*Pro Hac Vice*)
CAROLINA A.  FORNOS (*Pro Hac Vice*)
CLAIRE K.  WU (SBN 295966)
*Attorneys for Defendants-Appellants*
*Bombardier Aerospace Corporation,*
*Bombardier Inc., and Learjet, Inc.*

## CERTIFICATION PURSUANT TO FED. R. APP. P. 32

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). Exclusive of the exempted portions of the motion specified in Fed. R. App. P. 32(f), the motion contains 5,020 words. The brief has been prepared using Microsoft Word in 14-point Times New Roman font. The undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: May 24, 2024             */s/ Andrew M. Troop*
                                   Andrew M. Troop

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JONATHAN D. KING,

             Plaintiff - Appellee,

    v.

BOMBARDIER AEROSPACE
CORPORATION, et al.,

             Defendants - Appellants.

No. 24-2703

D.C. No. 2:22-cv-06637-JAK
Central District of California,
Los Angeles

**DECLARATION OF ANDREW M.
TROOP**

I, Andrew M. Troop, declare as follows:

1.     I am over 18 years of age and a partner at Pillsbury Winthrop Shaw Pittman LLP, counsel to Defendants - Appellants Bombardier Aerospace Corporation, Bombardier Inc. and Learjet, Inc. (collectively, "Bombardier"). I submit this declaration in support of Bombardier's Statement in Support of Jurisdiction ("Statement").

2.     I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would so testify.

3.     Attached hereto as **Exhibit A** is a true and correct redacted copy of the *Civil Minutes* entered by the United States District Court for the Central District of California on March 26, 2024, defined as the "District Court Order" in the Statement.

1

4.     Attached hereto as **Exhibit B** is a true and correct copy of the *Final Judgment in Favor of Bombardier Aerospace Corporation, Bombardier Inc., and Learjet, Inc.*, entered by the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") on September 7, 2022, defined as the "Final Judgment" in the Statement.

5.     Attached hereto as **Exhibit C** is a true and correct redacted copy of the *Memorandum Decision* entered by the Bankruptcy Court on June 23, 2022, defined as the "Dismissal Order" in the Statement.

6.     Attached hereto as **Exhibit D** is a true and correct copy of the Transcript of the August 29, 2022 Hearing on *Bombardier's Motion for Entry of Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b)* before the Bankruptcy Court.

7.     Attached hereto as **Exhibit E** is a true and correct copy of the Bankruptcy Court's *Order Granting Motion for Entry of Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b)*, dated September 7, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: May 24, 2024

*/s/ Andrew M. Troop*
Andrew M. Troop

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Present: The Honorable     JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Appellant: | Attorneys Present for Appellees: |
| Not Present | Not Present |

Proceedings:     **(IN CHAMBERS) ORDER RE BANKRUPTCY APPEALS (21-7572 DKT. 1;**
**22-2004 DKT. 1; AND 22-6637 DKT. 1)  [UNDER SEAL]   JS-6**

## I.    Introduction

On May 21, 2019, Jonathan D. King ("King," "Trustee" or "Appellant"), acting solely in his capacity as the Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd. (collectively "Zetta Jet" or "Debtors"), filed an Adversary Complaint against CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CAVIC") and Bombardier Aerospace Corporation ("BAC," or together with CAVIC, the "2004 Defendants"). 2004 R.[1] at 000347-80 (the "2004 Complaint"). The 2004 Complaint asserted seven causes of action: (1) against CAVIC seeking a declaratory judgment that the Financed Leases[2] are financings and not true leases; (2) against BAC seeking a declaratory judgment that the APA is terminated; (3) against CAVIC seeking a declaratory judgment that CAVIC's security interest in the Refund is not perfected; (4) against CAVIC seeking to avoid CAVIC's allegedly unperfected security interest; (5) against CAVIC stating that the Trustee can recover the Refund for the benefit of the estate; (6) against BAC stating that the Refund is the property of the estate; and (7) against CAVIC for the avoidance and recovery of preferential transfers. *Id.* On October 7, 2020, the second cause of action was maintained and all of the remaining ones were dismissed without prejudice. 2004 R. at 002815-83 (the "2004 First Dismissal").

On September 13, 2019, Appellant filed an Adversary Complaint against Jetcraft Corporation("Jetcraft Corporation"); Jetcraft Global, Inc. ("Jetcraft Global"); JetCoast 5000-5, LLC ("Jetcoast"); Orion Aircraft

---

[1]  Docket entries from *In re Zetta USA, Inc.*, 2:21-cv-07572-JAK (Sept. 22, 2021) are referred to with the prefix "7572 Dkt." Docket entries from *In re Zetta Jet USA, Inc.*, 2:22-cv-02004-JAK (Mar. 25, 2022) are referred to with the prefix "2004 Dkt." Docket entries from *In re Zetta Jet USA, Inc.*, 2:22-cv-06637 (Sept. 16, 2022) are referred to with the prefix "6637 Dkt." Documents from the bankruptcy court proceedings in these cases are referred to with the prefixes "7572 R.," "2004 R.," and "6637 R.," respectively.

[2]  In this Order, in connection with the discussion of the factual background of this matter, these agreements are referred to as the "Finance Leases," because that is how they are identified in the relevant pleadings. However, the use of this term does not reflect any conclusion as to the status of the relevant transactions, including whether they involved finance or operating leases.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Holdings Ltd. ("Orion"); Jetcraft Asia Limited ("Jetcraft Asia," and together with Jetcraft Corporation, Jetcraft Global, Jetcoast, and Orion, "Jetcraft"); FK Group Ltd. ("FK Group"); FK Partners Ltd. ("FK Partners"); Jahid Fazal-Karim ("Fazal-Karim" and together with Jetcraft, FK Group, and FK Partners, the "Fazal-Karim Defendants"); Bombardier Aerospace Corporation ("BAC"); Bombardier, Inc. ("BI," and together with BAC, "Bombardier"); Learjet, Inc. ("Learjet"); ECN Aviation Inc. f/k/a Element Aviation Inc. ("Element Aviation"); and ECN Capital Corporation, as successor to Element Financial Corporation ("ECN" and together with Element Aviation, "Element," and together with the other Defendants named in the Adversary Complaint, the "6637 Defendants"). 6637 R. at 000192-256 (the "6637 Complaint").

The 6637 Complaint asserted 17 causes of action: (1) aiding and abetting a breach of fiduciary duty against the Fazal-Karim Defendants and Bombardier; (2) civil conspiracy against the Fazal-Karim Defendants and Bombardier; (3) a violation of Cal. Bus. & Prof. Code § 17200 against the Fazal-Karim Defendants and Bombardier; (4) unjust enrichment against the Fazal-Karim Defendants and Bombardier; (5) constructive trust against the Fazal-Karim Defendants and Bombardier; (6) fraud against the Fazal-Karim Defendants and Bombardier; (7) avoidance and recovery of a fraudulent transfer and obligations related to Plane 1 against Jetcraft Corporation, Jetcoast, ECN, and Element Aviation; (8) avoidance and recovery of a fraudulent transfer and obligations related to Plane 10 against Jetcraft Global, Orion, ECN, and Element Aviation; (9) avoidance and recovery of a fraudulent transfer and obligations related to Plane 11 against Element Aviation and ECN; (10) avoidance and recovery of a fraudulent transfer and obligations related to CAVIC Payments against Bombardier; (11) avoidance and recovery of a fraudulent transfer and obligations related to Plane 6 against Bombardier; (12) avoidance and recovery of a preference against ECN and Element Aviation; (13) avoidance and recovery of a preference against Bombardier; (14) avoidance and recovery of a preference against Bombardier and Learjet, Inc.; (15) willful violation of the automatic stay against Bombardier; (16) turnover of property of the estate against Jetcraft and Jetcraft Global; and (17) disallowance of claims against each of the 6637 Defendants. *Id.* On March 11, 2020, the first, second, third, fifth, sixth, tenth, eleventh, thirteenth, fourteenth and seventeenth causes of action were dismissed without prejudice, and the fourth cause of action was dismissed with prejudice. 6637 R. at 1173-216 (the "6637 First Dismissal").

On September 13, 2019, Appellant filed an Adversary Complaint against Yuntian 3 Leasing Company Designated Activity Company f/k/a Yuntian 3 Leasing Company Limited ("Yuntian 3"), Yuntian 4 Leasing Company Designated Activity Company f/k/a Yuntian 4 Leasing Company Limited ("Yuntian 4"), Minsheng Financial Leasing Co., Ltd. ("Minsheng Financial"), Minsheng Business Aviation Limited ("Minsheng Business" and together with Minsheng Financial, "Minsheng"), Export Development Canada ("EDC"), Universal Leader Investment Limited ("Universal Leader"), Glove Assets Investment Limited ("Glove Assets"), Truly Great Global Limited ("Truly Great"), and Li Qi ("Li," and together with the other Defendants named in the Adversary Complaint, the "7572 Defendants"). 7572 R. at 00221-73 (the "7572 Complaint").

The 7572 Complaint asserted 15 causes of action: (1) avoidance and recovery of fraudulent transfers related to the 2015 Acquisitions against Universal Leader, Glove Assets, and Li Qi; (2) avoidance and recovery of fraudulent transfers related to Plane 6 and Plane 7 against Li Qi, Universal Leader, Glove Assets, Yuntian 3, Minsheng Financial, and Minsheng Business; (3) in the alternative to the second cause of action, avoidance and recovery of a preference to Yuntian 3; (4) in the alternative to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

second cause of action, avoidance and recovery of a preference to Li Qi, Universal Leader, and Glove Assets related to the Plane 6 Loan Transfers; (5) in the alternative to the second cause of action, avoidance and recovery of a preference to Li Qi and Universal Leader related to the $55 Million Transfer; (6) in the alternative to the second cause of action, avoidance and recovery of fraudulent transfers to Minsheng Business and Yuntian 4; (7) in the alternative to the second cause of action, turnover of property of the bankruptcy estate against Yuntian 4, Minsheng Business, and Minsheng Financial; (8) avoidance and recovery of fraudulent transfers related to the Interest Payment Transfers against Universal Leader and Li Qi; (9) avoidance and recovery of a preference to EDC and Yuntian 4; (10) avoidance and recovery of a preference to Yuntian 4; (11) turnover of property of the bankruptcy estate against Yuntian 4, Minsheng Financial, and Minsheng Business; (12) avoidance and recovery of a preference related to the Legal Fees Transfers against Minsheng Business, Minsheng Financial, Yuntian 3, and Yuntian 4; (13) recharacterization of Universal Leader's Third Investment as an equity interest; (14) violation of the automatic stay against Truly Great and Li Qi; and (15) disallowance of claims against Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, Universal Leader, Glove Assets, and EDC. *Id.* On July 29, 2020, the first, second, fourth, fifth, eighth, thirteenth and fifteenth causes of action in the 7572 Complaint were dismissed without prejudice by the Bankruptcy Court. 7572 R. at 02126-75 (the "7572 First Dismissal").

On March 4, 2020, Appellant moved for an order compelling Bombardier to deposit the Refund into the Bankruptcy Court's registry pending resolution of the claims against Bombardier. 2004 R. 000924-40. On May 13, 2020, that motion was denied. 2004 R. 002424.

On December 4, 2020, Appellant sought to file one consolidated complaint in lieu of amending the 2004 Complaint and 6637 Complaint. 2004 R. 002984-98; 6637 R. 001784-88. On April 5, 2021, Appellant's motion was denied. 2004 R. 003129-30; 6637 R. 003151-3153.

On March 29, 2021, Appellant filed an amended Adversary Complaint against the 7572 Defendants. 7572 R. at 02292-390 (the "7572 FAC"). The 7572 FAC stated ten causes of action: (1) avoidance and recovery of fraudulent obligations and subsequent transfers made on account of such obligations related to the 2015 Plane 6 and Plane 7 Finance Leases[3] against Universal Leader, Glove Assets, and Li Qi; (2) avoidance and recovery of fraudulent obligations and subsequent transfers made on account of such obligations related to the Minsheng Refinancing against Li Qi, Universal Leader, Glove Assets, Yuntian 3, Minsheng Financial, and Minsheng Business; (3) in the alternative to the second cause of action, avoidance and recovery of fraudulent transfers against Minsheng Business and Yuntian 4; (4) in the alternative to the second and third causes of action, turnover of property of the bankruptcy estate against Yuntian 4, Minsheng Business, and Minsheng Financial; (5) turnover of property of the bankruptcy estate against Yuntian 4, Minsheng Financial, and Minsheng Business; (6) recharacterization of Universal Leader's Third Investment as an equity interest; (7) violation of the automatic stay against Truly Great and Li Qi; (8) recharacterization of the 2016 Plane 6 Lease

---

[3] In this Order, in connection with the discussion of the factual background of this matter, these agreements are referred to as the 2015 Plane 6 and Plane 7 Finance Leases because that is how they are identified in the relevant pleadings. However, this is not intended to reflect any conclusion as to the status of the relevant transactions, including whether they involved finance or operating leases.
.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Agreement against Minsheng Business, Yuntian 3, Li Qi, Glove Assets, and Universal Leader; (9) recharacterization of the 2016 Plane 7 Lease Agreement against Minsheng Business, Yuntian 3, Li Qi, Glove Assets, and Universal Leader; and (10) disallowance of claims with respect to Yuntian 3, Yuntian 4, Universal Leader, and Glove Assets. *Id.*

On April 28, 2021, Appellant sought leave to amend the 2004 Complaint to add four new parties and one new claim. *See* 2004 R. 003206, 003225. On July 23, 2021, the Bankruptcy Court denied the motion for leave to amend. 2004 R. 010608-35.

On July 28, 2021, Appellant filed an amended Adversary Complaint against the 2004 Defendants. 2004 R. at 16019-53 (the "2004 FAC"). The 2004 FAC stated six causes of action: (1) against CAVIC seeking a declaratory judgment that the Financed Leases are not true leases; (2) against BAC seeking a declaratory judgment that the Plane 5 APA is terminated; (3) against CAVIC seeking a declaratory judgment that CAVIC's security interest in the Refund is not perfected; (4) against CAVIC seeking the avoidance of its unperfected security interest in the Refund; (5) against CAVIC seeking to recover the Refund; and (6) against CAVIC for turnover of the Refund. *Id.*

On July 28, 2021, Appellant also filed an amended Adversary Complaint against the 6637 Defendants. 6637 R. at 026671-825 (the "6637 FAC"). The 6637 FAC stated causes of action numbered between one and 32, although several numbers were intentionally skipped in identifying them: (1) aiding and abetting breach of fiduciary duty against the Fazal-Karim Defendants and Bombardier; (2) civil conspiracy against the Fazal-Karim Defendants and Bombardier; (3) a violation of Cal. Bus. & Prof. Code § 17200 against the Fazal-Karim Defendants and Bombardier; (6) fraudulent misrepresentation against the Fazal-Karim Defendants and Bombardier; (7) fraudulent concealment and non-disclosure against the Fazal-Karim Defendants and Bombardier; (8) avoidance and recovery of actually fraudulent transfers related to Plane 1 against Jetcraft Corp. and Jetcoast; (9) avoidance and recovery of constructively fraudulent transfers related to Plane 1 against Jetcraft Corp. and Jetcoast; (10) avoidance and recovery of actually fraudulent transfers related to Plane 10 against Jetcraft Global and Orion; (11) avoidance and recovery of constructively fraudulent transfers related to Plane 10 against Jetcraft Global and Orion; (12) avoidance and recovery of actually fraudulent transfers related to Planes 2-5 against Bombardier; (13) avoidance and recovery of constructively fraudulent transfers related to Planes 2-5 against Bombardier; (14) avoidance and recovery of actually fraudulent transfers related to Planes 2-5 against Bombardier; (15) avoidance and recovery of constructively fraudulent transfers related to Planes 2-5 against Bombardier; (16) avoidance and recovery of actually fraudulent transfers related to Plane 6 against Bombardier; (17) avoidance and recovery of constructively fraudulent transfers related to Plane 6 against Bombardier; (18) avoidance and recovery of a preference against BAC; (19) avoidance and recovery of a preference against Learjet, BI, and BAC; (20) violation of the automatic stay against BAC; (24) turnover of property of the estate against Jetcraft Corp. and Jetcraft Global; (25) disallowance of claims against all Defendants; (31) avoidance and recovery of actually fraudulent transfers related to Plane 6 against Bombardier; and (32) avoidance and recovery of constructively fraudulent transfers related to Plane 6 against Bombardier. *Id.*

On August 17, 2021, the Bankruptcy Court dismissed the first, second, sixth, seventh, eighth, ninth and tenth causes of action in the 7572 FAC with prejudice. 7572 R. at 10350-94 (the "7572 Final Dismissal"). On September 22, 2021, Appellant appealed the dismissal of the 7572 FAC with respect to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the claims against Li Qi, Universal Leader, Glove Assets, and Truly Great (the "7572 Appellees"). 7572 Dkt. 1. On December 30, 2021, Appellant filed an opening brief stating its position. 7572 Dkt. 30 (the "7572 Opening Brief"). On March 28, 2022, the 7572 Appellees filed an answering brief, contending that the 7572 Final Dismissal should be affirmed. 7572 Dkt. 43 (the "7572 Answering Brief"). On April 13, 2022, the Appellant filed a timely reply brief. 7572 Dkt. 44 (the "7572 Reply Brief").

On March 8, 2022, the Bankruptcy Court dismissed the first, third, fourth, fifth, and sixth causes of action in the 2004 FAC with prejudice. 2004 R. at 021053-121 (the "2004 CAVIC Final Dismissal"). On March 25, 2022, Appellant appealed the dismissal of the 2004 FAC with respect to the claims against CAVIC and BAC. 2004 Dkt. 1. On August 16, 2022, Appellant filed an opening brief in support of its position. 2004 Dkt. 52 (the "2004 Opening Brief"). On October 14, 2022, the 2004 Appellees filed answering briefs, contending that the 2004 CAVIC Final Dismissal should be affirmed. 2004 Dkts. 65, 66 (the "2004 Bombardier Answering Brief," the "2004 CAVIC Answering Brief," and collectively, the "2004 Answering Briefs"). On January 6, 2023, Appellant filed a timely reply brief. 2004 Dkt. 74 (the "2004 Reply Brief").

On June 23, 2022, the Bankruptcy Court dismissed the first through third, sixth, seventh, twelfth through twentieth, twenty-fifth, thirty-first, and thirty-second causes of action in the 6637 FAC with prejudice. 6637 R. at 041476-558 (the "6637 Final Dismissal"). On September 16, 2022, Appellant appealed the dismissal of the 6637 FAC with respect to the claims against BAC, BI, and Learjet. 6637 Dkt. 1. On February 22, 2023, Appellant filed an opening brief in support of its position. 6637 Dkt. 45 (the "6637 Opening Brief"). On April 19, 2023, the 6637 Appellees filed an answering brief, contending that the 6637 Final Dismissal should be affirmed. 6637 Dkt. 69 (the "6637 Answering Brief"). On May 17, 2023, Appellant filed a timely reply brief. 6637 Dkt. 71 (the "6637 Reply Brief").

A hearing on all three appeals was held on August 21, 2023. For the reasons stated in this Order, the 7572 Final Dismissal, 2004 CAVIC Final Dismissal and 2004 Bombardier Final Dismissal are **AFFIRMED**. The 6637 Final Dismissal is **REVERSED IN PART** as to the first, second, and seventh causes of action and **AFFIRMED IN PART** as to all other claims. All the interlocutory orders of the Bankruptcy Court are **AFFIRMED**. In the 6637 Adversary Proceeding, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements. However, the Trustee is not given leave to add any other parties, causes of action, or legal theories.

This Order is initially issued under seal. Within 14 days of its issuance, the parties shall jointly submit any proposed redactions, with a corresponding declaration from a percipient witness as to why the information should not be available on the public docket in this action. Based on a review of those submissions, a redacted version of this Order shall be made available on the public docket in conformance with the determinations made in response to the requested redactions.

II.   **Factual Background**

Because the Trustee is seeking review of rulings on motions to dismiss, all the factual allegations in the 7572 FAC, the 2004 FAC, and the 6637 FAC are taken as true for purposes of resolving the present appeals.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
| Title | In re Zetta Jet USA, Inc., et al. | | |

A.     Parties and Relevant Non-Parties

The Trustee is the duly appointed Chapter 7 trustee of the bankruptcy estates of the Debtors. 6637 FAC ¶ 20.

1.     The Debtors and Related Parties

Debtor Zetta PTE was organized on July 15, 2015, by Geoff Cassidy ("Cassidy") together with James Seagrim ("Seagrim") and Matthew Walter ("Walter"). 6637 FAC ¶ 21. Cassidy owned 34% of Zetta PTE's shares through Asia Aviation Company Pte. Ltd. ("Asia Aviation") and Seagrim and Walter each owned 33% of Zetta PTE's shares. *Id.* Zetta PTE is a Singaporean corporation. 2004 FAC ¶ 16.

Zetta PTE purchased Zetta USA, one of the other Debtors, in August 2016 and merged with Asia Aviation. 6637 FAC ¶ 22. Zetta USA is a California corporation. 2004 FAC ¶ 17. Zetta USA was formerly known as Advanced Air Management, Inc. ("AAM") until the August 2016 merger. 6637 FAC ¶ 23. Zetta USA was a private jet charter company based in Burbank, California, and operated by Seagrim and Walter. *Id.* Asia Aviation was owned by Cassidy and his wife at that time, Miranda June Tang Kim Choo ("Tang"); it operated a single jet on behalf of the jet's owner until it was merged into Zetta PTE. *Id.* ¶ 24.

Cassidy was at all relevant times the Debtors' Managing Director and a Director of Zetta PTE. 6637 FAC ¶ 25. Tang was at all relevant times a Director of Zetta PTE. *Id.* ¶ 26. Seagrim was the Debtors' Director of Operations and a Director of Zetta PTE and Zetta USA. *Id.* ¶ 27. Seagrim was based in Zetta USA's Burbank, California office. *Id.* Walter was the Debtors' Director of Sales and a Director of Zetta PTE and Zetta USA. *Id.* ¶ 28. Walter was also based in Burbank. *Id.*

Li Qi ("Li") is a businessman and investor who resides in Hong Kong. 6637 FAC ¶ 29. He became a director of Zetta PTE on February 26, 2016. *Id.* Li allegedly controls three entities relevant to this matter: Universal Leader Investment Limited ("Universal Leader"); Truly Great Global Limit ("Truly Great"); and Glove Assets Investments Ltd. ("Glove Assets"). *Id.* It is alleged that Truly Great is nominally owned by Li's mother. 7572 FAC ¶ 37.

Zetta PTE did not hold any formal board meetings until August 17, 2017. 6637 FAC ¶ 30. Board decisions before that date were made by the issuance of written directors' resolutions or by e-mail. *Id.* Zetta PTE's Memorandum of Association required a majority vote of its directors to enter into the transactions at issue here. *Id.* ¶ 31. It also required that any "director who is in any way, directly or indirectly, interested in a transaction or proposed transaction with the Company shall declare the nature of his interest in accordance with the provisions of the Act" and further states that "a director shall not vote in respect of any transaction in which he is interested (and if he does his vote shall not be counted), nor shall he be counted for the purpose of any resolution regarding the same." *Id.*

Zetta Jet Global 6000-1 Limited ("Zetta Jet 6000-1"), Zetta Jet Global 6000-2 Limited ("Zetta Jet 6000-2"), Zetta Jet Global 6000-3 Limited ("Zetta Jet 6000-3"), Zetta Jet Global 6000-4 Limited ("Zetta Jet 6000-4"), Zetta Jet Global 6000-5 Limited ("Zetta Jet 6000-5"), Zetta Jet Global 5000-1 Limited ("Zetta Jet 5000-1"), Zetta Jet Global 5000-2 Limited ("Zetta Jet 5000-2"), and Zetta Jet Challenger 650-1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Limited ("Zetta Jet 650") (collectively, the "Zetta BVI Subsidiaries") are companies formed under the laws of the British Virgin Islands (the "BVI") by Zetta PTE. 6637 FAC ¶ 35. Zetta PTE is the sole shareholder of each of the Zetta BVI Subsidiaries. *Id.* Cassidy and Seagrim were the directors of each of the Zetta BVI Subsidiaries. *Id.* The Zetta BVI Subsidiaries were formed just prior to each finance and lease transaction for which they were needed. *Id.* ¶ 36. They did not conduct business, had no bank accounts, had no employees, generated no income, had no presence in the BVI, and never held a meeting of their Board of Directors. *Id.* They served no purpose other than their role in these transactions. *Id.* Specifically, Zetta Jet 5000-1 was used in the transaction involving Plane 1, Zetta Jet 6000-4 in the transaction involving Plane 4, Zetta Jet 6000-5 in the transaction involving Plane 5, Zetta Jet 6000-3 in the transaction involving Plane 6, Zetta Jet 6000-2 in the transaction involving Plane 7, Zetta Jet 6000-1 in the transaction involving Plane 10, and Zetta Jet 5000-2 in the transaction involving Plane 11. *Id.* ¶ 37.

>    2.    Fazal-Karim, Jetcraft, and Related Parties

Fazal-Karim owns 95%, and is the Chairman of the Boards, of Jetcraft Corp. and Jetcraft Global, as well as the director and sole beneficial owner of FK Partners and FK Group. 6637 FAC ¶¶ 38, 43. It is alleged that he is a resident of the United Arab Emirates. *Id.* ¶ 38. He has more than 25 years of experience in the aviation industry. *Id.* ¶ 39. In May 2008, Fazal-Karim acquired 50% of Jetcraft Corp. *Id.* Prior to that, he worked at Bombardier from approximately 2001 to 2008 as the regional vice president of sales for the Americas, and then as the vice president of international sales. *Id.* Previously, he worked at Airbus as Vice President of Business Development and Asset Management from 1996 to 2001. *Id.*

Since at least August 16, 2015, Fazal-Karim, through his entity, FK Group, allegedly held himself out as the exclusive representative of Bombardier in southeast Asia. 6637 FAC ¶ 40. He also allegedly represented Bombardier in sophisticated negotiations involving billions of dollars in connection with sales of Bombardier aircraft, and in extremely complex transactions involving some of the world's largest corporations and most wealthy individuals. *Id.*

Jetcraft Corp. is a Delaware corporation whose principal place of business is in North Carolina. 6637 FAC ¶ 41. Jetcraft Global is a BVI corporation whose principal place of business is in North Carolina. *Id.* ¶ 42. Jetcraft Asia is a BVI corporation whose principal place of business is in North Carolina. *Id.* ¶ 44. Jetcraft Asia is a wholly owned subsidiary of Jetcraft Global. *Id.* Jetcoast is a Delaware corporation whose mailing address is in North Carolina, and which is also a wholly owned subsidiary of Jetcraft Global. *Id.* ¶ 45. Orion is a BVI corporation whose registered office is in that jurisdiction. *Id.* ¶ 46. It is also a wholly owned subsidiary of Jetcraft Global. *Id.*

Jetcraft is in the business of providing sales, leasing, acquisition and trade services with respect to aircraft. 6637 FAC ¶ 47. It distributes new and pre-owned aircraft and provides consulting, fleet planning, and contract services. *Id.* Fazal-Karim operates Jetcraft, and in doing so uses his "fk-group.net" e-mail account, sometimes with a signature block that says "Jetcraft Chairman." *Id.*

Anne Behrend ("Behrend") is the Chief Financial Officer of both Jetcraft Corp. and Jetcraft Global; she is located in Indiana. 6637 FAC ¶ 48. Peter Antonenko ("Antonenko") is the Chief Operating Officer of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Jetcraft Corp., and is located in Minnesota. *Id.* ¶ 49. Chad Anderson ("Anderson") is the President of Jetcraft Corp., and is also located in Minnesota. *Id.* ¶ 50.

FK Group is an entity based in Dubai. 6637 FAC ¶ 51. FK Partners is a United Kingdom entity whose registered office is in that jurisdiction. *Id.* ¶ 52.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

    3.    <u>Bombardier and Related Parties</u>

BI is a Canadian corporation whose principal place of business is in Montreal, Canada. 6637 FAC ¶ 53. BAC is a Delaware corporation whose principal place of business is in Texas. *Id.* ¶ 54. BAC is a wholly owned subsidiary of BI. *Id.* Bombardier Business Aircraft is allegedly a division of both BI and BAC. *Id.* ¶ 55. Learjet is a Kansas corporation whose principal place of business is there. *Id.* ¶ 56. It is also a subsidiary of BAC. *Id.*

Khader Mattar ("Mattar") is the Vice President of Sales for the Middle East, Africa, Asia Pacific and China for Bombardier Business Aircraft. 6637 FAC ¶ 57. In that role, he was responsible for overseeing Bombardier's sales in Asia and was its primary point of contact for Bombardier's relationship with the Debtors. *Id.* Mattar is based in Dubai. *Id.* Yu Yubin ("Yu") is the Vice President of Sales for the Middle East and Africa and Director of Sales for the Greater China region for Bombardier Business Aircraft. *Id.* ¶ 58. Yu was also very involved in Bombardier's relationship with the Debtors. *Id.* Finally, David Coleal ("Coleal") is the President of Bombardier Business Aircraft and allegedly oversaw the work of both Mattar and Fazal-Karim. *Id.* ¶ 59.

    4.    <u>Financing Parties</u>

CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CAVIC") is an Irish corporation located in that jurisdiction. 6637 FAC ¶ 60. AVIC International Leasing Co. Ltd. ("AVIC") is a Chinese corporation located in that jurisdiction. *Id.* ¶ 61. AVIC is allegedly the ultimate parent corporation of CAVIC, and was allegedly responsible for designing and negotiating the transactions between CAVIC and the Debtors. *Id.*

The ZJ6000-1 Statutory Trust ("ZJ6000-1 ST"), the ZJ6000-2 Statutory Trust ("ZJ6000-2 ST"), and the ZJ6000-3 Statutory Trust ("ZJ6000-3 ST," and collectively the "CAVIC Statutory Trusts") are trusts formed under Delaware law with registered offices in that jurisdiction. 6637 FAC ¶ 62. They are special purpose vehicles established by AVIC for the financed leases of Planes 2-4. *Id.* It is alleged that all decisions made by the trusts were at the direction of AVIC. *Id.*

The Zetta MSN 9716 Statutory Trust ("9716 Trust") is a trust formed under the laws of Wyoming whose principal office is in Utah. 2004 FAC ¶ 24. The 9716 Trust is a trust formed by Zetta PTE, which allegedly exercised sole authority and control over it. *Id.* The Zetta MSN 9740 Statutory Trust (the "9740 Trust") is another trust formed under the laws of Wyoming whose principal office is in Utah. *Id.* ¶ 27. Again, it is alleged that Zetta PTE formed the 9740 Trust and exercised sole authority and control over it. *Id.* The Zetta MSN 9764 Statutory Trust ("9764 Trust") is also a trust formed under the laws of Wyoming whose principal office is in Utah. *Id.* ¶ 30. It was allegedly formed by Zetta PTE, which allegedly exercised sole authority and control over it. *Id.* Finally, the Zetta MSN 9788 Statutory Trust ("186 Trust") is another trust formed under the laws of Wyoming, whose principal office is in Utah, and that was formed by Zetta PTE, and allegedly controlled by that entity. *Id.* ¶ 33.

Wells Fargo Bank Northwest N.A. ("Wells Fargo") is a national banking association whose principal place of business is in Utah. 6637 FAC ¶ 63. Wells Fargo is a party to various trust agreements in which it acted as owner-trustee of certain of the airplanes at issue. *Id.* Specifically, it worked with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Yuntian 3, Yuntian 4, Universal Leader, and Glove Assets during the sales of Plane 6, Plane 7, and Plane 12. 7572 FAC ¶ 69.

TVPX ARS Inc. ("TVPX") is a Wyoming corporation that was a party to various trust agreements with certain subsidiaries of the Debtors. 6637 FAC ¶ 64. Under those agreements, TVPX agreed to hold the alleged finance leases for aircraft in trust for the benefit of the subsidiaries. *Id.* TVPX also acted as signatory for the CAVIC Statutory Trusts. *Id.*

Element Aviation is an Ontario company whose principal place of business is in Ontario. 6637 FAC ¶ 65. Element Aviation is a wholly owned subsidiary of ECN Capital Corporation ("ECN"), another Ontario company. *Id.* ¶¶ 65-66. Michael O'Keefe ("O'Keefe") is the Vice President of Capital Markets in ECN's Aviation Finance Division. *Id.* ¶ 67. Frederic Larue ("Larue") is the Vice President of Business Development in ECN's Aviation Finance Division. *Id.* ¶ 68. Tony Bergeron ("Bergeron") is the President, Element Aviation Finance, of ECN. *Id.* ¶ 69. Steve Hudson ("Hudson") is the CEO of ECN. *Id.* ¶ 70.

Export Development Canada ("EDC") is a Canadian corporation located in Ontario. 6637 FAC ¶ 71. It was CAVIC's secured lender under the Plane 2-5 alleged finance leases. *Id.*

Minsheng Financial Leasing Co., Ltd. ("Minsheng Financial"), Minsheng Business Aviation Limited ("Minsheng Business," or with Minsheng Financial, "Minsheng") are also aviation financiers. 6637 FAC ¶ 100. Minsheng Financial is organized under the laws of China with its principal place of business there. 7572 FAC ¶ 65. It is alleged that Minsheng Financial is an affiliate and controlling entity of Minsheng Business, Yuntian 3, and Yuntian 4. *Id.* Minsheng Business is a Chinese company whose principal place of business is in Hong Kong. *Id.* ¶ 66. Yuntian 3 and Yuntian 4 are Irish companies whose principal places of business are there. *Id.* ¶¶ 67-68.

B.    Cassidy, Seagrim, and Walter Form Zetta PTE

In 2008, when Cassidy was approximately 19 years old, he made headlines in Australia when he allegedly attempted to buy two yachts worth more than $27 million by claiming that he was the chief executive of an aviation company. 6637 FAC ¶ 72. His false statements were allegedly exposed when he claimed that he could not use his credit card because he had recently purchased a $300,000 piano, and misspelled the name of his alleged hometown. *Id.* The party who was selling the yacht allegedly called Cassidy's purported bank and discovered that it had never heard of Cassidy. *Id.* Later in 2008, Cassidy allegedly tried to buy an Australian professional basketball team by making the same false statements as to his wealth, but was unsuccessful. *Id.* ¶ 73. Cassidy would later allegedly state that he was entitled to "drink the top shelf expensive and exclusive alcohol and Champagne and eat caviar," instead of "bottom shelf alcohol" and "McDonalds." *Id.* ¶ 96.

In 2012, when Cassidy was approximately 24 years old, he entered the Asian private luxury jet market. 6637 FAC ¶ 74. By 2014, Cassidy and Tang were the owners of Asia Aviation, which managed a Bombardier jet for private use by a wealthy Singaporean. *Id.* ¶ 75. Asia Aviation did not have an Air Carrier and Operator Certificate under 14 C.F.R. Part 135 (a "Part 135 Certificate") issued by the FAA, which is required to operate certain commercial charter flights for paying customers. *Id.* ¶ 76.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 11 of 91 Page ID #:41159736

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

AAM, a private jet charter business operated by Seagrim and Walter, had nine airplanes by 2014, which consisted of both managed and leased aircraft. 6637 FAC ¶ 77. AAM catered primarily to high net worth individuals, celebrities and corporate clients in the U.S. and Europe. *Id.* AAM had a Part 135 Certificate, and significant experience in operating a charter airline that serviced many customers. *Id.* ¶ 78.

In or around March 2014, a representative of Cassidy approached Seagrim and Walter. 6637 FAC ¶ 79. AAM ultimately executed a Tri-Party Charter Management Agreement with Asia Aviation and the Singaporean owner of the jet so Cassidy could operate charters on the jet that Asia Aviation managed. *Id.* In early 2015, Cassidy asked Seagrim and Walter to enter a joint business venture with him. *Id.* ¶ 80. Cassidy allegedly told Seagrim and Walter that he had access to large amounts of capital in China that could be used to purchase new aircraft, that he was independently wealthy due to a recent inheritance, that he had experience in his family's business operating charter services in Asia, and that he had access to wealthy Chinese clientele who would pay top-of-market rates for the use of aircraft. *Id.* It is alleged that all these statements were false. *Id.*

On July 15, 2015, Cassidy, Seagrim, and Walter incorporated Zetta PTE in Singapore to conduct a private luxury jet charter business. 6637 FAC ¶ 81. Each of them owned one-third of the stock in the new company. *Id.* At or about the same time, AAM made a filing with the FAA as to conducting authorized operations under the business name "Zetta Jet," and this name was affixed to all new aircraft delivered to Zetta PTE. *Id.* It was established that all existing planes of Asia Aviation and AAM were added to the AAM Part 135 Certificate, and that AAM would operate all the revenue-generating chartered flights. *Id.* ¶ 82.

Zetta PTE's finance department was located in Singapore; it reported to Cassidy and his wife, Tang. 7572 FAC ¶ 85. Until Cassidy and Tang were removed from their positions in August 2017, both had the right to approve transfers of funds with respect to Zetta PTE. *Id.* In late 2016, Zetta USA sent all of its financial records to Singapore as requested by Cassidy. *Id.*

In September 2015, a few months after Zetta PTE was formed, Cassidy created the First Business Plan, which he sent to potential financiers to seek to attract interest in Zetta PTE. 7572 FAC ¶ 128. The Trustee alleges that the First Business Plan contained several materially false and misleading statements. *Id.* ¶ 130. Specifically, the Trustee contends that the First Business Plan stated a profit margin that was significantly higher than that of the Debtors' more established competitors, understated the financing and other costs that were ultimately incurred, projected that the Debtors would be able to lease the aircraft for a higher hourly rate than was ultimately realized, and overstated the amount of contracted future revenue the Debtors had. *Id.*

    C.    Bombardier's Financial Condition

At or about the time Zetta PTE was formed, the Asian private jet industry was experiencing difficulty due to economic downturns in China, Asia's largest private jet market. 6637 FAC ¶ 83. Both Mattar and Fazal-Karim made public comments that the private jet industry in Asia was suffering, primarily because of a slow market in China. *Id.* Competitors in the industry made similar comments. *Id.* ¶ 84.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

During the fall of 2015, Bombardier's share price fell. 6637 FAC ¶ 87. The financial condition of the company also required that it lay off a significant number of employees. *Id.* ¶ 85. Bellemare later stated that Bombardier was "on the brink of bankruptcy" in 2015. *Id.* ¶ 88.

D.    Zetta PTE's Transactions in Planes

In each of the following transactions, the Debtors would enter an aircraft purchase agreement ("APA") with Bombardier or a Jetcraft subsidiary. 6637 FAC ¶ 106. The APAs required Zetta PTE to pay ███████████████████████████████████████████████████ *Id.* ███████████████████ *Id.* ███████████ *Id.* ███████████ *Id.*

The Debtors never had sufficient funds to purchase aircraft without financial support. 6637 FAC ¶ 107. Accordingly, they obtained financing either from Jetcraft and Li or from an aircraft financier like CAVIC, Element, or Minsheng. *Id.* The financing transactions allegedly took place using either a direct secured loan from a financier under which a debtor-controlled entity was a borrower and the financier was the lender, or using a "finance lease" where the financier received a payment (characterized as rent) over a fixed term and the Debtors could exercise a nominal or free option to purchase the aircraft, which was used for the other planes. *Id.* ¶ 108. Under both structures, the financier did not possess or operate the airplane, but only received principal and interest payments form the Debtors, who would take on all the risks and obtain any benefits of ownership. *Id.* ¶ 109. At closing, either TVPX or Wells Fargo would serve as owner-trustees or lessor-trustees to effect the transaction. *Id.*

During the transactions, Zetta USA was used to operate the planes under its Part 135 Certificate, either under a lease from Zetta PTE or a sub-lease from TVPX. 6637 FAC ¶ 112. To maintain its Part 135 Certificate, the following was required: Zetta USA's principal base of operations had to be located in the United States; its Director of Maintenance, Chief Pilot, and Director of Operations had to be its direct employees, and its president and two-thirds or more of its board of directors were required to be citizens of the United States; and at least 75% of its voting interests were required to be owned or controlled by persons who were citizens of the United States. *Id.* ¶¶ 113-15. In addition, Zetta USA signed guarantees for all the obligations under the aircraft financing documents. *Id.* ¶ 116.

1.    The First Element Transaction (Plane 1)

This transaction involved the purchase of a Bombardier Global 5000 (Plane 1) from Jetcoast that was financed by Element. 6637 FAC ¶ 118. On November 19, 2015, Cassidy, on behalf of Zetta PTE, executed a letter of intent with Element to Purchase Plane 1. *Id.* ¶ 119. On December 5, 2015, Cassidy entered into an Aircraft Purchase Agreement (the "Plane 1 APA") with Jetcraft Corp. and Jetcoast for this airplane. *Id.* ¶ 120. The transaction closed on December 30, 2015. *Id.* ¶ 121. Element Aviation entered into an Aircraft Loan Agreement (the "Plane 1 Loan Agreement") with Zetta PTE through Zetta Jet 5000-1 to finance the purchase. *Id.* The same day, Zetta USA, which was still known as AAM, agreed to guarantee the operating lease on the aircraft. *Id.* Element, the Debtors and TVPX then

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 14 of 91 Page ID #:41738

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

effected the transaction. *Id.* Seagrim and Walter executed the directors' resolutions and other transactional documents in California. *Id.* ¶ 122. Zetta PTE was required to pay a ▮▮▮▮▮▮ deposit within ▮▮▮▮▮▮ of entering the APA, with the balance of ▮▮▮▮▮▮ due at the time of closing. *Id.* ¶ 123. It paid the deposit on December 10, 2015. *Id.* ¶ 124. On December 30, 2015, Zetta PTE directed Element Aviation to disburse $37.8 million to Jetcoast. *Id.* ¶ 126. That same day, AAM wired ▮▮▮▮ to Jetcraft Corp. *Id.* ¶ 127. Finally, Zetta PTE wired ▮▮▮▮▮▮ to Jetcraft Corp. on January 5, 2016. *Id.* ¶ 128.

The Debtors accepted delivery of Plane 1 at Cahokia, Illinois and the plane was thereafter based in Burbank, California. 6637 FAC ¶¶ 129, 131(c). The transaction was to be governed by New York law, and the closing occurred in Oklahoma City. *Id.* ¶¶ 131(b), 131(d). Payment was allegedly sent through Wachovia Bank in New York as a correspondent bank. *Id.* ¶ 131(e).

On December 30, 2015, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement (the "Plane 1 Repurchase Agreement"). 6637 FAC ¶ 132. Under that agreement, Jetcraft Corp. agreed that if the Debtors defaulted on their obligations on Plane 1, Jetcraft Corp. would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Fazal-Karim, Jetcraft Corp., and Jetcoast received ▮▮▮▮▮▮ in commissions and ▮▮▮▮▮▮ in other profits on Plane 1. 6637 FAC ¶ 130.

During November 2015, Cassidy and Fazal-Karim agreed that Cassidy would be paid $500,000 by Jetcraft as part of the "purchase price" of Plane 1. 6637 FAC ¶ 252. At this time, the payment was termed a "3rd Party Fee" and described as an "outside commission" *Id.* ¶¶ 252, 269. On March 4, 2016, Cassidy, using his Asia Aviation e-mail account, sent Fazal-Karim an invoice dated March 1, 2016, for $500,000 in "Support Services" and requested that a payment be made to Cassidy's private bank account. *Id.* ¶ 256. On March 28, 2016, Behrend sent $500,000 from Jetcraft Global's bank account in the Cayman Islands to Cassidy's personal bank account. *Id.* ¶ 258. This payment was not disclosed in the transaction documents, and this payment was inconsistent with the provision in the Plane 1 APA that the Debtors had not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 260.

The Trustee contends that this payment was a bribe. *See* 6637 FAC ¶ 241. The FAC defines it as the First Kickback, and alleges that it was a payoff for agreeing to use Fazal-Karim to acquire all future planes from Jetcraft or Bombardier. *Id.* It was also an alleged inducement to acquire Plane 1 in the First Element Transaction and to acquire Planes 2-6 from Bombardier directly as part of a letter of intent signed at the same time as the financing proposal for the First Element Transaction. *Id.* The Trustee contends that the transactions relating to Planes 1-6 were all part of a single agreement. *Id.* ¶ 242. The Trustee supports this position by noting that the transactions were negotiated simultaneously and directed at the common goal of securing four or five Global 6000 aircraft for the Debtors. *Id.* Also, on November 3, 2015, less than one month before the letters of intent for Planes 1-6 were signed, the parties discussed a draft letter of intent that mentioned all six planes. *Id.* ¶ 244. In addition, it is alleged that Bombardier had a direct financial interest in the sale of Plane 1 because, when Bombardier sold Plane 1 to Jetcraft, it was agreed that Bombardier would receive a percentage of any return earned by Jetcraft if and when Jetcraft elected to resell the aircraft. *Id.* ¶ 250.

Case 2:21-cv-06637-JAK Document 81*SEALED*Partial Filed 03/26/24 Page 14 of 91 Page ID #:14159739

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On December 2, 2015, Cassidy sent an e-mail to Seagrim and Walter that attached a document showing that Zetta PTE would be more than $1.6 million "in the red" based on the closing of Plane 1. 7572 FAC ¶ 154.

      2.     The CAVIC Transactions (Planes 2-5)

      a)     The Transactions

During the discussion as to the First Element Transaction, Cassidy negotiated and entered into a letter of intent to purchase six additional Global 6000s directly from Bombardier. 6637 FAC ¶ 133. Planes 2-5 and Plane 6, which was eventually purchased by Li, were part of this letter of intent. *Id.* It was executed on November 18, 2015. *Id.* ¶ 134.

Cassidy, on behalf of Zetta PTE, executed four APAs with BAC (the "Plane 2-5 APAs") on December 10, 2015, for four Global 6000s ("Planes 2-5" and collectively the "CAVIC Aircraft") directly from Bombardier. 6637 FAC ¶ 135. Under the Plane 2-5 APAs, ███████████████████████

███████████ *Id.* ¶ 136. ███████████████████████████

██ *Id.*

To complete the purchase of the CAVIC Aircraft, the Debtors obtained financing from CAVIC through an alleged finance lease structure. 6637 FAC ¶ 137. At the closing of the sale of each airplane, the Debtors (through TVPX) entered into finance lease agreements with CAVIC (through the CAVIC Statutory Trusts). *Id.* Specifically, on or around May 24, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-1 ST) for Plane 2. *Id.* On or around September 16, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-2 ST) for Plane 3. *Id.* On or about December 23, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-3 ST) for Plane 4. *Id.* On the same days, TVPX entered into corresponding sub-leases with Zetta USA. *Id.* To repay CAVIC for the financing, the Debtors made payments characterized as ones due under the lease. *Id.* ¶ 138. The alleged finance leases were entered into by TVPX, acting as trustee for the ultimate benefit of the Debtors. *Id.* ¶ 139. Using sub-leases, all responsibility and obligations under the alleged finance leases were passed from TVPX to Zetta Jet. *Id.* The sub-leases mirrored the alleged finance leases in terms of the amount of rent, interest, and other non-financial obligations. *Id.* TVPX never made or received payments on the CAVIC Aircraft. *Id.*

The Trustee contends that the parties intended to enter into a finance lease, rather than a true or operating lease, for the following reasons: Zetta PTE was not able to terminate the lease after acceptance of the CAVIC Aircraft; Zetta PTE had the option through its subsidiaries and TVPX to purchase the CAVIC Aircraft at the end of the lease period for only $100 each; the risk of loss or damage to the CAVIC Aircraft passed to the Debtors upon delivery and the Debtors' obligations to make rent payments continued even upon a total loss of the aircraft; the Debtors had an absolute and unconditional obligation to pay rent to CAVIC even if their use of the CAVIC Aircraft was interrupted

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 16 of 92 Page ID #:41159740

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

due to a defect that affected airworthiness; the outstanding rent accrued interest and would accrue default interest in the event of a default; the rent was calculated based upon the principal amount and interest that CAVIC owed EDC under its loan under its Facility Agreement with EDC and floating rates in interest charged under that facility; the final payment of rent was equal to the final amount that was due to EDC by CAVIC under the Facility Agreement; the Debtors were responsible for all general maintenance obligations and the cost and expense of replacing all parts; and the Debtors were responsible for all insurance costs on the CAVIC Aircraft. 6637 FAC ¶ 140.

The Debtors accepted delivery of Planes 2-4, and would have accepted delivery of Plane 5, at Windsor Locks, Connecticut. 6637 FAC ¶ 142(d). The closings occurred in Oklahoma City. *Id.* ¶ 142(b). The payments for these planes were sent to BAC's Bank of America account in Texas. *Id.* ¶ 142(e).

Zetta PTE made transfers to BAC for the CAVIC Aircraft, including the following: $1 million on December 4, 2015; $10 million on February 16, 2016; $10 million on March 8, 2016; $1.2 million on March 28, 2016; $2.4 million on or about June 30, 2016[4]; $3,091,334 on March 28, 2017; and $3,262,834 on June 27, 2017. 6637 FAC ¶ 143. The Debtors also made transfers to BAC totaling $120.36 million in loan proceeds from CAVIC. *Id.* Ultimately, Plane 2 was delivered on or about May 24, 2016, Plane 3 was delivered on or about September 22, 2016, Plane 4 was delivered on or about March 28, 2017 and Plane 5 was never delivered. *Id.* ¶¶ 144-47.

Fazal-Karim received commissions of ██████ for each of the transactions for Planes 2-5. 6637 FAC ¶ 148.

    b)     The Plane 5 Pre-Delivery Payments ("PDPs")

Under the Plane 5 APA, advance payments, which were called pre-delivery payments ("PDPs"), were to be made on a periodic basis to fund the purchase of Plane 5. 2004 FAC ¶ 34. ████████████████████

    *d.* This right is denoted the "Refund." Under the Plane 5 APA, Zetta PTE ████████████████

████████████ *Id.* ¶ 69.

On December 10, 2015, when the Plane 5 APA was signed, Universal Leader paid BAC ██████ in PDPs. 2004 FAC ¶ 41. On February 25, 2016, BAC and Zetta PTE executed a First Amendment to the Plane 5 APA. *Id.* ¶ 42. On March 28, 2016, Zetta PTE paid PDPs totaling ██████ to BAC under the Plane 5 APA. *Id.* ¶ 43. On September 26, 2016, BAC and Zetta PTE executed a Second Amendment to the Plane 5 APA. *Id.* ¶ 44.

In March 2017, the Debtors were due to make another, $30 million PDP under the Plane 5 ADA. 2004 FAC ¶ 36. In the fall of 2016, CAVIC and Zetta PTE allegedly began negotiating the terms of a financing relationship whereby CAVIC would finance the manufacture and purchase of Plane 5 and

---

[4] This payment was originally made in connection with Planes 8-9, but was later transferred to apply to Plane 4 on March 24, 2017. 6637 FAC ¶ 143.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Zetta PTE would repay this loan, with interest, allegedly pursuant to a lease financing structure. *Id.* ¶ 45. On November 17, 2016, Zetta PTE and AVIC, on behalf of CAVIC, memorialized the blueprint for the structure of the alleged PDP loan and long term lease financing agreement in a Term Sheet, which was sent from AVIC to Zetta PTE as a "letter of intent." *Id.* ¶ 46. On December 13, 2016, BAC and Zetta PTE executed a Third Amendment to the Plane 5 APA. *Id.* ¶ 47.

On December 22 and 23, 2016, it is alleged that Zetta PTE, Zetta USA, CAVIC, EDC, TVPX, and the ZJ6000-4 ST signed the following documents:

- The PDP Facility Agreement between EDC as lender, security trustee and agent, and CAVIC as borrower;
- The 186 Trust Agreement between Zetta Jet 6000-5 as trustor and TVPX as lessee trustee, which formed the 186 Trust;
- The ZJ6000-4 Trust Agreement between CAVIC as trustor and TVPX as owner trustee, which formed the ZJ6000-4 ST;
- The Plane 5 Lease Agreement between the ZJ6000-4 ST as lessor and TVPX as lessee;
- The Plane 5 Sub-Lease between TVPX as lessor and Zetta Jet USA, Inc. as lessee;
- The Plane 5 Lease Guarantee between the ZJ6000-4 ST as beneficiary and Zetta PTE, Zetta USA, Asia Aviation Holdings PTE Ltd., and Geoff Cassidy as guarantors;
- The Plane 5 FPA between CAVIC as seller and TVPX as owner trustee and buyer;
- The Plane 5 FPA Guarantee between CAVIC as beneficiary and the same guarantors as the Plane 5 Lease Guarantee; and
- The Plane 5 EDC Security Agreement between CAVIC as borrower and EDC as security trustee.

2004 FAC ¶ 48.

Under the PDP Facility Agreement, CAVIC could issue utilization requests to EDC to borrow $30 million. 2004 FAC ¶ 76. CAVIC was required to make only one principal payment to EDC at the Expiry Date, which was the delivery date of the plane, or 11 months after funding, whichever occurred earlier. *Id.* However, regular interest payments were also required. *Id.* Following the funding of this transaction, the Debtors made two interest payments to CAVIC on based on CAVIC's invoices for "financing interest" issued under Section 6.1.1 of the Plane 5 FPA. *Id.* ¶ 36.

Under the PDP Facility Agreement, CAVIC could prepay at its option so long as it was not in default and the prepayment was after the first monthly interest period. 2004 FAC ¶ 77. It is alleged that the Plane 5 FPA was a condition precedent to the effectiveness of the PDP Facility Agreement. *Id.* ¶ 36. In these documents, CAVIC agreed not to alter the terms of the Plane 5 FPA without the consent of EDC. *Id.*

Under the Plane 5 FPA, the Debtors allegedly were unconditionally obligated to repay the alleged "Plane 5 PDP Loan" advanced under the PDP Facility Agreement upon the Expiry Date, absent a default by CAVIC. 2004 FAC ¶ 79. Nevertheless, under the Plane 5 FPA, the Debtors could require CAVIC to sell them its interest in the aircraft by having it voluntarily prepay under the PDP Facility

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Agreement. *Id.* ¶ 84. If the Debtors did not do so and CAVIC did not prepay, Plane 5 would be transferred to the ZJ6000-4 ST. *Id.* ¶ 86. The ZJ6000-4 ST would then lease Plane 5 to TVPX under the terms of the Plane 5 Aircraft Lease, and TVPX would then sub-lease Plane 5 to Zetta USA under the terms of the Plane 5 Sub-Lease. *Id.* ¶ 87. The amounts owed would be rolled into the Plane 5 EDC Long-Term Finance Facility Agreement, and the Debtors would repay their obligations through quarterly rent payments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. *Id.* After 28 quarterly rent payments, the final payment of which was calculated to be for the outstanding balance owed to EDC under the Plane 5 EDC Long-Term Finance Facility Agreement, the Debtors could exercise a $100 purchase option to acquire title to Plane 5. *Id.* It is alleged that e-mail correspondence between the parties refer to this transaction as "leasing and financing," to CAVIC as the "lending" party, and to payments as a "drawdown of the Aircraft Loan." *Id.* ¶ 88.

On March 16, 2017, the ZJ6000-4 ST, as a borrower, and EDC, as a lender and security trustee, executed the Plane 5 EDC Long-Term Finance Facility Agreement. 2004 FAC ¶ 49. This agreement committed EDC to provide funding to CAVIC of up to $40.5 million, or ███ of the Plane 5 purchase price, upon delivery of Plane 5. *Id.* The debt incurred under this agreement was used to calculate quarterly rent payments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. *Id.* It is alleged that the borrowings under the Plane 5 EDC Long-Term Finance Facility Agreement would allow the Debtors to roll over the alleged PDP Loan into the principal loan balance financed under the Plane 5 Lease Agreement. *Id.*

On March 25, 2017, BAC and Zetta PTE executed both a Fourth Amendment and a Fifth Amendment to the Plane 5 APA. 2004 FAC ¶ 50. ████████████████████████████████████████████████████████████████████████ after payment of which the parties are released from all claims against each other. *Id.* ¶ 68.

On March 31, 2017, Zetta PTE assigned certain of its rights and obligations under the Plane 5 APA to CAVIC pursuant to a March 31 Assignment executed by BAC, CAVIC, and Zetta PTE. 2004 FAC ¶ 51. On either March 30 or March 31, BAC received $30 million from CAVIC to satisfy Zetta PTE's obligation under the Plane 5 APA. *Id.* ¶ 52. On March 31, 2017, BAC, TVPX and CAVIC executed the Consent, in which BAC agreed to the Security Agreement and FPA. *Id.* ¶ 53. It is alleged that the March 31 Assignment expressly stated it was for the purpose of procuring financing for Zetta PTE's acquisition of Plane 5, and it is also alleged that the contemporaneous, corresponding transactional documents and November 2016 term sheet stated that the proposed assignment was for security. *Id.* ¶ 37.

On June 21, 2017, BAC, Zetta PTE, and CAVIC executed a Sixth Amendment to the Plane 5 APA. 2004 FAC ¶ 54.

It is alleged that CAVIC failed to perfect its security interest in the Refund under the March 31 Assignment. 2004 FAC ¶ 39. It is further alleged that BAC is currently holding the Refund, has not asserted an independent claim to the Refund, and is awaiting the adjudication of the rights of the Trustee and CAVIC to the Refund before returning it. *Id.* ¶ 40.

       3.    <u>The Li / Minsheng Transactions (Planes 6-7)</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Also in December 2015, Cassidy worked with Li, later a shareholder and director of Zetta PTE, to acquire two additional Global 6000s, one of which Li had purchased earlier for Zetta PTE to operate. 6637 FAC ¶ 149. In October and November 2015, at the same time Cassidy and Fazal-Karim were negotiating letters of intent relating to Plane 1, Cassidy and Fazal-Karim were also negotiating letters of intent to purchase five to six additional Global 6000s directly from Bombardier. *Id.* ¶ 150. Cassidy informed Fazal-Karim that one of these planes would be assigned to Li. *Id.* Li and Cassidy also discussed having Zetta PTE purchase a Global 6000 (Plane 7) from Li's company, Universal Leader. *Id.* ¶ 151. Plane 7 was a used plane, although Cassidy caused the Debtors to pay the same price for both Plane 6 and Plane 7. 7572 FAC ¶ 204. Cassidy offered Li a guaranteed 10% return, which was allegedly twice the market rate for similar transactions. 6637 FAC ¶ 151.

In December 2015, Universal Leader transferred $48 million to Zetta PTE's bank account, where they were allegedly commingled with other funds belonging to Zetta PTE. 6637 FAC ¶ 152. It is alleged that there was no formal loan documentation regarding the transfer of these funds prior to when that occurred. *Id.* On December 10 and 28, 2015, respectively, Zetta PTE transferred $46.3 million and then $1 million from its Singapore account to BAC's Bank of America bank account in Texas towards the purchase of another Global 6000 (Plane 6). *Id.* ¶ 153. Although Zetta PTE paid Bombardier directly for Plane 6, the title to Plane 6 passed to Glove Assets, another company affiliated with Li, rather than Zetta PTE. *Id.*

Fazal-Karim received a ▮▮▮▮▮ commission from Bombardier for the Plane 6 transaction. 6637 FAC ¶ 154. On December 28, 2015, Fazal-Karim told Mattar that he was not willing to disclose his commission to Li. *Id.* ¶ 155.

On or about December 29, 2015, Cassidy, on behalf of Zetta PTE, entered into two Master Aircraft Finance Leases--the 2015 Plane 7 MAFL and the 2015 Plane 6 MAFL. 6637 FAC ¶¶ 157, 158. The 2015 Plane 7 MAFL was with Universal Leader and attached a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement. *Id.* ¶ 157. The purchase price for Plane 7 was $50 million. *Id.* The 2015 Plane 6 MAFL was with Glove Assets, and it was also accompanied by a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement. *Id.* ¶ 158. Under the terms of these agreements, the lessee was granted the full residual economic ownership of the asset, and assumed the attendant risks, at the inception of the lease in exchange for the payment of principal and interest over the lease term, including a final $20 million balloon payment due at the end of the lease. *Id.* ¶ 160.

The obligations could not be terminated by the lessee. 6637 FAC ¶ 160. However, Zetta PTE could pay off the balance early, but was required to make a prepayment penalty of 50% of the remaining interest due. *Id.* ¶ 163. Zetta PTE agreed to pay $50 million in 60 monthly installments at an effective annual interest rate of 12% including a final $20 million balloon payment at the end of the term. *Id.* ¶ 162. Annex 4 to the Supplement allocated these payments into principal and interest components. *Id.* This $50 million transaction was recorded on the Debtors' books as a loan to Zetta PTE, and Plane 6 was carried as an asset on Zetta's consolidated balance sheet. *Id.* ¶ 165. This transaction closed in Oklahoma City and the aircraft was delivered to the Debtors in Windsor Locks, Connecticut. *Id.* ¶¶ 166, 167. All the payments made by Zetta PTE were to Universal Leader's bank account at HSBC Bank in New York. *Id.* ¶ 170. The payments were denominated in U.S. dollars. 7572 FAC ¶ 178. The parties also used a United States law firm and corporate trustee. *Id.* It was further required that the planes be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

maintained at a facility in the United States. *Id.*

In February 2016, Li caused Truly Great to invest $19 million in exchange for a 10% interest in Zetta PTE (the "First Investment"). 6637 FAC ¶ 174. Li also loaned $10 million to Zetta PTE (the "First Loan"). *Id.* Li also became a director of Zetta PTE. *Id.* Cassidy used $20 million from Li's investment to pay deposits and payments on the CAVIC Aircraft. *Id.*

In early March 2016, Cassidy began inquiring about purchasing a $3.4 million, 70-foot yacht called the Dragon Pearl. 6637 FAC ¶ 175. On May 16, 2016, Cassidy signed a contract with Maritimo Offshore Pty Ltd. to purchase the Dragon Pearl. *Id.*

### 4. The Bombardier Purchase Orders (Planes 8-9)

On February 6, 2016, soon after the initial purchases and at approximately the same time as the transfer of cash from Li's initial investment, Cassidy executed two additional APAs for two additional Global 6000s (Planes 8 and 9). 6637 FAC ¶ 176. Much like the Plane 2-5 APAs, in these agreements, ███████████████████████████████████████████ *Id.* ¶ 177. ████████████████████████████ ███ *Id.* Neither Plane 8 nor Plane 9 had been delivered by the time the Debtors filed for bankruptcy. *Id.* ¶ 178.

Fazal-Karim was entitled to additional commissions of ████ each on Planes 8 and 9, but it is not clear if these commissions were paid. 6637 FAC ¶ 179.

On April 8, 2016, shortly after these purchases, Cassidy had Zetta PTE transfer $100,000 to Jetcraft Asia. 6637 FAC ¶ 180.

### 5. Bombardier Gives Cassidy Tickets and Talks About Giving Him Jet Skis

On July 14, 2016, Cassidy sent an e-mail to Mattar stating that he needed two Sea-Doo jet skis, worth approximately $42,569, delivered to Gold Coast, Australia. 6637 FAC ¶ 306. (Maritimo, the entity from which Cassidy purchased his yacht, is located in Gold Coast, Australia. *Id.*) On July 20, 2016, Cassidy sent an e-mail to Mattar, Fazal-Karim, Yu, and others in which he stated that he was placing them "on formal notice" of his "intention to Cancel all orders and not take deliver[y] of [Plane 3]." *Id.* ¶ 307. On July 21, 2016, Cassidy sent another e-mail to these individuals again stating that he planned to "issue termination notice[s]" with respect to the transactions between the Debtors and Bombardier. *Id.* ¶ 308. The next day, Cassidy stated that he was "not going to continue talking on all this rubbish, the ball is in your court." *Id.* ¶ 309. In the same e-mail, he asked Mattar and Fazal-Karim to "let [Cassidy] know on the [jet skis], otherwise I need to order one shortly." *Id.*

On July 28, 2016, Cassidy requested that Bombardier provide him with five tickets to the Singapore F1 racing event on September 16-18, 2016, whose value was approximately $43,890. 6637 FAC ¶ 310. On July 29, 2016, a Bombardier employee told Cassidy that another company could sell him tickets. *Id.* Less than 20 minutes later, Cassidy sent an e-mail to Mattar, Fazal-Karim, Yu, and others and

Case 2:22-cv-02004-JAK Document 181-1 (Ex-Parte) Filed 03/26/24 Page 21 of Page ID Page #:4259

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

instructed them to cancel the purchase agreements for Planes 4, 5, 8 and 9. *Id.* ¶¶ 310-11. The Trustee contends that, if the orders had been cancelled, the Debtors would have avoided $230 million in aircraft financing obligations that they could not afford, for overpriced aircraft and, in fact, would have been entitled to a net refund of $5 million in excess prepayments. *Id.* ¶ 312. On July 30, 2016, Mattar allocated the F1 tickets to the Zetta team and stated that the Debtors would not have to pay for them. *Id.* ¶ 313.

On August 24, 2016, Cassidy followed up with Fazal-Karim regarding the two jet skis, by asking him if Mattar could take care of this issue, possibly through arranging the intermediation of Philippe Crevier ("Crevier"), a consultant paid by Zetta PTE. 6637 FAC ¶¶ 315-16. On September 7, 2016, Fazal-Karim told Mattar and Crevier that Crevier should order the jet skis and send Fazal-Karim the invoice. *Id.* ¶ 316. Fazal-Karim stated that he would "sort it out with Bombardier." *Id.* On September 14, 2016, Mattar wrote that Cassidy should buy the jet skis, bill them back to Jetcraft, and Mattar and Fazal-Karim would split the cost between them. *Id.* ¶ 318. Cassidy sent an invoice of $42,569 for the jet skis to Fazal-Karim. *Id.* ¶ 319. On September 21, 2016, Zetta PTE purchased the jet skis. *Id.* ¶ 320.

The Trustee contends that the purchase of the jet skis violated Bombardier's Code of Ethics, which states that "[e]mployees, suppliers, partners and other third parties representing Bombardier must avoid giving or receiving gifts or entertainment if these might improperly influence the recipient's judgment or might be perceived to do so." 6637 FAC ¶ 324. Elsewhere, that Code of Ethics states that "an exchange of gifts" can be appropriate when "the gifts [are] reasonable, in good taste, and have token or nominal value." *Id.* ¶ 325.

6. <u>The Second Element Transaction (Planes 10-11)</u>

By August and September 2016, the Debtors were facing significant financial problems, and only had "breathing room" of a month and a half. 6637 FAC ¶ 181. Cassidy stated shortly before this period that he was trying to "keep[] off the wolves," *i.e.*, keep the Debtors' creditors at bay. *Id.* ¶ 182. Nevertheless, Cassidy acquired more planes from Jetcraft through Fazal-Karim and from Element. *Id.* ¶ 181. In this transaction, the Debtors purchased a Bombardier plane (Plane 10) from Orion, a Jetcraft affiliate, and agreed to lease another Bombardier plane (Plane 11) owned by Element. *Id.*

Cassidy and Fazal-Karim first discussed the purchase of Plane 10 on June 14, 2016. 6637 FAC ¶ 184. Plane 10 had previously been purchased by Orion from an unrelated third party in a transaction financed by Element. *Id.* ¶ 183. Under that contract, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; the first such payment was due June 30, 2016. *Id.* On June 19, 2016, Element internally circulated a financing proposal for the Debtors' purchase of Plane 10 for $48.8 million. *Id.* ¶ 185. In the last week of June, Element and Fazal-Karim discussed postponing Orion's interest payments until the earlier of 90 days or the sale of Plane 10. *Id.* ¶¶ 186-87.

On August 30, 2016, Zetta PTE, through Zetta Jet 6000-1, entered into an APA with Jetcraft Global and Orion for Plane 10. 6637 FAC ¶ 188. Zetta USA agreed to guarantee the operating lease on the aircraft, and Element Aviation entered into a loan agreement with Zetta Jet 6000-1 to finance the purchase. *Id.* The transaction was completed on September 22, 2016. *Id.* ¶ 189. No down payment was made. *Id.* That day, Zetta Jet 6000-1 sent a direction of funds letter to Element Aviation, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

confirmed the advance of the loan of ███████ and authorized and directed Element Aviation to disburse ███████ to Orion. *Id.* ¶ 191.

As part of the same transaction, the Debtors allegedly also agreed to acquire Plane 11. 6637 FAC ¶ 192. Earlier drafts of the Plane 10 loan agreement included a default if the Plane 11 transaction did not close within 30 days. *Id.* Although that provision was not included in the loan agreement because both Planes closed on the same day, it is alleged that the Debtors had an understanding that a default on either of those transactions would also be a default of the loan agreement for Plane 1. *Id.*

On September 22, 2016, ECN and TVPX entered into the Plane 11 Master Lease, and TVPX, as sub-lessor, leased Plane 11 to Zetta PTE, as sub-lessee, pursuant to the Plane 11 Sub-Lease. 6637 FAC ¶ 193. The Plane 11 Master Lease and the Plane 11 Sub-Lease (the Plane 11 Finance Lease) was allegedly a finance lease rather than a true lease. *Id.* ¶ 194. The Plane 11 Finance Lease ultimately operated as the sale of Plane 11 to Zetta PTE with 84 payments of $390,000 to be made to ECN over a seven-year period, and a mandatory purchase obligation of $18.5 million at the end of the lease. *Id.* Thus, the Debtors were obligated to pay $51.3 million for Plane 11 over seven years. *Id.*

As part of this overall transaction, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement dated September 22, 2016 (the Plane 10 Repurchase Agreement). 6637 FAC ¶ 199. Under the Plane 10 Repurchase Agreement, Jetcraft Corp. agreed that if the Debtors defaulted on their obligations with respect to Plane 10, Jetcraft Corp. would ███████████████████████████████ ████████████████████████. *Id.*

Delivery of both Plane 10 and Plane 11 was accepted in Cahokia, Illinois. 6637 FAC ¶ 198(c). The closing for the transaction occurred in Oklahoma City. *Id.* ¶ 198(b). The parties agreed that the transaction would be governed by New York law and the relevant payments were sent through Wachovia Bank in New York. *Id.* ¶¶ 198(d), (e).

Fazal-Karim, Jetcraft Corp., and Jetcoast received $██████ in commissions and ██████████ in other profits on Plane 10. 6637 FAC ¶ 197. Jetcraft Corp. also received a $█████ "broker fee" from Element for facilitating the Plane 11 transaction. *Id.*

On November 21, 2016, Behrend sent a $500,000 payment from Jetcraft Global's bank account in the Cayman Islands to Cassidy's personal bank account. 6637 FAC ¶¶ 273-74. On November 22, 2016, Behrend asked Cassidy to send her an invoice in the amount of $500,000 directed to Orion, so that she could wire him $500,000 for "services" related to Plane 10. *Id.* ¶ 275. On February 10, 2017, Fazal-Karim asked Cassidy for a revised invoice reflecting a payment of $750,000. *Id.* ¶ 279. Fazal-Karim stated that he was asking for the invoice in the event that Cassidy convinced Zetta to pay an extra $250,000 for Plane 10, in which case Fazal-Karim would "resend" that money back to Cassidy. *Id.* Cassidy sent the requested invoice on February 13, 2017. *Id.* ¶ 281. Later in February 2017, Fazal-Karim told Element that he would not provide Element with a copy of Cassidy's invoices, but would show them to Element at an in-person meeting. *Id.* ¶ 283. The payment to Cassidy was not disclosed either to the Debtors' other directors, or in the transaction documents. *Id.* ¶¶ 284-85.

Case 2:22-cv-02004-JAK Document 81-1 *SEALED* Filed 03/26/24 Page 22 of 91 Page ID #:13747

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
| --- | --- | --- | --- |
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee contends that this payment, which it calls the Second Kickback, was a bribe, was fraudulently concealed and disguised as a payment for undescribed "services." *See* 6637 FAC ¶¶ 284-86. The Trustee also contends that it was a payoff for continued work with Fazal-Karim and Bombardier as well as an inducement to acquire Planes 10 and 11 in the Second Element Transaction, to acquire Planes 12-15 in the Challenger Transactions, and to accept delivery of Plane 3 and others rather than cancel the contracts as Cassidy expressly had threatened to do. *Id.* ¶ 271.

      7.    <u>The Minsheng Refinancing and Challenger Transactions (Planes 12-15)</u>

Contemporaneously with the Second Element Transaction, Cassidy began working to refinance Planes 6 and 7. 6637 FAC ¶ 200. At this time, Zetta PTE was unable to make the payments required by the leases for Planes 6 and 7 and by the First Loan from Li. *Id.* ¶ 201.

In June 2016, Cassidy approached Li about refinancing Zetta PTE's purchase of Planes 6 and 7. 6637 FAC ¶ 203. In a June 28, 2016 e-mail, Cassidy informed Li that Minsheng had agreed to refinance both planes by purchasing them for a total of $80 million. *Id.* Cassidy told Li that the proceeds from this $80 million refinance would provide capital to Zetta PTE that could be used to purchase additional planes. *Id.* Cassidy described himself and Li as "partners" and "the priority over the banks." *Id.* Of the $80 million in proceeds, $55 million would cover the full principal balance owed under the 2015 Plane 7 Finance Lease plus $8.6 million of the $10.5 million termination fee. *Id.* ¶ 204. The remaining $1.9 million of the termination fee would be added to an unsecured loan along with the full principal balance owed under the 2015 Plane 6 Finance Lease. *Id.* Of the remaining $25 million in proceeds, Zetta PTE was to receive $12.6 million and was to use the remaining $12.4 million to make initial payments on four Bombardier Challenger 650 planes (Planes 12-15) from Bombardier. *Id.* Specifically, $6,852,560 was to be applied towards the purchase of Plane 12 (consisting of an upfront fee in the amount of $602,560, a security deposit in the amount of $870,000, and a down payment in the amount of $5,380,000) and $5,557,680 was applied towards the purchase of Planes 13-15. *Id.* ¶ 221.

In the same exchange, Li requested that, if Zetta PTE was unable to repay its debts as they became due, Cassidy and Zetta PTE give preference to Li over AVIC and Minsheng. 6637 FAC ¶ 205. Li also requested that, if in the future Zetta Jet had profits to share, Li and Cassidy would get an additional share of them. *Id.* ¶ 206. Cassidy did not disclose these positions to the other directors. *Id.* ¶ 208. Cassidy allegedly told the other directors that Li had agreed to lower the monthly payments on the loan, when in fact, Cassidy allegedly accepted the terms that Li had required. *Id.* ¶ 209. Cassidy also allegedly understated to the other directors the monthly payments due on Planes 6 and 7. *Id.* ¶ 210. Cassidy allegedly did not disclose that he needed immediate funds to pay for a yacht, or that he would take at least $2.66 million from the proceeds of the Minsheng Refinancing. *Id.* ¶ 213.

On July 19, 2016, Zetta PTE received another $10 million from Universal Leader (the "Second Loan"). 7572 FAC ¶ 247. The alleged terms of the Second Loan were as follows: Universal Leader would loan Zetta PTE $10 million for a term of three months at an interest rate of 10%; and Universal Leader and Cassidy would have a "priority profit share" in which Cassidy and Universal Leader would share the first 10% of profits for 2016, 2017, and 2018. *Id.* If repayment of either the First Loan or Second Loan was delayed, the profit split between Cassidy and Universal Leader would be increased each month by 1%. *Id.*

Case 2:22-cv-02004-JAK Document 81 (Ex Parte) Filed 03/26/24 Page 24 of Page ID Page #:4250748

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On August 12, 2016, Cassidy and Li caused Zetta PTE to enter into the August 2016 Plane 7 Purchase Agreement with Universal Leader. 7572 FAC ¶ 250. As described above, the new purchase price in this agreement was $55 million. *Id.* In the same month, Universal Leader and Zetta PTE entered the August 2016 Plane 6 Purchase Agreement, which provided for a purchase price of $48,423,839.69. *Id.* ¶ 251.

On September 20, 2016, the parties entered new sale and leaseback agreements for Plane 6 and Plane 7 (the "Plane 6 SLB Agreement" and "Plane 7 SLB Agreement"). 7572 FAC ¶ 253. Under these agreements, Wells Fargo, on behalf of Yuntian 3, purchased the interests of Glove Assets and Universal Leader (also held by Wells Fargo) in Planes 6 and 7. *Id.* ¶ 254. Simultaneously, Wells Fargo entered into aircraft lease agreements with TVPX (the "2016 Plane 6 Lease Agreement" and "2016 Plane 7 Lease Agreement"), in which the airplanes were subleased to Zetta USA (the "Plane 6 Sub-Lease" and the "Plane 7 Sub-Lease"). *Id.* ¶¶ 258, 262. These agreements provided that the Debtors could purchase the airplanes on the last day of the lease for the nominal sum of $1. *Id.* ¶ 259. The Debtors could not terminate their obligation to make rent payments absent exercise of the $1 purchase option or a total casualty loss of the aircraft. *Id.* ¶ 260. The Debtors were responsible for all the operational costs of the aircraft, as well as insurance, maintenance and other costs. *Id.* ¶ 263.

The Trustee contends that Li and Cassidy only intended to pay off the 2015 Plane 7 Finance Lease through the Minsheng Refinance. 7572 FAC ¶ 264. The Trustee argues that Li and Cassidy intended to leave the amount allegedly due and owing on Plane 6 under the August 2016 Plane 6 Purchase Agreement on Zetta PTE's books as a general unsecured loan (the "Plane 6 Loan"). *Id.* Thus, on September 20, 2016, the parties also entered into the Plane 6 Clarification. *Id.* ¶ 265. This document provided that Zetta PTE still had to repay the Plane 6 Loan, plus interest, to Glove Assets notwithstanding both the Minsheng Refinancing and that Plane 6 was never sold or delivered to Zetta PTE. *Id.*

Also on September 20, 2016, Zetta PTE and Zetta USA executed the Guarantee. 7572 FAC ¶ 267. In that agreement, Zetta PTE, Zetta USA, Cassidy and Asia Aviation guaranteed the obligations under the 2016 Plane 6 and 7 Lease Agreements. *Id.*

The Minsheng Refinancing closed on September 21, 2016. 6637 FAC ¶ 216. The closing occurred through an escrow agent in Oklahoma City. 7572 FAC ¶ 269. The signature pages were released in Oklahoma City and registered with the FAA in the same location. *Id.* ¶ 270. The parties required that all funds transferred at closing be held by Insured Aircraft Title Service ("IATS"), which is located in Oklahoma City, in its bank account at a Bank of America location in New York City. *Id.* ¶ 272. After the release of the signature pages, IATS initiated wire transfers from the Bank of America closing account to Universal Leader's New York bank account, to Minsheng through US Bank and to Zetta PTE through HSBC USA. *Id.* ¶ 273.

At closing, $12,410,240 was disbursed to Minsheng Business to pay deposits on Planes 12-15. 7572 FAC ¶ 299. Specifically, $6,852,560 was applied towards the purchase of Plane 12, and $5,557,680 was applied towards the purchase of Planes 13-15, which were never delivered. *Id.*

The day after closing, Cassidy took $3.66 million from Zetta Jet, characterizing the payment as a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Director Fee," and deposited the funds into his personal bank account. 6637 FAC ¶ 216. Of this $3.66 million, $1 million was allegedly due and payable to Cassidy and his wife for their ultimate ownership of equity in Asia Aviation, an entity that the Trustee contends was worthless. *Id.* The Trustee contends that Cassidy could offer no justification for taking the remaining $2.66 million, and that Cassidy fabricated invoices to conceal his improper taking of these funds. *Id.* On September 27, 2016, less than one week after the Minsheng Refinancing closed, Cassidy took $607,084 out of the closing proceeds and made a payment on the Dragon Pearl. *Id.* ¶ 217. On September 30, 2016, he also transferred $336,030 from Zetta PTE's bank account to pay for a deposit on his condominium in Singapore. *Id.* The Trustee alleges that Cassidy's true purpose in promoting the Minsheng Refinancing was to prolong his aircraft debt and misappropriate the Debtors' funds. *Id.* ¶ 219. The Trustee also contends that Cassidy misappropriated an additional $2 million in Debtor funds by purchasing luxury goods, luxury cars, expensive vacations and other personal items. 7572 FAC ¶ 126.

On October 26, 2016, Zetta PTE purchased Plane 12 through an alleged finance lease structure. 7572 FAC ¶ 302. On that date, Yuntian 4, using Wells Fargo as a trustee, entered into an Aircraft Lease Agreement (the "Plane 12 Aircraft Lease"), with TVPX acting as a trustee for the Debtors. *Id.* TVPX then sub-leased Plane 12 to Zetta USA pursuant to an Aircraft Sub-Lease Agreement that was dated the same day (the "Plane 12 Sub-Lease"). *Id.* Zetta USA then operated Plane 12. *Id.* The Trustee contends that the Plane 12 Aircraft Lease is a "finance lease" for the same reasons as the leases used for Planes 6 and 7. *Id.* ¶ 303. The Plane 12 Aircraft Lease notes that the debt encumbering the plane is a "first priority New York mortgage and security agreement . . . which shall be registered with the FAA." *Id.* ¶ 306. Also on October 26, Zetta PTE and Zetta USA executed the Challenger Guarantee, pursuant to which the Debtors, Cassidy, and Asia Aviation guaranteed all the obligations under the Plane 12 Aircraft Lease and the other agreements at issue. *Id.* ¶ 304. The Guarantee was executed in Burbank, California. *Id.* ¶ 305. As before, the signature pages of the Plane 12 Aircraft Lease and related agreements were released from Oklahoma City and immediately filed with the FAA in that city. *Id.* ¶ 308. During the transaction, funds were moved from a Bank of America account in Oklahoma City to another bank account in the U.S. *Id.* ¶ 311.

Fazal-Karim negotiated the sales of Planes 12-15, and he was entitled to receive approximately ▉ ▉ in total commissions. 6637 FAC ¶¶ 222-23. The Trustee does not know if these commissions were paid. *Id.*

8.     Cassidy and Fazal-Karim's Yacht Transactions

In early 2017, Cassidy and Fazal-Karim planned to begin a new business venture through which they would purchase a yacht from G-Yachts and operate charters. 6637 FAC ¶ 327. Ultimately, they targeted a 121-foot superyacht, originally called the Tosca, which was later renamed the Nyota by Fazal-Karim's wife. *Id.* ¶ 328. Fazal-Karim purchased the Nyota. *Id.* ¶ 328. Cassidy and Fazal-Karim agreed that Fazal-Karim would pay for the Nyota and Cassidy would later pay for half of the purchase price. *Id.* It is alleged that Cassidy never paid his portion. *Id.*

It is also alleged that Fazal-Karim used his various companies and assets interchangeably during the transaction. 6637 FAC ¶ 329. On February 7, 2017, an employee of the yacht company sent Cassidy and Fazal-Karim an e-mail with an attached invoice to FK Partners for 10% of the purchase price on the

Case 2:22-cv-06637-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 25 of 91 Page ID #:13750

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Nyota, after Fazal-Karim asked him to direct the invoice to FK Partners rather than FK Group. *Id.* ¶ 330.

Cassidy and Fazal-Karim used Philippe Crevier, a consultant paid by Zetta PTE and who used a Zetta PTE e-mail address and signature block, to work with a service company to help register a new Maltese company to manage the yacht. 6637 FAC ¶ 331. On February 13 and 14, 2017, Crevier, using his Zetta e-mail address, contacted a G-Yachts employee, and copied Fazal-Karim and others. *Id.* ¶ 332. Crevier confirmed that Cassidy would be listed as a director and shareholder of the entity that would own the Nyota "under his personal name." *Id.* No one suggested that Cassidy was entering the transaction on behalf of the Debtors. *Id.* On February 22, 2017, Cassidy sent an e-mail to a G-Yachts employee, with a copy to Fazal-Karim, stating that the Nyota would be listed on the Debtors' insurance policy for the "plane fleet," as Cassidy had done with the Dragon Pearl. *Id.* ¶ 333.

On June 1, 2017, Nicholas Houseman ("Houseman") of GSM Capital sent an e-mail to Cassidy with an attached invoice on behalf of FK Partners to "Geoff Cassidy" for 50% of the price of the Nyota. 6637 FAC ¶ 334. Houseman directed Cassidy to send the funds to an FK Partners account. *Id.* The same day, Fazal-Karim asked Cassidy to send the funds to his "Swiss account" rather than "Singapore." *Id.* Cassidy agreed to send the funds in euros to Switzerland as requested. *Id.* On June 2, 2017, Cassidy asked Fazal-Karim about Jetcraft paying for the two Sea-Doos described above. *Id.* ¶ 335. Fazal-Karim replied as follows: "Jetski has nothing to do with Jetcraft. You can offset jet ski on the boat. It is personal. The invoices to Jetcraft need to be settled for accounting purposes." *Id.* The Trustee alleges that the "boat" was the Nyota, that Fazal-Karim knew the payment for the Sea-Doos for Cassidy would cause issues for Jetcraft's accounting, and requested that Cassidy deduct the amount Fazal-Karim owed for the Sea-Doos from the amount Cassidy owed on the Nyota.

The Trustee alleges that Cassidy did not disclose this transaction to the Debtors and that, even after he was removed from the Board of Directors of the Debtors, Cassidy misrepresented his involvement with the Nyota, stating that he had only been on the yacht as a guest. 6637 FAC ¶ 340.

The Trustee further alleges, on information and belief, that the Nyota was sold in August 2020 for approximately 3.5 million euros. 6637 FAC ¶ 339.

9.    Li's Third Investment

In June 2017, at about the same time as the yacht transactions by Cassidy and Fazal-Karim, Zetta PTE needed more capital to fund its day-to-day operations. 7572 FAC ¶ 318. Seagrim, Walter, and Cassidy urged Li to make an additional loan, warning him that Zetta PTE would fail without it. *Id.* On June 12, 2017, Cassidy wrote Li a letter confirming a "shareholder loan" in the amount of $15 million and stating that the "loan" would be "interest free on the condition that new investors are brought in under the agreement with BNP Paribas." *Id.* ¶ 319. The negotiations continued after June 12, and during that time, Li stated that he would need additional shares in exchange for the $15 million he was providing. *Id.* ¶ 320. Walter and Seagrim allegedly transferred shares totaling 20% of Zetta PTE's stock to Truly Great in exchange for the $15 million capital infusion (the "Third Investment"). *Id.* ¶ 321. The Trustee contends that this transaction was an equity investment rather than a true loan. *Id.* ¶ 322. On June 27, 2017, Universal Leader transferred $15 million to Zetta PTE's HSBC bank account. *Id.* ¶ 323.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

10.  The Falconwing Transaction (Plane 16)

By August 2017, the Debtors were experiencing further financial distress. At this time, Cassidy stated in writing that the Debtors were "unable to provide security that [they could] fulfill [their] obligations over time." 6637 FAC ¶ 224.

As part of the Second Element Transaction, Zetta PTE was obligated to make a payment of $5 million to Element Aviation on or before December 1, 2016 (the Element Obligation), and Jetcraft Corp. had entered into the Plane 10 Repurchase Agreement under which it guaranteed that payment. 6637 FAC ¶ 225. Zetta PTE was unable to pay the Element Obligation by December 1, 2016, and also had missed payments due on Planes 1, 10, and 11. Id. ¶ 226. Element threatened a default on all three planes. Id. Zetta PTE and Element Aviation tolled the deadline to February 28, 2017, but Zetta PTE then missed that deadline as well. Id.

On June 14, 2017, Fazal-Karim sent an e-mail to O'Keefe and Bergeron, both employees of Element, informing them that he was going to meet with Cassidy. 6637 FAC ¶ 227. Fazal-Karim asked Element to defer issuing a default notice to Zetta PTE for repeated failure to pay the Element Obligation. Id. At that time, Cassidy was working on an agreement to pay off the Element Obligation through a transaction to purchase a Bombardier Global 6000 (Plane 16) from Falconwing Limited ("Falconwing"), which was owned by Fok Kin Canning ("Fok") and Wu Kebo ("Wu"). Id. ¶ 228. The contemplated purchase price was $11 million, to be paid in the form of 1500 block hours. Id.[5] It was anticipated that Plane 16 would be resold to Jetcraft Global for ▇▇▇▇▇▇▇, of which $5 million would be used to pay off the Element Obligation. Id. In light of this potential transaction, in an e-mail dated June 20, 2017, Element agreed to defer action on the default, and on June 30, 2017, again continued the deadline for the Element Obligation to the earlier of the sale of Plane 16 or July 31, 2017. Id. ¶ 229. This transaction was eventually consummated in early August 2017. Id. ¶ 230. In addition, Zetta PTE and Jetcraft Global entered into a Side Letter Agreement on August 9, 2017, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Id. At this time, Fazal-Karim had entered into one LOI and had received another LOI to re-sell Plane 16 at ▇▇▇▇▇▇▇ Id.

Cassidy stated to Seagrim and Walter that the transaction was necessary to secure immediate cash so the Debtors could fulfill their obligations. 6637 FAC ¶ 232. Cassidy also stated that Debtors needed to offer 1500 block hours or Falconwing would not sell Plane 16, fearing that the Debtors were at risk of defaulting on their obligations. Id. The Trustee alleges that the true purpose of the transaction was to benefit Element and Fazal-Karim by paying down $5 million of the outstanding amount and thereby decrease the amount Jetcraft Corp. would owe under the Plane 10 Repurchase Agreement. Id. ¶ 231.

The Falconwing Transaction closed on August 15, 2017. 6637 FAC ¶ 233. On that day, Jetcraft Corp. transferred ▇▇▇▇▇▇▇ from its Bank of America account in North Carolina to the Oklahoma bank account of IATS, which was acting as the escrow agent. Id. IATS then transferred $5 million to Element at the direction of the Debtors. Id.

On September 5, 2017, after Cassidy had been removed from his position and 12 days before the

---

[5]  The term "block hours" refers to the right to utilize an aircraft for a given period of time.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Debtors filed for bankruptcy, Cassidy sent an e-mail to O'Keefe of Element and Fazal-Karim stating that his "last deed at Zetta" was to get them $5 million; he then thanked them for their "time and assistance in closing that saga out." 6637 FAC ¶ 234. Cassidy also warned Fazal-Karim and Element that the Debtors were insolvent and advised them to "cover [their] position." *Id.* ¶ 235.

On December 28, 2017, Jetcraft Global entered into a contract to sell Plane 16 to Thorney Alpha Pty Ltd for ▮▮▮▮▮▮. 6637 FAC ¶ 236. The Trustee contends that, after the deduction of costs, Zetta PTE was entitled to $387,500.48 under the Side Letter Agreement. *Id.* Jetcraft Global has not paid the amounts the Trustee contends are due and owing under the Side Letter Agreement. *Id.*

### 11. The Relationship Between Fazal-Karim and Mattar

Throughout the transactions described above, Fazal-Karim made certain related payments to Mattar. 6637 FAC ¶ 294. The Trustee has a spreadsheet reflecting a ▮▮▮▮▮ payment for Planes 1 and 6, an ▮▮▮▮▮ payment for Planes 2-5, and payments totaling ▮▮▮▮▮ for Planes 12-15. *Id.* ¶ 293. As to the payments related to Planes 2-5 and 12-15, the amounts were exactly ▮▮▮▮ of the amount of Fazal-Karim's commissions for those planes. *Id.* The spreadsheet also contains an entry reflecting an agreement to pay ▮▮▮▮ related to Planes 8-9, which is ▮▮▮▮ of Fazal-Karim's promised commission, but it does not show a payment received. *Id.* The Trustee argues that the spreadsheet shows Mattar was aware of the First Kickback. *Id.* ¶ 295. The Trustee also argues that Mattar has destroyed documents relevant to his alleged misconduct. *Id.* ¶¶ 297-303.

### E. The Overpricing Allegations

The Trustee contends that each of the planes was significantly overpriced. 6637 FAC ¶ 342. The 6637 FAC cites, without further specificity, "expert analysis of publicly available valuations of similar planes from three sources as well as specific transactions involving substantially similar planes during the relevant time frame" and "further expert analysis from the perspective of the value provided to the Debtors' estates . . . ." *Id.* ¶¶ 343, 345. The purchase price for each plane, along with the fair market value and estate value identified by the Trustee, are summarized in the following table. *Id.* ¶¶ 344-45.

| Plane | Purchase Price | Alleged Fair Market Value | Alleged Estate Value |
|---|---|---|---|
| Plane 1 | ▮▮▮▮▮ | $35,700,000 | $29,300,000 - $31,600,000 |
| Plane 2 | ▮▮▮▮▮ | $37,400,000 | $29,600,000 - $33,900,000 |
| Plane 3 | ▮▮▮▮▮ | $37,400,000 | $28,500,000 - $32,900,000 |
| Plane 4 | ▮▮▮▮▮ | $35,700,000 | $16,864,168 - $21,364,168 |
| Plane 6 | $50,000,000 | $39,000,000[6] | $21,300,000 - |

---

[6] In the 7572 FAC, the Trustee alleges that the fair market value of this aircraft is $35.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 288.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

| | | | $27,300,000[7] |
|---|---|---|---|
| Plane 7 | $50,000,000 | $37,600,000[8] | $21,300,000 - $27,300,000[9] |
| Plane 10 | ▓▓▓▓▓ | $37,400,000 | $18,500,000 - $23,000,000 |
| Plane 11 | ▓▓▓▓▓ | $30,400,000 | $11,647,222 - $14,447,222 |
| Plane 12 | ▓▓▓▓▓ | $21,375,000 | Not Stated |

The Trustee contends that the Debtors overpaid for the planes because Cassidy failed to engage in a competitive bidding process with other private luxury jet manufacturers, and took this course due to bribes and kickbacks he received. 6637 FAC ¶ 346. The Trustee also contends that Cassidy failed to negotiate prices with Bombardier and Jetcraft, and instead paid "full retail in a buyer's market." *Id.* ¶ 347. The Trustee also contends that Cassidy failed to seek quantity discounts from Jetcraft or Bombardier, notwithstanding that it is common in the industry to provide discounts when several planes are purchased at the same time. *Id.* ¶ 348.

The Trustee also contends that Planes 1 and 10 were purchased by Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion at significantly lower prices, and then resold to the Debtors shortly thereafter. 6637 FAC ¶ 349. Plane 1 was purchased by Jetcoast at ▓▓▓▓▓ *Id.* ¶ 350. It was then sold to the Debtors about two months later for a base purchase price of ▓▓▓▓▓, plus $1.855 million in upgrades, and a $2 million security deposit, for a total purchase price of ▓▓▓▓. *Id.* ¶ 355. Plane 10 was purchased by Orion for ▓▓▓▓. *Id.* ¶ 358. However, it was sold to the Debtors nine months later for ▓▓▓▓. *Id.* ¶ 359.

F.     Zetta PTE Files for Bankruptcy

In mid-2017, during preparations for Zetta PTE's first, statutorily mandated audit, Zetta PTE's CFO began asking questions about the $2.66 million Cassidy received following the Minsheng Refinancing. 6637 FAC ¶ 361. Cassidy allegedly falsified two invoices to cover up his alleged embezzlement. *Id.* Zetta PTE's CFO later resigned during the audit. *Id.*

On August 12, 2017, Walter sent the Zetta PTE Board of Directors and the Debtors' new CFO an e-mail stating that "Zetta has been operating without proper financial controls," noting that the CFO leaving in mid-audit was a "BIG RED FLAG," and accusing Cassidy of "managing a **Ponzi scheme**." 6637 FAC ¶ 362. In a follow-up e-mail later that day, Walter also noted that Cassidy's presentation to a French investment bank overstated the value of the Debtors' aircraft by $150 million, which Walter twice called another "**MASSIVE RED FLAG**." *Id.* Walter demanded that Cassidy "prove to us that Zetta is not a Ponzi scheme." *Id.*

---

[7] In the 7572 FAC, the Trustee alleges that the estate value of this aircraft is between $22.7 million and $28.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 288.

[8] In the 7572 FAC, the Trustee alleges that the fair market value of this aircraft is $35.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 286.

[9] In the 7572 FAC, the Trustee alleges that the estate value of this aircraft is between $22.7 million and $28.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 286.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On August 17, 2017, the Zetta PTE Board of Directors held a meeting in Hong Kong. 6637 FAC ¶ 363. Seagrim, Walter and Li voted to suspend Cassidy and Tang. *Id.* On August 22, 2017 they were removed from the board and their other roles at the Debtors. *Id.*

At the time Cassidy was removed, he was preparing a Second Business Plan to entice new investors. 7572 FAC ¶ 140. The Trustee contends that the last draft of the Second Business Plan included materially false statements, underestimating the amount of capital the Debtors would need to make the required payments on the planes that had already been ordered, overstating the Debtors' revenues and profits, overvalued the Debtors' fleet of planes, and stating that the Debtors were not involved in any pending or threatened legal proceedings. *Id.* ¶¶ 141-45.

On September 8, 2017, the Debtors filed a civil action against Cassidy in the United States District Court for the Central District of California. 6637 FAC ¶ 364. On September 15, 2017, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. *Id.* ¶ 365.

On November 30, 2017, the Trustee shut down the Debtors' operations and terminated all employees due to a lack of funds to operate the business. 6637 FAC ¶ 366. On December 4, the Debtors' Chapter 11 cases were converted to Chapter 7 cases. *Id.*

On September 27, 2017, BAC asserted before the Bankruptcy Court that the Plane 5 APA was an executory contract between BAC and Zetta PTE and that Zetta PTE should be compelled to assume or reject it by a date certain. 2004 FAC ¶ 55. This matter was later resolved by a stipulation. *Id.* ¶¶ 58-59.

On December 20, 2017, the Trustee moved to reject the Plane 5 APA, terminating the Debtors' future obligations under the Plane 5 APA. 2004 FAC ¶ 60. On January 25, 2018, the Bankruptcy Court granted the Trustee's motion. *Id.* ¶ 61. On April 24, 2018, BAC and CAVIC filed proofs of claim relating to the Plane 5 APA and, in the case of CAVIC, the March 31 Assignment. *Id.* ¶¶ 64-65.

Li, via Universal Leader and Glove Assets, also filed proofs of claim in these Chapter 7 cases. 7572 FAC ¶ 332. Yuntian 3 and Yuntian 4 also filed proofs of claim. *Id.*

### III. Legal Standards

#### A. Standard of Review

In an appeal from an order of a bankruptcy court, conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. *Blausey v. U.S. Tr.*, 552 F.3d 1124, 1132 (9th Cir. 2009) (citing *In re Salazar*, 430 F.3d 992, 994 (9th Cir. 2005)). The clear error standard is "significantly deferential, requiring a definite and firm conviction that a mistake has been committed before reversal is warranted." *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008) (internal quotation marks omitted). A "district court may affirm on any ground supported by the record." *Thrifty Oil Co. v. Bank of America, Nat'l Trust and Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003); *In re DeMasi*, 227 B.R. 586, 587 (D.R.I. 1998) ("[The] Court is not bound to remain within the confines of the Bankruptcy Court's reasoning for its decision, but is free to affirm the decision below on any ground supported by the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

record.").

A bankruptcy court's dismissal of an action for failure to state a claim is reviewed *de novo*. *In re Turner*, 859 F.3d 1145, 1148 (9th Cir. 2017). A bankruptcy court's decision to deny leave to amend is reviewed for abuse of discretion, but whether leave to amend would be futile is reviewed *de novo*. *Id.* "A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard or its factual findings are illogical, implausible, or without support from evidence in the record." *In re Aykiran*, BAP No. NC-21-1134-TFG, 2022 WL 214816, at *3 (B.A.P. 9th Cir. Jan. 25, 2022).

Whether a plaintiff has Article III standing is a question of law that is reviewed *de novo*. *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002). Denial of a motion to consolidate is reviewed for abuse of discretion. *Cf. May v. Bennett*, 122 F.3d 1072 (Table), 1997 WL 537502 (9th Cir. 1997) (reviewing district court's consolidation order for abuse of discretion). Denial of a motion to require a deposit in an interpleader matter may also be reviewed by a district court. *See Am. Gen Life Ins. Co. v. Eisenhauer*, Case No. ED CV 15-00412-VAP (KKx), 2015 WL 13039439, at *3 (C.D. Cal. May 7, 2015).

     B.     Motion to Dismiss

Fed. R. Civ. P. 12(b) "applies in adversary proceedings" in bankruptcy court. Fed. R. Bankr. P. 7012(b).

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

A party may move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). "Dismissal . . . is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support [one]." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citation omitted), allowing leave

Case 2:22-cv-02004-JAK Document 21 *SEALED* Filed 04/09/24 Page 32 of 92 Page ID #:14459

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

**IV.** **The 7572 Appeal**

The Trustee challenges the order of the Bankruptcy Court dismissing with prejudice three groups of claims: (1) the avoidance claims, which are the first and second causes of action; (2) the recharacterization claims, which are the sixth, eighth, and ninth causes of action; and (3) the disallowance claim, which is the tenth cause of action.

    A.    The Avoidance Claims (First and Second Causes of Action)

The Bankruptcy Court dismissed the avoidance claims with prejudice because it determined that § 548 does not apply extraterritorially, and that all of the relevant conduct was there. The Bankruptcy Court also rejected the Trustee's argument that, because the 7572 Appellees filed proofs of claim, all aspects of the relevant transactions are subject to federal bankruptcy law with an extraterritorial application of § 548 permitted.

    1.    Whether § 548 Applies Extraterritorially

"United States law governs domestically but does not rule the world." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)). "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). As a result, the presumption against extraterritoriality bars non-domestic application of a statute unless "Congress has affirmatively and unmistakably instructed that the statute will do so." *Id.* (citing *Morrison*, 561 U.S. at 261). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* (quoting *Morrison*, 561 U.S. at 255). However, "an express statement of extraterritoriality is not essential" and "[c]ontext" has occasionally been "dispositive." *Id.* at 340.

The Supreme Court has adopted a "two-step framework for analyzing extraterritoriality issues." *Nabisco*, 579 U.S. at 337. "At the first step, [courts] ask whether the presumption against extraterritoriality has been rebutted--that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* "If the statute is not extraterritorial, then at the second step [courts] determine whether the case involves a domestic application of the statute, and [courts] do this by looking to the statute's 'focus.' " *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

The statute at issue provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--(A) made such

Case 2:22-cv-02004-JAK Document 91 *SEALED* Filed 03/26/24 Page 33 of 91 Page ID #:13757

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) [certain other conditions apply]." 11 U.S.C. § 548(a)(1).

The Trustee contends that this provision must be read in conjunction with 11 U.S.C. § 541(a)(1), which provides that a debtor's "estate is comprised of all the following property, wherever located and by whomever held: . . . all legal or equitable interests of the debtor in property as of the commencement of the case. The estate also includes "[a]ny interest in property that the trustee recovers under" various provisions of the Bankruptcy Code. 11 U.S.C. § 541(a)(3).

Courts have reached different outcomes as to whether § 548 applies extraterritorially. The two leading cases are *French* and *Midland Euro*. In *French*, the Fourth Circuit concluded that "creditors are entitled to the 'interests of the debtor in property' under § 541--expressly including all property 'wherever located'--and that they may avoid a debtor's fraudulent transfer of the same 'interest[s] of the debtor in property' under § 548." *In re French*, 440 F.3d 145, 152 (4th Cir. 2006). As *French* then explained, "Congress thus demonstrated an affirmative intention to allow avoidance of transfers of foreign property that, but for a fraudulent transfer, would have been property of the debtor's estate." *Id.*

*Midland Euro* noted that "[n]othing in the text of § 548 indicates congressional intent to apply it extraterritorially." *In re Bankr. Est. of Midland Euro Exch. Inc.*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006). *Midland Euro* also rejected the interpretation of § 541 in *French* stating that "[t]he majority of the courts have concluded that property held by third-party transferees only becomes 'property of the estate' after the transfer has been avoided." *Id.* (collecting cases). *Midland Euro* also recognized that the holding in *French* was premised on the assumption "that the debtor retains a 'legal or equitable' interest in the property transferred pre-petition, or to paraphrase, that 'property of the estate' includes property transferred but not yet recovered." *Id.* at 719. *Midland Euro* added that *French* had "ignore[d]" the language of § 541(a)(3). *Id.*

Under § 541(a)(1), the property of the estate includes property interests when "the debtor [has] an interest in the property 'as of the commencement of the case' . . . ." *Id.* at 719. Under § 541(a)(3), the property of the estate also "includes any interest in property that the trustee *recovers* . . . ." *Id.* (emphasis added). If interests in property are part of the estate under § 541(a)(1) even before they are recovered, then § 541(a)(3) would be redundant. Reading these two provisions together, property that was fraudulently transferred but not recovered is not part of the estate at the commencement of the case. According to *Midland Euro*, *French* "violate[d] [the] maxim of statutory interpretation that holds that the court should attempt to give meaning and effect to every word, clause and section of a statute." *Id.*

Some cases have disagreed with *Midland Euro*. *Lyondell* held that "fraudulently conveyed property does not become property of the estate until it has been recovered" but dismissed this distinction as "just a matter of timing." *In re Lyondell Chem. Co.*, 543 B.R. 127, 153 (Bankr. S.D.N.Y. 2016). Indeed, *Lyondell* held that "sections 541(a)(1) and (a)(3) were speaking as of different times" and rejected the proposition that "property not in the estate as of the commencement of the case cannot be brought into the estate because it is in a foreign locale." *Id.* at 153-54. *Lyondell* stated that it was "hard to believe

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 34 of 92 Page ID #:41758

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|---|------|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

that Congress intended for the Code to apply extraterritorially with respect to property of the estate, but not to apply extraterritorially with respect to what would have been property of the estate but for a fraudulent transfer." *Id.* at 154. Similarly, *Madoff* held that "[i]n *French*, extraterritorial application of Section 548 was not premised on fraudulently transferred assets constituting actual property of the estate prior to recovery" because "Section 548's reference to Section 541 expressed congressional intent to grant the Trustee authority to avoid and recover *all transfers* that, but for a fraudulent transfer, would have been property of the estate, even if not currently property of the estate." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Madoff*"), 480 B.R. 501, 528 (Bankr. S.D.N.Y. 2012).

The Trustee also argues that the holding of the Bankruptcy Court was inconsistent with *Begier v. I.R.S.*, 496 U.S. 53 (1990). There, the Supreme Court held that, "[b]ecause the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate--the property available for distribution to creditors--'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier*, 496 U.S. at 58. The Supreme Court used § 541 as "guidance" for defining the phrase "property of the debtor" in the preferential transfer statute. *Id.* at 58-59. However, *Begier* did not present issues as to extraterritoriality and, accordingly, did not address the strong presumption against its application.

In reviewing this issue, most courts have agreed with *Midland Euro. See, e.g.*, *In re CIL Ltd.*, 582 B.R. 46, 89-92 (Bankr. S.D.N.Y. 2018), *amended on other grounds on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) (rejecting *Lyondell* on the grounds that, although § 541(a)(3) might be viewed as giving rise to a mere "timing" problem, Congress knows how to place foreign transactions within the jurisdictional reach of a statute; and distinguishing *Begier* because it was not an extraterritoriality case); *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (rejecting *French* and its progeny because "[p]roperty transferred to a third party prior to bankruptcy in payment of an antecedent debt is neither property of the estate nor property of the debtor at the time the bankruptcy case is commenced, the only two categories of property mentioned in Bankruptcy Code § 541(a)(1)"; and distinguishing *Begier* because "[t]he Supreme Court read section 541(a) as a limitation on the trustee's avoiding powers, not as an expansion of those powers"); *In re Sherwood Invs. Overseas Ltd., Inc.*, No. 15-CV-1469-ORL-40TBS, 2016 WL 5719450, at *11 (M.D. Fla. Sept. 30, 2016) (the position adopted in *French* "ignores the remainder of § 541's text--notably, a subsection which limits property of the estate to property *recovered* as a fraudulent transfer"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 230 n.2 (S.D.N.Y. 2014), *supplemented*, No. 12-MC-115 JSR, 2014 WL 3778155 (S.D.N.Y. July 28, 2014), *rev'd on other grounds sub. nom. In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019) (rejecting *French* because it relied "on a notion that the foreign property 'would have been property of the debtor's estate' absent a fraudulent transfer," which the court concluded was incorrect); *see also In re Maxwell Commc'n Corp. plc* ("*Maxwell I*"), 186 B.R. 807, 819 (S.D.N.Y. 1995), *aff'd sub nom. In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036 (2d Cir. 1996) ("[N]othing in the language or legislative history of § 547 expresses Congress' intent to apply the statute to foreign transfers.").

The majority position is the more persuasive one for several reasons. *First*, although § 541 and § 548 contain similar language and are addressing similar issues, the phrase defined in § 541, which is "property of the estate," is not used anywhere in § 548. For this reason, it is of limited value in

Case 2:22-cv-06637-JAK Document 31-2 (Ex Parte) Filed 03/26/24 Page 34 of 91 Page ID #:1359

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

interpreting § 548. Even if § 541 provides "guidance" in interpreting § 548 as it does in interpreting § 547, the presumption against extraterritoriality requires "a clear, affirmative indication that [a given statute] applies extraterritorially." *Nabisco*, 579 U.S. at 337.

*Second*, as noted in *Midland Euro* and cases that have adopted its analysis, the interpretation in *French* of § 541 renders § 541(a)(3) surplusage. As *Lyondell* points out, property that would be part of the estate had it not been fraudulently transferred may eventually be recovered and become part of the estate--but only if the Trustee meets its burden to prove each of the elements specified in § 548. Because recovery of an alleged fraudulent transfer is not guaranteed, it is incorrect to call the distinction raised in *Midland Euro* "just a matter of timing." *See Lyondell*, 543 B.R. at 153.

*Third*, *Lyondell* found no reason for Congress to reach extraterritorial property that is undisputedly part of the estate while leaving untouched extraterritorial property that might have been part of the estate but for an alleged fraudulent transfer. However, this would not have been an irrational policy choice. The resolution of § 548 claims can be especially contentious and fact intensive. Fraudulent transfer claims often subject a foreign citizen to the potential burden associated with alleged liability for fraudulent or other deceptive conduct. In addition, if the Trustee is successful, a foreign citizen will have to surrender property in its possession to a United States court; this does not always occur with other types of bankruptcy claims. § 548 claims present concerns about comity to a greater extent than some other claims litigated during a bankruptcy proceeding. Among other things, the presumption against extraterritoriality "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *Nabisco*, 579 U.S. at 335.

*Finally*, many courts have concluded this statute is not an extraterritorial one. This supports the conclusion that Congress did not write "clear[ly]" or "unmistakably" when it allegedly instructed that § 548 applies extraterritorially. *Cf. id.*

For the foregoing reasons, the presumption against extraterritoriality is a strong one, and it has not been rebutted by the Trustee.

      2.    <u>Whether the Relevant Conduct Occurred Abroad</u>

The next issue is an analysis of the second step of the test stated in *Nabisco*. The Trustee disputes the conclusion of the Bankruptcy Court that the relevant conduct occurred abroad. The Trustee contends that the relevant conduct was domestic because the transfers at issue were made in the United States, the relevant obligations were incurred in the United States, and extraterritorial transfers may be disgorged or avoided when they are made on account of domestic obligations.

"If the statute is not extraterritorial, then at the second step [courts] determine whether the case involves a domestic application of the statute, and [courts] do this by looking to the statute's 'focus.' " *Nabisco*, 579 U.S. at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* Of course, it is "a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 35 of 91 Page ID #:13760

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

United States." *Morrison*, 561 U.S. at 266. Accordingly, "the presumption against extraterritorial application" is not "a craven watchdog" that "retreat[s] to its kennel whenever *some* domestic activity is involved in the case." *Id.*

         a)      Whether the Transfers Were Extraterritorial

As the Trustee concedes, the funds used in the relevant transactions began in a Singapore bank account belonging to Zetta PTE, a Singapore corporation. 7572 Opening Brief at 29. The funds then passed through a United States correspondent bank in New York. *Id.* at 29-30. Then, the funds passed through a United States corresponding bank account to Universal Leader's Hong Kong bank account. *Id.* at 30.[10] The Bankruptcy Court determined that these transfers were foreign in nature because, notwithstanding that the funds were routed through New York, they passed from Singapore to Hong Kong. *Id.* The Trustee contends that "the use of U.S. correspondent bank accounts in foreign transactions between foreign parties constitutes domestic conduct under § 548." *Id.*

In discussing these issues, the parties discuss two cases. *First*, in *Arcapita*, it was recognized that "the focus of the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate." *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 244 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022), and *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022) (quoting *In re Ampal-Am.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017)). In *Arcapita*, the bankruptcy court relied on a previous holding by the district court that the defendants had minimum contacts with New York because their "New York contacts--*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts--are at the heart of this cause of action." *Id.* at 236. The district court reasoned that "when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located." *Id.* Although the bankruptcy court acknowledged that the personal jurisdiction and extraterritoriality analyses are distinct, it cited the law of the case doctrine and relied on the determination by the district court that the transfers in New York were central to the preference claim at issue. *Id.* at 245, 245 n.8. *Arcapita* also cited cases interpreting other statutes in which it was determined that "the use of bank accounts in the United States [was] sufficient to displace the presumption against extraterritoriality." *Id.* at 245. Although *Arcapita* acknowledged that other cases had reached a different outcome, it distinguished these because "both sides of the challenged transfer used a U.S. bank to complete the transfer." *Id.* at 246. As a result, *Arcapita* held that certain transfers from the debtor's New York bank to the defendants' New York correspondent banks were domestic in nature. *Id.* at 249.

*Second*, *Picard* held that "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property." *Picard*, 917 F.3d at 100. Thus, "[w]hen a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States." *Id. Picard* acknowledged that its holding relied on "two nexuses" between

---

[10] With respect to Minsheng Refinancing, certain funds passed from Minsheng's Hong Kong bank account to a Hong Kong account owned by one of Li's entities. 7572 Opening Brief at 29-30.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the relevant transactions and "the United States: (1) the debtor is a domestic entity, and (2) the alleged fraud occurred when the debtor transferred property from U.S. bank accounts." *Id.* at 99 n.9. The Second Circuit did not address whether a transfer would be domestic if only one of these two factors was present. *Id.*

The Trustee also relies on cases involving other statutes. Under the federal stolen-goods statute, "[t]he use of correspondent banks in foreign transactions between foreign parties constitutes domestic conduct within § 2314's reach, especially where bank accounts are the principal means through which the relevant conduct arises." *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 692 (S.D.N.Y. 2017). However, this statute has a different focus than that of § 548. It is "primarily concerned with [controlling] the movement of stolen property across state lines" rather than preventing fraud. *Id.* (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 99 (D.D.C. 2017) ). The Trustee also relies on *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020). Unlike *Prevezon*, *Ho* did not apply the presumption against extraterritoriality; rather, the issue before the Second Circuit was the interpretation of the words "to" and "from" in the money laundering statute. The Trustee's reliance on *United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993) is unpersuasive for the same reason.

The 7572 Appellees also argue that the use of correspondent banks should be disregarded because their conduct is not relevant under the statute. "[T]o the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred . . . from--(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). "[A] transferee is one who . . . has 'dominion over the money or other asset, the right to put the money to one's own purposes.' " *In re Incomnet, Inc.*, 463 F.3d 1064, 1070 (9th Cir. 2006) (quoting *Abele v. Modern Fin. Plans Servs., Inc.* ("*In re Cohen*"), 300 F.3d 1097, 1102 (9th Cir. 2002)). "The inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished." *Id.* The Trustee cites *Bahrain Islamic Bank* for the proposition that a correspondent bank "act[s] as [the recipient's] agent when it receive[s] . . . funds, and thus, [the correspondent bank's] receipt of the funds in [the United States] can be imputed to [the recipient]." *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 70 n.18 (S.D.N.Y. 2016). However, *Bahrain Islamic Bank* only held that personal jurisdiction had been established over the recipient because of its use of a correspondent bank; it did not hold that the transfers at issue were domestic. *Id.* at 71. Moreover, Ninth Circuit precedent is controlling in this matter. Under the Ninth Circuit dominion test, that a correspondent bank is an agent of a transferee does not make the bank itself a transferee unless that bank has dominion over the property.

The 7572 Appellees have the more persuasive position. *Picard* is persuasive in its determination that § 548 targets the transfer of property, not its receipt. Even *Arcapita* acknowledges that transfers are relevant only because they may "deplete" the property of the estate. In any completed transfer, money is both transferred and received. Nevertheless, the focus of § 548 is the effect on the debtor-transferor rather than the effect on the transferee. To the extent *Arcapita* held otherwise, it would be inconsistent with *Picard*, which would be binding if *Arcapita* were decided presently. Furthermore, to the extent *Arcapita* held that the focus of the relevant cause of action was the use of the correspondent banks, it relied on the law-of-the-case doctrine and the minimum-contacts test. *Arcapita*, 549 B.R. at 67. Because there has been no prior determination in this action that the use of the correspondent banks

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

was at the core of the Trustee's causes of action, there is no reason to apply the law-of-the-case doctrine. In addition, the minimum-contacts test only requires contacts "between the defendant and the forum State such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 105 (1987) (internal quotations omitted). The standard here is different: Where did the relevant conduct that is the "focus" of the statute occur? Because *Arcapita* is based on matters that does not apply in this case, its holding is unpersuasive with respect to the issues presented here.

The 7572 Appellees also persuasively contend that the focus of § 548 is on the debtor-transferor and not the banks the debtor-transferor and the transferee may use as conduits. If a debtor fraudulently transfers property to a correspondent bank, § 550 does not permit recovery of that property from the bank under § 548 unless the bank has dominion over the property. *See Incomnet*, 463 F.3d at 1070. The Trustee contends that, although § 550 determines who is a transferee, § 550 does not determine whether a debtor has an interest in property. Nevertheless, because § 550 limits the recoveries allowed under § 548, it is relevant to understanding its purpose.

Because the focus of § 548 is on the debtor-transferor and the transfer it makes, it is determined that the use of U.S. correspondent banks does not make a transfer domestic for purposes of § 548 unless at least one of the *Picard* factors is present. In this context, either the debtor must be a United States entity, or the debtor must have transferred property from United States bank accounts. It is not necessary to address the question reserved in *Picard*, which was the status of a transfer where only one of the *Picard* factors was present. Here, neither factor is present. Zetta PTE is a Singapore entity, and the Trustee has not identified any allegation in the 7572 FAC that any of the money it transferred came from a United States bank account, apart from the use of correspondent banks described above.

It does not appear that there was any other error by the Bankruptcy Court in the relevant portion of the 7572 Final Dismissal. None of the parties involved in the relevant transactions is from the United States; all are from Singapore, BVI, China, Hong Kong, Ireland, or Canada. *See* 7572 R. 02156. Thus, whether or not this factor is relevant, it would not weigh in favor of a finding that the transaction was domestic. Similarly, the choice of law provisions at issue adopt Hong Kong and English law. *See* 7572 R. 02162. Again, whether or not this factor is relevant, it would not weigh in favor of a finding that the transaction was domestic.

The Bankruptcy Court did not err in determining that the registration of the planes with the FAA and their operation in the U.S. in compliance with FAA regulations, the maintenance of the planes at a U.S. base, and the use of Wells Fargo and TVPX as nominal trustees related to FAA registration did not support the Trustee's position. The "focus" of the statute is on the initial transfer that depletes what would have become property of the state, not the parties' other, subsequent business activities. Nor did the Bankruptcy Court err in holding that the use of American professionals does not make the transaction domestic. *See, e.g.*, *In re CIL Ltd.*, 582 B.R. 46, 96 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018). The Trustee has presented no contrary authority.

Finally, the Bankruptcy Court also did not err in holding that payment in U.S. dollars did not warrant a contrary conclusion. The Bankruptcy Court cited authority that the denomination of the payment is of

Case 2:22-cv-02004-JAK Document 91 *SEALED* Filed 03/26/24 Page 39 of 92 Page ID #:1341359763

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

limited utility in determining whether the transaction is domestic. *See Banco Safra S.A. - Cayman Islands Branch v. Samarco Mineracao S.A.*, No. 16 CIV. 8800 (RMB), 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019), *aff'd*, 849 F. App'x 289 (2d Cir. 2021) (for purposes of fraud claims, "Banco Safra's allegation that the transactions listed in Exhibit A were 'consummated with U.S. dollars' is also insufficient to plead a U.S. domestic transaction"). Given that fraudulent conveyance actions and fraud claims have a similar "focus," this authority is persuasive. Furthermore, the Trustee has cited no contrary authority.

In light of the preceding discussion regarding *Arcapita* and *Picard*, the Bankruptcy Court did not err in determining that, because the Debtors did not transfer property from United States bank accounts, the structure of the transactions did not support the Trustee's position. For all of the foregoing reasons, the Trustee cannot prevail on this basis.

b) Whether the Obligations Were Extraterritorial

"[T]he primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors." *In re N. Merch., Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004). Ultimately, the goal of this statute is "to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property." *Id.* at 1060 (quoting *Walker v. Treadwell* (*In re Treadwell*), 699 F.2d 1050, 1051 (11th Cir.1983)). This principle applies whether the transaction involves property transferred or obligations incurred. Fraudulent transfers may "deplete the debtor's estate of valuable assets without bringing in property of similar value from which creditors' claims might be satisfied." *Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 989 (2d Cir. 1981). In addition, "the incurring of an obligation chargeable against the debtor's property, as distinguished from the actual grant of an interest in that property, may unfairly deplete the debtor's estate if the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred." *Id.* Thus, an obligation chargeable against the debtor's property depletes the estate because the debtor may have to transfer an interest in that property at some future time.

In a § 548 case based on transfers, "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property." *Picard*, 917 F.3d at 100. If obligations deplete the debtor's estate because they suggest that future transfers will occur, it is logical that, in a § 548 case based on obligations, the relevant conduct is the debtor's future transfer of property out of the estate. Therefore, the relevant question is the source of the transfers Zetta PTE was obligated to make. The 7572 FAC alleges that the entirety of Zetta PTE's financial apparatus was located in Singapore. 7572 FAC ¶ 85. The 7572 FAC does not identify any assets or funds Zetta PTE as being available to pay the obligations at issue, except the Debtors' bank accounts, which were located in Singapore. *See generally* 7572 FAC ¶¶ 341-407. Therefore, the allegations in the 7572 FAC do not raise a plausible inference that Zetta PTE incurred obligations sufficient to suggest that there would be future transfers of property located in the United States.

The Trustee contends that the obligations were incurred domestically for the following reasons: (1) the signature pages were sent to the United States; (2) the agreements became effective once the signature pages were released; (3) the parties used United States corporate trusts; (4) Zetta USA signed a guarantee in the United States; (5) the debtors accepted the aircraft in the United States; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
| --- | --- | --- | --- |
| Title | In re Zetta Jet USA, Inc., et al. | | |

(6) certain of the closing funds were transferred through a Untied States bank account so the closing agent could distribute them to the parties. 7572 Opening Brief at 34-35. This domestic conduct does not include any of the future transfers that might deplete the estate and harm creditors.

The Trustee contends that the focus of § 548 in an "obligations incurred" case is the place where the agreements closed, not where the obligations were subsequently performed. 7572 Opening Brief at 24. However, *Picard*, *Northern Merchandise*, and other cases emphasize that the focus of § 548 is the depletion of the property of the estate. This can only occur in a jurisdiction where the estate has property. There are no allegations in the 7572 FAC suggesting that any such jurisdiction is within the United States.

The Trustee argues that the Bankruptcy Court failed to consider the distinction between transfers and obligations, which the Trustee contends prejudice creditors "not because of a reduction in estate assets . . . but rather the fraudulent inflation of [the] claims pool . . . ." 7572 Opening Brief at 36. The cases cited above do not suggest that the focus of § 548 is different when applied to "transfers made" and "obligations incurred." Although fraudulent transfers and fraudulent obligations may harm creditors in different ways, this distinction does not warrant a finding that the focus of § 548 is different in fraudulent obligation and fraudulent transfer cases.

    c)  Whether § 550 Authorizes Recovery of Extraterritorial Transfers Based on Domestic Obligations

Even accepting the Trustee's argument that the relevant obligations were domestic, § 550 does not authorize recovery of extraterritorial transfers based on those obligations.

Under § 550, the Trustee can only recover property "to the extent a transfer is avoided under section . . . 548 . . . ." 11 U.S.C. § 550(a). "If the trustee avoids a 'transfer,' he can recover the property transferred or the value of the property under § 550." *In re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005). "If, on the other hand, he avoids an obligation, the obligation is rendered unenforceable, there is nothing to return and § 550 affords no remedy." *Id.*; *see In re Foxmeyer Corp.*, 290 B.R. 229, 234 (Bankr. D. Del. 2003) ("[E]ven if [an obligation] is avoidable as a fraudulent conveyance, [this] cannot result in any recovery to the Trustee under § 550(a)(1) given that only transfers of property are remediable under § 550(a)(1)."). Thus, § 550 only comes into effect to the extent the Trustee is permitted to avoid a transfer under § 548. § 550 does not provide the Trustee with any authority to avoid transfers beyond that provided by § 548. Because all of the transfers at issue in this action were extraterritorial, the Trustee cannot avoid them by citing § 550.

"[T]ransfers made by the debtor on account of [a fraudulently incurred] obligation are not made for reasonably equivalent value, and may be set aside as actually or constructively fraudulent if the other requirements for actual or constructive fraud are met." *In re Brooke Corp.*, 541 B.R. 492, 507 (Bankr. D. Kan. 2015) (quoting 5 Collier on Bankruptcy ¶ 548.03[4][a]). However, *Brooke* is consistent with the principles discussed earlier. It does not state that § 550 provides the Trustee with authority to avoid transfers. Rather, it concludes that transfers made on account of a fraudulent obligation may be avoided provided that the other requirements of § 548 are met.

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 41 of Page ID
Page #:44459765

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee's reliance on *In re Int'l Manuf. Grp., Inc.*, No. 14-25820-D-11, 2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016), *report and recommendation adopted*, No. BR 16-2090-D, 2016 WL 7409947 (E.D. Cal. Dec. 22, 2016) is also unpersuasive. It held that "if one or more of the obligations [at issue] [we]re avoided, the trustee would be seeking . . . to recover the repayments made on the avoided obligations, repayments that were without question 'transfers.' " *Id.* at *6. Like *Brooke*, *International Manufacturing* does not suggest that § 550 provides the Trustee with authority to avoid transfers where § 548 would not. Furthermore, the bases offered by the Bankruptcy Court for distinguishing *International Manufacturing*--that it did not address extraterritoriality and that the trustee in *International Manufacturing* was seeking to avoid obligations to invalidate security interests--make *International Manufacturing* inapplicable.

Finally, the Trustee argues that *Picard* supports his position. *Picard* held that "Section 550(a) works in tandem with § 548(a)(1)(A) by enabling a trustee to recover fraudulently transferred property." *Picard*, 917 F.3d at 98. The Second Circuit determined that the focus of § 550(a) was "the debtor's initial transfer" because "it is the initial transfer that fraudulently depletes the estate" and "[o]nly the initial transfer involves fraudulent conduct, or any conduct, by the debtor." *Id.* Thus, so long as the initial transfer is domestic, subsequent extraterritorial transfers can be recovered. *Id.* at 99. *Picard* does not support the position of Trustee for two reasons. *First*, *Picard* and § 550(a) only mention transfers, not obligations. *Second*, the initial transfers here are all extraterritorial. Because the focus of § 550(a) is on initial transfers, the relevant conduct for purposes of § 550(a) is extraterritorial. Even if those extraterritorial transfers were made on account of domestic obligations, that is not a basis for the Trustee to seek to use § 550(a) to reach those transfers.

3.  <u>Whether Filing a Proof of Claim Permits an Extraterritorial Application of § 548</u>

"[B]ankruptcy courts have summary jurisdiction to adjudicate controversies relating to property within their possession." *Katchen v. Landy*, 382 U.S. 323, 330 (1966). "The whole process of proof, allowance, and distribution is . . . an adjudication of interests claimed in a res[.]" *Id.* (quoting *Gardner v. State of New Jersey*, 329 U.S. 565, 573 (1947)). "This power to allow or to disallow claims includes full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is made. " *Id.* at 329 (quoting *Lesser v. Gray*, 236 U.S. 70, 74 (1914)) (internal quotations omitted). "The Bankruptcy Act . . . converts the creditor's legal claim into an equitable claim to a pro rata share of the res, a share which can neither be determined nor allowed until the creditor disgorges the alleged voidable preference he has already received." *Id.* at 336 (internal citation omitted). Indeed, "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." *Id.* at 332 n. 9.

The Supreme Court has distinguished *Katchen*, limiting its holding to cases where "the process of adjudicating [the] proof of claim would necessarily resolve" the claim over which jurisdiction was asserted and where the right of recovery was "created by federal bankruptcy law." *Stern v. Marshall*, 564 U.S. 462, 497-98 (2011).

The Trustee relies on *In re Simon*, 153 F.3d 991 (9th Cir. 1998), which has two principal holdings. *First*, "[t]he district court in which the bankruptcy case is commenced obtains exclusive *in rem* jurisdiction over all of the property in the estate." *Id.* at 996. "The court's exercise of 'custody' over the debtor's

Case 2:22-cv-02004-JAK Document 81 SEALED (Ex) Filed 03/26/24 Page 41 of 92 Page ID #:44759766

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

property, via its exercise of *in rem* jurisdiction, essentially creates a fiction that the property--regardless of actual location--is *legally* located within the jurisdictional boundaries of the district in which the court sits." *Id.* "This includes property outside the territorial jurisdiction of the United States." *Id.* For this reason, a bankruptcy court may "enjoin[] [a creditor] from commencing collection against any bankruptcy estate property regardless of its geographic location." *Id.*

*Second*, "a bankruptcy court may enjoin a foreign collection action against the debtor personally, or as to assets which do not form part of estate property," so long as the creditor "fully participated in the . . . bankruptcy, thus surrendering to United States jurisdiction." *Id.* at 996-97. "Because allowing a participating creditor to disregard bankruptcy court orders would have 'substantial effects within the United States,' the presumption against extraterritorial effect of a statute does not apply." *Id.* at 997 (internal citation omitted) (quoting *Laker Airways, Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909, 925 (D.C. Cir. 1984)). This applied the pre-*Morrison* extraterritoriality standard, under which a statute was deemed to regulate extraterritorial conduct with substantial domestic effects, even if the statute contained no clear indication that it was meant to apply extraterritorially. *See Laker Airways*, 731 F.2d at 925. The Ninth Circuit rejected the creditor's argument that it submitted itself to limited bankruptcy court jurisdiction confined to the parameters of its proof of claim. *In re Simon,* 153 F.3d at 997. The Ninth Circuit noted that a creditor that files a proof of claim "loses the right to a jury trial on any counter-claims filed by the debtor or the trustee," "loses previously-held rights to assert 'legal claims' against the debtor and his estate," and "forefeit[s] any right ha[s] to claim that the court lack[s] the power to enjoin [the creditor] from commencing a post-bankruptcy proceeding against the debtor." *Id.* However, the Ninth Circuit did not "decide whether [§ 524 of the Bankruptcy Code] applies extraterritorially in all cases . . . ." *Id.*

The Trustee also cites similar pre-*Morrison* authority for the proposition that "when a party affirmatively invokes the jurisdiction of the bankruptcy court, the presumption against extraterritoriality does not apply to that party." *Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-CV-1446 BTM (BLM), 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010) (citing *In re Simon*, 153 F.3d at 997); *see also In re Interbulk, Ltd.*, 240 B.R. 195, 199 (Bankr. S.D.N.Y. 1999) (a preference action was not extraterritorial where the defendant was a domestic corporation, the preference was an effort to secure assets belonging to the debtor that were in New York, and the defendant filed a proof of claim).

In *Morrison*, the Supreme Court rejected the proposition that "the extraterritorial reach of [a statute] . . . raise[s] a question of subject-matter jurisdiction," holding that "to ask what conduct [a statute] reaches is to ask what conduct [it] prohibits, which is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253-54 (2010). *Katchen* and other cases only held that "[t]he whole process of proof, allowance, and distribution" provides a bankruptcy court with "summary jurisdiction to adjudicate controversies." *Katchen*, 382 U.S. at 329-30 (quoting *Gardner*, 329 U.S. at 574); *In re Ass'n of Volleyball Pros.*, 256 B.R. 313, 316 (Bankr. C.D. Cal. 2000) ("Thus a proof of claim confers on the bankruptcy court both personal jurisdiction over the claimant and subject matter jurisdiction over the claim."). The 7572 Appellees contend that, post-*Morrison*, even if filing a proof of claim subjected them to the jurisdiction of the Bankruptcy Court, that does not affect the analysis as to extraterritoriality.

The Bankruptcy Court correctly determined that *In re Simon* does not control. *In re Simon* concerned the scope of § 524, which may be applied to enjoin actions to collect property of the debtor on account

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

of claims that have been discharged. That section applies to all "property of the debtor of the kind specified in section 541(a)(2) . . . ." 11 U.S.C. § 524(a)(3). The property described in section 541 expressly includes property "wherever located . . . ." 11 U.S.C. § 541(a). Even if submitting a proof of claim permits an extraterritorial application of § 524, it does not follow that submitting a proof of claim permits an extraterritorial application of § 548. Further, the analysis in *In re Simon*, as well as the other pre-*Morrison* case law cited by the Trustee, is clearly irreconcilable with *Morrison*. *In re Simon* held that the conduct regulated by § 524 had substantial domestic effects, but it did not hold that the text of the statute or its context reflected a clear showing that it was meant to apply extraterritorially. Further, *In re Simon* held that § 524 could apply extraterritorially because the defendant had submitted to the jurisdiction of the bankruptcy court. *Morrison* has now clarified that these are separate analyses: extraterritoriality is a question as to the merits, not a jurisdictional one. The Trustee has not offered any reason to extend *In re Simon* beyond the specific facts that were presented.

B. The Recharacterization Claims (Sixth, Eighth, and Ninth Causes of Action)

1. Li's Third Investment (Sixth Cause of Action)

The Trustee contends that the Sixth Cause of Action should not have been dismissed. Thus, he argues that he does not seek to avoid any extraterritorial transfer of funds, but rather to object to and disallow a claim filed by one of the 7572 Appellees under § 502. 7572 Opening Brief at 46.

Notwithstanding that the caption of the sixth cause of action cites both § 105(a) and § 502, the relief sought by the sixth cause of action is the "recharacteriz[ation]" of the Third Investment "pursuant to 11 U.S.C. § 105(a) as an equity interest . . . ." 7572 FAC ¶ 502. Nothing in the sixth cause of action mentions the disallowance of a claim. Therefore, the Bankruptcy Court correctly concluded that the sixth cause of action was a recharacterization claim under § 105(a).

The Ninth Circuit has held that "courts may not rely on § 105(a) . . . to determine whether recharacterization [of a debt as equity] is warranted." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1149 (9th Cir. 2013). The sixth cause of action therefore failed to state a claim and was properly dismissed.

2. The 2016 Plane 6 and 7 Lease Agreements (Eighth and Ninth Causes of Action)

The Trustee objects to the dismissal of the eighth and ninth causes of action. 7572 Opening Brief at 46. The Trustee contends that these causes of action were stricken by the Bankruptcy Court. *Id.* However, the Bankruptcy Court decided "to dismiss, rather than to strike, Counts 8 and 9 . . . ." 7572 Final Dismissal at 35. Although the Bankruptcy Court concluded that the Trustee had exceeded the scope of the leave to amend that had been granted earlier, these causes of action were also "dismissed based on the presumption against extraterritoriality," like the avoidance claims on which these recharacterization claims are based. *Id.* at 34. The Trustee has not addressed this ruling. Therefore, any challenges have been waived. Even absent waiver, the Trustee has not provided any reason to find that the conduct that is the focus of § 105(a) occurred domestically. For the same reasons as stated in connection with the first and second causes of action, the eighth and ninth causes of action are dismissed based on the presumption against extraterritoriality.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

      C.     The Disallowance Claim (Tenth Cause of Action)

The Bankruptcy Court dismissed this claim because it held that the Trustee failed to state claims under §§ 548 and 550. The Trustee does not contest the holding of the Bankruptcy Court that viable claims under §§ 548 or 550 are prerequisites to a disallowance claim under § 502; rather, the Trustee contends that his claims under §§ 548 and 550 are viable for the reasons already discussed. 7572 Opening Brief at 47-48. For the same reasons stated earlier, the Trustee's disallowance claim was properly dismissed.

      D.     Leave to Amend

In the 7572 Opening Brief, the Trustee refers to a request for leave to amend only in the context of the eighth and ninth causes of action. *See* 7572 Opening Brief at 46-47. The Trustee does not otherwise challenge the determination by the Bankruptcy Court that leave to amend would both be futile and cause prejudice to the 7572 Appellees. *See* 7572 Final Dismissal at 39-41; *see generally* 7572 Opening Brief.

As to the eighth and ninth causes of action, the Trustee contends that the Bankruptcy Court should not have stricken the claims as exceeding the scope of the permissible leave to amend. However, for the reasons previously stated, the Bankruptcy Court did not strike these claims, and it also dismissed them on extraterritoriality grounds. That alternative ruling is not challenged in the 7572 Appeal. In addition, in light of the prior determinations regarding extraterritoriality, further leave to amend as to these causes of action would be futile.

As to the other causes of action, the Trustee has waived any challenge to the determinations by the Bankruptcy Court that further leave to amend would be futile and prejudicial to the 7572 Appellees, by failing to address those determinations. Even absent such a waiver, the Trustee has not requested leave to amend as to the causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations the Trustee could make to cure the deficiencies in the 7572 FAC. This determination is also supported by the Trustee's failure to cure the deficiencies in the original 7572 Complaint. Nor does an independent review of the 7572 FAC show that the deficiencies could be cured by granting leave to amend.

Case 2:22-cv-02004-JAK Document 81 (EX-PARTE) Filed 03/26/24 Page 45 of 92 Page ID #1441:59769

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

## V.    The 2004 Appeal

This appeal raises several issues. The Trustee contends that the first five causes of action were incorrectly dismissed. In the alternative, the Trustee contends that leave to amend should have been granted. Finally, the Trustee challenges several interlocutory orders that denied motions made by the Trustee: (1) a motion to compel Bombardier to turn over certain property to the Court; (2) a motion to consolidate this action with another brought against Fazal-Karim and certain related entities; and (3) a motion to amend the 2004 FAC.

### A.    Claims Against CAVIC (First, Third, Fourth, and Fifth Causes of Action)

#### 1.    Whether the Financed Leases Are Financings or True Leases (First Cause of Action)

The Bankruptcy Court dismissed the first cause of action because it found the Trustee did not have standing under Article III. It also found that English law provided the governing standard for determining whether the leases in question are financings or true leases. Under that standard, it determined that the leases in question were financings. It denied the Trustee leave to amend this claim because it determined that the fraud theory proposed by the Trustee would be futile.

##### a)    Whether the Trustee Has Article III Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *Id.* "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* By contrast, "federal courts do not adjudicate hypothetical or abstract disputes," "do not possess a roving commission to publicly opine on every legal question," "do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities," and "do not issue advisory opinions." *Id.* at 423-24.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002) (quoting *Graham v. FEMA*, 149 F.3d 997, 1001 (9th Cir. 1998)).

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he dispute [must] be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)) (permitting a patentee to challenge the

Case 2:22-cv-06637-JAK Document 18-1 (Ex Parte) Filed 03/26/24 Page 46 of 92 Page ID #13470

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

validity of a patent it had licensed rather than requiring the patentee to breach the license and wait to be sued). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). For example, a bankruptcy trustee may "seek[] a declaration that will bind [a defendant], to defeat its assertion that" the debtor has engaged in conduct that could expose it to liability. *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1077 (9th Cir. 2010).

CAVIC argues that the parties do not have adverse legal interests with respect to whether the Financed Leases are financings or true leases. CAVIC cites the Trustee's acknowledgement to the Bankruptcy Court that "recharacterization of the Delivered Aircraft Leases 'does not affect CAVIC's rights.' " 2004 Answering Brief at 31. The Trustee does not deny making this statement. 2004 Reply Brief at 28.

On appeal, the Trustee asserts that the first cause of action will "determine whether the Trustee or CAVIC holds a property interest in loan proceeds under the" Finance Leases. 2004 Reply Brief at 28. Elsewhere, the Trustee cites § 548 of the Bankruptcy Code as one possible basis for a claim against CAVIC. 2004 Opening Brief at 51. However, the 2004 FAC does not include any such fraudulent transfer claim, or a preference claim against CAVIC. Thus, even if the Trustee prevails on the first cause of action, CAVIC would not have to return to the Debtors any of the payments it received.

Declaratory judgments may be issued even when no "further relief is or could be sought" beyond the declaratory judgment itself. 28 U.S.C. § 2201(a). However, the authorities cited by the Trustee, *MedImmune* and *Lyon*, are distinguishable. In each of those cases, there was a concrete possibility that the defendant in the declaratory judgment claim would sue the plaintiff with respect to that claim. In *MedImmune*, the defendant could have sued the plaintiff for patent infringement had it breached the terms of the license. As a result, the plaintiff could seek a declaratory judgment that the patents at issue were invalid and that its products did not infringe them. In *Lyon*, the defendants could have sued the debtors for trespass, so the debtors could seek a declaratory judgment that their conduct did not constitute trespassing.

In this proceeding, neither party is seeking to recover money from the other on the basis that it is entitled to the payments under the Finance Leases. Neither party has threatened to bring such a claim, nor is there other evidence showing a sufficient probability that such an action would be filed. Indeed, the Trustee specifically argues that he only "seeks recharacterization to support claims against Bombardier in *Jetcraft*," a different action against a different defendant. 2004 Opening Brief at 60. In short, the Trustee has not shown that any possible future dispute is of "sufficient immediacy and reality" to provide him with Article III standing. *See Maryland Casualty*, 312 U.S. at 273.

This resolves the first cause of action in favor of CAVIC. However, even if the Trustee had standing, the 2004 CAVIC Final Dismissal could be affirmed on the alternative bases next addressed.

      b)      Whether English Law Should Be Applied

"In the Ninth Circuit, federal common law choice of law rules apply in bankruptcy cases." *In re Miller*,

Case 2:22-cv-06637-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 47 of 92 Page ID #14459771

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

292 B.R. 409, 413 (B.A.P. 9th Cir. 2003) (citing *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002)). "Federal choice-of-law rules in the Ninth Circuit follow the Restatement (Second) of Conflict of Laws," as a "source of general choice-of-law principles," and "an appropriate starting point for applying federal common law in this area." *In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017) (quoting *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987)).

"Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188." Restatement (Second) of Conflict of Laws § 186 (1971).

When there is a choice-of-law provision, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). Furthermore, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either" of two conditions holds. *Id.* § 187(2). *First*, the parties' choice of law does not control if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . ." *Id.* § 187(2)(a). *Second*, the parties' choice of law does not control if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* § 187(2)(b).

Under § 188 of the Restatement, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188(1) (1971). "In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2). Pursuant to § 6, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." *Id.* § 6(1). However, "[w]hen there is no such directive the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* § 6(2).

Under the California Commercial Code, "when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties." Cal. Com. Code § 1301(a). In addition, "[i]n the absence of [such] an agreement . . . this code applies to transactions bearing an appropriate relation to

Case 2:22-cv-02004-JAK Document 81 SEALED Filed 03/26/24 Page 48 of 92 Page ID Page #:14439772

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

this state." *Id.* § 1301(b).

As an initial matter, the parties disagree regarding whether Restatement § 6 or Restatement § 187 applies. Some courts have concluded that "section 6(1) applies to choice of law clauses in a contract when a state has a statutory directive concerning such clauses," and "section 187 is intended to apply only when there is no such statutory directive." *In re Gibson*, 234 B.R. 776, 779 (Bankr. N.D. Cal. 1999). The Trustee thus relies on *Eagle Enterprises*, which also concluded that the relevant section of the Pennsylvania Commercial Code was controlling; however, *Eagle Enterprises* followed "Pennsylvania's choice of law rules" in reaching this determination, rather than federal choice of law rules and the Restatement. *In re Eagle Enterprises, Inc.*, 223 B.R. 290, 292-98 (Bankr. E.D. Pa. 1998), *aff'd*, 237 B.R. 269 (E.D. Pa. 1999).

Other courts have made rulings consistent with the position of CAVIC, by applying § 187 to contracts without regard to any statutory provision. *See, e.g.*, *In re CMR Mortg. Fund, LLC*, 416 B.R. 720, 729 (Bankr. N.D. Cal. 2009) (citing § 187 and holding, under federal choice of law principles, "parties may agree to apply the law of a forum to decide all questions regarding the construction and performance of an agreement, but not questions regarding capacity to contract, or other contract-formation issues"); *In re Mayacamas Holdings LLC*, 608 B.R. 522, 526 (Bankr. N.D. Cal. 2019), *aff'd in relevant part, rev'd in part on other grounds and remanded sub nom. Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830 (N.D. Cal. 2022) ("Federal common law applies section 187 of the Restatement (Second) Conflicts of Law to determine the enforceability of contractual choice-of-law provisions."); *see also In re Maue*, 611 B.R. 367, 383 (Bankr. W.D. Wash. 2019) ("Although § 6 of the Restatement covers general factors for consideration when analyzing choice of law, other sections of the Restatement specifically deal with the validity and enforceability of a choice of law clause in a trust agreement.").

*In re Zukerkorn*, 484 B.R. 182 (B.A.P. 9th Cir. 2012), *aff'd*, 591 F. App'x 631 (9th Cir. 2015) also supports the position advanced by CAVIC. There, § 187 was applied notwithstanding that the trustee argued that the public policies embodied in the California Probate Code limited the grantor's ability to choose to have Hawaiian law apply to her trust. *Id.* at 191. The Trustee distinguishes *Zukerkorn* because the California Probate Code was at issue, not the California Commercial Code. However, the Trustee has not provided a persuasive reason for this distinction. Indeed, "choice of law provisions are usually respected by California courts in the area of both contracts and trusts." *Id.* at 192.

The Bankruptcy Court held that § 187 applies. This decision is correct for several reasons. *First*, the text of, and comments to, § 6 suggest that it does not control the enforceability of a choice-of-law provision in a federal bankruptcy case. According to § 6, a court is to "follow . . . statutory directive[s] of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1) (1971). This principle applies because a court "subject to constitutional limitations, must follow the directions of its legislature." *Id.* § 6 cmt. a. For a federal bankruptcy court applying federal choice of law principles, the relevant legislature is Congress, not the California state legislature. Congress has not adopted the Uniform Commercial Code. This supports the view that the California Commercial Code does not govern the enforceability of a choice-of-law provision in a bankruptcy proceeding.

*Second*, the comments characterize the section of the Uniform Commercial Code on which the relevant section of the California Commercial Code was based as "a statute directed to choice of law" permitting

Case 2:22-cv-06637-JAK   Document 81-1 (Ex. *SEALED* Part 1)   Filed 03/26/24   Page 49 of 92   Page ID
Page #:14173

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"the application of the law chosen by the parties . . . ." *Id.* Section 6 does not read this section of the Uniform Commercial Code as a statute that provides "for the application of the law of a particular state . . . ." *Id.* It would be inconsistent with this comment to read the California Commercial Code narrowly.

*Third*, in federal bankruptcy proceedings that occur within the Ninth Circuit, federal choice of law principles apply. *See In re Vortex Fishing Sys., Inc.*, 277 F.3d at 1069. It would be inconsistent with this holding if, by operation of § 6 of the Restatement, a California statute, rather than federal common law, governed the enforceability of a choice-of-law provision in a federal bankruptcy proceeding. The reasoning adopted in *In re Vortex* applies. "[B]ecause th[is] case can only be litigated in federal court," "the risk of forum shopping which is avoided by applying state law has no application . . . ." *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995). Accordingly, "[t]he value of national uniformity of approach need not be subordinated . . . to differences in state choice of law rules." *Id.*

Whether § 6 or § 187 applies, the Bankruptcy Court correctly concluded that English law governs. To the extent § 187 applies, the initial question is whether "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). This occurs where the parties "incorporate into the contract by reference extrinsic material which may . . . be the provisions of some foreign law," thereby "fill[ing] gaps in a contract which the parties could themselves have filled with express provisions." *Id.* § 187 cmt. c. Thus, as to "rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance and to excuse for nonperformance, including questions of frustration and impossibility," the choice of law provision "will be applied. . . ." *Id.* §§ 187 cmt. c, 187(1). "Examples of [questions that cannot be resolved by the parties] are those involving capacity, formalities and substantial validity." *Id.* § 187 cmt. d. In these cases, § 187(2) applies.

The issue here is whether the contract is a financing or a lease. This is not one that the parties could resolve entirely by agreement. Under the approach advocated by the Trustee, this question depends on an examination of the terms of an agreement rather than the labels used by the parties. 2004 Reply Brief at 26-27. Even under the formalist approach advocated by CAVIC, the relevant question is whether the agreement provides that title is retained by the seller or lessor. *See* 2004 Answering Brief at 27-28. Thus, the question is whether the agreements operate as financings or as leases. The rules of no specific jurisdiction are raised by this issue. Therefore, it is appropriate to apply § 187(2).

Under § 187(2), a choice of law provision is enforced unless there is no reasonable basis for the law chosen by the parties in their agreement, or if the choice of law provision violates a state's fundamental policy. On appeal, the Trustee does not identify any fundamental policy allegedly contravened by the choice of law provision at issue. The Trustee contends, however, that there is no reasonable basis for choosing English law. 2004 Reply Brief at 24-25. Section 187 recognizes that "[c]ontracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so." Restatement (Second) of Conflict of Laws § 187 cmt. f. (1971). Courts need not "apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge." *Id.* However, "[t]he parties to a multistate contract may have a reasonable basis for choosing a state with which the contract has no substantial relationship"; "the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed." *Id.* The Third Circuit has

Page 48 of 91

Case 2:22-cv-02004-JAK Document 81 SEALED Filed 03/26/24 Page 50 of 92 Page ID #:14459

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

recognized that this "is a minimal standard." *Zavecz v. Yield Dynamics, Inc.*, 179 F. App'x 116, 121 (3d Cir. 2006).

The parties involved in this action are located in several jurisdictions and their activities have occurred in different countries. The Bankruptcy Court correctly noted that the parties had a legitimate interest in having all their contracts governed by a single body of law. 2004 CAVIC Final Dismissal at 14. In addition, the Bankruptcy Court noted that "international aircraft financing and leasing contracts" are "generally governed by New York or English law." *Id.*; Carlos Sierra, *Ten Years of the Cape Town Convention and the Aircraft Protocol in Mexico*, Air & Space L., 2018, at 11. This is sufficient to meet the minimal "reasonable basis" standard of § 187(2).

If § 6 applies, and the enforceability of the choice of law provision is determined by Cal. Com. Code § 1301, this Court would reach the same result. In accord with § 187(2), Cal. Com. Code § 1301 only requires a "reasonable relation to . . . [the] state or nation" whose law the parties have agreed to use, rather than a "substantial relationship." Again, in accord with § 187(2), the section of the UCC upon which Cal. Com. Code § 1301 is based affirms "the right of the parties to a multi state transaction or a transaction involving foreign trade to choose their own law." UCC § 1-301 cmt. 1. It also states that "the test of 'reasonable relation' is similar to that laid down by the Supreme Court in *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403 (1927)." *Id.* In *Seeman*, a choice of law provision was upheld where it was based on "a legitimate interest" and could not "be condemned as an evasion" of the usury law that would otherwise govern. *Seeman*, 274 U.S. at 408-09. Finally, the UCC recognizes that "an agreement as to choice of law may sometimes take effect as a shorthand expression of the intent of the parties as to matters governed by their agreement, even though *the transaction has no significant contact with the jurisdiction chosen*." UCC § 1-301 cmt. 1. (emphasis added). Neither party cites any caselaw suggesting that the tests in Cal. Com. Code § 1301 and § 187(2) of the Restatement are different.

For these reasons, it is determined that English law applies.

c)      Whether the 2004 FAC Plausibly Pleads a Recharacterization Claim

The Trustee contends that "the Bankruptcy Court erred when it held that English law proscribed recharacterization." 2004 Opening Brief at 53. The Trustee incorporates by reference more than 300 pages of material addressing English law. However, these materials do not provide a sufficient basis to show any error in the analysis by the Bankruptcy Court.

Based on a review of the materials cited in the 2004 CAVIC Final Dismissal, the Bankruptcy Court did not err. "In English law, there is a clear, formalistic distinction between a sale and a hire purchase or lease." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 700 F. Supp. 2d 681, 688 (D.N.J. 2010). When the parties enter a hire purchase agreement, which is a "lease with an option to purchase provided at the end of the term of the lease," "the lessor retains ownership of the goods" "[u]nless the option is exercised." *Id.*

In the reply brief, the Trustee argues for the first time that the Bankruptcy Court ignored a distinction between a financing lease and an operating lease, and incorporates by reference certain materials regarding English law previously submitted to the Bankruptcy Court. 2004 Reply Brief at 26-27.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 51 of 92 Page ID #:1459775

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|----------------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

However, the Bankruptcy Court considered and correctly rejected the Trustee's argument that the distinction between financing leases and operating leases compelled a ruling in favor of the Trustee.

Case 2:22-cv-06637-JAK Document 18-1 (Ex Parte) Filed 03/26/24 Page 51 of 92 Page ID #:1441

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

d)      Whether the Trustee Could Add Additional Allegations to Alter the Choice of Law Analysis

The Trustee also argues in the 2004 Reply Brief that a choice-of-law clause does not limit the Trustee's avoidance powers. 2004 Reply Brief at 22-23. However, because the first cause of action seeks only a declaratory judgment and does not concern the Trustee's powers to avoid contracts and recover property, this issue is not material.

The Trustee argues that choice-of-law clauses do not bind bankruptcy trustees in fraudulent conveyance actions. The Trustee relies on *Morse Tool*, which held that "[t]he parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege that they were defrauded by the conveyance." *In re Morse Tool, Inc.*, 108 B.R. 384, 386 (Bankr. D. Mass. 1989). Therefore, a "choice-of-law clause carries little weight" in "a fraudulent conveyance action [rather than] a contract action." *Id.* The Trustee's position is unpersuasive for two reasons.

*First*, this is not a fraudulent conveyance action because the Trustee has not alleged any claims against CAVIC under § 548. Nor could the Trustee amend the 2004 FAC to do so. "An action or proceeding under section . . . 548 . . . of [the Bankruptcy Code] may not be commenced after the earlier of--(1) the later of--(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee . . . or (2) the time the case is closed or dismissed." 11 U.S.C. § 546(a). The order for relief was entered in 2017, and the Trustee was appointed shortly thereafter. The Trustee does not dispute that any § 548 claim against CAVIC would be untimely. 2004 Opening Brief at 59-60.[11]

Nor is the statute-of-limitations analysis different as to the first cause of action, which seeks declaratory relief. "Declaratory judgment actions . . . are 'subject to a statute of limitations generally applicable to civil claims.' " *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1015-16 (N.D. Cal. 2015) (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369-70 (9th Cir. 1996), *as amended* (June 14, 1996)). When "a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period time will govern." *Id.* (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688-89 (9th Cir. 1993)). The Trustee cannot get around the two-year statute of limitations by styling his claim as one for declaratory judgment rather than one to recover a fraudulent conveyance.

The Trustee contends that leave to amend should have been granted because the recharacterization claim is "essentially part of the claims allowance process and determination of property interests of the estate, and therefore not subject to [the] statute of limitations." 2004 Opening Brief at 60. In support of this position, the Trustee relies on *Maxim*, which held that "[a] claim to recharacterize debt as equity is essentially part of the claims process, a process that has not yet begun in the underlying bankruptcy case and will not until there is money to distribute to Debtor's claimants." *In re Maxim Truck Co., Inc.*,

---

[11]  Nor does the "relation back" doctrine aid the Trustee. *See* Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(c). The Bankruptcy Court determined that a § 548 claim would not relate back because it did not arise "out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." 2004 R. 10627-34; *see* Fed. R. Civ. P. 15(c)(1)(B). This determination has not been challenged on appeal. *See generally* 2004 Opening Brief.

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 53 of Page ID Page #:4459

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

415 B.R. 346, 359 (Bankr. S.D. Ind. 2009). However, the Trustee's claims are premised on the Declaratory Judgment Act, which has an applicable limitations period. In addition, a claim to recharacterize debt as equity is part of the claims process because the status of an investment as debt or equity establishes its priority. Here, the Trustee seeks to recharacterize the lease to recover certain payments from Bombardier rather than to resolve claims against the estate. The Trustee also relies on *Fitness Holdings*, which did not address the statute of limitations at all. *See In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1148 (9th Cir. 2013).

*Second*, the holding in *Morse Tool* that fraudulent conveyance actions do not sound in contract is inconsistent with decisions by the Supreme Court and the Ninth Circuit. The Supreme Court held that fraudulent conveyance suits are "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Stern v. Marshall*, 564 U.S. 462, 492 (2011) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)). For purposes of the statute of limitations, the Ninth Circuit has held that "a cause of action to recover fraudulent conveyances" is "not founded upon a tort . . . ." *United States v. Neidorf*, 522 F.2d 916, 917-18 (9th Cir. 1975). To the extent these cases conflict with *Morse Tool*, Supreme Court and Ninth Circuit precedent controls. Thus, at least one decision within the Ninth Circuit has rejected the contention that "fraudulent transfer actions are not actions based on contracts and are not governed by the choice of law provisions within a contract." *In re Century City Drs. Hosp., LLC*, 466 B.R. 1, 9 (Bankr. C.D. Cal. 2012). This provides an independent basis for concluding that the Trustee's requested amendments would not alter the choice of law analysis.

> 2. <u>Whether CAVIC's Alleged Security Interest in the Refund Is Perfected (Third Cause of Action); Whether the Trustee May Recover the Refund from CAVIC (Fifth Cause of Action); and Whether the Trustee May Recover the Refund from CAVIC (Fifth Cause of Action)</u>

Both parties argue that the status of these three causes of action depends on whether the 2004 FAC plausibly alleges that the March 31 Assignment was an assignment for security rather than an absolute assignment. *Compare* 2004 Opening Brief at 18-33 *with* 2004 Answering Brief at 24-31. The March 31 Assignment purported to assign certain of the Debtors' rights to CAVIC, including the benefit of certain advance payments made by the Debtors and the right to the performance of certain contractual obligations by BAC. *See* 2004 Dkt. 58 at 118. The Trustee argues that the Bankruptcy Court made three errors. *See* 2004 Reply Brief at 9. Each is considered in the following discussion.

> a) Whether the Bankruptcy Court Erred by Failing to Use the "Transfer of Risk" Test

"To decipher a security agreement from an absolute assignment is often a difficult task." *Matter of Candy Lane Corp.*, 38 B.R. 571, 575 (Bankr. S.D.N.Y. 1984). "[N]o particular phraseology is required to effect an assignment." *Id.* "All that is required is that the property must be sufficiently identifiable and there must be an intent to assign a present right in the subject matter of the assignment, divesting the assignor of all control over that which is assigned." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Nevertheless, "[a] document which is seemingly an absolute assignment on its face may nevertheless be treated as a security agreement in certain instances. *Candy Lane*, 38 B.R. at 575. A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* (quoting N.Y. U.C.C. § 1-201(37)). The courts must "determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen." *Id.* (quoting 1 G. Gilmore, Security Interests in Personal Property § 11.1, at 334 (1965)). "As is true with an assignment, no formal wording is required to establish a security agreement." *Id.* at 576. "[T]he intent of the parties governs," and "[t]he determination should be based on an examination of the substance of the documents in the context of the surrounding transaction." *Id.* "However, it is incumbent upon the party challenging the assignment to show by clear and convincing proof that only a security interest was intended." *Id.* at 577.

The Ninth Circuit has adopted a similar standard. "Whether the parties intended outright sales or loans for security is determined from all the facts and circumstances surrounding the transactions at issue." *In re Golden Plan of Cal., Inc.*, 829 F.2d 705, 709 (9th Cir. 1986). In this analysis, the transfer of risk is often an especially significant factor. "The absence of risk 'seems to result in a finding of a debtor-creditor relationship in most cases.' " *In re Com. Money Ctr., Inc.*, 350 B.R. 465, 484 (B.A.P. 9th Cir. 2006) (quoting *In re Woodson Co.*, 813 F.2d 266, 271 (9th Cir. 1986)). However, "the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest." *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 544 (3d Cir. 1979).

The parties and the Bankruptcy Court have both relied on several cases applying this test. In those decisions, consistent with the principles stated above, whether the assignor retains a material risk after the assignment is a very significant factor. However, other factors are also considered.

In *Commercial Money*, the debtor was required to pay to the counterparty a minimum fixed amount plus certain principal and interest payments, regardless of what was paid by the nominal lessees. 350 B.R. at 483. Once the principal was paid in full, any residual value in the transferred assets was returned to the debtor; the counterparty was not permitted to receive more than repayment of the principal and interest. *Id.* at 484. For this reason, the court determined that the counterparty had "none of the potential benefits of ownership" and was "contractually allocated none of the risk of loss." *Id.* Therefore, it was determined that the transaction was a loan rather than a sale. *Id.*

In *Joseph Kanner*, an assignment was also deemed an assignment for security. *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940 (2d Cir. 1973). The assignment occurred simultaneously with the loan. *Id.* It was undisputed that any payment received under the assignment would be applied to reduce the amount due under the loan. *Id.* Conversely, any payment in excess of the loan amount would have been returned to the payee. *Id.* The bank treated the assignment as a source of payment of the loan if the parties did not pay it. *Id.* In addition, the bank acted in a manner consistent with an assignment for security because it required the note to be personally endorsed and attached property of the endorsers when amounts were not paid under the note. *Id.* The bank also did not object when part of the property at issue was transferred to a third party notwithstanding that it later argued that it had been assigned that property. *Id.*

In *Major's Furniture*, an assignment was deemed a secured loan. 602 F.2d at 546. It was first

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

determined that the allocation of risks supported the view that the transaction constituted an assignment for security. *Id.* at 545. The debtor was required to retain the risk that the accounts being assigned would be uncollectible, the counterparty required warranties that the accounts were collectible, the counterparty required the debtor to make credit checks, the counterparty required the debtor to indemnify it, and the counterparty required the debtor to repurchase any account after the customer was in default for more than 60 days. *Id.* The counterparty only assumed the risk that the debtor became unable to fulfill its obligations. *Id.* In addition, it was determined that the counterparty unilaterally imposed new conditions on the parties' ongoing relationship, which was consistent with a "line of credit" transaction but not a true sale. *Id.*

In *O.P.M. Leasing*, it was determined that certain portions of the rent payments were assigned absolutely while others were assigned for security. *In re O.P.M. Leasing Servs., Inc.*, 30 B.R. 642, 646 (Bankr. S.D.N.Y. 1983). The analysis began with a review of the language of the relevant agreements. *Id.* However, other language in those agreements suggested the assignment was for security. *Id.* The court noted that the monthly payments to the assignee were in excess of the rent payments allegedly assigned. *Id.* Furthermore, the note was collateralized by payments beyond the rent payments at issue. *Id.* The parties anticipated that the excess amounts would be remitted by the assignee to the assignor. *Id.* The court also concluded that the assignee was to credit the assignor for the monthly balance at issue. *Id.* at 647. The assignor also retained a reversionary right to the equipment for which rent was being paid. *Id.* Thus, when the agreement ended, the assignee would not receive the equipment. *Id.* The assignor received the equipment at the end of the lease, covenanted to the assignee that it would pay taxes on the collateral, covenanted to the assignee that it would warrant and defend its interest in the collateral, and made other similar commitments. *Id.*

In *Golden Plan*, the Ninth Circuit rejected the argument by the bankruptcy trustee that an assignment was for security. 829 F.2d at 709. Instead, it determined that an absolute sale had occurred. *Id.* The documentation showed that the investors received absolute ownership of the loan in question from one of the affiliates of the debtors. *Id.* Another debtor acted as the collection agent for the loan, collecting payments made under the loan, and passing them to the investors; it was also responsible for handling foreclosure if one became necessary. *Id.* Further, the investors received no contractual guarantee of repayment or compensation in the event of a foreclosure. *Id.* In the event of a default under the loan, the debtor could pay the investors the amount they were owed, in which case the debtor could collect that amount (and any late charges) from the party obligated under the loan. *Id.* at 710. Thus, the investors could receive payments notwithstanding that the borrower had defaulted on the underlying obligation. *Id.* However, if this occurred, the investors would not receive any late fees. *Id.* The investors also testified that a sales transaction was intended. *Id.*

The Ninth Circuit reached a different outcome in *Woodson*. There, the court found the transaction was a loan from the participants to the lead lender rather than a sale. *Woodson*, 813 F.2d at 271. The lead lender did not retain a percentage participation in any of the loans. *Id.* Further, the lead lender relieved the participants from any risk of loss because the participants were paid interest regardless of whether the original borrower paid the lead lender. *Id.* The Ninth Circuit also noted the wide variation in the interest rate paid by borrowers to the lead lender and that paid by the lead lender to the participants. *Id.* at 272. It was determined that the rates were tied to prevailing borrowing rates rather than a servicing fee, which showed that this was a lending transaction rather than a purchase. *Id.* Finally, it was

Page **54** of **91**

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 56 of 92 Page ID #1341780

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

determined that the participants did not possess any of the usual indicia of ownership. *Id.*

In discussing several of these cases, *Evergreen Valley* listed "[s]everal factors" that "indicate when an assignment operates to create a security interest only." *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982). "A security interest is indicated where the assignee retains a right to a deficiency on the debt if the assignment does not provide sufficient funds to satisfy the amount of debt." *Id.* "A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source." *Id.* "Likewise, a security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt." *Id.* "Evidence that the assignor's debt is not reduced on account of the assignment is also evidence that the assignment is intended as security." *Id.* "Finally, the contract language itself may express the intent that the assignment is for security only." *Id.* "In contrast, assignments have been found to be absolute transfers where the assignment operates to discharge the underlying debt." *Id.* at 661-62. In *Evergreen Valley*, the assignment at issue was held to have created a security interest because the assignor was liable for any deficiency, payment from some other source would extinguish the debt, the debt was discharged as money became available under the agreement rather than upon the assignment, and the agreement itself indicated an intent to create a security interest. *Id.* at 662.

Similarly, in *Candy Lane*, the contractual language was ambiguous regarding whether the assignee was to be repaid from the condemnation award that was assigned but, if that fund proved insufficient, then the assignee could collect on personal guarantees by the assignor's principals. 38 B.R. at 577. It was, therefore, determined that "[w]hether this assignment was absolute or intended as security presents a triable issue of fact which cannot be disposed of by summary judgment." *Id.*

*Voboril* also identified factors that were relevant to determining whether an assignment is an absolute transfer of ownership or a grant of security. *In re Voboril*, 568 B.R. 797, 799 (Bankr. E.D. Wis. 2017). "Generally, an assignment of accounts creates a security interest where: (1) the assignee retains a right to a deficiency on the debt; (2) the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source; (3) the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt; (4) the assignor's debt is not reduced on account of the assignment; or (5) the contract language itself expresses the intent that the assignment is only for security." *Id.* In *Voboril*, the agreement stated that payment to the assignee was to commence only after a default. *Id.* at 799-800. Nor did the agreement state or imply that the assignment reduced or eliminated the debt. *Id.* at 800. Instead, its stated purpose was to provide "collateral security" for the repayment of certain debts. *Id.* Furthermore, the assignee had no interest in the property after the loan was paid off. *Id.* For these reasons, it was determined that the assignment granted a security interest. *Id.* at 799.

The Trustee relies on *Arthur Pew Construction Co. v. Lipscomb*, 965 F.2d 1559 (11th Cir. 1992). This decision does not address whether the assignment was absolute or for security. Instead, it addressed whether bank officials assumed a duty to maintain the assignments for the benefit of another party and whether they were liable for any breach of that duty. *Id.* at 1575.

The Trustee also relies on *S & H Packing & Sales Co., Inc. v. Tanimura Distributing, Inc.*, 883 F.3d 797

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 91 of 92 Page ID #:4559781

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(9th Cir. 2018). There, the Ninth Circuit defined the issue presented as follows: "[W]hether, in the context of determining the assets included in a PACA trust, a court needs to conduct a threshold true sale inquiry before it determines whether a transaction transferring PACA trust assets was a commercially reasonable sale." *Id.* at 801. The Ninth Circuit answered this question in the affirmative. It then directed that, in determining when a true sale has occurred, "a district court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan." *Id.* at 802. "In doing so, the transfer of risk should be a primary factor to which a court looks." *Id.* Elsewhere, the Ninth Circuit called the transfer of risk "a key, but not the sole, factor." *Id.* at 801. In assessing whether risk has been transferred, courts can examine "[1] the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt." *Id.* at 808 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995)).

The Trustee contends that the Bankruptcy Court erred by failing to adopt the "transfer of risk" test from *S & H Packing*. The Trustee argues that, under the "transfer of risk" test, "[t]he ultimate question is which party bears the true burden of ownership after the transaction . . . ." 2004 Opening Brief at 29. According to the Trustee, an assignment is for security whenever all risk has been transferred to the assignee. *S & H Packing* did not adopt such a test. *S & H Packing* emphasized that the transfer of risk was "not the sole" factor, calling it "*a* primary" and "*a* key" factor rather than the "ultimate question." 883 F.3d at 801-02 (emphasis added). This language is consistent with *Woodson*, where the assignment left the assignor with no risk of loss, which "*seems to result* in a finding of a debtor-creditor relationship in *most cases*." 813 F.2d at 271 (emphasis added). The Trustee also misinterprets the rule by seeking to equate the transfer of risk with the transfer of "the burdens of ownership." Instead, what is important in evaluating the transfer of risk is "who accepts risk of non-payment on the transferred accounts," not who possesses or operates the underlying property. *See S & H Packing*, 883 F.3d at 809 (quoting *S & H Packing & Sales Co. v. Tanimura Distrib. Inc.*, 850 F.3d 446, 457 (9th Cir. 2017)).

The Bankruptcy Court distinguished *S & H Packing* on the basis that it was decided under PACA. Other courts have declined to limit *S & H Packing* to PACA cases. *See, e.g.*, *In re Medley*, No. 20-BK-11768-SY, 2023 WL 1960799, at *6 n.3 (B.A.P. 9th Cir. Feb. 13, 2023) ("Although *S & H Packing & Sales* concerned a PACA transaction, there is no reason to think that its analysis of whether a factoring agreement is a "true sale" or actually a secured loan is inapplicable in other contexts."). Although *S & H Packing* discussed the history and purposes of PACA, *S & H Packing* did not limit its holding to matters arising under PACA. Indeed, *S & H Packing* is consistent with the other cases cited above. Therefore, although the Bankruptcy Court erred in limiting *S & H Packing* to PACA cases, it did not err in rejecting the Trustee's characterization of the "transfer of risk" test.

In the 2004 CAVIC Final Dismissal, the Bankruptcy Court identified the following eight factors supporting its conclusion that the 2004 FAC did not adequately allege an assignment for security:

1) the plain language of the agreement;
2) the timing of the assignment and the loan;

Case 2:22-cv-06637-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 58 of 91 Page ID #:1459

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

3) whether payments received under the assignment would be applied to reduce the amount of the loan;

4) whether the assignment will be a source of payment if the loan is not paid;

5) whether any excess paid on the loan will be returned to the assignor;

6) whether the assignee retains a right to deficiency if the assignment does not satisfy the amount of debt owed;

7) whether the assignee's rights in the assigned property would be extinguished if the assignor paid the debt from another source; and

8) whether, before the complaint was filed, the assignee filed proofs of claims or other documents asserting that it was a secured party.

2004 CAVIC Final Dismissal at 47.

The third, fourth, fifth, sixth, and seventh factors all address whether any risk of loss was retained by the assignor. It was appropriate to consider these factors for the reasons stated in *S & H Packing*, *Woodson*, *Commercial Money*, and the other cases cited above. Nor did the Bankruptcy Court err by considering the first, second and eighth factors. In *Golden Plan*, the Ninth Circuit considered the language of the relevant agreements as one factor in determining whether the relevant assignment was absolute. 829 F.2d at 709. The second factor, which is the length of time between the assignment and the loan, was considered by the Second Circuit in *Joseph Kanner*, and the Trustee has identified no reason why this was an error. 482 F.2d at 940. Nor has the Trustee identified any reason why the decision in *Candy Lane* was incorrect in considering the eighth factor--whether the assignee filed proofs of claims or other documents asserting that it was a secured party. 38 B.R. at 576-77. Even the 2004 FAC relies on these factors. 2004 FAC ¶¶ 95-118.

> b) Whether the Bankruptcy Court Erred by Failing to Consider Parol Evidence

Neither party contends that the parol evidence rule applies. *See In re Com. Money Ctr., Inc.*, 350 B.R. 465, 482 (B.A.P. 9th Cir. 2006) ("We interpret *Golden Plan* to mean that testimony should be admitted or excluded consistent with the ordinary rules regarding parol evidence."); *Singer v. Boychuk*, 194 A.D.2d 1049, 1051 (1993) (holding that an assignment was absolute under New York law "because plaintiff's intent clearly is set forth in the documents, [and] parol evidence is not admissible to alter the plain import of the language"); *Kolbe v. Projects & Joint Ventures Int'l, Inc.*, 186 A.D.2d 988, 98889 (1992) ("Oral declarations or secret agreements between a mortgagor and an assigning mortgagee made prior to the assignment are inadmissible against the assignee to establish a defense to the action brought by the assignee to enforce the mortgage.").

The Trustee nevertheless identifies three places in the 2004 CAVIC Final Dismissal where the Bankruptcy Court allegedly erred by declining to consider parol evidence. *First*, the Trustee quotes language from the 2004 CAVIC Final Dismissal that "[u]nder New York law, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." 2004 CAVIC Final Dismissal at 36. However, the court recognized on the next page that "[p]arol evidence may be used to show that an absolute assignment was intended for security." *Id.* at 37. The Bankruptcy Court did not exclude any evidence under the parol evidence

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 59 of 92 Page ID #:134459783

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

rule.

*Second*, the Trustee argues that the Bankruptcy Court refused to consider the Term Sheet based on the Plane 5 APA's integration clause and the parol evidence rule. 2004 Opening Brief at 35 (citing 2004 CAVIC Final Dismissal at 38). However, the Bankruptcy Court considered the Term Sheet in a detailed analysis. The Bankruptcy Court was evaluating the Trustee's allegations that the Term Sheet formed the "blueprint" for the structure of the relevant transaction. 2004 FAC ¶¶ 46, 70. The Bankruptcy Court correctly rejected this allegation as conclusory and implausible given that the Term Sheet stated it contained "proposals" rather than agreements and stated it was a non-binding "letter of intent." 2004 CAVIC Final Dismissal at 38. Although the Bankruptcy Court stated the letter of intent was not legally binding, the Bankruptcy Court did so to explain why the Trustee's allegations were implausible considering the role played by a letter of intent in a commercial transaction. After all, "[d]etermining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Bankruptcy Court did not make these statements to support an application of the parol evidence rule. The Bankruptcy Court noted that the assignment contained an integration clause not as part of the application of the parol evidence rule, but to support the points discussed here. The parol evidence rule is not mentioned in the language cited by the Trustee.

*Third*, the Trustee argues that the Bankruptcy Court held it could not consider extrinsic evidence where the language of the contract was unambiguous. However, the language cited by the Trustee did not exclude any extrinsic evidence. Rather, the Bankruptcy Court held that the principle that "specific terms control over general ones" is not relevant unless the specific and general terms are "inconsistent or in conflict with one another." 2004 CAVIC Final Dismissal at 51-52. The Bankruptcy Court also held that disputes about a contract's meaning can be resolved as a matter of law but that arguments "stretch[ing] the documents beyond their ordinary meaning" do not change that principle. *Id.* at 53. Again, these holdings were not related to parol evidence.

   c) Whether the Bankruptcy Court Erred in Applying the Governing Standards

The Bankruptcy Court did not err in applying the governing standards. Accepting the factual allegations in the 2004 FAC as true except where they are contradicted by documents incorporated by reference, and drawing all plausible inferences in favor of the Trustee, none of the relevant factors supports the Trustee's position.

   (1) <u>Plain Language of the Documents</u>

The Trustee concedes that Article 1 of the March 31 Assignment states that it was absolute. 2004 FAC ¶ 96. However, the Trustee alleges that Article 10.1 of the March 31 Assignment suggests that the assignment was for security. *Id.*. Neither Article 4 nor Article 10.1 supports the Trustee's position. Article 10.1 states that &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

     *See* 2004 FAC ¶ 69. Article 4 of the March 31 Assignment states that

Case 2:22-cv-02004-JAK Document 81 SEALED Partially Filed 03/26/24 Page 59 of 91 Page ID #:44784

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Bombardier and [the Debtors] acknowledge and agree that, for the purposes of Article 10.1 of the Agreement, [CAVIC] is an entity that has been established by a third party financier in connection with the [Debtors'] acquisition of the Aircraft." 2004 Dkt. 58 at 119. This Article also states that "[n]otwithstanding the provisions of Article 10.1 of the Agreement, Bombardier and [the Debtors] individually and collectively acknowledge and agree that this Assignment is made in conformity with Article 10.1 of the Agreement." *Id.* Article 4 of the March 31 Assignment, particularly as reflected in its second half, is a waiver of Bombardier's rights under Article 10.1 to prevent Zetta PTE from assigning its rights under the Plane 5 APA. Article 4 does not state or imply that the March 31 Assignment would have been permitted absent Bombardier's consent, that CAVIC provided financing to Zetta PTE or that Zetta PTE acquired the aircraft. Even if the Trustee's reading were plausible, and Zetta PTE planned to acquire the aircraft in some manner, that would not be basis to show that Zetta PTE had not assigned its rights to that aircraft to CAVIC.

The Trustee also argues that "the fact that EDC required CAVIC to sign . . . an express *security* assignment of CAVIC's rights under the March 31 Assignment" supports its position. 2004 FAC ¶ 101. The Trustee's argument is unpersuasive. Even if CAVIC assigned its rights for security, it does not necessarily follow that Zetta PTE's assignment was also for security. To the extent the labels used by CAVIC and EDC are relevant, they suggest that the parties stated that assignments were absolute when they were absolute and stated that they were for security when they were for security.

The Trustee next argues that the Consent designated Zetta PTE as a "buyer," and that this designation supports its position. 2004 FAC ¶ 102. However, this document also designated Zetta PTE as an "assignor" and stated that its rights were "assigned by" it to CAVIC. 2004 CAVIC Final Dismissal at 52; 2004 First Dismissal at 48. This language does not support the Trustee's contention that Zetta PTE retains title to the rights it assigned to CAVIC. The Trustee does not address the assessment of this language by the Bankruptcy Court. *See generally* 2004 Opening Brief; 2004 Reply Brief.

The balance of the Trustee's positions related to this factor are conclusions about the legal effect of the relevant documents rather than factual allegations. *See, e.g.*, 2004 FAC ¶¶ 97, 99. Consequently, these contentions need not be taken as true. This factor does not support the Trustee.

       (2)    Timing of the Assignment

The Trustee alleges that "[t]he March 31 Assignment was a condition precedent to CAVIC's draw request under the PDP Facility Agreement." 2004 FAC ¶ 105. Specifically, the Trustee alleges that EDC required that the Plane 5 FPA, Plane 5 FPA Guarantee, and other documents be in place before it granted CAVIC's draw request. *Id.*

This factor does not support the Trustee. In *Joseph Kanner* and *Candy Lane*, a borrower made an assignment to a lender at the same time that the lender extended credit. It was determined that this suggested that the assignment was for security. Here, Zetta PTE made an assignment to CAVIC at the same time that EDC extended credit to CAVIC. The Trustee does not allege that the Debtors were a party to any of the contracts to which EDC was a party. *See* 2004 FAC ¶¶ 48, 105. Thus, there are not allegations that EDC--or anyone else--extended credit to the Debtors at the time of the assignment. *Joseph Kanner* and *Candy Lane* are distinguishable on this basis. As before, whether the transaction

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 61 of 82 Page ID #:14659785

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

between CAVIC and EDC was an assignment for security is not relevant to whether the transaction between Zetta PTE and CAVIC was an assignment for security. Even accepting the Trustee's contention that cross-default provisions were in place in these two transactions, the Trustee has not alleged that Zetta PTE extended credit to CAVIC simultaneously with the March 31 Assignment.

(3) <u>Whether Payments Received Under the Assignment Would Reduce the Loan Amount</u>

The Trustee alleges that the Debtors had no debt to CAVIC on account of Plane 5 prior to the March 31 Assignment and the entry of the alleged PDP Loan. 2004 FAC ¶ 104. The Trustee also alleges that, "[p]ayments made by the Debtors to CAVIC on account of the alleged Plane 5 PDP Loan pursuant to the Plane 5 FPA and the Plane 5 Guarantee, would directly reduce the Plane 5 PDP Loan balance." *Id.* ¶ 106.

The Trustee's argument on this factor has four parts. *First*, the Trustee alleges that the Debtors had the right, exercisable through TVPX, to issue a notice to sell under Section 2.2.2 of the Plane 5 FPA, to require CAVIC to prepay the alleged Plane 5 PDP Loan prior to the Expiry Date upon the Debtor's compliance and funding of the payment of the outstanding balance owed under the PDP Facility Agreement under Section 4.2 of the Plane 5 FPA. 2004 FAC ¶ 106. However, the Trustee's allegations are not consistent with the transactional documents on which they are premised. Section 2.2.2 obligates CAVIC to sell its interest in Plane 5 to TVPX, if TVPX requested that it do so, and other conditions were satisfied. 2004 Dkt. 58-1 at 1261. It does not state that it relieves the Debtors of their obligations, or provide the Debtors with any rights. Indeed, the Debtors were not parties to the Plane 5 FPA. Section 4.2 imposes conditions on the exercise of the right in Section 2.2.2--and certain other rights; it does not state that the Debtors would be relieved of their debt as a result of payments under the March 31 Assignment. *Id.* at 1263. The Debtors are never mentioned in either Section 2.2.2 or Section 4.2. *See id.* at 1261, 1263.

*Second*, the Trustee alleges that the Debtors incurred debt in the full amount of the alleged Plane 5 PDP Loan, and that the Debtors made two interest payments under Section 6.1.1 of the Plane 5 FPA and Plane 5 Guarantee. 2004 FAC ¶¶ 104, 107. Although the Debtors guaranteed TVPX's performance to CAVIC, interest payments made by the Debtors on TVPX's behalf would not reduce the amount owed by the Debtors under the PDP Facility Agreement. Only the latter amount pertains to the rights that were assigned in the March 31 Assignment.

*Third*, the Trustee alleges that BAC issued a credit memo to the Debtors that reduced the amount of the debt. 2004 FAC ¶ 108. However, the Trustee acknowledges that this credit memo was the result of a "settlement agreement between the Debtors and BAC with respect to a number of issues *unrelated to Plane 5*." *Id.* (emphasis added). Because this credit memo is not related to the March 31 Assignment, the Trustee's allegations regarding its contents are not relevant.

*Fourth*, the Trustee alleges that the parties contemplated in the Term Sheet that the alleged Plane 5 PDP Loan would be rolled into the Plane 5 EDC Long-Term Financing Facility to be repaid by the Debtors through quarterly rent installments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. 2004 FAC ¶ 109. However, the Term Sheet states that it was a non-binding offer. An allegation

Case 2:22-cv-06637-JAK Document 1 SEALED (Ex Parte) Filed 03/26/24 Page 61 of 91 Page ID #:41659786

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

that the parties at one point considered rolling the alleged Plane 5 PDP Loan into the Plane 5 EDC Long-Term Financing Facility is not sufficient to allege that the parties ultimately agreed to enter such a transaction. For the reasons stated above, the Bankruptcy Court did not err in rejecting the Trustee's arguments related to the Term Sheet.

This factor supports CAVIC.

(4)  Whether the Assignment Is a Source of Payment on the Loan

The Trustee alleges that the March 31 Assignment was a source of payment for the alleged Plane 5 PDP Loan. Specifically, the Trustee alleges that the March 31 Assignment was intended to grant CAVIC the right to collect any amounts due to Zetta PTE under the Plane 5 APA as one of the "securities" for repayment of the alleged PDP Loan. 2004 FAC ¶ 113. The Trustee also alleges that the parties contemplated that the March 31 Assignment would be a source of payment if Debtors defaulted under the Plane 5 FPA and Plane 5 Guarantee. *Id.*

The allegations regarding the parties' intent in entering into the March 31 Assignment, as well as the legal effect of that document, are conclusory. Further, the Bankruptcy Court correctly observed that the transactional documents do not refer to a Plane 5 PDP Loan. The March 31 Assignment does not mention securities. To the extent the Trustee relies on § 19 of the Head Lease to support the argument on this factor, the Bankruptcy Court correctly concluded that § 19 governs the risk of damage to the aircraft. *See* 2004 First Dismissal at 49. It is not linked to whether the March 31 Assignment was a source of payment on any alleged loan.

(5)  Whether Excess Paid on the Loan Would Be Returned to the Assignor

The Trustee advances two arguments regarding this factor. *First*, the Trustee alleges that the Debtors could always issue a notice to sell and force CAVIC to pay off the alleged Plane 5 PDP Loan upon providing sufficient funds to CAVIC to do so and retain any upside in value. 2004 FAC ¶ 110. The provisions cited by the Trustee permit CAVIC to sell its interest in Plane 5 to TVPX, or permit TVPX to purchase that interest. *See* 2004 Dkt. 58-1 at 514. CAVIC would only have to sell its rights under the APA if it defaulted, or if TVPX required CAVIC to exercise its rights under the PDP Facility Agreement voluntarily to prepay the loan from EDC. These provisions do not pertain to excess proceeds under the alleged loan, and the Debtors are not a party to the contract that contains these provisions.

*Second*, the Trustee alleges that "the Debtors retained any excess over the principal and interest owed under the Plane 5 EDC Long-Term Financing Facility Agreement." 2004 FAC ¶ 112. Specifically, the Trustee contends that payments received from a governmental authority or an insurance provider with respect to a total loss of Plane 5 were to be paid first to EDC (to repay amounts owed by CAVIC to EDC) and then the excess were to be paid to TVPX and ultimately Zetta PTE. *Id.* However, this provision addresses payments from governmental entities and insurance providers, not excess payments made by the Debtors under the alleged loan.

This factor supports CAVIC's position.

Case 2:22-cv-00663-JAK Document 81-1 (Ex. Parte) Filed 03/26/24 Page 63 of 91 Page ID #:4659787

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(6)    <u>Whether the Assignee Retained a Right to Deficiency</u>

The Trustee alleges that "[t]he Debtors were jointly and severally liable under the Plane 5 FPA Guarantee if the alleged Plane 5 PDP Loan was not repaid." 2004 FAC ¶ 114. The Trustee relies on Sections 2.1(c), 2.4, and 2.5 of the Plane 5 FPA Guarantee. *Id.* The Trustee also alleges that Zetta PTE remained jointly and severally liable on all obligations under the Plane 5 APA under the March 31 Assignment. *Id.*

The Trustee is correct that the Debtors guaranteed TVPX's performance to CAVIC under the Plane 5 FPA. *See* 2004 Dkt. 58-1 at 560. Each of the Debtors was liable jointly and severally with every other guarantor for the full amount guaranteed to CAVIC. *Id.* However, the Plane 5 FPA Guarantee does not provide that any Debtor was jointly and severally liable with CAVIC for any amount owed to EDC or anyone else. *See id.* Consequently, this provision gave CAVIC no right to pursue the Debtors if BAC defaulted on the assigned obligations.

The Trustee is also correct that Zetta PTE was jointly and severally liable with CAVIC under the APA. *See* 2004 First Dismissal at 50. However, the Bankruptcy Court correctly distinguished between joint and several liability and a right to a deficiency. This factor supports a finding that an assignment is for security if the assignee can pursue the assignor if the value of the property assigned is insufficient to cover the assignor's obligations to the assignee. However, CAVIC's only right against the Debtors was for contribution or indemnity in the event that CAVIC paid the amount owed jointly and severally by both CAVIC and the Debtors. Even if this right qualified as a right to a "deficiency," the $30 million payment owed by CAVIC and the Debtors under the Plane 5 APA was paid by EDC almost immediately after the March 31 Assignment, thereby extinguishing their potential joint and several liability. *See* 2004 FAC ¶ 52. Therefore, the Trustee's allegations do not raise a plausible inference that the assignment was one for security.

This factor supports the view that the assignment was absolute.

(7)    <u>Whether the Assignee's Right to the Property Would Be Extinguished if the Assignor Paid Off the Loan</u>

The Trustee's argument with respect to the seventh factor is identical to that with respect to the fifth. The Trustee alleges that the Debtors' issuance of a notice to sell under Section 2.2.2 of the Plane 5 FPA would require CAVIC to prepay the alleged Plane 5 PDP Loan. The Trustee also alleges that the consequent funding of the loan prepayment by the Debtors would have extinguished CAVIC's rights under the March 31 Assignment and would have required CAVIC to re-assign its rights back to the Debtors. 2004 FAC ¶ 116. For the reasons already stated, the Trustee's allegations regarding the effect of the notice to purchase and notice to sell provisions are legal conclusions that are contradicted by the relevant transactional documents.

This factor supports CAVIC's position.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 94 of 92 Page ID #:14150788

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(8)     Whether the Assignee Filed Proofs of Claim Asserting It Was a Secured Party

The Trustee alleges that CAVIC filed proofs of claim 162 and 163 relating to the Plane 5 APA and March 31 Assignment. 2004 FAC ¶ 118. The Trustee alleges that these proofs of claims acknowledged that the Debtors were obligated to pay interest on the Plane 5 PDP Loan pursuant to Section 6.1.1 of the Plane 5 FPA and Plane 5 FPA Guarantee, and that these proofs of claim stated that some or all of the claim against the Debtors is secured. Id. The Trustee argues that these representations are "flatly inconsistent" with CAVIC's present position that the assignment was absolute. Id.

The proofs of claim, which are attached to the 2004 FAC, do not support the Trustee's position. Instead, the proofs of claim expressly state that the assignment was "absolute[]" and further state that they were filed "as a prophylactic, due to the upcoming bar date, and in response to statements made by the Chapter 7 Trustee, concerning his 'investigation' of the transaction relating to Purchase Agreement 186 and the Assignment." 2004 Dkt. 58 at 68, 71, 89, 92. There is no inconsistency between this text and CAVIC's present position.

This factor does not support the Trustee.

B.     Whether the Appeal Against BAC Is Moot

The 2004 Appellees assert that, after judgment was entered in their favor and against the Trustee and after the automatic stay of that judgment expired, CAVIC requested that BAC pay to it the $30 million that is in dispute between the parties. 2004 Dkt. 65-1 ¶ 7. The 2004 Appellees have stipulated that, on March 31, 2022, CAVIC and BAC terminated the Aircraft Purchase Agreement 6000-08186 relating to Plane 5 and BAC returned the PDP to CAVIC. Id. ¶¶ 8, 9.

As a result, BAC claims the appeal is moot with respect to its interests.

1.     Article III Mootness

An "appellate court lacks jurisdiction and must dismiss the appeal" when it is moot. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000)). "When events change such that the appellate court can no longer grant 'any effectual relief whatever to the prevailing party,' any resulting opinion would be merely advisory." *Id.* (quoting same).

BAC asserts that the second cause of action is moot because it has now terminated the Plane 5 APA to the extent that it was not terminated previously. The second cause of action "seeks a declaratory judgment that the Plane 5 APA is terminated," and no other relief. 2004 FAC ¶ 135. The Trustee disputes that BAC paid the PDP to CAVIC in a final and irrevocable manner and requests jurisdictional discovery regarding the "circumstances and timing of the termination." 2004 Reply Brief at 15. However, the Trustee does not dispute that the Plane 5 APA has now been terminated. Because the Trustee has not identified any legal interest with respect to the timing of the termination of the Plane 5

Page 63 of 91

Case 2:22-cv-02004-JAK Document 81-2 (Ex Parte) Filed 03/26/24 Page 95 of 282 Page ID #:41659

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

APA, a determination that the Plane 5 APA was terminated when the Trustee rejected it, rather than at the time of the stipulation between the 2004 Appellees, would not affect the legally cognizable interest of any party. Therefore, the 2004 Appeal is dismissed as **MOOT** with respect to the second cause of action.

BAC does not contend that the sixth cause of action is moot under Article III. However, mootness is an issue that a court is to consider *sua sponte*. The Trustee seeks "prejudgment interest against BAC from the date the Refund was due to be paid" through the date the Refund is paid into the estate. 2004 FAC ¶ 160. For this and other reasons, it appears that there remains a controversy between the Trustee and BAC with respect to the sixth cause of action.

This ruling disposes of the second cause of action. However, even if this cause of action were not moot, the Bankruptcy Court did not err in dismissing this cause of action, for the reasons stated in the discussion of the second cause of action below.

### 2. Equitable Mootness

The doctrine of equitable mootness "has some sway in bankruptcy cases where public policy values the finality of bankruptcy judgments because debtors, creditors, and third parties are entitled to rely on a final bankruptcy court order." *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir. 2012). Equitable mootness requires a "comprehensive change of circumstances" so "as to render it inequitable for th[e] court to consider the merits of the appeal." *Id.* (quoting *In re Roberts Farms*, 652 F.2d 793, 798 (9th Cir. 1981)). In addition, the case must "present transactions that are so complex or difficult to unwind that the doctrine of equitable mootness would apply." *Id.* (quoting *Lowenschuss v. Selnick*, 170 F.3d 923, 933 (9th Cir. 1999)).

The Ninth Circuit has adopted the following test for deciding the equitable mootness issue:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Id.* at 881. Failure to gain a stay is a "factor to be considered," but is not "controlling." *Id.* at 881-82.

BAC argues that the appeal is equitably moot both because the Trustee failed to seek a stay of the judgment and because many of the steps contemplated by the judgment have been completed. 2004 Answering Brief at 34-35. BAC concedes that the third and fourth factors do not weigh in favor of mootness. *Id.* at 35. The Trustee does not dispute that it failed to seek a stay of the judgment. *See* 2004 Reply Brief at 17-18.

Equitable mootness does not warrant dismissal of the appeal. Although the Ninth Circuit has applied

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the equitable mootness doctrine to bankruptcy court orders other than those confirming a reorganization plan, *see In re City of Vallejo, CA*, 551 F. App'x 339 (9th Cir. 2013), BAC has not made an adequate showing that it would be inequitable to consider the merits of the sixth cause of action. Notwithstanding that the Trustee failed to seek a stay and that BAC has now paid CAVIC, the other two factors support the Trustee's position. BAC has not identified any third party whose interests would be affected by this appeal. Nor would granting relief to the Trustee create an "uncontrollable situation" for the Bankruptcy Court. If the Trustee prevails, BAC and/or CAVIC will have to pay the Refund to the Debtors' creditors. The stipulation between BAC and CAVIC involved a single, simple payment from BAC to CAVIC. There has been no showing that this transaction was complex or difficult to unwind.

For these reasons, it is appropriate to consider the merits of the sixth cause of action.

Case 2:22-cv-02004-JAK Document 81-1 (Ex Parte) Filed 03/26/24 Page 67 of 92 Page ID #:41659791

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; <br> LA CV22-02004 JAK; and <br> LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

C.   Claims Against BAC (Second and Sixth Causes of Action)

1.   <u>Whether the Claims Against BAC Are Derivative of Those Against CAVIC</u>

BAC argues that the claims in which it has been named are, at best, derivative of the third, fourth and fifth causes of action against CAVIC. 2004 Answering Brief at 35-36. The Trustee does not respond to this argument, and does not offer any basis upon which the second and sixth causes of action could be maintained if the third, fourth and fifth causes of action fail. *See* 2004 Reply Brief at 19-21. Thus, because the March 31 Assignment was absolute, the Trustee has no interest in the Refund and cannot recover it from either Bombardier or CAVIC.

In light of these determinations and for the same reasons that the claims against CAVIC fail, those against BAC fail. This determination is dispositive as to the second and sixth causes of action. Further, for the reasons stated below, these causes of action were also properly dismissed for the other reasons stated by the Bankruptcy Court.

2.   <u>Whether the Plane 5 APA Is Terminated (Second Cause of Action)</u>

The Bankruptcy Court found that, even if the March 31 Assignment was for security, the Trustee had not adequately alleged that BAC constructively terminated the Plane 5 APA. During the proceedings before the Bankruptcy Court, the Trustee raised three theories allegedly supporting the claim of constructive termination. Each is renewed in connection with this appeal.

a)   Election of Remedies

Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). "When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options." *Id.* "He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." *Id.* "The non-repudiating party must, however, make an affirmative election." *Id.* What is important is "whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election." *Id.* at 259 (quoting *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995)). "There is no specific time limit within which to make this election and generally, an election need not be made until the time comes when the party making the election must render some performance under the terms of the contract." *Id.* "At this point, 'either performing or failing to perform will indicate an election.' " *Id.* (quoting *Bigda*, 898 F. Supp. at 1004).

The Trustee argues that BAC elected to treat the Plane 5 APA as terminated by filing a proof of claim. The Bankruptcy Court correctly held that BAC's proof of claim was not an election of remedies. A proof of claim is not an action seeking to recover damages. Rather, the timely filing of a proof of claim is a procedural prerequisite to receiving a distribution from the bankruptcy estate. When "proof of [a] claim is not timely filed," it can be denied. 11 U.S.C. § 502(b)(9). The proof of claim also expressly stated that

Case 2:22-cv-02004-JAK Document 81 SEALED Filed 03/26/24 Page 68 of 92 Page ID #:34459

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

it was not "an election of remedy . . . ." 2004 Dkt. 58 at 60. For this reason, the proof of claim did not suggest to the Debtors that BAC had made an election. Nor has the Trustee identified on appeal any performance obligation that required BAC to make an election.

b) UCC § 2-718

"Where the seller justifiably withholds delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds (a) the amount to which the seller is entitled by virtue of terms liquidating the seller's damages . . . or (b) in the absence of such terms, twenty per cent of the value of the total performance for which the buyer is obligated under the contract or $500, whichever is smaller." N.Y. U.C.C. Law § 2-718(2).

The Trustee contends that a deposit must be returned within a reasonable time after the non-breaching party has elected to seek liquidated damages resulting from the alleged breach of the underlying contract. The Trustee's contentions are unpersuasive. Section 2-718 only entitles the buyer to restitution of payments made by the buyer. Even if the March 31 Assignment was for security, which would have entitled the Debtors to the Refund, the Debtors did not make any payments to BAC. The Trustee does not challenge on appeal the Bankruptcy Court's finding that it was undisputed that the PDP was paid by CAVIC.

The cases cited by the Trustee do not address circumstances in which the plaintiff did not make a deposit. *Gongora v. Eye Gallery of Scarsdale*, 51 Misc. 3d 140(A), 37 N.Y.S.3d 207 (N.Y. App. Term. 2016) ("Plaintiff commenced this small claims action to recover a $750 deposit that she had given to defendant."); *McCann v. McSorley*, 53 Misc. 3d 48, 49, 39 N.Y.S.3d 583 (N.Y. App. Term. 2016) ("Plaintiff commenced this small claims action to recover the $1,800 deposit that he had paid defendant."); *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 680 (7th Cir. 1987) ("Davis paid Diasonics a $300,000 deposit on February 29, 1984.").

In the 2004 Reply Brief, the Trustee contends, for the first time, that "[l]oan proceeds transferred by a lender to [a] third party on a debtor's behalf are property of [the] debtor . . . ." 2004 Reply Brief at 20. Even if this argument had not been waived by failing timely to raise it, the cases cited by the Trustee do not support this position. *See In re TOUSA, Inc.*, 422 B.R. 783, 872-73 (Bankr. S.D. Fla. 2009), *quashed in part on other grounds*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012), and *aff'd*, No. 10-CV-62035-KMM, 2017 WL 8785510 (S.D. Fla. Mar. 8, 2017) ("If funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers has a property interest in the funds."); *In re Bay Plastics, Inc.*, 187 B.R. 315, 336 (Bankr. C.D. Cal. 1995) (the debtor did not receive value where "the selling shareholders gave up their shares of stock in the debtor in exchange for their payment of $3.5 million" and "[t]he debtor itself received neither shares nor money").

Because it is determined that § 2-718 does not entitle the Trustee to a refund of the PDP, it is unnecessary to address whether § 2-718 requires that the refund be made within a commercially reasonable time.

c) Judicial Estoppel

Case 2:22-cv-02004-JAK Document 31-2 (Ex. Part B) Filed 03/26/24 Page 69 of 92 Page ID #:1793

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). There are no "inflexible prerequisites" or "exhaustive formula[e] for determining the applicability of judicial estoppel." *Id.* at 783 (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)). However, the Supreme Court has highlighted three factors that "typically inform" the analysis. *Id.* at 782 (quoting same). "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* (quoting same). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' " *Id.* (quoting same). "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting same).

None of these considerations supports the Trustee's position. The Bankruptcy Court did not err in holding that BAC's position was not inconsistent. The Trustee argues that BAC's position was inconsistent because it represented that it has no interest in the PDP, which means the Plane 5 APA must have been terminated, and then denies that the Plane 5 APA has been terminated. There is no such inconsistency. BAC's position is that it had not terminated the Plane 5 APA but that, once the Plane 5 APA had been terminated, it would return the PDP once the Bankruptcy Court determined who was entitled to it. *See* 2004 Answering Brief at 43-44. Even if there had been some inconsistency in these positions, the Trustee has not shown that the Bankruptcy Court adopted the position that BAC had not terminated the Plane 5 APA. Nor has the Trustee identified an unfair advantage obtained by BAC--or an unfair detriment suffered by the Trustee--that cannot be avoided if judicial estoppel is not applied.

3. <u>Whether the Trustee May Recover the Refund from BAC (Sixth Cause of Action)</u>

The Trustee objects to the ruling by the Bankruptcy Court with respect to the sixth cause of action. The Trustee argues that the Bankruptcy Court held that "the Trustee could not obtain relief" "even if the March 31 Assignment was a security interest" "because the estate would still be bound by the Debtors' pre-petition conveyance." 2004 Opening Brief at 50.

The Trustee contends that "the proposition that the bankruptcy trustee is not bound by the pre-petition debtor's agreements for the purposes of a fraudulent transfer action has been Ninth Circuit law for over 50 years." 2004 Opening Brief at 50 (citing *Pac. Metal Co. v. Joslin*, 359 F.2d 396, 397 (9th Cir. 1966)). However, *Pacific Metal* did not involve an alleged fraudulent transfer or avoidance. Although the "contract [was] void against the trustee, who stands in the shoes of creditors," *Pacific Metal* reached this conclusion because the applicable provision of Washington law was that, when a "contract permits both repossession and a deficiency judgment," it is only "valid against creditors, as a chattel mortgage, if recorded as such," and the contract was not properly recorded. *Pacific Metal*, 359 F.2d at 397.

D. The Interlocutory Orders

1. <u>The Trustee's Motion to Compel</u>

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 70 of 92 Page ID #:41759794

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee argues that the Bankruptcy Court erred in denying the Trustee's motion to compel BAC to pay the PDP into the Bankruptcy Court's registry. The Bankruptcy Court held that it did not have authority to grant the Trustee's motion under either Fed. R. Bankr. P. 7022, which is analogous to Fed. R. Civ. P. 22, or § 105 of the Bankruptcy Code. The Trustee challenges both of those determinations.

"Rule 22(a) [of the Federal Rules of Civil Procedure] applies in adversary proceedings" in a bankruptcy court. Fed. R. Bankr. P. 7022. Under Rule 22, "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." Fed. R. Civ. P. 22(a)(1). "Joinder for interpleader is proper even though: (A) the claims of the several claimants, or the titles on which their claims depend, lack a common origin or are adverse and independent rather than identical; or (B) the plaintiff denies liability in whole or in part to any or all of the claimants." *Id.* In addition, "[a] defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim." Fed. R. Civ. P. 22(a)(2).

This action is not a traditional interpleader proceeding. BAC, the only party that might be subject to overlapping liability if both the Trustee and CAVIC prevail on their claims that they are entitled to the Refund, has not sought to join any parties in this action. It has only sought the dismissal of the claims in which it is named.

The Trustee argues that BAC has effectively joined the Trustee and CAVIC in an interpleader action because it disavows any interest in the funds that are at issue. In interpreting the removal statute, the Ninth Circuit has held that an action was an interpleader when "the substantive posture of the parties mirrored the substance of an action in interpleader, even if the motion practice of the parties did not use the same labels as actions taken to initiate an interpleader proceeding." *Quality Loan Serv. Corp. v. 24702 Pallas Way, Mission Viejo, CA 92691*, 635 F.3d 1128, 1132 (9th Cir. 2011) (quoting *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 633 (5th Cir. 2002)).

Even if *Quality Loan* applies outside the context of removal, the Trustee's argument that Rule 22 compels BAC to deposit the PDP into the Bankruptcy Court's registry is not persuasive. As *Quality Loan* acknowledged, an interpleader action can occur even if "the funds [a]re never deposited with the court." 635 F.3d at 1132. Indeed, nothing in Rule 22 states that the disputed property must be deposited with the court while the interpleader action is pending. Although the Bankruptcy Court denied the Trustee's attempt to enter a preliminary injunction ordering BAC to deposit the funds, 2004 Dkt. 44-5 at 2423-2442, the Trustee has not challenged that ruling on appeal.

The Trustee argues that, in the alternative, 11 U.S.C. § 105(a) provides the Bankruptcy Court with authority to compel a party to deposit funds in which it has expressly disclaimed an interest. Under § 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Id.* This is not a "roving commission to do equity" or authorization "to create substantive rights that are otherwise unavailable under applicable law . . . ." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). In addition, this is "the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). Thus, the use of this power must "be tied to another Bankruptcy Code section

Case 2:22-cv-02004-JAK Document 81-1 *SEALED* Filed 03/26/24 Page 71 of 92 Page ID
Case 2:22-cv-02004-JAK Document 91 *SEALED* Filed 03/26/24 Page 71 of 92 Page ID
Page #:14175
#:14179

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

and not merely to a general bankruptcy concept or objective." *Id.* (quoting 2 Collier on Bankruptcy ¶ 105.01[1]). Fed. R. Bankr. P. 7065 permits bankruptcy courts to enjoin parties in adversary proceedings, but the Bankruptcy Court denied the Trustee's motion for a preliminary injunction, which is a ruling that is not challenged on appeal. Because the Trustee "is not entitled to substantive relief under th[at] section[] . . . [and] no provision of the Bankruptcy Code may be successfully invoked . . . section 105(a) affords . . . no independent relief." *See id.*

The cases relied upon by the Trustee are distinguishable. For example, the Trustee cites a case in which a party "disavowed any interest in the interpleaded funds" and for this reason was not permitted to take them back from the court on "judicial estoppel" grounds. *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 597-98 (5th Cir. 1996). *In re Tekoil & Gas Corp.*, No. 08-80270-G3-11, 2008 WL 3297854 (Bankr. S.D. Tex. Aug. 1, 2008) did not rely on section 105. Instead, that case involved a straightforward application of sections 363 and 365 of the Bankruptcy Code. *Id.* at *2. The other case on which the Trustee relies held that "a deposit is not a jurisdictional requirement to [R]ule 22(1) interpleader and thus was not required here." *Gelfgren v. Republic Nat. Life Ins. Co.*, 680 F.2d 79, 81-82 (9th Cir. 1982) (internal citation omitted). None of these cases supports the view that § 105(a) provides the Bankruptcy Court with the authority claimed by the Trustee.

2.    The Trustee's Motion to Consolidate

The Trustee argues that the Bankruptcy Court abused its discretion by refusing to consolidate the 2004 Adversary Proceeding with the Jetcraft Adversary Proceeding. "Rule 42 [of the Federal Rules of Civil Procedure] applies in adversary proceedings." Fed. R. Bankr. P. 7042. "If actions before the court involve a common question of law or fact, the court *may*: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a) (emphasis added).

The Trustee also argues that the Bankruptcy Court erred by holding that the Trustee was required to file amended complaints so that the Bankruptcy Court could make precise findings as to whether there were common question of law or fact. The Bankruptcy Court did not abuse its discretion. At the time this motion was denied, the 2004 Complaint and the complaint in the Jetcraft Adversary Proceeding had been dismissed, at least in part. Therefore, it was unclear which claims would be re-alleged. Furthermore, even if there were common questions of law or fact between the 2004 Adversary Proceeding and the Jetcraft Adversary Proceeding, the Jetcraft Adversary Proceeding covers a wide range of transactions between the Debtors and Jetcraft. In many of them, the 2004 Appellees played no role. Conversely, Jetcraft played no role in connection with the Refund. In light of these circumstances, the Bankruptcy Court did not abuse its discretion in denying the request for consolidation.

3.    The Trustee's Motion for Leave to Amend

The Trustee challenges the denial of his motion for leave to amend "to add allegations relating to choice of law from the proposed consolidated amended complaint." 2004 Opening Brief at 57. For the reasons stated in connection with the first cause of action, the Trustee's proposed amendments would be futile. The Trustee does not have Article III standing to bring the first cause of action against CAVIC, and is not seeking "affirmative relief on fraudulent transfer claims against CAVIC*.*" *Id.* at 59-60. Rather,

Case 2:22-cv-06637-JAK Document 21 SEALED *Filed 03/26/24* Page 71 of 91 Page ID #:41759

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the "Trustee seeks recharacterization to support claims against Bombardier in *Jetcraft*." *Id.* at 60. As a result, new theories for avoiding the English choice-of-law clause would not assist the Trustee in advancing viable claims. Further, the 2004 Appeal only identifies one way in which the proposed allegations would assist the Trustee. Thus, the Trustee contends that leave to add allegations of fraud would bring this case within the ambit of *Morse Tool*. For the reasons previously discussed, such an amendment would be futile because a § 548 claim against either CAVIC or Bombardier would now be barred by the statute of limitations; a declaratory judgment action for recharacterization would be subject to the same analysis; and *Morse Tool* is inconsistent with later Supreme Court and Ninth Circuit precedent. For all of these reasons, the Bankruptcy Court did not err in holding that leave to amend would have been futile.

In the alternative, if the proposed amendments had been allowed, this would have prejudiced the 2004 Appellees. Although the Trustee's proposed amendments did not add additional claims against the 2004 Appellees, the proposed allegations presented very detailed positions regarding all of the transactions and activities of the Debtors and Cassidy--even those in which CAVIC and BAC played no role. *See generally* 2004 Dkt. 50-6. Had the Trustee's proposed amendments been allowed, CAVIC and BAC would have faced a substantially greater burden in answering the amended complaint and then conducting sufficient discovery. Because the Trustee did not make an adequate showing that these new allegations were germane to the transactions in which the 2004 Appellees participated, the Bankruptcy Court could have denied the Trustee's motion on grounds of prejudice.

Nor would it be appropriate to grant leave to amend as to other causes of action. Apart from the challenge rejected above, the Trustee does not otherwise contest the determination by the Bankruptcy Court that leave to amend would both be futile and would prejudice the 2004 Appellees. *See* 2004 CAVIC Final Dismissal at 64-67; 2004 Bombardier Final Dismissal at 11-14; *see generally* 2004 Opening Brief. The Trustee has waived any challenge to this determination by failing to address it on appeal. Even absent this waiver, the Trustee has not requested leave to amend as to the other causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations the Trustee could make to cure the deficiencies in the 2004 FAC. This determination is also supported by the Trustee's failure to cure the deficiencies in the original 2004 Complaint. Nor does an independent review of the 2004 FAC show that the deficiencies could be cured by granting leave to amend.

### VI.    The 6637 Appeal

The Trustee challenges the Bankruptcy Court's dismissal with prejudice of three groups of claims: (1) the tort claims, which are the first, second, third, sixth, and seventh causes of action; and (2) the bankruptcy claims, which are the twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-fifth, thirtieth, and thirty-first causes of action. The Trustee also appeals the decision by the Bankruptcy Court to deny consolidation and to deny the Trustee further leave to amend.

      A.      The Tort Claims (First, Second, Third, Sixth, and Seventh Causes of Action)

            1.      <u>Choice of Law</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"In the Ninth Circuit, federal common law choice of law rules apply in bankruptcy cases." *In re Miller*, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003) (citing *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002)). "Federal choice-of-law rules in the Ninth Circuit follow the Restatement (Second) of Conflict of Laws, as a "source of general choice-of-law principles," and "an appropriate starting point for applying federal common law in this area." *In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017) (quoting *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987)).

The Trustee argues that California choice-of-law rules apply. In a recent case, the Ninth Circuit held that "[j]udicial creation of federal common law to displace state-created [choice-of-law] rules must be 'necessary to protect uniquely federal interests.' " *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022) (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1507 (2022)). This rule applies "[i]n federal question . . . and other cases in which . . . jurisdiction is not grounded in diversity." *Id.* In *Dobbas*, the Ninth Circuit held that, because "state law supplie[d] 'the substantive rule of decision,' there [wa]s no federal interest in 'supplant[ing] the otherwise applicable choice-of-law rule.' " *Id.*

The Ninth Circuit has identified a unique, federal interest in applying federal choice-of-law rules in bankruptcy cases. Specifically, the Ninth Circuit has referred to the substantial "value [in] national uniformity of approach" in bankruptcy cases. *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995). Federal jurisdiction in bankruptcy cases is exclusive. *See* 28 U.S.C. § 1334. Thus, unlike the rule that applies in many areas of the law, in bankruptcy cases, "the risk of forum shopping which is avoided by applying state law has no application . . . ." *Lindsay*, 59 F.3d at 948.

Neither *Dobbas* nor *Cassirer* addressed the choice-of-law standard that applies to a bankruptcy case. In dicta, one case has rejected the Trustee's argument that *Dobbas* compels the use of state choice-of-law principles whenever state law provides the substantive rule of decision. *DotC United, Inc. v. Google Asia Pac. Pte. Ltd.*, No. 22-CV-04990-JSC, 2023 WL 3202663, at *2-3 (N.D. Cal. May 1, 2023) (evaluating "state law breach of contract claims"). *DotC* recognized that the Ninth Circuit had "stated [a] federal interest in uniformity in New York Convention cases," and found that it satisfied the requirement in *Dobbas* that some "federal interest" be present before federal choice-of-law principles could apply. *Id.* at *3. The Ninth Circuit has made similar statements about the importance of uniformity in both bankruptcy and New York Convention cases. Therefore, *Lindsay* and its progeny remain binding authority.

The Trustee concedes that Zetta PTE's agreements with Bombardier contained a New York choice-of-law clause that purports to govern tort claims between the parties. 6637 Opening Brief at 45. Each such agreement contained the following language:

> This Agreement including its formation, performance, termination and/or enforcement and the parties' relationship in connection therewith, together with any related claims arising under common law or statute, whether sounding in contract, tort or otherwise shall be governed, construed and enforced in all respects in accordance with the laws of the State of New York, U.S.A., excluding the State of New York's conflicts of law provisions. The parties hereby irrevocably waive their rights to a jury trial of any claim or cause of action arising out of this Agreement or any related documents and any dealings

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|----------------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

between them relating to this transaction or any related transactions.

6637 Dkt. 41-2 at 390. Zetta PTE signed these agreements; Zetta USA did not. *Id.* at 397.

The Trustee contends that tort claims cannot be governed by a contractual choice-of-law provision.

None of the Ninth Circuit cases cited by the parties is dispositive of this issue. In a maritime case, the Ninth Circuit held that "United States law determines the *enforceability* of a choice-of-law provision." *Odin Shipping Ltd. v. Drive Ocean V MV*, 221 F.3d 1348, 2000 WL 576436 (9th Cir. 2000) (unpublished disposition). However, "[t]he *scope* of that provision is a matter of contract construction and interpretation . . . which would in turn be governed by the law selected in the choice-of-law provision." *Id.* It was, therefore, determined that the law chosen in the contract would govern the parties' tort claims. *Id.* In another case, the Ninth Circuit held that "[a]lthough parties are generally entitled to select the law which applies to contractual claims, we have expressly determined that tort claims are not governed by a contractual choice-of-law provision." *Invs. Equity Life Ins. Co of Hawaii, Ltd. v. ADM Invs. Servs., Inc.*, 1 F. App'x 709, 711 (9th Cir. 2001). Neither of these cases has precedential effect.

In other cases, the Ninth Circuit has held that "[c]laims arising in tort are not *ordinarily* controlled by a contractual choice of law provision." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citing *Consol. Data Terminals v. Applied Digital Data Sys.*, 708 F.2d 385, 390 n.3 (9th Cir. 1983)) (emphasis added). In addition, *Sutter Home* applied Arizona choice-of-law principles, rather than federal ones. *Id.* at 405 n.3. The Trustee also relies on *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549 (9th Cir. 2020). However, *Cooper* holds that choice-of-law provisions "have no bearing on tort claims *filed by third parties*" that did not sign the contract, and *Cooper* was also decided using California choice-of-law principles. *Id.* at 559 (emphasis added).

The Bankruptcy Court was persuaded that a New York choice-of-law provision could govern tort claims under the circumstances permitted by New York law. This was not an error. Although *Odin Shipping* was not itself precedential, it cited a long line of cases for the proposition that, under federal choice-of-law principles, the scope of a choice-of-law provision is decided under the law selected in the provision. *See Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992); *Siegelman v. Cunard White Star*, 221 F.2d 189, 193 (2d Cir. 1955); *Jansson v. Swedish American Line*, 185 F.2d 212, 218 (1st Cir. 1950). The Trustee's reliance on *Sutter Home* and *Cooper* is misplaced. Neither supports the Trustee's conclusion that a choice-of-law provision signed by the plaintiff and the defendant cannot govern tort claims arising between those parties. Furthermore, as the Bankruptcy Court stated, both *Sutter Home* and *Cooper* relied on choice-of-law principles that are different from those at issue in a bankruptcy proceeding. Although some language in *Investors Equity* appears to bar choice-of-law provisions from governing tort claims, the only authority relied on by *Investors Equity* for that proposition is *Sutter Home*, which did not adopt such an absolute rule. Finally, *Investors Equity* is not a binding decision.

The Trustee argues that the tort claims at issue fall outside the choice-of-law provision for three reasons. *First*, the choice-of-law provision does not reach tort claims, even under New York law. "Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire

Case 2:22-cv-06637-JAK Document 81-1 (Ex. Part) Filed 03/26/24 Page 75 of Page ID Page #:3799

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)). Here, the choice-of-law provision extends to both "the parties' relationship" and "any related claims," and is expressly applicable to claims "sounding in . . . tort . . . ." 6637 Dkt. 41-2 at 390. The Bankruptcy Court did not err in holding that this clause applied to the entire relationship between the parties. Nor did the Bankruptcy Court err in holding that the claims at issue were based on the formation, performance, termination or enforcement of the contracts entered by the parties, or the resulting contractual relationships. The alleged commercial bribes and kickbacks at issue in these claims were allegedly inducements for Cassidy to cause the Debtors to enter the contracts at issue and to decline to cancel them. Notwithstanding the Trustee's present position, the allegations in the 6637 FAC establish that the tort claims are closely related to the parties' contractual relationship.

*Second*, the Trustee contends that the conduct at issue predated Zetta PTE's agreement with Bombardier. The Trustee only cites 6637 FAC ¶¶ 251-52, which describe the conduct of Cassidy and Fazal-Karim "before the agreements relating to Planes 1-6 were executed," but while those agreements were being negotiated. Because this conduct pertains to the "formation" of "the parties' relationship," it falls within the scope of the clause. *See* 6637 Dkt. 41-2 at 390.

*Third*, the Trustee contends that, because Zetta USA did not sign any of the agreements with Bombardier, it is not bound by the choice-of-law provision. In the 6637 FAC, the Trustee alleged that the Debtors entered the agreements with Bombardier as well as Zetta PTE. 6637 FAC ¶ 106. The Trustee also alleged that Zetta USA guaranteed Zetta PTE's obligations under the agreements with Bombardier. *See id.* ¶ 116. Nevertheless, the Bankruptcy Court erred in assuming that Zetta USA was bound by the choice-of-law provision because Zetta PTE was so obligated. At this time, this Court cannot determine whether Zetta USA is bound by the choice-of-law provision. Thus, for purposes of the 6637 Appeal, Zetta USA's claims in the 6637 FAC are sufficient if they are viable under California law. The Trustee only contends that California law is more favorable in that its commercial bribery statute applies and that California takes a more limited view of the *in pari delicto* doctrine. *See* 6637 Opening Brief at 43.

*Finally*, the Trustee argues that the choice-of-law provision is unenforceable. The parties disagree whether § 187(1) or § 187(2) of the Restatement (Second) of Conflict of Laws applies. The Trustee relies on *Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003). There, "the agreement provided that federal maritime law governed the entire contract rather than the particular issue of attorneys' fees." *Id.* at 917. It was determined that "[f]ederal maritime law was not incorporated by reference as to any particular matter in the contract" and § 187(2) therefore applied. *Id.* In contrast, choice-of-law provisions that apply specifically to the "construction and performance of the Agreement" are evaluated under § 187(1). *In re CMR Mortg. Fund, LLC*, No. 08-32220 TEC, 2009 WL 2870114, at *3 (Bankr. N.D. Cal. Sept. 4, 2009).

It is determined that § 187(2) applies. The relevant question is whether "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). § 187(1) applies where the parties "incorporate into the contract by reference extrinsic material which may . . . be the provisions of some foreign law," thereby "fill[ing] gaps in a contract which the parties could themselves have filled with

Case 2:22-cv-02004-JAK Document 81 (Ex. Parte) Filed 03/26/24 Page 75 of 91 Page ID #:341759800

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

express provisions." *Id.* § 187 cmt. c. Thus, as to "rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance and to excuse for nonperformance, including questions of frustration and impossibility," the choice of law provision "will be applied . . . ." *Id.* §§ 187 cmt. c, 187(1). The choice-of-law provision at issue affects more than the importation of the default, gap-filling rules under New York law because the choice-of-law provision imports New York tort law. For these reasons, § 187(1) does not apply.

When § 187(2) applies, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either" of two conditions is present. Restatement (Second) of Conflict of Laws § 187(2) (1971). *First*, the choice of law of the parties does not control if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . ." *Id.* § 187(2)(a). *Second*, the choice of law by the parties does not control if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* § 187(2)(b).

The Trustee contends that both conditions are satisfied here. This position is not persuasive. *First*, there was a reasonable basis for the choice of New York law by the parties. As the Bankruptcy Court noted, "international aircraft financing contracts" are "generally governed by New York or English law." 6637 Final Dismissal at 29; Carlos Sierra, *Ten Years of the Cape Town Convention and the Aircraft Protocol in Mexico*, Air & Space L., 2018, at 11. In addition, Zetta PTE and BAC were companies with worldwide activities, who had a legitimate interest in ensuring that their contracts would be interpreted under the laws of a single jurisdiction with a substantial number of precedents interpreting aircraft financing contracts. This is sufficient to meet the "reasonable basis" standard of § 187(2).

§ 187(2) presents "a minimal standard." *Zavecz v. Yield Dynamics, Inc.*, 179 F. App'x 116, 121 (3d Cir. 2006). § 187(2) also recognizes that "[c]ontracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so." Restatement (Second) of Conflict of Laws § 187 cmt. f (1971). Courts need not "apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge." *Id.* However, "[t]he parties to a multistate contract may have a reasonable basis for choosing a state with which the contract has no substantial relationship"; "the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed." *Id.* Even under California choice-of-law principles, courts have recognized that "international defendants have an interest in contracting under the laws of a state--even one not substantially related to the contract--for reasons of uniformity and predictability." *Cooper v. Certain Underwriters at Lloyd's, London*, 716 F. App'x 735, 736 (9th Cir. 2018).

The Trustee argues that these are insufficient bases for selecting New York law. However, the cases cited by the Trustee do not support this position. In *KST Data*, there was "a single agreement between two relatively sophisticated parties with no other identifiable connection, within or without the agreement, to New York." *KST Data, Inc. v. DXC Tech.*, No. CV 17-07927 SJO (SK), 2018 WL 5734227, at *5 (C.D. Cal. Mar. 26, 2018), *aff'd in part, rev'd in part and remanded sub nom. KST Data, Inc. v. DXC Tech. Co.*, 836 F. App'x 484 (9th Cir. 2020). There was no argument "that the parties have

Case 2:22-cv-06637-JAK Document 81-2 (Ex Parte) Filed 03/26/24 Page 77 of 92 Page ID #:13801

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

a particular familiarity with New York law," "that the law itself would minimize uncertainty in a specific and foreseeable way," or that there were "many like agreements with parties in multiple states." *Id. KST* is distinguishable. In the present action, there was more than one contract at issue, there were more than two parties involved in the transactions, many of the parties were from different jurisdictions, and New York law would reduce uncertainty because it has more clarity as to the interpretation of aircraft financing contracts.

The Trustee's reliance on *NexRep* is also misplaced. *See NexRep, LLC v. ALIPHCOM*, No. 16-CV-06647-JSC, 2017 WL 1356345, at *3 (N.D. Cal. Mar. 8, 2017), *report and recommendation adopted*, No. 16-CV-06647-PJH, 2017 WL 1315461 (N.D. Cal. Apr. 7, 2017). *NexRep* did not address any of the arguments raised above; instead, the "record [did] not contain any information to support a reasonable basis for selecting New York law." *Id. NexRep* neither held nor suggested that the possible bases for selecting New York law identified in the opinion were exhaustive. Finally, the Trustee argues that uniformity and predictability does not support the selection of New York law because, although the APAs were all governed by New York law, the parties sometimes selected English law for other agreements. The relevant authorities do not suggest that absolute uniformity or absolute predictability is required to satisfy the "minimal" standard of § 187(2).

Finally, the Trustee argues that the choice-of-law provision is unenforceable because application of New York law would be contrary to a fundamental policy of California law. The Trustee contends that "California has a fundamental policy against shielding third parties who conspire with an employee by attributing the acts of the employee to the employer." 6637 Opening Brief at 50. The Trustee also cites California authority for the proposition that "[a]n agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal" and that "[a] corporation is not chargeable with the knowledge of an officer who collaborates with an outside to defraud it . . . ." *Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116, 1138 (2001), *as modified on denial of reh'g* (Aug. 21, 2001) (quoting Cal. Civ. Code § 2306; and quoting *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242, 264 (1966)).

It is unclear whether the application of New York law would contravene this policy. Both California and New York law recognize an *in pari delicto* defense: "federal and state courts in California have applied the *in pari delicto* defense to dismiss actions filed by bankruptcy trustees against third parties who may have participated with a debtor or a debtor's management in the concealment or dissipation of the debtor's assets prior to the petition date." *In re Yellow Cab Coop., Inc.*, 602 B.R. 357, 360 (Bankr. N.D. Cal. 2019). The Trustee cites *Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F. Supp. 3d 1156 (S.D. Cal. 2015), which determined that New York's failure to offer those who were insured a tort action against insurers that engaged in bad-faith conduct contravened a fundamental policy of California law. 88 F. Supp. 3d at 1170. The present litigation does not relate to disputes between insurers and insureds. The Trustee also suggests that New York law violates a fundamental California policy because the *in pari delicto* defense is broader under New York than California law. However, "the public policy exception in choice of law analysis . . . require[s] something more than the law of the other state be different from the law of California." *In re Zukerkorn*, 484 B.R. 182, 193 (B.A.P. 9th Cir. 2012), *aff'd*, 591 F. App'x 631 (9th Cir. 2015). The Trustee has not shown that New York law's version of the *in pari delicto* doctrine is sufficiently broad to contravene any fundamental policy of California.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Because the Trustee has not adequately identified any fundamental California policy that would be contravened by the application of New York law, it is unnecessary to determine whether California has a materially greater interest in the determination of this issue.

For the foregoing reasons, it is determined that New York law applies to the claims by Zetta PTE and California law to those by Zetta USA.

> 2.   Whether Fazal-Karim Was Bombardier's Agent

The Trustee seeks to hold Bombardier liable for the conduct of Fazal-Karim and his company, Jetcraft. The Bankruptcy Court held that the Trustee had not adequately alleged agency in the 6637 FAC.

An agency relationship may exist for some, but not all, transactions between parties. The Trustee argues that agency must be evaluated globally, at least at the pleading stage. *See* 6637 Opening Brief at 30. The Trustee's position is not supported by the controlling cases.

The Eleventh Circuit has recognized, even on a motion to dismiss, that allegations that the alleged agents "may have sometimes functioned as [the defendant's] agent[s] . . . in other contexts, the Complaint [may] not allege that they operated in this capacity for purposes of the [relevant] [t]ransaction." *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1342 (11th Cir. 2017). The Trustee seeks to distinguish *Fundamental* because the complaint at issue expressly alleged that there was no agency relationship. *Fundamental* does not support this position. Instead, the complaint cited by the Trustee was filed by the defendant in a different case, although it was determined that the defendant's complaint was incorporated by reference and created an inconsistency that was "not helpful." *Id.* at 1343. Like the 6637 FAC, the complaint in *Fundamental* alleged that there was an agency relationship.

Furthermore, whether *Fundamental* is distinguishable is not related to the propriety of the transaction-by-transaction method of analysis adopted by the Eleventh Circuit. Bombardier also cites *Bd. of Managers of the 411 East 53rd Street Condominium v. Perlbinder*, No. 650603/2014, 2016 WL 1597761 (N.Y. Sup. Ct. Apr. 21, 2016). *Board of Managers* held that, for purposes of an action for assisting a breach of fiduciary duty, the defendant was an agent for one purpose but not another. *Id.* at *3. The Trustee suggests that *Board of Managers* has little force because it was a decision as to summary judgment. However, the Trustee has offered no reason why a transaction-by-transaction analysis would be appropriate in evaluating a motion for summary judgment but not a motion to dismiss.

The Trustee also relies on *Donovan v. Flamingo Palms Villas, LLC*, No. 208CV01675RCJRJJ, 2010 WL 11579451 (D. Nev. May 6, 2010). There, it was determined "that Plaintiffs did not at the dismissal stage need to specifically allege for each transaction which broker was an agent for which lender, and with respect to which loans," even though "[t]his will eventually have to be proved," because "the allegations listing the brokers and lenders separately, coupled with the allegation that the brokers were the agents of the lender" was sufficient. *Id.* at *7. *Donovan* supports a proposition that is distinct from the one advanced by the Trustee. In *Donovan*, there were sufficient allegations that the brokers were all agents of the lenders, so it was unnecessary to identify the lenders and brokers who were agents with

Case 2:22-cv-02004-JAK Document 81-1 *SEALED* Filed 03/26/24 Page 79 of Page ID Page #:41753803

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

respect to each transaction. Nothing in *Donovan* contradicts the general rule that, before it has been determined that agency has been sufficiently alleged, a transaction-by-transaction analysis is appropriate. The Trustee also relies on *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 826847, at *6 (S.D.N.Y. May 2, 2002) for the principle that it is premature to conduct a transaction-by-transaction analysis of agency. *Cromer* did not address the issue identified by the Trustee. Therefore, applying these cases confirms that the Bankruptcy Court did not err in holding that agency must be adequately alleged with respect to each transaction, rather than adopting the Trustee's all-or-nothing analysis.

"[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 402-03 (S.D.N.Y. 2021) (quoting *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012)). "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Id.* at 403 (quoting *Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984)). "For 'an agency relationship . . . purported to be established by contract, 'a court will look to the language of the agreement to ascertain the relationship created between the parties.' ' " *JVJ Pharmacy*, 630 B.R. at 403 (quoting *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013)). However, "the realities of the contractual relationship between the parties, not labels in the agreement, control." *JVJ Pharmacy*, 630 B.R. at 403.

"Actual authority 'may be express or implied,' and in both cases 'exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.' " *Stewart v. Target Corp.*, No. 11-CV-3557 DLI RER, 2013 WL 1182080, at *4 (E.D.N.Y. Mar. 20, 2013) (quoting *Themis Capital, LLC v. Democratic Republic of Congo*, 2012 WL 3114732, at *4 (S.D.N.Y. July 26, 2012)). "Whether actual authority exists 'depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship.' " *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002) (quoting *Itel Containers Int'l Corp. v. Atlantrafik Express Serv. Ltd.,* 909 F.2d 698, 702 (2d Cir.1990)).

"The question whether an agency relationship exists is highly factual, however, and can turn on a number of factors, including: the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) (cleaned up) (quoting *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.,* 522 F.2d 369, 375-76 (2d Cir.1975)).

"When . . . a contract for services is at issue, courts look to the purported principal's authority to give interim instructions to distinguish ordinary contractual obligations from provisions indicating control." *JVJ Pharmacy*, 630 B.R. at 406; *see* Restatement (Third) Of Agency § 1.01 (2006) cmt. f(1) (stating that "a principal has the right to give interim instructions or directions to the agent once their relationship is established").

Agency can also be established by apparent authority. However, "[a]pparent authority must be based

Case 2:22-cv-02006-JAK Document 18-1 (Ex Parte) Filed 03/26/24 Page 80 of 92 Page ID #:11809804

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

on words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction; an agent cannot, though his own acts, cloak himself with apparent authority." *1230 Park Assocs., LLC v. N. Source, LLC*, 852 N.Y.S.2d 92, 93 (N.Y. App. Div. 2008) (internal citation omitted). "Key to the creation of apparent authority is that the third person, accepting the appearance of authority as true, has relied upon it." *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980) (internal citation omitted).

Neither party identifies any material difference in the law of California and New York as to agency. Therefore, the analysis is the same as to Zetta USA's California claims. *See, e.g.*, *Holt v. Kormann*, No. SACV 11-1047 DOC MLG, 2012 WL 2150070, at *5 n.3 (C.D. Cal. June 12, 2012) ("The essential elements of an actual agency relationship are: (1) that the agent holds power to alter legal relations between the principal and third persons and between the principal and himself; (2) that the agent is a fiduciary with respect to matters within the scope of the agency; and (3) that the principal has the right to control the conduct of the agent with respect to matters entrusted to him."); Cal. Civ. Code § 2300 ("An agency is ostensible when the principal intentionally, or by want of care, causes a third person to believe another to be his agent who is not really employed by him."); Cal. Civ. Code § 2334 ("A principal is bound by the acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.").

The Bankruptcy Court erred in holding that actual authority had not been adequately alleged. The Trustee made the following allegations. *First*, with respect to the transactions for Planes 1-6, 8-9, and 12-15, the Trustee alleges that Fazal-Karim negotiated the relevant transactions in cooperation with Bombardier employees. 6637 FAC ¶ 388.

*Second*, during the period the parties negotiated the transactions involving Planes 10 and 12-15, Fazal-Karim was subject to a Sales Representative Agreement with Bombardier. *Id.* ¶ 389. Under the Sales Representative Agreement, Bombardier designated Fazal-Karim its "PREFERRED sales representative," permitted Fazal-Karim to use Bombardier's "trademarks, trade names, and service marks," required Fazal-Karim to "comply with Bombardier's Code of Ethics and Business Conduct," prohibited Fazal-Karim from producing "advertising, invitation[s], . . . promotional material[s] or press release[s]" with information related to Bombardier's products without Bombardier's consent, and required Fazal-Karim to maintain certain records about his activities. *Id.* ¶ 394.

*Third*, Fazal-Karim held himself out publicly as Bombardier's "exclusive representative for Southeast Asia." *Id.* ¶ 390. He made similar statements directly to the Debtors. *Id.* ¶ 397.

*Fourth*, Bombardier gave Fazal-Karim sensitive, trade secret pricing information. *Id.* ¶ 392.

*Fifth*, Fazal-Karim worked with Bombardier's highest executives. *Id.* He also participated in internal Bombardier strategy decisions, made recommendations to executives, and took directions from Bombardier executives. *Id.*

*Sixth*, Bombardier trained Fazal-Karim, gave him the authority to use Bombardier's trademarks and logos, and required Fazal-Karim to comply with Bombardier's policies. *Id.* ¶ 393.

Case 2:22-cv-02004-JAK Document 81 (EX-PARTE) Filed 03/26/24 Page 81 of 92 Page ID #:44859805

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The third through sixth facts are applicable to all of the transactions at issue.

*Seventh*, with respect to Plane 1, the Trustee argues that Bombardier would receive a percentage of any return earned by Fazal-Karim's company when it sold Plane 1. *Id.* ¶¶ 250, 388, 610, 627.

*Finally*, with respect to Planes 2-6, 8-9, and 11-15, Fazal-Karim received, or would have received, commissions on the sale of the planes. *Id.* ¶ 399.

The Trustee incorporated by reference into the 6637 FAC certain agreements between Bombardier and Fazal-Karim, which include the following statement as to the status of Fazal-Karim:

> [Fazal-Karim] acknowledges and agrees that it is acting as an independent contractor and not as an agent of [Bombardier], and that [Fazal-Karim] has no express or implied authority to bind or obligate [Bombardier] in any manner whatsoever. [Fazal-Karim] further agrees not to make any claims, warranties or representations pertaining to the Aircraft, except as expressly authorized in writing by [Bombardier]. The prices and other terms and conditions of the sale of the Aircraft, including the Aircraft warranty, shall be established and determined solely by [Bombardier].

6637 Final Dismissal at 44.

Certain other circumstances are also relevant to the evaluation of the Trustee's allegations. Bombardier concedes that Fazal-Karim's role was to promote Bombardier's products and negotiate sales of them. That role is at the core of Bombardier's business. Fazal-Karim was also deeply involved in the process by which Bombardier bound itself to transactions with the Debtors. In addition, Fazal-Karim was negotiating high-value, complex transactions. All these alleged facts make it less likely that Bombardier would allow Fazal-Karim to operate without controlling the way he performed. Finally, the relationship between Fazal-Karim and Bombardier extended over several transactions and over a long time period. This also supports the Trustee's position that Fazal-Karim acted at Bombardier's direction and subject to its control. It is also relevant that Plane 10 was purchased from an unrelated third party rather than Bombardier. 6637 FAC ¶ 183.

The Bankruptcy Court incorrectly found all of the foregoing allegations to be conclusory and, therefore, insufficient. The Trustee adequately alleged that Bombardier could control Fazal-Karim's conduct. This has particular force as to Planes 12-15 because, during the negotiations regarding the sale of these planes, Fazal-Karim was subject to the Sales Representative Agreement and was expressly bound by Bombardier's Code of Ethics and Business Conduct. Bombardier also controlled certain of his advertising and public relations activities and required him to maintain certain records.

However, the Trustee has adequately alleged control even as to the remaining transactions. The Bankruptcy Court did not err in holding that the Sales Representative Agreement was not in force during the negotiations of the transactions in Planes 1-6 and 8-9. Nevertheless, the Trustee also alleged that Fazal-Karim was subject to Bombardier policies separate from the Trustee's allegations regarding the Sales Representative Agreement. 6637 FAC ¶ 393. The Trustee's allegation that

Case 2:22-cv-02004-JAK   Document 81 *SEALED*   Filed 03/26/24   Page 81 of 91   Page ID #:1859806

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Bombardier provided training to Fazal-Karim has very limited force, but does suggest some level of control over his activities. Thus, it can be inferred that Bombardier would not need to train Fazal-Karim in how to do his work if Bombardier had no control over how he carried it out.

In addition to this direct evidence of control, the Trustee has provided circumstantial evidence that Bombardier had good reason to control Fazal-Karim's activities. Fazal-Karim was entrusted with trade secret pricing information as well as the rights to use Bombardier's trademarks, and to participate in high-level strategic discussions with Bombardier executives. Even Bombardier does not dispute, for purposes of the 6637 Appeal, that Fazal-Karim was entrusted with the negotiation of transactions on its behalf, and that these transactions were high-level, complex, and took place over a substantial period of time.

Fazal-Karim's statements about his own authority also provide support for the Trustee's position. Although, standing alone, this would not be sufficient to allege agency, that Fazal-Karim believed he had authority to act on behalf of Bombardier supports the plausibility of the allegation that Bombardier actually gave Fazal-Karim that authority. Finally, that Fazal-Karim performed much of the same work as Yu and Mattar, who were Bombardier employees, weighs significantly in favor of the sufficiency of the claims as to agency.

The Trustee's "actual authority" argument is less persuasive with respect to Planes 1 and 10, but the allegations are adequate. Bombardier sold Plane 1 to one of Fazal-Karim's companies months before any negotiations between Fazal-Karim and the Debtors. Plane 10 was purchased by Fazal-Karim from an unrelated third party rather than from Bombardier. *See* 6637 FAC ¶ 183. However, the Trustee has adequately alleged that the Plane 1 transaction was negotiated simultaneously with the transactions in Planes 2-5, and that the Plane 10 transaction was negotiated simultaneously with the transactions in Planes 12-15.

The Trustee has also adequately alleged that Fazal-Karim expressly linked the transactions in his conversations with Cassidy. *See* 6637 FAC ¶¶ 243, 271, 321. The payments that the Trustee identifies as the First Kickback and Second Kickback were allegedly disguised as part of the purchase price for Planes 1 and 10, respectively. A plausible inference from these allegations is that Fazal-Karim was acting individually in the transactions related to Planes 1 and 10, and that the kickbacks were paid during the transactions where Bombardier was less directly involved. Thus, they support the inference that Fazal-Karim wanted to prevent Bombardier from learning that Fazal-Karim was paying kickbacks. Another plausible inference from these allegations is that Fazal-Karim and Bombardier agreed that Fazal-Karim would pay kickbacks to Cassidy from the commissions paid to Fazal-Karim by Bombardier. Consequently, a reasonable inference is that the kickbacks were disguised as part of the purchase price for Planes 1 and 10, rather than one of the other transactions negotiated at the same time, to give Bombardier the basis for denying them. Because neither inference is implausible, the one that favors the Trustee is to be adopted.

The Bankruptcy Court did not err in rejecting the Trustee's argument that Bombardier's economic interest in Fazal-Karim's sale of Plane 1, or Fazal-Karim's potential commissions on the sale of Planes 2-6, 8-9 or 11-15, supported a finding of agency. However, for the reasons stated above, the Trustee's actual authority allegations are sufficient.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

In dismissing the 6637 FAC, the Bankruptcy Court relied in substantial part on the agency disclaimer in the agreements between Bombardier and Fazal-Karim. *See* 6637 Final Dismissal at 44. Although the analysis by the Bankruptcy Court of this issue was thorough, it erred in determining at the pleading stage, despite the allegations outlined above, that the agency disclaimer should be enforced. It is "the realities of the contractual relationship between the parties, not labels in the agreement, [that] control." *JVJ Pharmacy*, 630 B.R. at 403. In addition, the agreement is not entirely consistent in that it disclaims agency while designating Fazal-Karim a representative of Bombardier.

In contrast, the Bankruptcy Court did not err in holding that the Trustee's apparent authority theory has not been adequately alleged. The Trustee's theory is substantially the same with respect to each transaction. *First*, the Trustee alleges that Fazal-Karim stated on his website that he was an "exclusive representative" of Bombardier. 6637 FAC ¶ 390. The Trustee further alleges that an agent of Fazal-Karim told the Trustee in a letter that Fazal-Karim was an "authorized representative of Bombardier." *Id.* ¶ 391. The Trustee next alleges that Fazal-Karim told Cassidy that he was "clearly Bombardier's exclusive representative in Singapore," called himself "Bombardier's rep," and stated that he "negotiated this transaction for Bombardier." *Id.* ¶ 397. However, statements by Fazal-Karim do not support an apparent authority theory, which must be based on statements or conduct of the alleged principal, which is Bombardier, rather than the alleged agent, Fazal-Karim.

*Second*, the Trustee alleges that Fazal-Karim negotiated the transactions in Planes 1-6, 8-9 and 12-15 together with Mattar and Yu, who are undisputedly agents of Bombardier. 6637 FAC ¶¶ 388. The Trustee also alleges that Bombardier employees copied Fazal-Karim on most of the e-mails between Cassidy and Bombardier and relied on him to handle the relationship with the Debtors. *Id.* ¶¶ 395, 398. Unlike the first group of allegations, Bombardier's alleged reliance on Fazal-Karim in the negotiations with the Debtors is conduct of Bombardier, the alleged principal. However, even accepting the Trustee's theory that these three sets of transactions--for Planes 1-6, for Planes 8-9, and for Planes 12-15--were linked, the first two sets of transactions were accompanied by express statements to the Debtors about Fazal-Karim's authority, which are incorporated in the 6637 FAC by reference:

> Buyer understands that Jahid Fazal-Karim may be appointed as a sales representative of Seller in connection with this transaction. Whether or not said appointment is finally approved by Seller, Jahid Fazal Karim has no authority and will not have any authority to make any representations or warranties on behalf of Seller or to legally bind Seller under a contract for the sale of the subject Aircraft.

*E.g.*, 6637 Dkt. 41-2 at 396.[12]

---

[12] The Trustee argues that the Bankruptcy Court erred by considering these, and other, agency disclaimers. This was not error. The Trustee argues that ambiguities in a contract, or disputes about its meaning, cannot be resolved at the pleading stage. However, the agency disclaimers here are clear and unambiguous. Nor does the Trustee dispute the meaning of these agency disclaimers. The Trustee only contends that its other allegations are sufficient to show agency. The Trustee also asserts that the agency disclaimers are irrelevant because the Trustee did not sign them. However, a "bankruptcy trustee . . . stands in the shoes of the debtor" with respect to the trustee's "legal duty to collect property of the debtor's estate for the benefit of the debtor's creditors." *United*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

This language was sufficient to notify the Debtors that Fazal-Karim did not have the authority the Trustee claims. As to the transactions in Planes 12-15, Bombardier sold the planes to Yuntian 4 rather than the Debtors, so there are no comparable APAs between Bombardier and the Debtors related to Planes 12-15. Nevertheless, the ultimate outcome of the analysis is the same. The language discussed above shows that the Debtors were on notice that Fazal-Karim did not have authority to bind Bombardier to transactions, and the 6637 FAC does not contain further allegations that Bombardier said anything to suggest that Fazal-Karim's status had changed. Considering the foregoing, it has not been adequately alleged that the Debtors were presented with a basis for concluding that Fazal-Karim had the ability to bind Bombardier to the transactions in question. In addition, neither the 6637 FAC nor the arguments on appeal identify any manner in which the Debtors relied on Bombardier's alleged representations, which presents an independent basis to conclude that the Trustee adequately alleged apparent authority. However, because it has been determined that actual authority is adequately alleged, the defects in the Trustee's apparent-authority allegations are not material.

The determination that actual authority has been adequately alleged does not address the likelihood that the Trustee will be able to establish the factual allegations or whether there may be genuine disputes of material fact about them following discovery. Rather, they recognize that agency presents a "highly factual" question, *see Cleveland*, 448 F.3d at 522, and that the allegations are sufficiently plausible to warrant discovery as the alleged relationship between Bombardier and Fazal-Karim.

3. <u>Aiding and Abetting a Breach of Fiduciary Duty (First Cause of Action)</u>

"The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff." *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014). New York law is not materially different. It requires the plaintiff to plead and prove "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721, 723 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003)). To satisfy the second element, the defendant must have "actual knowledge of the breach of duty," because "[c]onstructive knowledge of the breach of fiduciary duty by another is legally insufficient to impose aiding and abetting liability." *Kaufman*, 760 N.Y.S.2d at 169. Further, knowing participation in a breach of fiduciary duty requires that the defendant provide "substantial assistance" to the violator of the fiduciary duty. *Id.* at 170. "However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.*

The first cause of action advanced by the Trustee alleges that Cassidy breached his fiduciary duty to the Debtors by accepting the First Kickback and the Second Kickback from Jetcraft, five sports tickets

---

*States v. One 2009 Maserati Granturismo*, No. ED CV-2361-PA (DTBx), 2016 WL 4502457, at *1 (C.D. Cal. June 6, 2016). The Trustee may only prevail where the Debtors would have valid tort claims. Because the Debtors received the agency disclaimers, they are relevant to the issues addressed in this action.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 85 of Page ID Page #:34859

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

from Bombardier, and potentially the Sea-Doos from Bombardier. The Trustee seeks to hold Bombardier responsible for the First Kickback and Second Kickback on the basis of a claimed agency relationship.

Bombardier does not dispute that the Trustee has adequately alleged wrongdoing by Jetcraft in paying the First Kickback and Second Kickback to Cassidy. 6637 Opening Brief at 21-27. Instead, Bombardier contends that these payments cannot be imputed to Bombardier. *Id.* Because the Trustee has adequately alleged that Fazal-Karim and Jetcraft were agents of Bombardier for purposes of the relevant transactions, the first cause of action is sufficiently alleged.

Because the first cause of action may proceed based on the First Kickback and Second Kickback, it is unnecessary to determine whether the first cause of action is also sufficiently alleged with respect to the purchase of the sports tickets and the potential purchase of the Sea-Doos. At the appropriate time, the Bankruptcy Court may evaluate the evidence submitted in support of these two alternative theories in light of the prior determination regarding agency.

### 4. Conspiracy (Second Cause of Action)

"To state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 251 (S.D.N.Y. 2014) (citation omitted). *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 299 (S.D.N.Y. 2023). Under California law, "to support a conspiracy claim, a plaintiff must allege the following elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *AREI II Cases*, 216 Cal. App. 4th 1004, 1022 (2013) (cleaned up).

In dismissing the second cause of action, the Bankruptcy Court determined that Bombardier was only accused of participating in the conspiracy through its agent Fazal-Karim. 6637 Final Dismissal at 63. Because this determination on agency has been reversed, the dismissal of this cause of action is also reversed. In addition, the Trustee may allege all the claims he has, even if they are inconsistent. Thus, the Trustee is permitted to take the positions that Fazal-Karim was Bombardier's agent and that, in the alternative, he was a co-conspirator of Bombardier.

### 5. Cal. Bus. & Prof. Code § 17200 (Third Cause of Action)

The Bankruptcy Court did not err in dismissing Zetta PTE's third cause of action. "A valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (citing *Medimatch, Inc. v. Lucent Techs, Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000)). Zetta PTE's claims are governed by a valid New York choice-of-law provision for the reasons already stated. Therefore, there was no error in dismissing this cause of action as to Zetta PTE.

The claims of Zetta USA against Bombardier are not governed by those choice-of-law provisions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Bombardier contends that Zetta USA's claims fail because the Trustee has not adequately alleged agency. For the reasons stated above, the Trustee's allegations on that issue are adequate. However, "the presumption against extraterritoriality applies to [California's] UCL in full force." *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). Thus, "a non-California resident may have standing under the UCL . . . if either (1) the injury occurred in California, or (2) defendants' conduct occurred in California." *Wisdom v. Easton Diamond Sports, LLC*, No. CV 18-4078 DSF (SSX), 2018 WL 6264994, at *4 (C.D. Cal. Oct. 9, 2018). No party has identified any reason why the persuasive analysis in *Wisdom* should be limited to non-California residents, or why California would have an interest in applying its law to unfair business practices imposed on a California resident if the conduct and injury occurred outside California.

The Trustee has not alleged that any of the relevant conduct took place in California. Nor has the Trustee alleged that Zetta USA's injury occurred in California. Although the Trustee alleges that part of the funds used to buy the allegedly overpriced planes came from Zetta USA (6637 FAC ¶¶ 470-71), what is unlawful is the alleged acceptance of commercial bribes and the alleged breach of fiduciary duty by agreeing to purchase planes from Bombardier and failing to cancel those contracts. Cassidy allegedly did all those things in Singapore. Therefore, the third cause of action was properly dismissed with respect to Zetta USA.

6.    Fraudulent Misrepresentation (Sixth Cause of Action)

The Bankruptcy Court did not err in dismissing this claim. "A complaint for fraud must allege the following elements: (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages." *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1816 (1996). The elements of this cause of action under New York law are similar. "The elements of fraud in New York include: a false representation of material fact, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006).

Fraud must be alleged with particularity, and the 6637 FAC does not identify any misrepresentations to the debtors by either Bombardier or anyone who might be its agent. For example, the 6637 FAC alleges that Fazal-Karim and Cassidy falsified invoices to deceive the business partners of Orion and Fazal-Karim. 6637 FAC ¶¶ 600-04. However, there is no allegation that these invoices were sent to anyone associated with the Debtors.

The 6637 FAC alleges in conclusory terms that Fazal-Karim represented that the prices in the First and Second Element Transactions did not include the amounts of the First and Second Kickbacks. *Id.* ¶¶ 605-06. The 6637 FAC does not allege to whom these representations were made, what was misrepresented, and when and where the misrepresentations were made. The 6637 FAC also cites language from the Plane 1 and Plane 10 APAs where the Debtors warranted to Fazal-Karim, Jetcraft and other related entities that the Debtors had not ██████████████████████████ ████████████████████████████████ *Id.* ¶ 608. This is a representation from the Debtors to Fazal-Karim. Therefore, it cannot form the basis of the Trustee's fraud claim. The Trustee argues that this language was drafted by Fazal-Karim and Jetcraft. 6637 Reply Brief at 26. Even if this had been adequately

Case 2:22-cv-00663-JAK Document 91 *SEALED* Filed 03/26/24 Page 87 of 92 Page ID #:1859811

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

alleged in the 6637 FAC, the Trustee must allege that one of the defendants made a knowingly false representation to the Debtors. A representation by the plaintiff using language suggested by the defendant is not a sufficient allegation of a representation by the defendant.

### 7. Fraudulent Concealment or Nondisclosure (Seventh Cause of Action)

The elements of this cause of action are the same under California and New York law. "[T]he elements of an action for fraud and deceit based on a concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Boschma v. Home Loan Center, Inc.*, 198 Cal. App. 4th 230, 248 (2011) (quoting *Hahn v. Mirda*, 147 Cal.App.4th 740, 748 (2007)). "In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." *Warner Constr. Corp. v. L.A.*, 2 Cal. 3d 285, 294 (1970).

Under New York law, "[a] duty to disclose arises in one of three circumstances: [1] where the parties are in a fiduciary relationship; [2] under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or [3] where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 290 (S.D.N.Y. 2023) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005)).

The Trustee first argues that he has adequately alleged active concealment by Bombardier and/or Jetcraft. 6637 Opening Brief at 26-27 A review of the paragraphs cited by the Trustee shows that they allege that Bombardier or Jetcraft failed to disclose the alleged kickbacks to the Debtors' directors, that Cassidy concealed the alleged kickbacks from the Debtors' directors, or that Bombardier and Jetcraft actively concealed the alleged kickbacks from persons other than the Debtors. Because the 6637 FAC does not contain factual allegations sufficient to support a claim that Bombardier or Jetcraft engaged in active concealment, that theory has not been adequately alleged.

The Trustee argues that the Bankruptcy Court erred in holding that the Trustee was required to allege that the kickbacks were not reasonably discoverable by the Debtors, and that Bombardier and/or Jetcraft knew the Debtors were acting based on inaccurate information. The Bankruptcy Court did not err. The case cited by the Trustee holds that a defendant must know that the undisclosed facts are not known to or reasonably discoverable by the plaintiff. *See Warner*, 2 Cal. 3d at 294.

Notwithstanding the foregoing, in light of the prior determination regarding agency, the Bankruptcy Court erred in dismissing this claim. The Trustee has plausibly alleged that Bombardier is responsible

Case 2:22-cv-06637-JAK Document 31 SEALED *Filed 03/26/24 Page 88 of 92 Page ID #:13812

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

for the conduct of Fazal-Karim and Jetcraft in paying the alleged kickbacks. Although the Bankruptcy Court correctly held that the Trustee had not adequately alleged that information about the F1 tickets and Sea-Doos was not readily available to the directors of the Debtors, the Bankruptcy Court did not address the alleged kickbacks themselves. The 6637 FAC alleges that the directors did not know about the alleged kickbacks. Because the payments were allegedly made directly to Cassidy, it is plausible that information about these transfers was not readily or reasonably available to the directors of the Debtors. For the same reason, because no one allegedly disclosed these transfers to the directors of the Debtors, it is plausible that the defendants knew the directors acted based on mistake in approving the Plane 1 and Plane 10 APAs. Therefore, the Trustee has adequately alleged this cause of action.

8.    Unjust Enrichment

The Trustee argues that this claim was improperly dismissed because unjust enrichment can be advanced as a standalone claim. "California courts 'appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy.' "*Glob. Med. Solutions, Ltd. v. Simon*, No. CV12-04686-MMM-JCX, 2013 WL 12065418, at *38 (C.D. Cal. Sept. 24, 2013) (quoting *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007) (collecting cases). The Ninth Circuit has determined that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.' " *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Nevertheless, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.' " *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 231 (2014)); *accord ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).

To state a claim for restitution, a plaintiff must show that (1) the defendant received a benefit from the plaintiff, and (2) it would be unjust for the defendant to retain that benefit. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010); *Walters v. Fid. Mortg. of Cal.*, No. CIV-09-CV-3317-FCD/KJM, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) ("[T]o establish a cause of action for unjust enrichment, a plaintiff must plead 'receipt of a benefit and the unjust retention of the benefit at the expense of another.' ").

One unpublished decision by the Ninth Circuit held that "an independent claim for unjust enrichment [could] proceed," at least in some circumstances. *Bruton v. Gerber Prods. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017).

In other more recent cases, the Ninth Circuit has held that unjust enrichment claims may fail if there is a valid contract between the parties. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 n.6 (9th Cir. 2018) ("[A]n unjust enrichment claim does not lie where the parties have an enforceable express contract.") (quoting *Durell*, 183 Cal. App. 4th at 1370); *Goldwater Bank, N.A. v. Elizarov*, No. 22-55404, 2023 WL 387037, at *1 n.1 (9th Cir. Jan. 25, 2023) ("Goldwater's unjust enrichment claim . . . fails as a matter of law because there is a valid contract between the parties . . . ."). *Hartford Casualty Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988 (2015) is not to the contrary. There it was determined that an unjust enrichment claim could proceed, but only because it did "not contravene or alter any term of the contracts between" the parties. *Id.* at 1001.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 89 of 92 Page ID #:11813

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The relationship among the parties in this action is governed by several express contracts. The Trustee seeks the return of the funds the Debtors agreed to pay under those contracts because the Debtors were allegedly fraudulently induced to enter them. If granted, the relief sought by the Trustee would contravene and alter the terms of the contracts between the Debtors and the other parties to these agreements. For this reason, this cause of action fails to state a claim.

        9.   <u>In Pari Delicto</u>

The Bankruptcy Court did not address the argument by the 6637 Appellees that all the tort claims against them are conclusively barred by their *in pari delicto* affirmative defense. On remand, the Bankruptcy Court shall consider this issue in light of the determinations in this Order regarding choice of law and agency.

    B.    The Bankruptcy Claims (Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-Fifth, Thirty-First and Thirty-Second Causes of Action)

        1.   <u>Extraterritoriality (Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Thirty-First and Thirty-Second Causes of Action)</u>

The arguments of the Trustee on extraterritoriality in the 6637 Appeal mirror those raised in the 7572 Appeal. For the reasons stated in connection with the 7572 Appeal, §§ 547 and 548 of the Bankruptcy Code do not apply extraterritoriality. Furthermore, because "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property," *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 100 (2d Cir. 2019), these statutes do not reach transfers made by the debtor abroad, even if the proceeds of the transfer were later received in the United States. Nor does it appear that the Trustee is seeking a domestic application under §§ 547 and 548 if his claims are construed under the "obligation" prong of those statues rather than the "transfer" prong. The Trustee is also incorrect in claiming that Bombardier "waived" the presumption against extraterritoriality by filing a proof of claim.

For the first time in the 6637 Reply Brief, the Trustee argues that initial transfers from Zetta USA to Zetta PTE provide an independent basis to avoid subsequent transfers to Bombardier. This argument has been waived. "[O]n appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Even if the Trustee had not waived this argument, the 6637 FAC does not allege that the transfers at issue were initiated from the United States. The 6637 FAC merely alleges that Zetta USA operated charter flights, which generated revenues, a substantial portion of which were sent to Zetta PTE. *See* 6637 FAC ¶¶ 82, 94, 112. None of the allegations in the 6637 FAC sufficiently link these transfers to those challenged by the Trustee.

        2.   <u>Indispensable Parties (Fourteenth, Fifteenth, Thirty-First and Thirty-Second Causes of Action); the Constructive Fraudulent Transfer Claims (Thirteenth, Fifteenth, Seventeenth and Thirty-Second Causes of Action); the Actual Fraudulent Transfer Claims (Twelfth, Fourteenth, Sixteenth and Thirty-First</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Causes of Action); and the Preference Claims (Eighteenth and Nineteenth Causes of Action)

The 6637 Appellees argue that the dismissal of the bankruptcy claims may be affirmed for failure to join indispensable parties and because they have not been adequately alleged. Because all these claims are barred on extraterritoriality grounds, it is not necessary to address these additional arguments.

3.    Violation of the Automatic Stay (Twentieth Cause of Action)

"[A]n individual injured by any willful violation of [the automatic stay] shall recover any actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

"Under § 362[(k)], an *individual* harmed by a willful automatic stay violation is entitled to collect compensatory damages (including attorneys' fees) and, where appropriate, punitive damages." *In re Dyer*, 322 F.3d 1178, 1189 (9th Cir. 2003) (emphasis added). However, "the Trustee is ineligible to receive damages under that private cause of action, because [he] is not an 'individual.' " *Id.* (quoting *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 192 (9th Cir. 1995)). A bankruptcy trustee "may be entitled to recovery for violation of the automatic stay 'under section 105(a) as a sanction for ordinary civil contempt.' " *Id.* (quoting same). "Because the Trustee recovers under the contempt authority of § 105(a), rather than under § 362[(k)], however, the sanction award must conform to the legal standards governing that authority." *Id.* at 1190. Under § 105, sanctions are "permissive" and "a party with knowledge of bankruptcy proceedings is [not] charged with knowledge of the automatic stay." *Id.* at 1190-91.

The twentieth cause of action alleges that it is brought under § 362. Neither § 105 nor the word "contempt" is ever mentioned. The Trustee objects that he need not use "magic words" in requesting relief for a stay violation. Even assuming that this is correct, the Trustee must still provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Although there are similarities between the two statutes, a cause of action under § 362 is not the same as one under § 105. Nothing about the twentieth cause of action suggests that the Trustee was invoking the Bankruptcy Court's contempt authority or § 105.

Furthermore, this cause of action has not been adequately alleged for other reasons. The Trustee first argues that Bombardier set off debts owed by Bombardier to Zetta USA for charter flight services against debts owed by Zetta PTE to Bombardier under a separate services agreement. 6637 FAC ¶ 798. However, the 6637 FAC expressly alleges that the setoff took place eight days before the Debtors filed for bankruptcy. *Id.* ¶ 504. That Bombardier may have a financial obligation to the Debtors does not constitute a violation of the automatic stay. Thus, "merely retaining possession of estate property does not violate the automatic stay." *City of Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021).

The Trustee also argues that Bombardier violated the automatic stay by refusing to perform under the Smart Parts Agreement after the filing of the petition. 6637 FAC ¶ 799. However, the Trustee does not deny that he rejected the Smart Parts Agreement. *See* 6637 Opening Brief at 63. "After rejection, the performance of the non-bankrupt obligee is excused." *In re Pac. Express, Inc.*, 780 F.2d 1482, 1486 n.3

Case 2:22-cv-02004-JAK Document 81 (Ex Parte) Filed 03/26/24 Page 91 of 92 Page ID #:13415

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(9th Cir. 1986). Because the only stay violation alleged in the 6637 FAC is the alleged failure to perform an already rejected executory contract, this theory fails. Nor would a breach-of-contract cause of action related to the Smart Parts Agreement be viable. Because Bombardier's performance was excused after the Trustee rejected the contract, leave to add this theory would be futile.

The Trustee requests leave to add a cause of action for breach of the Charter Agreements. *See* 6637 FAC ¶¶ 502-03; 6637 Opening Brief at 51. The 6637 FAC alleges that BAC agreed to pay $2,360,190 for charter services under the Charter Agreements. 6637 FAC ¶ 502. It further alleges that these debts became due and payable before the filing of the bankruptcy petition yet were not paid. *Id.* ¶ 503. It does not appear that a claim for breach of the Charter Agreements would be futile or that it would prejudice the 6637 Appellees. Therefore, leave to amend is granted as to this claim.

        4.      § 502(d) (Twenty-Fifth Cause of Action)

Both sides agree that the twenty-fifth cause of action is dependent upon the fraudulent transfer and preference claims. 6637 Answering Brief at 92-93; 6637 Reply Brief at 50. Because the Bankruptcy Court properly dismissed those claims, this cause of action was also properly dismissed.

      C.      The Trustee's Motion to Consolidate

The Trustee argues that the Bankruptcy Court erred by refusing to consolidate the 2004 Adversary Proceeding with the 6637 Adversary Proceeding. "Rule 42 [of the Federal Rules of Civil Procedure] applies in adversary proceedings." Fed. R. Bankr. P. 7042. "If actions before the court involve a common question of law or fact, the court *may*: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a) (emphasis added).

Specifically, the Trustee argues that the Bankruptcy Court erred by holding that the Trustee needed to file amended complaints so that it could make precise findings as to the presence of any common questions of law or fact. The Bankruptcy Court did not abuse its discretion. At the time this motion was denied, the 2004 Complaint and the 6637 Complaint had been dismissed, at least in part, and it was unclear which claims would be re-alleged. Furthermore, even if there are common questions of law or fact between the 2004 Adversary Proceeding and the 6637 Adversary Proceeding, the 6637 Adversary Proceeding covers a wide range of transactions, but CAVIC did not participate in many of them. For these reasons, it was not an abuse of discretion to deny consolidation.

      D.      The Trustee's Motion for Leave to Amend

The Trustee seeks leave to amend the agency allegations and to address the *in pari delicto* defense in the event the 6637 Appellees prevail on these grounds. Because the agency allegations have been deemed sufficient and the 6637 FAC has not been dismissed on *in pari delicto* grounds, the requested leave to amend is moot.

As previously stated, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements.

Case 2:22-cv-02004-JAK Document 81 *SEALED* Filed 03/26/24 Page 91 of 92 Page ID
Page #:41959816

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

However, leave to amend is not appropriate as to any of the other causes of action with respect to which the 6637 Final Dismissal is affirmed. The Trustee has not requested leave to add additional allegations with respect to those causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations that could be made in support of those causes of action. That the Trustee has had a previous opportunity to amend the 6637 Complaint with respect to these causes of action weighs against granting leave to amend. Based on a review of the matters presented here, leave to amend would be futile. Finally, the Bankruptcy Court determined that leave to amend would be futile and prejudicial to the 6637 Appellees. 6637 Final Dismissal at 79-81. With respect to these causes of action, the Trustee has waived any challenge to the determination that leave to amend would be improper by failing to address the subject on appeal. *See generally* 6637 Opening Brief.

**VII.** **Conclusion**

For the reasons stated in this Order, the 21-7572 Final Dismissal, 22-2004 CAVIC Final Dismissal and 22-2004 Bombardier Final Dismissal are **AFFIRMED**. The 22-6637 Final Dismissal is **REVERSED IN PART** as to the first, second, and seventh causes of action and **AFFIRMED IN PART** as to all other claims. All the interlocutory orders of the Bankruptcy Court are **AFFIRMED**. In the 6637 Adversary Proceeding, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements. However, the Trustee is not given leave to add any other parties, causes of action, or legal theories.

This Order is initially issued under seal. Within 14 days of its issuance, the parties shall jointly submit any proposed redactions, with a corresponding declaration from a percipient witness as to why the information should not be available on the public docket in this action. Based on a review of those submissions, a redacted version of this Order shall be made available on the public docket in conformance with the determinations made in response to the requested redactions.

**IT IS SO ORDERED.**

|  |  | : |  |
|---|---|---|---|
| Initials of Preparer | | tj | |

# EXHIBIT B

PILLSBURY WINTHROP SHAW PITTMAN LLP
Claire K. Wu (CA Bar No. 295966)
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017
Telephone:    213-488-3655
Facsimile:     213-629-1033

Eric Fishman (admitted *pro hac vice*)
Andrew M. Troop (admitted *pro hac vice*)
Carolina A. Fornos (admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019
Telephone:    212-858-1000
Facsimile:     212-858-1500

*Attorneys for Bombardier Aerospace Corporation,
Bombardier Inc., and Learjet, Inc.*

**FILED & ENTERED**

**SEP 07 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY may        DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>ZETTA JET USA, INC., a California Corporation,<br><br>Debtor. | Lead Case No. 2:17-bk-21386-SK<br><br>Jointly administered with:<br>2:17-bk-21387-SK<br><br>Chapter 7 |
| In re<br><br>ZETTA JET PTE, LTD., a Singaporean Corporation,<br><br>Debtor. | **Adv. Proc. No. 2:19-ap-01382-SK**<br><br>**FINAL JUDGMENT IN FAVOR OF BOMBARDIER AEROSPACE CORPORATION, BOMBARDIER INC., AND LEARJET, INC.** |
| JONATHAN D. KING, solely in his capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd.,<br><br>            Plaintiff,<br><br>      v.<br><br>JETCRAFT CORPORATION, JETCRAFT GLOBAL, INC., JETCOAST 5000-5 LLC, ORION AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA LIMITED, FK GROUP LTD, FK PARTNERS LIMITED, JAHID FAZAL-KARIM, BOMBARDIER AEROSPACE CORPORATION, BOMBARDIER, INC., and LEARJET, INC.,<br><br>            Defendants. | [Relates to Adv. Dkt. Nos. 310, 383]<br><br>Hearing<br>Date:     April 27, 2022<br>Time:     9:00 a.m. PT<br>Place:    Courtroom 1575<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |

1     For the reasons set forth in the Court's Memorandum of Decision entered June 23, 2022 [Adv.

2  Dkt. No. 383], all counts against Defendants Bombardier Aerospace Corporation, Bombardier Inc.,

3  and Learjet, Inc. (together, "BAC/BI/LI"), including Counts 1-3, 6-7, 12-20, 25, and 31-32, of the

4  *First Amended Adversary Complaint* filed by Jonathan D. King, Chapter 7 trustee in the above-

5  captioned adversary proceeding, are dismissed with prejudice.

6     Final judgment is hereby entered in favor BAC/BI/LI.

7                                          # # #

8

9

10

11

12

13

14

15

16

17

18

19

20  Date: September 7, 2022

21                                    Sandra R. Klein
                                      United States Bankruptcy Judge

22

23

24

25                                          1

97

# EXHIBIT C

Before the Court is a "Revised[1] Motion to Dismiss Counts 1-3, 6-7, 12-20, 25, 31-32 of First Amended Adversary Complaint" (Motion), filed by Bombardier Aerospace Corporation (BAC), Bombardier Inc. (BI), and Learjet, Inc. (Learjet, and together with BAC and BI, BAC/BI/LI).  Jetcraft AP Docket #310.[2]  In support of the Motion, BAC/BI/LI filed a "Request for Judicial Notice and Incorporation by Reference . . ." (BAC/BI/LI RJN), Jetcraft AP Docket #310-1, and a "Declaration of Eric Fishman . . . " (Fishman 11/11/21 Decl.), Jetcraft AP Docket #310-2.  On 1/14/22, Jonathan D. King (King), in his capacity as chapter 7 trustee (Trustee) of Zetta Jet USA, Inc. (Zetta USA) and Zetta Jet PTE, Ltd. (Zetta Singapore, and together with Zetta USA, the Debtors), filed an "Opposition to Defendants Bombardier Aerospace Corporation, Bombardier Inc., and Learjet, Inc.'s Motion to Dismiss Counts 1-3, 6-7, 12-20, 25, 31-32 . . ." (Opposition), Jetcraft AP Docket #349, a "Request for Judicial Notice . . ." (Trustee RJN), Jetcraft AP Docket #350, and an "Objection to Request for Judicial Notice and Incorporation by Reference . . . Filed by [BAC/BI/LI]" (RJN Objection), Jetcraft AP Docket #353.  On 2/18/22, BAC/BI/LI filed a "Reply in Further Support of Their Motion to Dismiss Counts 1-3, 6-7, 12-20, 25, 31-32 of First Amended Adversary Complaint" (Reply), Jetcraft AP Docket #360, and a "Reply in Further Support of Request for Judicial Notice and Incorporation by Reference" (BAC/BI/LI RJN Reply), Jetcraft AP Docket #361.

On 4/27/22, the Court held a hearing on the Motion (4/27/22 Hearing), during which counsel for the Trustee and BAC/BI/LI appeared and were given an opportunity to be heard.  At the conclusion of the hearing, the Court took the Motion under submission.  Based on the argument in the pleadings and argument of counsel during the hearing, and for the reasons stated in the analysis below, the Court rules as follows: the Motion is granted and Counts 1-3, 6, 7, 12-20, 25, 31, and 32 are dismissed without leave to amend.  This memorandum constitutes the Court's findings of fact and conclusions of law regarding the legal sufficiency of the counts at issue in the FAC.

    I.      Facts

        a.  Bankruptcy Cases

On 9/15/17 (Petition Date), Zetta USA and Zetta Singapore filed chapter 11 petitions (collectively, Cases).  Zetta USA Docket #1; Zetta Singapore Docket #1.  King was

---

[1] On 9/7/21, BAC/BI/LI filed a "Motion to Dismiss Counts 1-3, 6-7, 12-20, 25, 31-32 of First Amended Adversary Complaint."  Jetcraft AP Docket #284.  On 11/4/21, the Court ordered BAC/BI/LI to file a revised motion and extended the briefing deadlines.  Jetcraft AP Docket #305.

[2] All references to "Zetta USA Docket" are to the docket in In re Zetta Jet USA, Inc., 17-bk-21386-SK.  All references to "Zetta Singapore Docket" are to the docket in In re Zetta Jet PTE Ltd., 17-bk-21387-SK.  All references to "Jetcraft AP Docket" are to the docket in Jonathan D. King v. Jetcraft Corporation et al., 19-ap-1382-SK (Jetcraft AP).

1

appointed as the chapter 11 trustee, and after the Cases were converted, he was appointed as the chapter 7 trustee.  Zetta USA Docket #s 159, 452, 458.

> b.  Adversary Proceeding and Motions to Dismiss

On 9/13/19, the Trustee filed an adversary complaint (Complaint) against: 1) Jetcraft Corporation (Jetcraft Corp.); 2) Jetcraft Global, Inc. (Jetcraft Global); 3) JetCoast 5000-5, LLC (Jetcoast); 4) Orion Aircraft Holdings Ltd. (Orion); 5) Jetcraft Asia Limited (Jetcraft Asia, and together with Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion, Jetcraft); 6) FK Group Ltd. (FK Group or FKG); 7) FK Partners Ltd. (FK Partners or FKP); 8) Jahid Fazal-Karim (Fazal-Karim); 9) BAC; 10) BI; 11) Learjet; 12) ECN Aviation Inc. f/k/a Element Aviation Inc. (Element Aviation); and 13) ECN Capital Corporation, as successor to Element Financial Corporation (ECN, and, together with Element Aviation, Element), (collectively, the Defendants), which alleged that Zetta Singapore was formed and run by a con artist, Geoffrey Cassidy (Cassidy), who, over a two-year period, with the Defendants' help, obtained $10 million from kickbacks, bribes and embezzlement, while saddling the Debtors with almost $500 million in unsustainable debt incurred by purchasing overpriced aircraft in a down market.  Jetcraft AP Docket #1.  The Complaint contained the following counts against BAC/BI/LI:

1) Aiding and Abetting Breach of Fiduciary Duty (Count I);
2) Civil Conspiracy (Count II);
3) California Business and Professions Code § 17200 (Count III);
4) Unjust Enrichment (Count IV);
5) Constructive Trust – California Civil Code §§ 2223 and 2224 (Count V);
6) Fraud (Count VI);
7) Avoidance and Recovery of Fraudulent Transfers and Obligations (CAVIC Payments) (Count X);
8) Avoidance and Recovery of Fraudulent Transfer and Obligations (Plane 6) (Count XI);
9) Avoidance and Recovery of U.S. Preference Transfer (Count XIII);
10) Avoidance and Recovery of U.S. Preference Transfer (Count XIV); and
11) Disallowance of Claims (Count XVII).

Complaint ¶¶ 233-85, 321-42, 356-77, 394-97.

> c.  BAC/BI/LI Motion to Dismiss

The Court granted a "Motion to Dismiss Counts I-VI, X-XI, XIII-XIV, XVII of Adversary Complaint" filed by BAC/BI/LI (BAC/BI/LI MTD), dismissing Counts I-VI, X-XI, XIII-XIV, and XVII with leave to amend all counts except Count IV for unjust enrichment (BAC/BI/LI MTD Ruling).  Jetcraft AP Docket #s 76, 109, 121.

2

### d.  Motions to Consolidate

The Trustee moved to consolidate the Jetcraft AP with <u>King v. CAVIC Aviation Leasing
(Ireland) 22 Co. Designated Activity Company et al.</u>, 19-ap-1147-SK (<u>King v. CAVIC</u> or
CAVIC AP), which contained 7 causes of action against the following parties:

| Count # | Type of Claim | Statute(s) | Defendant(s) | Page # |
|---|---|---|---|---|
| 1 | Declaratory Judgment that the Financed Leases are Financings and Not True Leases | N/A | CAVIC | 28 |
| 2 | Civil Judgment that the APA is Terminated | N/A | Bombardier | 29 |
| 3 | Declaratory Judgment that CAVIC's Security Interest in the Refund is Not Perfected | UCC Article 9 | CAVIC | 29 |
| 4 | The Unperfected Security Interest in the Refund Must Be Avoided and Preserved for the Benefit of the Debtor's Estate | 11 U.S.C.  §§ 544(a)(1) | CAVIC | 30 |
| 5 | The Right to the Refund is Recoverable for the Benefit of the Estate | 11 U.S.C.  §§ 550(a) | CAVIC | 31 |
| 6 | The Refund Is Property of the Estate | 11 U.S.C.  §§ 542(a) | Bombardier | 31 |
| 7 | Avoidance and Recovery of Preferential Transfers | 11 U.S.C.  §§ 547, 550 | CAVIC | 32 |

The Court denied the motion to consolidate.  CAVIC AP Docket #s 184, 236; Jetcraft AP
Docket #s 153, 193.

### e.  Motion to Amend

The Trustee filed a "Motion for Leave to Amend Adversary Complaint," seeking to add
claims and parties (Motion to Amend), which the Court denied.  Jetcraft AP Docket #s
199, 263.

### f.  First Amended Complaint

On 7/28/21, the Trustee filed the First Amended Complaint (FAC), which contains the
following bolded causes of action against BAC/BI/LI:

| Count # | Type of Claim | Statute(s) | Defendant(s) | Page # |
|---|---|---|---|---|
| 1 | **Aiding and Abetting Breach of Fiduciary Duty** | N/A | FK Defendants; BAC/BI | 111 |
| 2 | **Civil Conspiracy** | N/A | FK Defendants; BAC/BI | 114 |
| 3 | **Cal. Bus & Prof Code § 17200; Cal. Penal Code § 641.3** | Cal. Bus & Prof Code § 17200; Cal. Penal Code § 641.3 | FK Defendants; BAC/BI | 115 |
| 4 | OMITTED | | | 117 |
| 5 | OMITTED | | | 117 |
| 6 | **Fraudulent Misrepresentation** | N/A | FK Defendants; BAC/BI | 118 |
| 7 | **Fraudulent Concealment / Nondisclosure** | N/A | FK Defendants; BAC/BI | 121 |
| 8 | Avoidance and Recovery of Actual Intent Fraudulent Transfers (Plane 1) | 11 U.S.C. §§ 548, 550 | Jetcraft Corp.; Jetcoast | 123 |
| 9 | Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 1) | 11 U.S.C. §§ 548, 550 | Jetcraft Corp.; Jetcoast | 125 |
| 10 | Avoidance and Recovery of Actual Intent Fraudulent Transfers (Plane 10) | 11 U.S.C. §§ 548, 550 | Jetcraft Global; Orion | 127 |
| 11 | Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 10) | 11 U.S.C. §§ 548, 550 | Jetcraft Global; Orion | 128 |
| 12 | **Avoidance and Recovery of Actual Intent Fraudulent Transfers (Planes 2-5)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 129 |
| 13 | **Avoidance and Recovery of Constructive Fraudulent Transfers (Planes 2-5)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 131 |
| 14 | **Avoidance and Recovery of Actual Intent Fraudulent Transfers (Planes 2-5)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 132 |
| 15 | **Avoidance and Recovery of Constructive Fraudulent Transfers (Planes 2-5)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 136 |
| 16 | **Avoidance and Recovery of Actual Intent Fraudulent Transfer (Plane 6)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 139 |
| 17 | **Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 6)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 141 |
| 18 | **Avoidance and Recovery of US Preference Transfer** | 11 U.S.C. §§ 547, 550 | BAC | 142 |
| 19 | **Avoidance and Recovery of US Preference Transfer** | 11 U.S.C. §§ 547, 550 | BAC/BI/LI | 143 |
| 20 | **Violation of Automatic Stay** | 11 U.S.C. § 362 | BAC | 144 |
| 21 | OMITTED | | | 145 |
| 22 | OMITTED | | | 145 |
| 23 | OMITTED | | | 145 |
| 24 | Turnover of Property of the Estate | 11 U.S.C. § 542 | Jetcraft Global; Jetcraft Corp. | 145 |
| 25 | Disallowance of Claims | 11 U.S.C. § 502(d) | All Defendants | 146 |
| 26 | OMITTED | | | 146 |
| 27 | OMITTED | | | 146 |
| 28 | OMITTED | | | 147 |
| 29 | OMITTED | | | 147 |
| 30 | OMITTED | | | 147 |
| 31 | **Avoidance and Recovery of Actual Intent Fraudulent Transfer (Plane 6)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 147 |
| 32 | **Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 6)** | 11 U.S.C. §§ 548, 550 | BAC/BI | 149 |

3

Jetcraft AP Docket #265.

II.    Legal Standards

    a.    Motions to Dismiss Generally

Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP or Rules) applies in
adversary proceedings and provides that a party may assert the defense of "failure to
state a claim upon which relief can be granted." Fed. R. Bankr. P. 7012(b); In re
Kvassay, 2014 WL 2446181, at *9 (B.A.P. 9th Cir. May 30, 2014). A motion to dismiss
under Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. Lee
v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001); Student Loan Mktg. Ass'n v.
Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998). "A Rule 12(b)(6) dismissal may be based
on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged
under a cognizable legal theory.'" Johnson v. Riverside Healthcare Sys., LP, 534 F.3d
1116, 1121-22 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696,
699 (9th Cir. 1990)).

In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light
most favorable to the plaintiff, and accept all well-pled factual allegations as true.
Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001). The
Court, however, is not bound by conclusory statements, statements of law, and
unwarranted inferences cast as factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S.
544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir.
1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555
(citations omitted). A complaint "must contain either direct or inferential allegations
respecting all the material elements necessary to sustain recovery under *some* viable
legal theory." Id. at 562 (emphasis in original) (quoting Car Carriers, Inc. v. Ford Motor
Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court elaborated on the
Twombly standard:

        To survive a motion to dismiss, a complaint must contain sufficient factual
        matter, accepted as true, to "state a claim to relief that is plausible on its
        face." . . . A claim has facial plausibility when the plaintiff pleads factual
        content that allows the court to draw the reasonable inference that the

4

defendant is liable for the misconduct alleged. . . . Threadbare recitals of
the elements of a cause of action, supported by mere conclusory
statements, do not suffice.

The allegations of a complaint, along with other materials properly before the court on a
motion to dismiss, can establish an absolute bar to recovery.  See Weisbuch v. County
of Los Angeles, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (stating that if the pleadings
establish facts compelling a decision one way, that is as good as if depositions and
other expensively obtained evidence on summary judgment establish the identical
facts).  Generally, when ruling on a Rule 12(b)(6) motion to dismiss, courts cannot
consider material outside the pleadings.  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d
988, 998 (9th Cir. 2018); Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).
If matters outside of the pleadings are "presented to and not excluded by the court," the
motion to dismiss is converted to a motion for summary judgment under Rule 56 and all
parties must be given a "reasonable opportunity to present all the material that is
pertinent to the motion."  Fed. R. Civ. P. 12(d).  There are, however, two exceptions to
this rule: 1) matters that the Court can take judicial notice of under Rule 201 of the
Federal Rules of Evidence; and 2) the "incorporation-by-reference doctrine."  Khoja, 899
F.3d at 998.  The incorporation-by-reference doctrine treats certain documents as if they
were "part of the complaint itself."  Id. at 1002.

The party seeking dismissal under Rule 12(b)(6) has the burden of proof.  Muhammad
v. Reed (In re Reed), 532 B.R. 82, 88 (Bankr. N.D. Ill. 2015); Enron Corp. v. Arora (In re
Enron Corp.), 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004).

   b.  Rule 9(b) Heightened Pleading Standard

Under Rule 9(b), when alleging fraud or mistake, a party must state "with particularity
the circumstances constituting fraud or mistake."  A pleading is sufficient under Rule
9(b) if it identifies the circumstances constituting fraud so that the defendant can
prepare an adequate answer from the allegations.  Wimbledon Fund, SPC v. Graybox,
LLC, 2016 WL 7444709, at *4 (C.D. Cal. Aug. 31, 2016).  A false statement must be
alleged, and the "'circumstances indicating falseness' must be set forth."  Id.  To comply
with Rule 9(b), a plaintiff must identify the "who, what, when, where and how" of the
misconduct charged, as well as what is false or misleading about the purportedly
fraudulent conduct, and why it is false.  Id.  "[M]ere conclusory allegations of fraud are
insufficient."  Puri v. Khalsa, 674 F. App'x. 679, 687 (9th Cir. 2017) (citations and
internal quotation marks omitted).  While the circumstances constituting fraud must be
alleged with particularity, Rule 9(b) allows fraudulent intent to be alleged generally.
Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 995 n.5 (9th Cir.
2014); United States ex rel. Lee v. Corinthian Colleges, 655 F.3d 984, 996 (9th Cir.
2011).

5

III.    Argument and Analysis

a.  Briefing Considered

Throughout the Opposition, the Trustee refers to arguments he made in oppositions, which he filed in response to other motions to dismiss filed by other defendants in this case, as well as arguments that he made in an opposition that he filed in response to a motion to dismiss filed by CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company (CAVIC) in <u>King v. CAVIC</u>.  In total, the Trustee refers to 39 pages of arguments that he made in other briefs.

| Case Name | Case # | Document Name | Docket # Referenced | Pages Referenced (Bottom of Page) | # of Pages Referenced |
|---|---|---|---|---|---|
| King v. CAVIC | 19-ap-01147-SK | Trustee's Opposition to CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company's Motion to Dismiss Counts I, III, IV, V, and VI of Trustee's First Amended Adversary Complaint. | CAVIC Docket #328 | 29-34 | 6 |
| King v. Jetcraft | 19-ap-01382-SK | Trustee's Opposition to FK Group Ltd., FK Partners Ltd, Jahid Fazal Karim, and Jetcraft Asia Limited's Motion to Dismiss Counts 1-3, 6 and 7 of the First Amended Adversary Complaint | Docket #314 | 19-21 | 3 |
| King v. Jetcraft | 19-ap-01382-SK | Trustee's Opposition to Jetcraft Defendants' Motion to Dismiss Counts 8-11 & 24-25 of First Amended Adversary Complaint. | Docket #315 | 6-12 | 6[3] |
| King v. Jetcraft | 19-ap-01382-SK | Trustee's Opposition to Jetcraft Defendants' Motion to Dismiss Counts 8-11 & 24-25 of First Amended Adversary Complaint. | Docket #315 | 24-30 | 7 |
| King v. Jetcraft | 19-ap-01382-SK | Trustee's Opposition to FK Group Ltd., FK Partners Ltd, Jahid Fazal-Karim, and Jetcraft Asia Limited's Motion to Dismiss Counts 1-3, 6 and 7 of the First Amended Adversary Complaint. | Docket #332 | 17-33 | 17 |
| **Total Additional Pages** | | | | | **39** |

Before filing the Opposition, the Trustee sought leave to file an oversized, 45-page brief and the Court granted the Trustee's request.  Jetcraft AP Docket #s 341, 347.  Now, he essentially seeks to have the Court consider an additional 39 pages, for a total of 84 pages.  The Trustee has not cited any authority, and the Court was unable to locate any, indicating that it would be appropriate for the Court to consider arguments that the

---

[3] Although there were seven pages referenced, the first page included a header and only two lines of argument.  The Court did not include this page in its calculations.

6

Trustee made in response to other motions filed in this case or in another case. Further, it would be unfair to BAC/BI/LI for the Court to consider argument and analysis that the Trustee raised in response to other defendants' briefs. Therefore, in this ruling, the Court only considered the Trustee's arguments contained in the Opposition, Trustee RJN, and RJN Objection.

  b.  Request for Judicial Notice

   i.  Arguments

    1.  BAC/BI/LI RJN

BAC/BI/LI request that the Court take judicial notice of the adversary complaint filed by the Trustee in <u>King v. Yuntian 3 Leasing Co. Designated Activity Co. et al.</u>, 19-ap-1383-SK (<u>King v. Yuntian</u> or Yuntian AP), Docket #1, two memoranda of decision the Court issued in that case, Yuntian AP Docket #s 175, 314, and a memorandum of decision the Court issued in <u>King v. CAVIC</u>, CAVIC AP Docket #168. BAC/BI/LI RJN at 2. They argue that these documents can be judicially noticed because they were publicly filed in related judicial proceedings and their authenticity cannot reasonably be questioned. <u>Id.</u> at 3 (citing <u>Martinez v. Allstar Fin. Servs., Inc.</u>, 2014 WL 12597333, at *4 (C.D. Cal. Oct. 9, 2014)). BAC/BI/LI explain that they are only seeking judicial notice of objective facts in the filings, and the Court has previously taken judicial notice of documents filed in this adversary proceeding, related adversary proceedings, the Cases, and related actions filed in Singapore and state court. <u>Id.</u> at 3-4.

The Trustee responds that judicial notice is improper because BAC/BI/LI have not properly identified the facts to be noticed, seek to notice facts in dispute, and seek to notice non-adjudicative facts. RJN Objection at 9. The Trustee contends that if the Court takes judicial notice of a document, it must "specify what facts it judicially noticed" from the document. <u>Id.</u> at 11 (quoting <u>Baird v. BlackRock Inst. Tr. Co.</u>, 403 F. Supp. 3d 765, 774 (N.D. Cal. 2019)). The Trustee claims that BAC/BI/LI seek judicial notice of "specific interpretation[s]" of "positions" asserted by the Trustee and Court. <u>Id.</u> at 12.

BAC/BI/LI reply that judicial notice is appropriate because they: 1) clearly identify the facts they seek to have judicially noticed; and 2) are not seeking judicial notice of the documents in their entirety. BAC/BI/LI RJN Reply at 7-9. BAC/BI/LI argue that there is no requirement for a particular format or specificity and none of the cases the Trustee cites hold the movants to a formal standard. <u>Id.</u> at 9.

BAC/BI/LI assert that none of the facts sought to be judicially noticed are reasonably in dispute, and are either statements by the Trustee, statements of law by the Court, or restatements of law by this Court in decisions from related adversary proceedings. <u>Id.</u> at 10. They claim that, unlike <u>Khoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 1000

7

(9th Cir. 2018), there is no reasonable dispute about any of these issues.  Id. at 11.
BAC/BI/LI also argue that facts sought to be noticed from other adversary proceedings
concern the same transactions that are at issue here.  Id. at 11-15.

### 2.  Trustee RJN

The Trustee requests that the Court take judicial notice of a transcript from the 3/31/21
hearing before this Court on the Trustee's "Motion to Consolidate Related Adversary
Cases," Jetcraft AP Docket #194 (Consolidation Hearing Transcript).  Trustee RJN at 2.
Specifically, he requests that the Court take notice of statements made by CAVIC's
counsel.  Id. at 2-3 (citing Consolidation Hearing Transcript at 23:10-14).  The Trustee
contends that judicial notice is appropriate because it is a record of a judicial proceeding
that directly relates to this proceeding.  Id. at 3 (quoting Fontenberry v. MV Transp., Inc.,
984 F. Supp. 2d 1062, 1064 n.2 (E.D. Cal. 2013)).  BAC/BI/LI did not oppose or respond
to the Trustee RJN.

### ii.  Analysis

Under Federal Rule of Evidence 201(b), the Court can take judicial notice of a fact that
is not subject to reasonable dispute because it: "(1) is generally known within the trial
court's territorial jurisdiction; or (2) can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned."  The party requesting that
the court take judicial notice has the burden of demonstrating that it is appropriate for
the court to do so.  Manix Energy, Ltd. v. James (In re James), 300 B.R. 890, 894
(Bankr. W.D. Tex. 2003).  A Court may take judicial notice of its own docket.  Tuma v.
Firstmark Leasing Corp. (In re Tuma), 916 F.2d 488, 491 (9th Cir. 1990); DeHart v.
Eckert (In re Eckert), 485 B.R. 77, 81 (Bankr. M.D. Pa. 2013) (stating that a bankruptcy
judge may take judicial notice of his or her own docket, but the truth of the contents of
those records is not inferred by a judge taking judicial notice of the records); In re
Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (noting that while a
court may take judicial notice of the fact that a document or pleading has been filed for
certain purposes, it does not necessarily take judicial notice of the facts contained within
the pleading).

Here, the Court can take judicial notice of the fact that each of the documents cited by
BAC/BI/LI as well the Consolidation Hearing Transcript were filed in their respective
cases.  Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360,
1364 (9th Cir. 1998) (taking judicial notice of pleadings filed in a related case); United
States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248
(9th Cir. 1992) (taking notice of court proceedings that are "directly related" to the case);
C.B. v. Sonora Sch. Dist., 691 F. Supp. 2d 1123, 1138 (E.D. Cal. 2009) ("The Court
may take judicial notice of . . . court records available to the public through the PACER
system via the internet.").  The Court may not, however, infer the truth of the contents of

8

the documents cited in the BAC/BI/LI RJN or the Trustee RJN.  In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (indicating that bankruptcy judges may take judicial notice of bankruptcy court records but many not "infer the truth of the facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court").

     c.  Incorporation by Reference

        i.  Arguments

BAC/BI/LI request that the Court incorporate by reference the following documents:

1) Four "Aircraft Purchase Agreements"[4] executed by BAC as "Seller" and Yuntian 4 Leasing Company Limited (Yuntian 4) as "Buyer" on 9/9/16, 9/19/16, and 9/20/16 regarding Planes 12-15 (Plane 12-15 APAs).  Fishman 11/11/21 Decl. Exs. E, F, G, H.

2) Three documents titled "Assignment of Certain Rights Under the Aircraft Purchase Agreement . . ." executed by Zetta Singapore, and various additional parties,[5] which were agreed and consented to by BAC (APA Assignments).  Fishman 11/11/21 Decl. Exs. I, J, K.

3) An undated "Zetta Jet Information Memorandum" (Information Memo).  Fishman 11/11/21 Decl. Ex. L.

4) Four documents titled "Agreement for Payment of a Commission or Fee on the Sale of an Aircraft" between BI and Fazal-Karim as "Representative" (Representative Agreements).  Fishman 11/11/21 Decl. Ex. M.

---

[4] Zetta Singapore executed numerous aircraft purchase agreements (APAs), which the Court references by their plane numbers.  See FAC Sch. 2 (detailing the APAs attached to the FAC regarding each plane). For example, the APA for Plane 2 is referred to as the "Plane 2 APA."  Additionally, the APAs for Planes 2-5, 8, and 9 were executed by BAC as "Seller" and Zetta Singapore as "Buyer," and the Court refers to these collectively as the "Zetta-BAC APAs."  FAC Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88.

[5] The APA Assignments for Planes 2 and 3 identify Zetta Singapore as "Assignor," and were executed by Wells Fargo Delaware Trust Company, National Association, not in its individual capacity but solely as Trustee for ZJ6000-1 Trust and ZJ6000-2 Trust, the "Assignees."  Fishman 11/11/21 Decl. Exs. I, J.  The Plane 4 APA Assignment was executed by CAVIC as "Buyer" or "Assignor" and by TVPX ARS Inc. (TVPX), not in its individual capacity but solely as trustee by its appointed attorney for ZJ6000-3 Statutory Trust.  Id. Ex. K.  ZJ6000-1 Trust, ZJ6000-2 Trust, and ZJ6000-3 Statutory Trust were special purpose vehicles established by AVIC, CAVIC's parent company, for the leases of Planes 2-4, and AVIC controlled all decisions made by those trusts (CAVIC Statutory Trusts).  FAC ¶¶ 61-62.  Although the FAC refers to the ZJ6000-1 Trust as the ZJ6000-1 Statutory Trust and the ZJ6002-1 Trust as the ZJ6000-2 Statutory Trust, documents attached to the FAC demonstrate that only the ZJ6000-3 Statutory Trust had "statutory trust" in its name.  See FAC Exs. 2-27 (indicating that the ZJ 6000-1 Trust was the lessor of the Plane 2 Lease); 2-35 (showing that the ZJ 6000-2 Trust was the lessor of the Plane 3 Lease).

BAC/BI/LI RJN at 2-3.  BAC/BI/LI argue that these documents should be incorporated by reference because the FAC extensively refers to, selectively quotes, and relies on each one.  Id. at 4.  They highlight that the FAC links the Plane 12-15 APAs with $500,000 Jetcraft paid to Cassidy disguised to look like part of Plane 10's purchase price, which was an inducement for Cassidy to buy Planes 10-15 and accept delivery of Plane 3 and other aircraft (Second Kickback).  Id. (citing FAC ¶ 239).  And, the FAC alleges that BAC/BI bribed Cassidy with two Sea-Doo jet skis (Sea-Doos) and five tickets to a Formula 1 event (F1 Tickets) to ensure that he would accept delivery of Plane 3, and not cancel orders for Planes 4, 5, 8, and 9.  Id. (citing FAC ¶¶ 239, 321, 441, Sch. 1).

They contend that the FAC describes the aircraft transactions between CAVIC and Zetta Singapore in detail, but the APA Assignments are not included in FAC Sch. 2, which "purport[s] to include all transactional documents for Planes 2-5."  Id. (citing FAC ¶¶ 133-148, Sch. 2).  BAC/BI/LI note that the FAC quotes several projections from the Information Memo that are "materially false and misleading statements" and assert that the Information Memo was the beginning of Cassidy's fraud scheme.  Id. at 5 (citing FAC ¶¶ 408-10, 437).  They conclude that the FAC relies on the Representative Agreements to establish an agency relationship between BAC/BI and Fazal-Karim.  Id. (citing FAC ¶¶ 389, 394).

The Trustee responds that BAC/BI/LI's assertion that the FAC "extensively refers to, selectively quotes, and relies on" the Plane 12-15 APAs, APA Assignments, Information Memo, and Representative Agreements is incorrect.  RJN Objection at 4.  He contends that it is inappropriate for the Court to incorporate documents that are merely mentioned in the FAC, and BAC/BI/LI are seeking to incorporate documents that the FAC does not reference.  Id. (quoting Longo v. OSI Sys., Inc., 2020 WL 3124221, at *2 (C.D. Cal. Mar. 11, 2020)).

The Trustee asserts that the FAC does not quote the Plane 12-15 APAs but merely mentions them in three of its 840 paragraphs.  Id. at 5.  He argues that neither the FAC nor Sch. 2 refer to the APA Assignments.  Id. at 4-5.  The Trustee notes that the FAC references the Information Memo only "a handful" of times but it does not "refer extensively" to that document.  Id. at 6.  According to the Trustee, he does not quote from the Representative Agreements and the FAC's two paragraphs where they are mentioned do not constitute significant references to those documents.  Id.  He claims that "broad references" to the Representative Agreements are insufficient to incorporate them by reference.  Id. at 5-6 (quoting Morales-Garcia v. Higuera Farms, Inc., 2019 WL 4284512, at *2 (C.D. Cal. May 9, 2019)).

The Trustee contends that the cases cited by BAC/BI/LI are inapposite because they demonstrate that incorporation by reference is only proper where a document was extensively referenced and was "central to the Plaintiff's claims."  Id. at 6 (citing Khoja v.

Orexigen Therapeutics, Inc., 899 F.3d 988, 1003 (9th Cir. 2018); Coppes v. Wachovia Mortg. Corp., 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011)). He argues that In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 986 (9th Cir. 1999) is distinguishable because the claims in that case relied on the documents defendants sought to incorporate by reference. Id. at 6-7.

The Trustee asserts that the APA Assignments are not the basis for any of his claims, and BAC/BI/LI seek to introduce the Planes 12-15 APAs, Information Memo, and Representative Agreements to dispute that: 1) the planes were overpriced; 2) Zetta Singapore could cancel the APAs; and 3) Fazal-Karim had actual authority. Id. at 7-8. He contends that it is inappropriate to incorporate a document by reference merely to allow a party to rebut or defend against a well-pled complaint. Id. at 8 (citing Khoja, 899 F.3d at 1002; Riley v. Chopra, 2020 WL 5217154, at *2 (C.D. Cal. June 19, 2020); Murray v. Murray, 2020 WL 9813514, at *3 (C.D. Cal. July 20, 2020)). The Trustee distinguishes this case from Coppes v. Wachovia Mortgage Corp., 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011) and Tawfilis v. Allergan, Inc., 2016 WL 3919488, at *2 (C.D. Cal. May 31, 2016) because none of the documents that BAC/BI/LI seek to incorporate by reference are "central to" the FAC's claims, nor are those claims "entirely dependent" on the documents. Id. at 8-9. He acknowledges that the Information Memo contains statements that support the FAC's fraud claims but he argues that those claims are neither "central to" nor "entirely dependent" on it. Id. at 9.

BAC/BI/LI reply that incorporation by reference does not require a complaint to refer to or quote from a document, but is permitted where: 1) "the plaintiff's claim depends on the contents of a document"; 2) "the defendant attaches the document to its motion to dismiss"; and 3) "the parties do not dispute the authenticity of the document[.]" BAC/BI/LI RJN Reply at 15-16 (quoting Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005)). They argue that the doctrine is used to prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents on which their claims are based. Id. at 16 (quoting Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998)).

BAC/BI/LI contend that the Plane 12-15 APAs form the basis for "the entirety of the FAC" because the Trustee alleges that they were "central cogs in Cassidy's fraudulent scheme," linked to the Sea-Doos, F1 Tickets, and Second Kickback. Id. at 16-17 (citing FAC ¶¶ 239, 271, 296, 310, 321, 441, 628). They note that the Trustee concedes that the FAC mentions the Plane 12-15 APAs three times. Id. at 20. They argue that those APAs may also be incorporated by reference because they rebut the FAC's conclusory allegations that Zetta Singapore bought Planes 12-15 from BAC. Id. at 22.

Focusing on the APA Assignments, BAC/BI/LI assert that the Trustee discusses Planes 2-5 in detail as part of his argument to recharacterize the leases for Planes 2-4 (Plane 2-4 Leases) as "loans" to Zetta Singapore, which serve as the premise for his fraudulent transfer claims. Id. at 17 (citing FAC ¶¶ 133-148; FAC Exs. 2-27, 2-35, 2-47).

11

BAC/BI/LI contend that the FAC selectively references the Plane 2-4 APAs between BAC and Zetta Singapore and the leases between CAVIC and Zetta Singapore for those aircraft, but it excludes the APA Assignments.  Id. (citing FAC Exs. 2-24, 2-31, 2-40).  According to BAC/BI/LI, the FAC's fraudulent transfer claims and the Trustee's recharacterization argument involve the APA Assignments because the Plane 2-4 Leases and APA Assignments must be recharacterized for the Trustee to recover from BAC/BI.  Id. at 17-18.  BAC/BI/LI argue that the Trustee's assertion that the FAC does not rely on the APA Assignments demonstrates the implausibility of his claim that the Plane 2-4 Leases should be recharacterized and defeats his fraudulent transfer claims.  Id.  BAC/BI/LI highlight that the FAC contains 16 paragraphs describing the transactions between CAVIC and Zetta Singapore, culminating in the Plane 2-4 Leases, in which the APA Assignments played an integral role.  Id. at 20 (citing FAC ¶¶ 133-148).

BAC/BI/LI assert that the Trustee's argument that Cassidy defrauded Zetta Singapore by buying overpriced aircraft is based on the Information Memo.  Id. at 19 (citing FAC ¶¶ 408-09).  They argue that because the Trustee alleges that the Information Memo "proves" his case, it forms the basis for his claims and should be incorporated by reference.  Id. at 20 (citing U.S. Bank, N.A. for Registered Holders of ML-CFC Com. Mortg. Tr. 2007-7 v. Miller, 2013 WL 12183654, at *5 (C.D. Cal. Sept. 19, 2013)).  According to BAC/BI/LI, the Information Memo is quoted "at length" in the FAC.  Id. (citing FAC ¶¶ 408-10, 437).

BAC/BI/LI conclude that the Representative Agreements form the basis of the tort claims—Counts 1, 2, 3, 6, and 7 (Tort Claims)—because the FAC indicates that they are liable for Fazal-Karim's conduct, and the Representative Agreements govern their purported agency relationship.  Id. at 18-19 (citing FAC ¶¶ 239, 318, 387, 464, 564, 576, 610).  BAC/BI/LI assert that the Representative Agreements may be incorporated by reference because they disclaim an agency relationship and rebut the FAC's conclusory assertion that Fazal-Karim was BAC/BI's agent.  Id. at 23 (citing FAC ¶¶ 389, 394.a-394.g; Fishman 11/11/21 Decl. Ex. M).

                    ii.  Analysis

The incorporation-by-reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018).  A defendant may seek to incorporate a document into a complaint if: 1) the plaintiff "refers extensively to the document"; or 2) the document "forms the basis of the plaintiff's claim."  Id. (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).

For a document to be referred to "extensively" there must be more than a "mere mention of the existence of a document" in the complaint.  Id. (citing Coto Settlement v.

<u>Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010)).  But, a single reference could, in theory, satisfy the standard if the reference is relatively lengthy.  <u>Lowthorp v. Mesa Air Grp. Inc.</u>, 2021 WL 3089118, at *3 (D. Ariz. July 22, 2021) (quoting <u>Khoja</u>, 899 F.3d at 1003).

Incorporation by reference has also been extended "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."  <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076 (9th Cir. 2005).  Where a plaintiff's theories of liability are "entirely dependent" on the terms of an agreement or they are "central" to the plaintiff's claim, a court may incorporate the agreement by reference.  <u>Tawfilis v. Allergan, Inc.</u>, 2016 WL 3919488, at *2 (C.D. Cal. May 31, 2016); <u>Coppes v. Wachovia Mortg. Corp.</u>, 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011).

Incorporation by reference cannot be used merely to create a defense to well-pled allegations in a complaint.  <u>Riley v. Chopra</u>, 2020 WL 5217154, at *2 (C.D. Cal. June 19, 2020).  But, incorporation by reference can be used to "create factual disputes with a plaintiff's conclusory allegation."  <u>In re Eventbrite, Inc. Sec. Litig.</u>, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020).

1.  Plane 12-15 APAs

The FAC alleges that:

1) BAC/BI "agreed to pay Cassidy [a] bribe worth $42,569, less than two weeks before Cassidy induced the Debtors to sign [the Plane 12-15 APAs]."  FAC ¶ 239.
2) Cassidy executed the Plane 12-15 APAs on 9/22/16, less than 10 days after Khader Mattar (Mattar), the Vice President of Sales for the Middle East, Africa, Asia Pacific, and China for Bombardier Business Aircraft (a business group coextensive across BAC and BI), authorized the purchase of F1 Tickets and agreed to pay for Sea-Doos.  <u>Id.</u> ¶¶ 57, 321.
3) The Sea-Doos and F1 Tickets were paid partially in response to Cassidy's threats to terminate negotiations regarding Planes 12-15.  <u>Id.</u> ¶ 310.
4) The Second Kickback was paid to Cassidy as an inducement to acquire Planes 12-15.  <u>Id.</u> ¶ 271.

In addition to general allegations about the timing of the Plane 12-15 APAs' execution and their link to the Sea-Doos, F1 Tickets, and Second Kickback, the FAC mentions several specific provisions of those documents, including Plane 12's purchase price (and the amount by which it was overpriced), as well as the Plane 12-15 APAs' choice-of-law provisions, the aircrafts' contemplated delivery location (Connecticut), the place

13

Case: 24-2703, 05/24/2024, DktEntry: 6.1, Page 140 of 276

Case 2:19-ap-01382-SK    Doc 383-3    Filed 06/23/22    Entered 06/23/22 14:23:50    Desc
Redacted Memorandum of Decision    Page 14 of 81

of payment (BAC's Texas Bank of America account), and where those APAs were signed (Orlando).  FAC ¶¶ 344, 530, 532-34.  The FAC also provides that neither Zetta Singapore nor BAC—the "only parties to the [Plane 12-15] APAs"—were residents of New York or were incorporated or organized under New York law.  Id. ¶ 531.  Finally, FAC Sch. 1, titled "Summary of Aircraft Transactions," lists the dates the Plane 12-15 APAs were executed, as well as the Seller (BAC), the Buyer (Zetta Singapore), the Guarantor (Zetta USA), and the Financier (Minsheng/Yuntian).  Id. Sch. 1.

Far from merely referencing the Plane 12-15 APAs, the FAC highlights half-dozen relevant provisions from those documents.  Id. ¶¶ 344, 530, 531, 533, Sch 1.  The FAC addresses significant portions of the Plane 12-15 APAs, which are less than 15 pages long and only contain 17 Articles.  Id. ¶¶ 344, 530, 531, 533, Sch 1; Fishman 11/11/21 Decl. Exs. E, F, G, H.  The Trustee does so to buttress his position that Plane 12 was overpriced, to support his argument that California law should apply, and to show that BAC/BI participated in the Second Kickback, provided Cassidy the F1 Tickets, and agreed to pay for the Sea-Doos.  Id. ¶¶ 239, 305, 344, 538.  The very purpose of incorporation by reference is to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018).  Throughout the FAC, there are multiple references to the Plane 12-15 APAs, which extend well beyond merely mentioning those documents but instead "extensively" refer to them.  Id. (citing Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010)).  On this basis, the Court finds that it is appropriate to incorporate by reference the Plane 12-15 APAs.

Alternatively, the Plane 12-15 APAs can also be incorporated by reference because, as analyzed below, they strike at a central aspect of the Trustee's agency claims regarding Planes 12-15 and the Trustee does not challenge their authenticity.  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Coppes v. Wachovia Mortg. Corp., 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011).  The Plane 12-15 APAs show that Zetta Singapore did not buy those aircraft from BAC/BI.  Instead, Yuntian 4 bought those aircraft from BAC.  Fishman 11/11/21 Decl. Exs. E, F, G, H (BAC was the "Seller" and Yuntian 4 was the "Buyer" of each aircraft).  In fact, each APA referred to Zetta Singapore as Yuntian 4's "end user client," indicating that the Debtors were *not* the "Buyers" of Planes 12-15.  Fishman 11/11/21 Decl. Exs. E § 15.1, F § 15.1, G § 15.1, H § 15.1.

2.  APA Assignments

The FAC outlines Zetta Singapore's purchase of Planes 2-5 and transactions between CAVIC, BAC, and Zetta Singapore involving those aircraft:

14

1) In October and November 2015, Cassidy and Fazal-Karim negotiated letters of intent to buy Global 6000 aircraft, resulting in Zetta Singapore, executing an 11/18/15 letter of intent to buy six planes.  FAC ¶ 134.

2) On 12/10/15, Cassidy, on behalf of Zetta Singapore, executed APAs with BAC for Planes 2-5.  Id. ¶ 135.

3) The Debtors, through TVPX,[6] executed the Plane 2-4 Leases with the CAVIC Statutory Trusts.  Id. ¶¶ 62, 64, 137.

4) TVPX also executed subleases with Zetta USA, which mirrored the Plane 2-4 Leases, and transferred responsibility and obligations under those leases to Zetta USA.  Id. ¶¶ 137, 139.

5) Planes 2, 3, and 4 were delivered in May 2016, September 2016, and March 2017 respectively; Plane 5 was never delivered.  Id. ¶¶ 144-47.

6) Zetta Singapore transferred approximately $31 million to BAC for Planes 2-5, and also "made transfers to BAC consisting of $120.36 million in loan proceeds from CAVIC."  Id. ¶ 143.

The exhibits attached to the FAC provide more specific information regarding these transactions:

1) On 12/10/15, Zetta Singapore as "Buyer" and BAC as "Seller" executed APAs for Planes 2-5.  FAC ¶ 135; FAC Exs. 2-24, 2-31, 2-40, 2-53.

2) Regarding Plane 2,[7] on 5/24/16, a number of documents were executed:
   a. The CAVIC Statutory Trust, ZJ 6000-1 Trust,[8] as "Lessor" executed the Plane 2 Lease with TVPX, as "Lessee."  FAC Ex. 2-27.
   b. TVPX as "Lessor" executed an "Aircraft Sub Lease Agreement" with Zetta USA[9] (Plane 2 Sublease).  FAC Ex. 2-28.

---

[6] The "First Amended Adversary Complaint" filed in the CAVIC AP explains that TVPX was the owner trustee of the CAVIC Statutory Trusts and lessee trustee of several trusts formed and controlled by Zetta Singapore for the purpose of registering aircraft with the United States Federal Aviation Administration (FAA).  CAVIC AP Docket #300 ¶¶ 22-33.  This constitutes a judicial admission, which withdraws TVPX's identity from issue.  Am. Title Ins. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).

[7] The parties executed similar documents regarding Planes 2, 3, and 4, and except as noted below, the documents regarding each aircraft were virtually identical.  For Plane 3, the Lease, Sublease, Trust Agreement, and Deed of Guarantee were either executed on a different date or the execution date was blank.  For Plane 4, the documents were executed on either 12/22/16 or 12/23/16 other than the "Facility Agreement," which was signed on 3/17/17.  FAC Sch. 2.

[8] The Plane 3 and 4 Leases were executed by different CAVIC Statutory Trusts, ZJ6000-2 Trust and ZJ6000-3 Statutory Trust, respectively.  FAC Exs. 2-35, 2-47.

[9] The Plane 2 Sublease was executed by "Advanced Air Management, Inc." (AAM), which was the predecessor of Zetta USA.  FAC ¶ 23.  For ease of reference, AAM is referred to as Zetta USA.

15

    c. Zetta Singapore as "Trustor" executed a "Trust Agreement" with TVPX as "Owner Trustee," indicating that Zetta Singapore[10] was conveying the aircraft's title to TVPX.  FAC Ex. 2-29 § 2.01.

    d. ZJ 6000-1 Trust, as "Beneficiary," and Cassidy, Zetta Singapore, Zetta USA, and Asia Aviation Company Pte Ltd.[11] as Guarantors, executed a "Deed of Guarantee and Indemnity," under which each "Guarantor" guaranteed TVPX's and Zetta USA's performance of their respective obligations under the Plane 2 Lease and Plane 2 Sublease.  FAC Ex. 2-30 cls. 1.1, 2.1.

3) The FAC attaches a few additional documents regarding Plane 4:

    a. CAVIC as "Seller" executed a "Forward Purchase Agreement" (FPA) with TVPX, as "owner trustee" and "Buyer," which provided that CAVIC had or would enter into a "Purchase Agreement Assignment" with Zetta Singapore, the "Original Purchaser," under which CAVIC could buy Plane 4 from BAC.  FAC Ex. 2-49 cl. A.

    b. CAVIC as "Beneficiary," and Cassidy, Zetta Singapore, Zetta USA, and Asia Aviation Company Pte Ltd. as Guarantors, executed a "Deed of Guarantee," under which each "Guarantor" guaranteed TVPX's performance of its obligations under the FPA.  FAC Ex. 2-50 cls. 1.1, 2.1.

    c. ZJ6000-3 Statutory Trust as "Borrower" entered a "Facility Agreement" with Export Development Canada (EDC) as "Agent," "Security Trustee," and "Lender," under which EDC agreed to make available a term lending facility to finance part of Plane 4's purchase price.  FAC Ex. 2-52 cls. 2.1, 3.1, Sch. A.

The FAC does not mention the APA Assignments nor are they included in Sch. 2, so the Court cannot find that the Trustee "refers extensively" to them.  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018) (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).  But, the APA Assignments could be incorporated by reference if the Trustee's claims depend on their contents.  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

Here, the Trustee alleges in Counts 14 and 15 that: 1) the Debtors were the true economic owners of Planes 2-4; 2) the Plane 2-4 Leases were "finance leases" creating a security interest; 3) Debtors, not CAVIC, were the true economic owners of Planes 2-4; and 4) the Trustee is entitled to avoid the Plane 2-5 APAs and recover $120.36

---

[10] The Plane 4 Trust Agreement, though substantively similar, was between Zetta Jet Global 6000-4 Limited, a subsidiary of Zetta Singapore, as "Trustor" and TVPX as "Lessee Trustee."  FAC ¶ 35; FAC Ex. 2-46 § 2.01.

[11] Asia Aviation Company Pte. Ltd., which was owned by Cassidy and his wife, merged with Zetta Singapore in August 2016.  FAC ¶¶ 22, 24.

16

million of "loan proceeds" BAC received from CAVIC on behalf of the Debtors for those aircraft.  Id. ¶¶ 714-20, 729, 738-44, 750.

There are material gaps in the FAC's allegations and Sch. 2 regarding Planes 2-4, which the APA Assignments fill.  The Plane 2-4 Leases and Subleases demonstrate that title to Planes 2-4 passed from Zetta Singapore to a CAVIC Statutory Trust at some point.  The Plane 2-4 Leases identify the CAVIC Statutory Trusts as both "Lessors" and "Owners," and one of the conditions precedent for the Plane 2-4 Leases to be effective was that the CAVIC Statutory Trusts had to "acquire[] title to the aircraft from [BI] as seller."  FAC Exs. 2-27 Schs. 2, 3; 2-35 Schs. 2, 3; 2-47 Schs. 2, 3.  This is reenforced in the Plane 2-4 Subleases between TVPX and Zetta USA, which identify the CAVIC Statutory Trusts, rather than Zetta USA or Zetta Singapore, as "Owner[s]," of Planes 2-4.  FAC Exs. 2-28 Sch. 2; 2-36 Sch. 2; 2-51 Sch. 2.  Further, as a condition precedent to the Plane 2-4 Subleases' effectiveness, the CAVIC Statutory Trusts had to acquire title to Planes 2-4.  FAC Exs. 2-28 Schs. 2, 3; 2-36 Schs. 2, 3; 2-51 Schs. 2, 3.  The FAC confirms that the Plane 2-4 Leases became effective—the Debtors were alleged to have made millions of dollars of lease payments, meaning that all conditions precedent to the Plane 2-4 Leases and Planes 2-4 Subleases must have been satisfied.  FAC ¶¶ 138, 143.  For this reason, the CAVIC Statutory Trusts had to have acquired title to Planes 2-4.

The additional documents attached to the FAC regarding Plane 4 underscore this conclusion.  Plane 4's FPA identified CAVIC as the "Seller" of that aircraft and was premised on the precondition that CAVIC had or would enter into "Purchase Agreement Assignments" with Zetta Singapore.  FAC Ex. 2-49 cls. A, 2.1.  Further, the purpose of Plane 4's Facility Agreement was to finance Plane 4's purchase price.  FAC Ex. 2-52 cls. 3.1.

The gap between when and how Planes 2-4 were transferred from Zetta Singapore to entities controlled by CAVIC—the CAVIC Statutory Trusts—is central to Counts 14 and 15, which provides that:

1) The Plane 2-4 Leases were not true or operating leases but instead were finance leases.  FAC ¶¶ 714, 738.
2) The Court should declare that the Plane 2-4 Leases are recharacterized as secured financings and the Debtors had an economic ownership interest in Planes 2-4.  Id. ¶¶ 719, 743.
3) The Debtors, and not CAVIC, were the true owners of Planes 2-4.  Id. ¶¶ 718, 742.
4) The Trustee is entitled to avoid the APAs for Planes 2-5 and recover the value of the transfers made on account of the obligations under those APAs pursuant to 11 U.S.C. §§ 548(a)(1) and 550(a).  ¶¶ 729-30, 750-51.

17

Without the crucial information regarding how the CAVIC Statutory Trusts obtained title to Planes 2-4, via the APA Assignments, it is impossible to assess whether the Debtors had any interest in or obligations from the Plane 2-4 APAs.[12]

Further, Counts 14 and 15 also allege that the Debtors "made transfers to BAC consisting of a total of $120.36 million in loan proceeds from CAVIC." FAC ¶¶ 143, 720, 744. But again, a critical gap exists because the FAC does not contain any facts explaining why CAVIC transferred $120.36 million in "loan proceeds" to BAC. This is essential to the Trustee's fraudulent transfer claims, because a necessary element of these claims is that the $120.36 million transferred from CAVIC to BAC was "an interest of the [D]ebtor[s] in property." 11 U.S.C. § 548(a)(1).

The contents of the APA Assignments fill these gaps and the Court finds that they are essential to the Trustee's claims. Each was executed by Zetta Singapore as "Assignor" and a CAVIC Statutory Trust as "Assignee" and provided that:

> [Zetta Singapore] hereby transfers with full title under the warranty bill of sale and assigns to Assignee, i) its obligation to make all payments under the Agreement[13] to the extent not already performed by Assignor as if it were the original purchaser under the Agreement . . . , ii) its right to accept Delivery of the Aircaft [sic] and take title to the Aircraft and be named as buyer in the bill of sale for the Aircraft . . . , and iii) any and all rights of [Zetta Singapore] to compel performance of the terms of the Agreement by [BAC/BI] corresponding to the rights assigned under this clause in respect of the Aircraft, and Assignee accepts such transfer and assignment.

---

[12] The timing of the Plane 2-4 APA Assignments' execution buttresses this conclusion. The APA Assignments for Planes 2, 3, and 4 were executed on 5/24/16, 9/22/16, and 3/28/17 respectively. Fishman 11/11/21 Decl. Exs. I, J, K. These execution dates match the date that each of those aircraft were delivered. FAC ¶¶ 144-46. Additionally, the Plane 2 APA Assignment was executed on 5/24/16 contemporaneously with the Lease, Sublease, Trust Agreement, and Deed of Guarantee & Indemnity. FAC Sch 2; Fishman 11/11/21 Decl. Ex. I at 1. The Plane 3 APA Assignment was executed on 9/22/16, contemporaneously with the Plane 3 Deed of Guarantee & Indemnity and within a week of the related Lease and Sublease. FAC Sch 2; Fishman 11/11/21 Decl. Ex. J at 1. The Plane 4 APA Assignment was executed on 3/28/17, three months after the Plane 4 Lease, Sublease, Trust Agreement, Deed of Guarantee & Indemnity, FPA, and FPA Deed of Guarantee & Indemnity. FAC Sch. 2; Fishman 11/11/21 Decl. Ex. K at 1. The Plane 4 Facility Agreement, however, was executed on 3/17/17, only a couple weeks before the Plane 4 APA Assignment. FAC Sch. 2.

[13] The APA Assignments each define "Agreement" as the relevant APA between BAC and Zetta Singapore together with all (i) schedules, completion work and other specifications, and (ii) amendments, supplements, exhibits and letter agreements relating thereto, and (iii) any warranty Bill of Sale thereto. Fishman 11/11/21 Decl. Exs. I at 1, J at 1, K at 1.

18

Fishman 11/11/21 Decl. Exs. I § 1, J § 1. [14]  The APA Assignments: 1) show that Planes 2-4 were transferred from Zetta Singapore to a CAVIC Statutory Trust; and 2) specify the terms of the $120.36 million transfer from CAVIC to BAC: "as if [the CAVIC Statutory Trust] were the original purchaser under the Agreement." Id. Exs. I § 1, J § 1, K § 1. Because the APA Assignments are central to the Trustee's claims, fill gaps in the FAC's allegations and gaps in the exhibits attached to the FAC, and the Trustee does not dispute those documents' authenticity, the Court finds that it is appropriate to incorporate them by reference. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Coppes v. Wachovia Mortgage Corp., 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011).

### 3.  Information Memo

The FAC explains that Cassidy caused the Debtors to incur debts "with full knowledge that the Debtors' entire business was based on his fraudulent scheme," which began with preparing the "materially false and misleading" Information Memo, promising overstated profits and returns he knew were not achievable. FAC ¶¶ 404, 408. According to the FAC, Cassidy caused the Information Memo to be sent to investors and lenders "in hallmark Ponzi scheme fashion." Id. ¶ 409.  The FAC details specific false statements contained in the Information Memo, including:

1) As of 9/1/15, Zetta Singapore had contracts for approximately $75 million of pre-paid hours for a jet charter, when it had actually contracted for none. Id. ¶ 410.a.
2) Zetta Singapore's projected EBITDA margin would be 45.2% for the 2016 fiscal year, when its actual EBITDA margin was 16%. Id. ¶ 410.b.
3) As of September 2015, Zetta Singapore was operating five planes with the intent of acquiring five more by the end of the 2017 fiscal year, when the Debtors actually acquired 15 additional planes by the end of the 2017 fiscal year. Id. ¶ 410.c.
4) Zetta Singapore's projected finance costs would be $4.7 million and $10.1 million in the 2016 and 2017 fiscal years respectively, but its actual finance costs were $19.8 million and $59.3 million during those years. Id. ¶ 410.d.
5) The projected average charter rate was $12,000 per hour for on-demand services and $13,800 per hour for "blocked hours," however, the actual average hourly rate was $8,500, and Zetta Singapore only signed one contract at or above its projected hourly rate. Id. ¶ 410.e.
6) Projected costs were $46 million for the 2016 fiscal year, but actual costs were $70 million. Id. ¶ 410.f.

---

[14] The Plane 4 APA Assignment also included one additional clause indicating that Zetta Singapore assigned "the benefits of all the advance payments already made by [Zetta Singapore] in respect of the Aircraft" to the CAVIC Statutory Trust.  Fishman 11/11/21 Decl. Ex. K § 1.

19

Although the Trustee attempts to minimize the FAC's reliance on the Information Memo, the FAC outlines no fewer than six specific false statements made in the Information Memo in granular terms.  Id. ¶ 410.  Having referred so extensively to the Information Memo, the Trustee "can hardly complain when [BAC/BI/LI] use the same information in their defense."  In re Silicon Graphics Secs. Litig., 183 F.3d 970, 986 (9th Cir.1999).  Therefore, the Court finds that it is appropriate to incorporate by reference the Information Memo.

### 4.   Representative Agreements/Sales Representative Agreement

The FAC indicates that BAC/BI are independently liable for the misconduct of their agent, Fazal-Karim.  FAC ¶ 387.  According to the FAC, the alleged agency relationship between BAC/BI and Fazal-Karim was "ostensibly governed" by "(i) individual seller-representative agreements that governed commissions; and (ii) a Sales Representative Agreement."[15]  Id. ¶ 389.  The FAC provides that "[BAC/BI]'s agreements with Fazal-Karim treat[ed] him as an agent, not an independent contractor, because they [gave] [BAC/BI] the right to control Fazal-Karim's conduct with respect to the sale of aircraft."  Id. ¶ 394.  The FAC highlights several terms of the SRA and Representative Agreements between Fazal-Karim and BAC/BI, including that Fazal-Karim:

1) Personally received commissions of ██████ on each of Planes 2-5.  Id. ¶ 148.
2) Had the right to "acquire the right to market and sell" BAC/BI aircraft.  Id. ¶ 394.a.
3) Was the "PREFERRED sales representative" for the territory.[16]  Id. ¶ 394.b.
4) Was required to comply with BAC/BI's Code of Ethics and Business Conduct.  Id. ¶¶ 322, 394.c.
5) Was authorized to use BAC/BI's and BAC/BI affiliates' trademark, trade name, sign, logo, symbol, and service marks.  Id. ¶ 394.d.
6) Was forbidden from advertising information concerning BAC/BI aircraft without prior written consent of BAC/BI.  Id. ¶ 394.e.
7) Was required to maintain records and grant BAC/BI the "right to access" and to "examine and audit" the records.  Id. ¶¶ 394.f, 394.g.

The Trustee's theory of liability for the Tort Claims—which are addressed in the next section of this ruling—is premised, in part, on the assertion that Fazal-Karim was acting as BAC/BI's agent.  Id. ¶¶ 564-67, 572, 576, 598, 610, 623, 627, 640.  The FAC

---

[15] The FAC cites a "Sales Representative Agreement" dated 7/1/16 between BAC/BI and Fazal-Karim which "ostensibly governed their relationship," and allegedly treated Fazal-Karim as an agent (SRA). FAC ¶ 389.  This document was not attached to the FAC.

[16] Although the FAC indicates that Fazal-Karim served as BAC/BI's agent in southeast Asia, and he held himself out as the exclusive BAC/BI representative for southeast Asia and Singapore, the FAC does not describe the territory specifically covered by the SRA.  Id. ¶¶ 40, 390, 397.

20

provides that Fazal-Karim and BAC/BI's agreements, including the Representative Agreements, "ostensibly governed" the relationship and "treat[ed] [Fazal-Karim] as an agent, not an independent contractor[.]" Id. ¶¶ 389, 394. Because the Trustee bases the Tort Claims on an agency relationship, and the Representative Agreements govern that relationship, the FAC's Tort Claims against BAC/BI/LI "depend[] on the contents of [the Representative Agreements.]" Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); see also Coppes v. Wachovia Mortg. Corp., 2011 WL 4852259, at *1 (E.D. Cal. Oct. 12, 2011) (incorporating a document by reference where it was "central to the [p]laintiff's claims"). Additionally, the Court notes that the Representative Agreements were filed with BAC/BI/LI's Motion, and the Trustee does not dispute the documents' authenticity. Knievel, 393 F.3d at 1076.

Although the Trustee contends that BAC/BI/LI impermissibly use incorporation by reference as a tool to dispute facts and establish defenses against the well-pled FAC, this argument is not persuasive. Incorporation by reference is impermissible where the *only* purpose is to dispute a well-pled fact, but here several of the Trustee's claims "necessarily depend[] on [the Representative Agreements[.]" Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002, 1003 (9th Cir. 2018). And, incorporation by reference can be used to rebut "*conclusory* allegations." In re Eventbrite, Inc. Sec. Litig., 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020) (emphasis in original). The FAC summarily states that "[BAC/BI]'s agreements with Fazal-Karim treat[ed] him as an agent, not an independent contractor, because they [gave] [BAC/BI] the right to control Fazal-Karim's conduct" regarding "the sale of aircraft," which is a legal conclusion about Fazal-Karim's status. FAC ¶ 394. The Court is permitted to analyze the documents underlying the FAC's conclusory assertions. Eventbrite, 2020 WL 2042078, at *7.

d.  Tort Claims

The FAC alleges five tort claims against BAC/BI:

1)  Aiding and Abetting Cassidy's Breach of Fiduciary Duty (Count 1);
2)  Civil Conspiracy (Count 2);
3)  California's Unfair Competition Law (UCL) (Count 3);
4)  Fraudulent Misrepresentation (Count 6); and
5)  Fraudulent Concealment / Nondisclosure (Count 7).

Before considering the substance of each claim, the Court must address two dispositive issues: 1) which state's law governs the Tort Claims; and 2) whether Fazal-Karim acted as BAC/BI's agent regarding the transactions alleged in those claims.

i.  Choice of Law

1.  Whether Restatement 187(1) or 187(2) Applies

21

a. Arguments

BAC/BI/LI argue that federal common law choice-of-law rules apply in bankruptcy cases, with federal law determining the *enforceability* of a choice-of-law clause and the state law identified in the clause determining its *scope*. Motion at 27-28 (emphasis in original) (citing Odin Shipping Ltd. v. Drive Ocean V MV, 221 F.3d 1348 (Table), 2000 WL 576436, at *1 (9th Cir. May 11, 2000)). They contend that federal common law applies the Restatement (Second) of Conflict of Laws (Restatement) § 187 to determine enforceability of contractual choice-of-law provisions. Id. at 28 (citing "Court's Memorandum of Decision on 'Motion to Dismiss . . .'" (CAVIC MTD Ruling), CAVIC AP Docket #157-1 at 14). BAC/BI/LI argue that § 187 reflects a strong policy favoring enforcement of the parties chosen law, even where the law chosen by the parties does not have any reasonable relationship to the creation or performance of the contract. Id. (citing CAVIC MTD Ruling at 14). According to BAC/BI/LI, a reasonable relationship to the laws of a forum exists if a company has an interest in "'identifying a single body of law' to govern a multi-jurisdictional transaction." Id. (citing King v. Bumble Trading, Inc., 393 F. Supp. 3d 856, 865 (N.D. Cal. 2019); Cayanan v. Citi Holdings, Inc., 928 F. Supp. 2d 1182, 1195 (S.D. Cal. 2013); CAVIC MTD Ruling at 18).

BAC/BI/LI assert that the Trustee is not challenging the formation of the Zetta-BAC APAs or demanding their recission. Id. Instead, they highlight that he seeks damages for the difference between what the Debtors paid for their aircraft and what those aircraft were actually worth. Id. BAC/BI/LI argue that even if the Trustee were challenging the Zetta-BAC APAs' formation, there is a reasonable relationship to New York because BAC/BI are international companies with an interest in having a single body of law govern their contracts with Zetta Singapore. Id. at 28-29. BAC/BI/LI explain that this is why the Zetta-BAC APAs, APA Assignments, Zetta Singapore's "Promissory Note," the "Affidavit of Confession of Judgement," and "Settlement Agreement" all chose New York law. Id. at 29 (citing FAC ¶¶ 488, 495; FAC Exs. 13, 14).

The Trustee responds that under binding Ninth Circuit precedent, Restatement § 187(2) rather than § 187(1) applies. Opposition at 20 (citing KST Data, Inc. v. DXC Tech. Co., 836 F. App'x 484, 487 (9th Cir. 2020); Flores v. Am. Seafoods Co., 335 F.3d 904, 917 (9th Cir. 2003)). He claims that, even though KST Data and Flores did not involve disputes regarding the making of a contract, the Ninth Circuit held that § 187(2) applies to a clause governing the "entire contract," while § 187(1) applies only "where the contract provides that a particular matter in the contract is to be governed by the law of the specified forum[.]" Id. at 20-21 (quoting Flores, 335 F.3d at 917). The Trustee asserts that CMR Mortgage Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortgage Fund, LLC), 416 B.R. 720, 729 (Bankr. N.D. Cal. 2009), on which Court relied in the CAVIC MTD Ruling, has been expressly rejected by the Ninth Circuit. Id. at 21 (citing Flores, 335 F.3d at 917). He also contends that even if the Court were to

22

apply § 187(1), the Court must still consider § 187(2)'s exceptions.  Id. (citing SPBS, Inc. v. Mobley, 2018 WL 4185522, at *10 (E.D. Tex. Aug. 31, 2018); Lakeland Reg'l Health Sys. v. Rite-Aid Corp., 2011 WL 13201826, at *9 (W.D. Mich. Feb. 7, 2011)).

The Trustee explains that under § 187(2), California law applies unless BAC/BI establish that: 1) New York has a substantial relationship to the parties or the transaction; or 2) there is any other reasonable basis for the parties' choice-of-law.  Id. (citing Ottman v. Anthem Life Ins., 2015 WL 12683809, at *2 (C.D. Cal. Oct. 15, 2015)). He identifies factors courts have considered when evaluating a "reasonable basis" including: 1) the state of incorporation; 2) forum-selection clauses selecting the same jurisdiction; 3) the use of the same choice-of-law provision in all contracts with multiple parties; 4) the place of performance and execution; 5) a particular familiarity with the law specified; and 6) whether the choice-of-law provision explains the choice.  Id.  He claims that if none of the FAC's allegations connect the parties or the Zetta-BAC APAs to New York, there is no reasonable basis to apply New York law.  Id. at 22 (citing NexRep, LLC v. ALIPHCOM, 2017 WL 1356345, at *3 (N.D. Cal. Mar. 8, 2017)).

The Trustee asserts that BAC/BI/LI do not claim that there is a substantial relationship with New York.  Id.  He contends that BAC/BI/LI's argument relies exclusively on the Zetta-BAC APAs' choice-of-law provisions and BAC/BI/LI's interest in having a single body of law govern their contract with Zetta Singapore.  Id.  According to the Trustee, having a single body of law govern the contracts was rejected by KST Data, Inc. v. DXC Technology, 2018 WL 5734227, at *5 (C.D. Cal. Mar. 26, 2018), aff'd in relevant part, 836 F. App'x 484 (9th Cir. 2020), which involved nearly identical arguments as those advanced by BAC/BI/LI regarding minimizing uncertainty in business disputes.  Id.  The Trustee claims that "if a reasonable basis were created simply through the inclusion of a choice-of-law provision in a contract, this would nullify the entire choice-of-law analysis[.]"  Id. (quoting KST, 836 F. App'x at 487).  The Trustee argues that this is especially true where the contracts do not select "New York as the forum for any dispute."  Id. (citing KST, 836 F. App'x at 487 n.1).

The Trustee asserts that, even if BAC/BI/LI could show a substantial relationship or reasonable basis for selecting New York law, under Restatement § 187(2) the Court must decide if New York law is contrary to a fundamental policy of California and whether California has a materially greater interest than New York in the issue.  Id. at 22-23 (citing Ottman v. Anthem Life Ins., 2015 WL 12683809, at *3 (C.D. Cal. Oct. 15, 2015)).  He claims that, to the extent that New York law would bar any tort claim, it would be contrary to California's fundamental policy of recognizing that there "is nothing fair or equitable about permitting a third party to attribute a corporate employee's acts to the corporation where the third party is engaged in a conspiracy with the employee to use the corporation to obtain a benefit for himself."  Id. at 23 (quoting Saks v. Charity Mission Baptist Church, 110 Cal. Rptr. 2d 45, 64 (Ct. App. 2001)).  According to the Trustee, New York's in pari delicto defense contravenes Cal. Civ. Code § 2306, which

23

provides that an agent cannot have actual or ostensible authority to do "an act that is known or suspected by the person with whom he deals, to be a fraud upon the principal." Id.  He concludes that here, California has a greater interest because a California company was injured in California.  Id.

BAC/BI/LI reply that Restatement § 187(1) provides that a contract's choice-of-law provision should be applied, unless the making of the contract is at issue.  Reply at 13.  Because the Trustee does not challenge the making of the APAs or seek their recission, BAC/BI/LI contend that the law selected by the parties should control.  Id.

BAC/BI/LI assert that the two cases the Trustee cites to support his argument that Restatement § 187(2) applies are inapposite because they addressed California and maritime choice-of-law principles respectively.  Id. (citing KST Data, Inc. v. DXC Tech. Co., 836 F. App'x 484, 487 (9th Cir. 2020); Flores v. Am. Seafoods Co., 335 F.3d 904, 916 (9th Cir. 2003)).  BAC/BI/LI assert that Flores supports their position because the Zetta-BAC APAs' choice-of-law clause included claims sounding in tort.  Id.  BAC/BI/LI claim that even if Restatement § 187(2) applied, New York law would control because there was a "reasonable basis" to select one governing law for multiple contracting parties where the parties are from "all around the world."  Id. (quoting CAVIC MTD Ruling at 18 n.16).  They explain that because Zetta Singapore was "using different transaction structures," selecting New York law ensured that every contract involving Zetta Singapore was governed by the same law.  Id. at 13-14.  BAC/BI/LI contend that this case is distinguishable from KST Data, Inc. v. DXC Technology, 2018 WL 5734227, at *5 (C.D. Cal. Mar. 26, 2018) because it involves a "multi-party, multi-jurisdictional series of contracts . . . where the need for uniformity is self-evident."  Id. at 14.

Responding to the Trustee's argument that applying New York law would violate California public policy, BAC/BI/LI assert that even if a "chosen law provides greater or lesser protection than California law," or it "would not provide protection while California law would," that is not sufficient to apply California law.  Id. (citing Medimatch, Inc. v. Lucent Techs. Inc., 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000)).  They contend that laws of another state only violate California public policy if they are "prejudicial to recognized standards of morality and the general interest of citizens."  Id. (citing Medimatch, 120 F. Supp. 2d at 862).  BAC/BI/LI assert that California courts routinely apply non-California choice-of-law clauses to bar claims under California law without violating California "fundamental public policy."  Id.  BAC/BI/LI argue that the in pari delicto defense is available under both California and New York law, and, although New York's law imposes greater monitoring responsibilities on principals, application of New York's in pari delicto defense does not offend California public policy.  Id. at 15.

b. Analysis

24

In the Ninth Circuit, "federal common law choice of law rules apply in bankruptcy cases." Mandalay Resort Grp. v. Miller (In re Miller), 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003). Federal choice-of-law rules follow the Restatement (Second) of Conflict of Laws as a "source of general choice-of-law principles," and are an "appropriate starting point for applying federal common law."  PNC Bank v. Sterba (In re Sterba), 852 F.3d 1175, 1179 (9th Cir. 2017).  Federal common law applies Restatement § 187 to determine the enforceability of contractual choice-of-law provisions.  CMR Mortg. Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortg. Fund LLC), 416 B.R. 720, 728 (Bankr. N.D. Cal. 2009).

Restatement § 187 provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . .

Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971).  Here, the Zetta-BAC APAs, which are at issue in the Tort Claims, have identical choice-of-law clauses:

This Agreement including the formation, performance, termination and/or enforcement and the parties' relationship in connection therewith, together with any related claims arising under common law or statute, whether sounding in contract, tort or otherwise shall be governed, construed and enforced in all respects in accordance with the law of the State of New York, U.S.A., excluding the State of New York's conflicts of law provisions.

FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4.

25

The Trustee relies on Flores v. American Seafoods Co., 335 F.3d 904 (9th Cir. 2003) to support his position that Restatement § 187(2), rather than § 187(1) applies in this case. In Flores, crewmembers (Crew Members) who worked on American Seafoods Company's (ASC) ships signed identical employment contracts and received oral explanations of the bonus system. Id. at 908-09. The employment contracts contained choice-of-law clauses that provided "[t]his Agreement shall be governed exclusively by the general maritime laws of the United States and applicable United States Statutes," and indicated that the "obligations, rights and remedies with respect to the employment relationship established by this Agreement . . . shall not be enlarged, supplemented or modified by the laws of any State or local jurisdiction." Id. at 910. The Crew Members disagreed with their bonus calculations and sued ASC, alleging that the contracts violated federal maritime law because the oral explanation of the bonus system was not in writing, as required by 46 U.S.C. § 10601(a). Id. at 909. The district court found in favor of the Crew Members regarding the bonus system and awarded $1.8 million in damages and prejudgment interest. Id. at 909-10. The Crew Members then sought attorneys' fees and other litigation costs under Washington state law. Id. at 910. Of relevance here, the Washington district court found that attorneys' fees could be awarded under Washington law, even though the Crew Members' choice-of-law clause indicated that federal maritime law—which contained no provision for attorneys' fees—applied. Id. at 910, 916.

The Ninth Circuit reversed, explaining that Restatement § 187(1) "applies where the contract provides that a particular matter in the contract is to be governed by the law of the specified forum." Id. at 917, 919. Because federal maritime law governed the entire contract rather than the particular issue of attorneys' fees, the Ninth Circuit determined that federal maritime law was not "incorporated by reference" regarding any particular matter in the contracts and the district court properly analyzed the contracts under Restatement § 187(2). Id. at 917. The Ninth Circuit also determined that under § 187(2), Washington law did not govern, noting that: 1) the United States had a substantial relationship to the parties, because the agreements were maritime employment contracts, which have been regulated by federal law for more than two centuries; and 2) there was no evidence that Washington had a materially greatly interest than the United States and would be the law chosen in the absences of a choice-of-law clause. Id. at 917-18.

CMR Mortgage Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortgage Fund LLC), 2009 WL 2870114 (Bankr. N.D. Cal. Sept. 4, 2009) (CMR II) explains the limits of Flores. In CMR Mortgage Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortgage Fund LLC), 416 B.R. 720, 725-26 (Bankr. N.D. Cal. 2009) (CMR I), Canpartners Realty Holding Co. IV LLC (Canyon) and CMR Mortgage Fund, LLC (CMR) loaned millions to Halekua Development Corporation (HDC) to develop 161 acres in Hawaii and executed a Co-Lender Agreement (CLA), which subordinated CMR's rights to Canyon and limited its ability to pursue remedies

26

Case: 24-2703, 05/24/2024, DktEntry: 6.1, Page 153 of 276

Case 2:19-ap-01382-SK    Doc 383-3    Filed 06/23/22    Entered 06/23/22 14:23:50    Desc
Redacted Memorandum of Decision   Page 27 of 81

against HDC.  The CLA's choice-of-law provision provided that "matters of construction and performance" would be governed and construed in accordance with New York law.  Id. at 726-27.  When the loan came due, HDC defaulted and Canyon foreclosed.  Id. at 727-28, 730.  CMR sued Canyon, alleging breach of the CLA, and Canyon moved to dismiss.  Id. at 728.  The court highlighted that under Restatement § 187(1), where the making of a contract is not in dispute, the law chosen by the parties need not have any reasonable relationship to the creation or performance of the contract.  Id. at 728-29.  According to the court, "sophisticated, well-represented parties expressly contracted to apply New York law to all 'matters of construction and performance'" of the agreement, the claims involved construction and performance of the agreement, and there were no allegations that any party lacked capacity to contract or that a binding contract was not formed.  Id. at 729.  Therefore, the Court found that the choice-of-law provision was valid under Restatement § 187(1) and it granted Canyon's motion to dismiss.  Id. at 729-37.

CMR then filed an amended complaint, adding new facts and an additional claim.  CMR II at *1-2.  Canyon moved to dismiss and, as relevant to the issue before this Court, CMR alleged that California, rather than New York law, applied to its breach of contract and breach of the implied covenant of good faith and fair dealing claims.  Id.  CMR asserted that based on Flores v. American Seafoods Co., 335 F.3d 904, 917 (9th Cir. 2003), the court should analyze the issue under Restatement § 187(2) rather than § 187(1).  CMR II at *3.

According to the court in CMR II, Flores involved a "general, broad choice-of-law provision," which did not specify that federal maritime law applied to any particular matter in the contracts at issue.  CMR II at *3.  The choice-of-law provision in CMR II was more specific, indicating that New York law would apply to the CLA's "construction and performance," which were at issue in the breach of contract and breach of covenant of good faith and fair dealing claims.  Id.  The court applied Restatement § 187(1), noting that rules regarding the construction of a contract could be resolved by explicit agreement and finding that the CLA's New York choice-of-law clause governed the breach of contract and breach of the implied covenant of good faith and fair dealing claims.  Id.

This case is more akin to CMR II than to Flores.  The APAs' choice-of-law provisions specified that New York law governed disputes over the contract including those "sounding in . . . tort or otherwise[.]"  FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4.  In CMR II, the provision at issue specifically governed "construction and performance" of the contract.  CMR II at *3.  In contrast, the choice-of-law clauses at issue in Flores were all-encompassing: they indicated that the contracts would be "exclusively" governed by maritime law and applicable United States statutes and prohibited enlargement, supplementation, or modification by the laws of any other jurisdiction.  Flores v. Am. Seafoods Co., 335 F.3d 904, 910 (9th Cir. 2003).

27

As the court in <u>Boeing Co. v. KB Yuzhnoye</u>, 2018 WL 735971, at *3 (C.D. Cal. Feb. 6, 2018) noted, the Ninth Circuit in <u>Flores</u> held that the choice-of-law clauses did not apply because they did not "specifically speak to attorneys' fees." <u>Boeing</u>, 2018 WL 735971, at *3. Here, the APAs indicate that the parties considered the possibility that claims sounding in tort might arise and explicitly mentioned tort claims in the choice-of-law clause. This is precisely the point of Restatement § 187(1), which allows parties to "determine the terms of their contractual engagements" and "spell out these terms in the contract." Restatement (Second) of Conflict of Laws § 187 cmt. c (Am. Law Inst. 1971).

The Trustee also contends that the Ninth Circuit's decision in <u>KST Data, Inc. v. DXC Technology Co.</u>, 836 F. App'x 484, 487 (9th Cir. 2020), which was issued after the CAVIC MTD Ruling, is contrary to this Court's analysis of Restatement § 187. Opposition at 20. In <u>KST</u>, KST Data, Inc. (KST) contracted with Enterprise Services, LLC (ES) to provide services to NASA. <u>KST</u>, 836 F. App'x at 486. Following ES's nonpayment of $5.4 million, KST sued ES for breach of contract. <u>Id.</u> ES answered and brought contract and tort counterclaims against KST and Armando Tan, one of KST's principals. <u>Id.</u> KST moved to dismiss ES's counterclaims, arguing that the court should apply California law, even though the contract's choice-of-law provision indicated that it would be interpreted and governed by New York law. <u>KST Data, Inc. v. DXC Tech.</u>, 2018 WL 5734227, *1, *4-5 (C.D. Cal. Mar. 26, 2018).

The district court granted KST's motion to dismiss the counterclaims, finding that California law applied because there was no identifiable connection between New York and the contract, and ES did not provide any reasonable basis for designating New York law to govern the contract. <u>Id.</u> at *5, *7. The Ninth Circuit affirmed, determining that the district court properly selected California choice-of-law rules because it was a diversity case and Restatement § 187(2) applied. <u>KST</u>, 836 F. App'x at 486. Of particular note, ES conceded that there was no substantial relationship between the parties or transaction and New York and it was unable to show a reasonable basis for applying New York law. <u>Id.</u> at 486-87. The Ninth Circuit explained that neither the parties' sophistication nor the inclusion of a choice-of-law provision in a contract was sufficient to establish a reasonable basis to apply New York law. <u>Id.</u> at 487.

There are a number of reasons why the Trustee's reliance on <u>KST</u> is misplaced. As an initial matter, the Court notes that it is an unpublished decision, which is not binding or precedential. 9th Cir. R. 36-3. Second, <u>KST</u> was a diversity case decided using California's choice-of-law rules. <u>KST</u>, 836 F. App'x at 486. In contrast, bankruptcy cases are decided under federal common law choice-of-law rules. <u>Mandalay Resort Grp. v. Miller (In re Miller)</u>, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003). Third, ES conceded that there was no substantial relationship between the parties or transaction and New York. <u>KST</u>, 836 F. App'x at 486. Fourth, ES did not show a reasonable basis for the parties' choice of New York law. <u>Id.</u> at 486-87.

28

Finally, the Court does not find the Trustee's argument—that even if it applies Restatement § 187(1), it must still consider § 187(2)'s exceptions—persuasive. Opposition at 21.  The only support the Trustee provides for this argument are two unpublished, out-of-circuit cases that applied the Restatement in the context of Texas's and Michigan's choice-of-law rules.  SPBS, Inc. v. Mobley, 2018 WL 4185522, at *10 (E.D. Tex. Aug. 31, 2018); Lakeland Reg'l Health Sys. v. Rite-Aid Corp., 2011 WL 13201826, at *9 (W.D. Mich. Feb. 7, 2011).  Therefore, the Court finds that Restatement § 187(1) applies and New York law governs the Zetta-BAC APAs.

### i.    Restatement § 187(2)

Alternatively, even if the Court were to apply Restatement § 187(2), rather than § 187(1), it would not make a difference.

In the Motion, BAC/BI/LI do not directly address Restatement § 187(2) but they assert that they had an interest in "identifying a single body of law" to govern multijurisdictional transactions.  Motion at 28.  The Trustee argues that BAC/BI/LI is unable to show either a substantial relationship to the parties or the transaction or a reasonable basis for the parties' choice of law as required by § 187(2).  Opposition at 21-22.  In the Reply, BAC/BI/LI argue that the Court would find that New York law applies under § 187(2) because there is a reasonable basis for selecting one law to govern multiple contracts. Reply at 13-14.

In explaining the meaning of Restatement § 187(2)(a)'s "reasonable basis" standard, official comments to that section provide that "rarely, if ever, will parties choose a law without a good reason for doing so."  Restatement (Second) of Conflict of Laws § 187 cmt. f (Am. Law Inst. 1971).  Here, there was a reasonable basis for the choice of New York law because Zetta Singapore and BAC were international companies.  FAC ¶¶ 54-55, 81.  BAC/BI/LI's interest in the application of New York law is reflected in the consistency with which they included New York choice-of-law clauses, not only in their contracts with Zetta Singapore (the APAs, the APA Assignments, Zetta Singapore's "Promissory Note," the "Affidavit of Confession of Judgment," and the "Settlement Agreement"), FAC ¶¶ 488, 495; FAC Exs. 2-70 § 8, 13 at 5, 14 § 6(h); Fishman 11/11/21 Decl. Exs. I § 9, J § 9, K § 9, but also in APAs involving third parties.  See, e.g., FAC Ex. 2-1 § 4.4 (Plane 1 APA between BAC and Jetcoast); Fishman 11/11/21 Decl. Exs. E § 4.4, F § 4.4, G § 4.4, H § 4.4 (Plane 12-15 APAs between BAC and Yuntian 4).  Further, international aircraft financing contracts are often governed by New York law.  Carlos Sierra, Ten Years of the Cape Town Convention and the Aircraft Protocol in Mexico, Air & Space Law. 11, 11 (2018) (indicating that international aircraft financing and leasing contracts are generally governed by New York or English law).

29

The Trustee cites a number of cases, claiming that the Court must analyze several factors to determine whether a "reasonable basis" for selecting New York law exists. Opposition at 21-22. As an initial matter, all cases cited by the Trustee for this proposition were diversity cases decided using California's choice-of-law rules. Sandler Partners, LLC v. Masergy Commc'ns, Inc., 2019 WL 9047103, at *3 (C.D. Cal. Nov. 25, 2019); KST Data, Inc. v. DXC Tech., 2018 WL 5734227, at *4 (C.D. Cal. Mar. 26, 2018), aff'd in relevant part, 836 F. App'x 484 (9th Cir. 2020); NexRep, LLC v. ALIPHCOM, 2017 WL 1356345, at *3 (N.D. Cal. Mar. 8, 2017), adopted, 2017 WL 1315461 (N.D. Cal. Apr. 7, 2017); Ottman v. Anthem Life Ins., 2015 WL 12683809, at *2 (C.D. Cal. Oct. 15, 2015); Missaghi v. Coca-Cola Co., 2013 WL 12114765, at *2 (C.D. Cal. Jan. 2, 2013). But, as noted above, courts apply federal common law choice-of-law rules in bankruptcy cases. Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1069 (9th Cir. 2002).

Even if the Court were to consider the factors cited by the Trustee, the result would be the same. Two of the factors cited by the Trustee—familiarity with the law specified and the use of the same choice-of-law provision in all contracts with multiple parties—favor application of New York law. As the court in KST Data, Inc. v. DXC Technology, 2018 WL 5734227 (C.D. Cal. Mar. 26, 2018) explained, parties may select the law of another state if they have a particular familiarity with that state's law, or it would minimize uncertainty in a specific and foreseeable way. Id. at *5 (citing Qwest Commc'ns Co. LLC v. Sun Coast Merch. Corp., 2011 WL 13217684, at *4 (C.D. Cal. June 13, 2011)). The aviation industry's frequent use of New York law provides the requisite familiarity. Further, BAC/BI included New York choice-of-law clauses in their APAs with parties other than Zetta Singapore, which is a factor that courts consider. See FAC Ex. 2-1 § 4.4 (Plane 1 APA between BAC and Jetcoast); Fishman 11/11/21 Decl. Exs. E § 4.4, F § 4.4, G § 4.4, H § 4.4 (Plane 12-15 APAs between BAC and Yuntian 4); KST Data, 2018 WL 5734227, at *5 (citing 1-800-Got Junk? LLC v. Super. Ct. of L.A. Cty., 116 Cal. Rptr. 3d 923, 925-26 (Ct. App. 2010)); see also King v. Bumble Trading, Inc., 393 F. Supp. 3d 856, 865 (N.D. Cal. 2019) (finding that an interest in using uniform contracts for users spread across the country formed a reasonable basis for selecting New York law). Considering the factors cited by the Trustee, the Court finds there would be a reasonable basis for applying New York law under Restatement § 187(2)(a).

The Trustee also argues that under Restatement § 187(2)(b), California has a materially greater interest than New York in the outcome of the Tort Claims because a California company was injured in California. Opposition at 23. This portion of the Trustee's argument requires little analysis. There are no allegations in the FAC to support the Trustee's position that a "California company was injured in California." Opposition at 23. It is undisputed that Zetta USA is a California corporation, but it was not a party to any of the Zetta-BAC APAs, which were between Zetta Singapore and BAC, and the FAC contains no allegations that either Zetta Singapore or BAC have any connection to

30

California.[17]  See FAC ¶ 54 (alleging that BAC is a Delaware corporation with a principal place of business in Texas), ¶ 81 (explaining that Zetta Singapore was incorporated in Singapore); FAC Exs. 2-24 at 1, 2-31 at 1, 2-40 at 1, 2-53 at 1, 2-82 at 1, 2-88 at 1 (indicating that each of the Zetta-BAC APAs was between BAC and Zetta Singapore).

Additionally, there are no allegations or argument that any of the alleged harm sustained by the Debtors occurred in California.  BI is a Canadian corporation with a principal place of business in Montreal, Canada; BAC is a Delaware corporation with a principal place of business in Texas; and Learjet is a Kansas corporation with a principal place of business in Kansas.  FAC ¶¶ 53-56.  The FAC contains no allegations that any of these parties ever set foot in California let alone inflicted any injury on the Debtors here.

The Trustee also contends that New York's treatment of the Tort Claims (and the *in pari delicto* defense) would be "contrary to California's fundamental policy" because BAC/BI/LI would be able to benefit from a conspiracy with Cassidy by attributing Cassidy's actions to Zetta Singapore.  Opposition at 23 (citing Saks v. Charity Mission Baptist Church, 110 Cal. Rptr. 2d 45, 64 (Ct. App. 2001)).  Both California and New York recognize *in pari delicto* defenses.  See Sugarman v. Taylor (In re Yellow Cab Coop. Inc.), 602 B.R. 357, 360 (Bankr. N.D. Cal. 2019); Kirschner v. KPMG LLP, 938 N.E.2d 941, 950 (N.Y. 2010).  Although the California and New York substantive *in pari delicto* law differs, the choice of law public policy exception requires "something more than the law of the other state be different from the law of California."  Green v. Zukerkorn (In re Zukerkorn), 484 B.R. 182, 193 (B.A.P. 9th Cir. 2012).

Based on the analysis above, the Court concludes that regardless of whether Restatement § 187(1) or § 187(2) governs, New York law applies to the Zetta-BAC APAs.

        2. Whether the Choice-of-Law Clauses in the Zetta-BAC APAs Apply to the Trustee's Tort Claims

            a. Arguments

---

[17] The FAC alleges that: 1) to comply with FAA regulations, the Debtors' principal base of operations needed to be in the US; and 2) the Debtors' "principal base of operations was in Burbank, California," where James Seagrim (Seagrim) and Matthew Walter (Walter), two Zetta Singapore and Zetta USA directors, were based.  FAC ¶ 27-28, 113.  This does not alter the Court's analysis.  The FAC's other allegations make clear that Burbank was only *Zetta USA's* principal place of operation.  See Id. ¶ 114 (indicating that various Zetta USA employees were based in Burbank, and if they were no longer in those positions or were replaced, Zetta USA's Part 135 certification could have been revoked); ¶ 115 (to comply with FAA regulations, two thirds of Zetta USA's board of directors and other managing members had to be US citizens).

31

BAC/BI/LI argue that for a choice-of-law provision to apply to tort claims "arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." Motion at 29 (quoting Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)). BAC/BI/LI assert that the choice-of-law provisions in each of the Zetta-BAC APAs are broad and govern the "parties' relationships" including "claims . . . sounding in contract, tort or otherwise," and the Court should apply New York law to the Tort Claims. Id. (citing FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4). BAC/BI/LI also contend that a valid choice-of-law clause selecting another state's law is grounds to dismiss a claim under California's Unfair Competition Law. Id. at 41 (citing Cont'l Airlines, Inc. v. Mundo Travel Corp., 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006); Medimatch, Inc. v. Lucent Techs., Inc., 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000)).

The Trustee responds that tort claims are decided according to the law of the forum state. Opposition at 19 (quoting Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992)). He argues that the Ninth Circuit has "expressly determined that tort claims are not governed by a contractual choice-of-law provision." Id. at 19-20 (citing Inv'rs Equity Life Ins. Co. of Haw. v. ADM Inv'r Servs., Inc., 1 F. App'x 709, 711 (9th Cir. 2001); Sutter Home, 971 F.2d at 407; CMR Mortg. Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortg. Fund LLC), 416 B.R. 720, 729 (Bankr. N.D. Cal. 2009)). According to the Trustee, California courts apply California law unless a litigant invokes the laws of a foreign state and demonstrates that the foreign law, rather than California law, applies. Id. at 20 (citing Senne v. Kan. City Royals Baseball Corp., 934 F.3d 918, 928 (9th Cir. 2019)).

The Trustee contends that even if the New York choice-of-law clauses in the Zetta-BAC APAs were enforceable, the Tort Claims are based on BAC/BI paying commercial bribes and kickbacks, which fall outside their scope. Id. at 23. He highlights that in some cases, the wrongful conduct predated the agreements on which BAC/BI/LI rely. Id. (citing FAC ¶¶ 242-51, 349-50, 388).

BAC/BI/LI reply that the cases cited by the Trustee are not binding because federal common law governs the enforceability of choice-of-law provisions in bankruptcy proceedings. Reply at 12 (citing CMR I, at 729 n.3).

b. Analysis

For a choice-of-law provision to apply to tort claims incident to a contract, "the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996); see also Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994) (finding that common law fraud claims, a category of tort claims, should be construed under New York law where the contractual choice-of-law clause governed

any claim "arising out of or relating to" the contract).  Courts have found that contractual choice-of-law provisions control tort claims where they encompass "[t]his Agreement and all claims related to it, its execution or the performance of the parties under it" or "all issues concerning the validity of this Agreement, the construction of its terms and the interpretation and enforcement of the rights and duties of the parties."  Bausch & Lomb Inc. v. Mimetogen Pharm., Inc., 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016); Cap. Z Fin. Servs. Fund II, L.P. v. Health Net, Inc., 840 N.Y.S.2d 16, 19, 23 (App. Div. 2007).

The Zetta-BAC APAs' choice-of-law provisions are broad, governing not only the routine aspects of a contractual relationship (such as formation, performance, termination, and enforcement), but also *any* related claims arising under common law or statute, *including claims sounding in tort.*  FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4.  The Zetta-BAC APAs' choice-of-law clauses are also much broader than the provisions at issue in Turtur, Bausch & Lomb, or Capital Z, where the courts found that the law chosen by the parties applied to tort claims.

The Trustee objects to the Court considering the Zetta-BAC APAs' choice-of-law clauses, arguing that tort claims are "decided according to the law of the forum state." Opposition at 19-20, 19 n.3 (quoting Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992)).  There are several problems with the Trustee's analysis of and selective quotation from Sutter Home.  First, the Trustee argues definitively that "[t]ort claims are 'decided according to the law of the forum.'" Opposition at 19 (quoting Sutter Home, 971 F.2d at 407).  But, the Trustee omitted the critical preceding sentence, which provides that tort claims "are not *ordinarily* controlled by a contractual choice of law provision."  Sutter Home, 971 F.2d at 407 (emphasis added).  Next, the narrowness of the choice-of-law clause at issue in Sutter Home is distinguishable from the choice of law provisions here.  The agreement at issue in Sutter Home provided "[e]xcept as otherwise required by applicable law, this Agreement shall be governed by the law of the State of California."  Id. at 404.  In contrast, the Zetta-BAC APAs contained no carveout for "applicable law" of another jurisdiction, and explicitly provided that they governed claims sounding in tort.  FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4.

Perhaps most problematic for the Trustee, Sutter Home and almost all of the cases he cites for the proposition that tort claims are decided according to the law of the forum state were *diversity* cases, where courts apply the forum's choice-of-law rules.  See Sutter Home, 971 F.2d 401, 405 n.3 (9th Cir. 1992) (indicating that in a diversity case, the parties agreed that the court was required to apply Arizona choice of law rules); Inside Edge, LLC v. Nelson, 2008 WL 4889027, at *2 (C.D. Cal. Nov. 12, 2008) (applying California's choice-of-law rules in a diversity case); PAE Gov't Servs. v. MPRI, Inc., 2008 WL 11337999, at *4 (C.D. Cal. July 11, 2008) (applying the rules of the forum to a diversity case); Markos v. Sears, Roebuck & Co., 2005 WL 8155228, at *2 n.1

33

(C.D. Cal. Oct. 4, 2005) (applying California choice-of-law rules to tort claims in a diversity case).

The Trustee cites only two cases that involved federal questions and therefore federal common law.  The first is an unpublished decision, <u>Investors Equity Life Insurance Co. of Hawaii, Ltd. v. ADM Investor Services, Inc.</u>, 1 F. App'x 709, 711 (9th Cir. 2001), involving a Federal Arbitration Act award, in which a court's review is extremely limited to considering whether the arbitration panel's decision was "in manifest disregard of the law." <u>Inv'rs Equity Life Ins. Co. of Haw., Ltd. v. ADM Inv'r Servs., Inc.</u>, 1997 WL 33100645, at *5 (D. Haw. Dec. 15, 1997).  The Court does not find this unpublished, nonprecedential decision involving confirmation of an arbitration award persuasive.  The other case cited by the Trustee, <u>CMR I</u>, merely cites <u>Investors Equity</u> and <u>Sutter Home Winery</u> and does not contain any reasoning or analysis explaining why the "law to be applied to tort claims is the law of the forum state." <u>CMR Mortg. Fund LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortg. Fund LLC)</u>, 416 B.R. 720, 729 (Bankr. N.D. Cal. 2009)).  Additionally, the choice-of-law clause at issue in <u>CMR I</u> did not mention claims arising in tort and was much less expansive than the one currently before the Court.  <u>Id.</u> at 726-27.

The Trustee also argues that the Tort Claims fall outside the choice-of-law provisions, because they involved commercial bribes and kickbacks, and are not based on formation, performance, termination, or enforcement of the Zetta-BAC APAs or the parties' contractual relationship.  Opposition at 23.  But this is not an accurate description of the FAC's allegations.

According to the FAC, the $500,000 Jetcraft Global paid Cassidy disguised to look like part of Plane 1's purchase price (First Kickback) was an inducement for Zetta Singapore to buy: a) Plane 1 from Jetcoast in a transaction financed by Element; and b) Planes 2-6 from BAC/BI directly.  FAC ¶¶ 118, 241.  The FAC then details the circumstances surrounding Zetta Singapore's executing Planes 1-6's APAs, which undisputedly related to contract formation.  <u>Id.</u> ¶¶ 242-51.

The Second Kickback was an inducement for Zetta Singapore to: a) buy Plane 10 from Orion and lease Plane 11 from Element; b) buy Planes 12-15; and c) accept delivery of Plane 3 and other aircraft rather than cancel those contracts as Cassidy threatened to do.  <u>Id.</u> ¶¶ 117, 181, 204, 271.  As an initial matter, BAC/BI/LI did not sell Planes 10-15 to Zetta Singapore.  <u>See</u> FAC ¶ 181 (explaining that Zetta Singapore bought Plane 10 from Orion and leased Plane 11 from Element); Fishman 11/11/21 Decl. Exs. E at 1, F at 1, G at 1, H at 1 (Plane 12-15 APAs were between BAC and Yuntian 4).  Regarding Cassidy's threat to refuse delivery of Plane 3 and cancel the APAs for Planes 4, 5, 8, and 9 if BAC/BI rebuffed his demand for the Second Kickback, Sea-Doos, and F1 Tickets, these allegations relate to the parties' contractual relationship and performance. FAC ¶¶ 271, 305-321.

34

The Trustee also argues that some of BAC/BI's wrongful conduct predated the Zetta-BAC APAs, but his position is undercut by FAC's allegations and other arguments in the Opposition. Opposition at 23 (citing ¶¶ 242-51, 349-50, 388). The paragraphs highlighted by the Trustee explain that:

1) Fazal-Karim, agreed to have Jetcraft pay Cassidy the First Kickback, which was fraudulently disguised to appear as if it was part of Plane 1's purchase price, and was a payoff for agreeing to use Fazal-Karim for all future aircraft bought from Jetcraft or BAC/BI. FAC ¶ 241. The First Kickback was also an inducement to acquire Planes 1-6, which were "part of a single deal negotiated by Fazal-Karim." Id. ¶¶ 241-42.

2) Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion bought Planes 1 and 10 from BAC/BI and resold them to the Debtors at inflated prices. Id. ¶¶ 342, 349.

3) Fazal-Karim negotiated the Planes 1-6 transactions for BAC, he negotiated the purchase orders for Planes 8 and 9 for BAC/BI, and he negotiated the transactions for Planes 12-15 for BAC/BI. Id. ¶ 388.

The Trustee notes that Fazal-Karim negotiated the transactions for Planes 1-6, 8, 9, and 12-15 on behalf of BAC/BI, which occurred before the Zetta-BAC APAs—for Planes 2, 3, 4, 5, 8, and 9—were signed.[18] Id. ¶ 388. Negotiating the Zetta-BAC APAs involved contract formation, a subject explicitly included in the Zetta-BAC APAs' choice-of-law clauses. FAC Exs. 2-24 § 4.4, 2-31 § 4.4, 2-40 § 4.4, 2-53 § 4.4, 2-82 § 4.4, 2-88 § 4.4. The Trustee does not mention any other wrongful conduct predating the Zetta-BAC APAs that would fall outside their choice-of-law clauses.

Based on the analysis above, the Court finds that New York law applies to the Tort Claims.[19]

---

[18] Although the FAC states that Fazal-Karim negotiated the APAs for Planes 1-6, 8, 9, and 12-15 on BAC/BI's behalf, the transactions for Planes 1, 6, and 12-15 were not between BAC/BI and Zetta Singapore. See FAC Ex. 2-2 at 1 (Plane 1 APA was between Jetcoast, Jetcraft Corp., and Bank of Utah as "Sellers" and Zeta Singapore as "Buyer"); Yuntian AP Docket #1 ¶ 85 (explaining that Glove Assets Investment Limited (Glove Assets) entered an APA with BAC/BI for the purchase of Plane 6); Fishman 11/11/21 Decl. Exs. E at 1, F at 1, G at 1, H at 1 (the APAs for Planes 12-15 were between BAC and Yuntian 4). As a result, the Court focuses on the Zetta-BAC APAs for the purpose of this part of the analysis.

[19] In the BAC/BI/LI MTD Ruling, the Court found that, based on the Complaint's allegations and documents attached thereto, California law applied to the Tort Claims. BAC/BI/LI MTD Ruling at 26. The law of the case doctrine is not an impediment to the Court now finding that New York law applies to the Tort Claims because that doctrine only applies when the court has "previously entered a final decree or judgment." Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1042 (9th Cir. 2018).

More importantly, an issue must have been fully considered in a prior ruling to be entitled to deference under the law of the case doctrine. See Snow-Erlin v. United States, 470 F.3d 804, 807-08 (9th Cir.

ii. Agency

1. Arguments

a. Motion

BAC/BI/LI argue that the Court should not adhere to its earlier ruling that Fazal-Karim had actual authority or apparent authority to act on their behalf. Motion at 33-34. They claim that the Court did not previously consider the Representative Agreements or the Zetta-BAC APAs. Id. at 34 (citing Fishman 11/11/21 Decl. Ex. M; FAC Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88). BAC/BI/LI highlight that in the Court's earlier ruling, it did not evaluate whether Fazal-Karim acted as an agent in each aircraft transaction. Id. They contend that the First and Second Kickbacks, which were wired by Jetcraft Global to Cassidy, cannot be attributed to BAC or BI. Id.

BAC/BI/LI explain that actual agency involves a principal-agent fiduciary relationship. Id. (citing In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 607 (S.D.N.Y. 2005)). A principal must manifest consent that the other person, its agent, can act on its behalf and subject to its control and the agent must consent to the arrangement. Id. (citing Rezulin, 392 F. Supp. 2d at 607). BAC/BI/LI assert that courts have repeatedly found that where an agreement contains a "clear and unambiguous disclaimer of a fiduciary relationship," there is no agency relationship. Id. at 34-35 (quoting BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012)) (citing Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015); Butto v. Collecto Inc., 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011)). BAC/BI/LI contend that authorizing an individual to act as a service provider during negotiations does not give the provider authority to bind the principal. Id. at 35 (quoting Economist's Advoc., LLC v. Cognitive Arts Corp., 2004 WL 728874, at *6 (S.D.N.Y. Apr. 6, 2004)). Similarly, BAC/BI/LI assert that authorizing an agent to act on behalf of a principal in one transaction does not mean that the individual is authorized to act as the principal's agent in a different transaction. Id. (citing Jackson v. Schron (In re Fundamental Long Term Care, Inc.), 873 F.3d 1325, 1341-42 (11th Cir. 2017); Bd. of Managers of the 411 E. 53rd St. Condo. v. Perlbinder, 2016 WL 1597761, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2016), rev'd on other grounds, 55 N.Y.S.3d 45 (App. Div. 2017)).

BAC/BI/LI contend that the Representative Agreements contain an express agency disclaimer, showing that neither BAC nor BI granted Fazal-Karim actual authority to take

---

2006) (declining to apply the law of the case doctrine where an issue was not previously before the court). Here, the APAs were not before this Court when it was considering BAC/BI/LI MTD: the Trustee did not attach those APAs to the Complaint and BAC/BI/LI did not seek to incorporate them by reference but instead provided declarations that merely summarized their choice-of-law provisions. Jetcraft AP Docket #s 1, 76-1; BAC/BI/LI MTD Ruling at 4-6.

36

binding action on their behalf.  Id. at 35-36 (quoting Fishman 11/11/21 Decl. Ex. M at 2).
Further, they assert that even if there had been an agency relationship when Fazal-
Karim sold the aircraft *for BAC or BI*, Fazal-Karim's selling aircraft *for Jetcraft* was
outside that relationship.  Id. at 36.  BAC/BI/LI argue that control is the essence of an
actual agency relationship and the FAC does not show that BAC or BI had the ability to
control Fazal-Karim when he sold Planes 1 and 10 from Jetcraft's inventory.  Id.  They
claim that there are also no allegations that BAC or BI controlled Jetcraft Global's
payments and neither BI nor BAC were alleged to have had any relationship with
Jetcraft Global.  Id.

BAC/BI/LI also argue that Fazal-Karim had no apparent authority to bind BI or BAC.  Id.
They assert that apparent authority must be based on the principal's words or conduct,
"communicated to a third party, that give rise to the appearance and belief that the
agent possesses authority to enter into a transaction[.]"  Id. (citing 1230 Park Assocs.,
LLC v N. Source, LLC, 852 N.Y.S.2d 92, 93 (App. Div. 2008)).  They contend that
apparent authority cannot be created by the agent through his or her own acts.  Id.
(citing 1230 Park Assocs., LLC, 852 N.Y.S.2d at 93).  BAC/BI/LI assert that apparent
authority requires that a "third person, accepting the appearance of authority as true,
***has relied upon it***."  Id. (emphasis in Motion) (citing Greene v. Hellman, 412 N.E.2d
1301, 1306 (N.Y. 1980)).  According to BAC/BI/LI, if a party knew or should have known
that the agent exceeded his authority, it cannot claim that the party acted with apparent
authority.  Id. at 37 (citing Highland Cap. Mgmt. LP v. Schneider, 607 F.3d 322, 328 (2d
Cir. 2010)).

BAC/BI/LI conclude that the FAC fails to allege that Fazal-Karim was their agent
because it does not indicate that Zetta Singapore believed that he was acting as their
agent regarding Planes 1 and 10.  Id.  They highlight that each of the Zetta-BAC APAs
expressly stated that Fazal-Karim did not have the authority to act as their agent.  Id.
(citing FAC Exs. 2-24 § 14, 2-31 § 14, 2-40 § 14, 2-53 § 14, 2-82 § 14, 2-88 § 14).
BAC/BI/LI contend that regardless of whether Fazal-Karim was participating in
negotiations or receiving commissions, Zetta Singapore knew and agreed that he could
not take binding actions on BAC's behalf.  Id.

b.  Opposition

The Trustee responds that, according to the FAC, Fazal-Karim acted as BAC's and BI's
agent during negotiations for all aircraft Zetta Singapore bought, held himself out as
BAC's and BI's agent, was controlled and trained by BAC and BI, and acted as BAC's
and BI's main point of contact for Zetta Singapore.  Opposition at 35 (citing FAC ¶¶ 387-
99).  He argues that the Court previously found that these allegations were sufficient to
establish that Fazal-Karim was BAC/BI's agent and it should similarly find that he was
BAC/BI's agent for every transaction.  Id. (citing BAC/BI/LI MTD Ruling at 11).

37

The Trustee contends that a challenge to agency allegations is premature because agency may only be decided as a matter of law "if the material facts . . . are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case." Id. (quoting Harrah's Atl. City Operating Co. v. Lamonica (In re JVJ Pharmacy Inc.), 630 B.R. 388, 403 (S.D.N.Y. 2021)).  He asserts that the Court should not evaluate Fazal-Karim's agency on a per-transaction basis, which would ignore the FAC's allegations.  Id.  The Trustee argues that BAC/BI had a direct financial interest in the sale of Plane 1, highlighting that:

1) Fazal-Karim and Cassidy simultaneously negotiated the sale of Planes 1-6 and BAC/BI employees, Fazal-Karim, and Cassidy "expressly linked these transactions at the time." Id. at 36 (citing FAC ¶¶ 243-52).
2) Yubin Yu (Yu), the Vice President of Sales for the Middle East and Africa and Director of Sales for the Greater China region for Bombardier Business Aircraft (a business group coextensive across BAC and BI), praised Fazal-Karim for his "team efforts" in pushing Cassidy "to sign Plane 1 at the same time Cassidy was pushing to get deposits to [BAC/BI] for Planes 2-6." Id. (citing FAC ¶ 248).
3) The Second Kickback was paid as part of Plane 10's transaction so that Cassidy would cause the Debtors to buy Planes 12-15, take delivery of Plane 3, and not cancel contracts. Id. (citing FAC ¶ 271).
4) Plane 10's transaction closed on the same day that Cassidy executed the Plane 12-15 APAs, which Fazal-Karim negotiated for BAC/BI. Id. (citing FAC ¶ 321).
5) The KM.xlsx spreadsheet shows improper payments between Fazal-Karim and Mattar, a BAC/BI executive. Id. (citing FAC ¶¶ 290-304).

The Trustee rejects BAC/BI's argument that it contractually disclaimed an agency relationship because the realities of the contractual relationship, not a contract's labels, control.  Id. (quoting In re JVJ Pharmacy Inc., 630 B.R. at 403).  He argues that this is true even if a contract provides that it was not intended to create an agency relationship.  Id. (citing Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *8 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom., Samba Enters., Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010)).  He asserts that Butto v. Collecto Inc., 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011) is distinguishable because the only evidence of an agency relationship in that case was "other provisions of the agreement," whereas here, the FAC pleads facts about the practical functioning of the parties' relationship that override boilerplate disclaimers.  Opposition at 36 (citing FAC ¶¶ 387-99).

The Trustee contends that the Zetta-BAC APAs' representative disclosure clauses support his agency argument because a provision identifying a party "as an independent contractor" and prohibiting it "from binding (or purporting to bind)" the other party is evidence of agency rather than a disavowal.  Id. at 37 (quoting Supreme Showroom, Inc. v. Branded Apparel Grp. LLC, 2018 WL 3148357, at *9 & n.10 (S.D.N.Y. June 27, 2018)).  He explains that agents without "authority to bind their

38

principals to contracts nevertheless often have authority to negotiate or to transmit or
receive information on their behalf." Id. (quoting Supreme Showroom, 2018 WL
3148357, at *9 & n.10). The Trustee contends that Highland Capital Management LP v.
Schneider, 607 F.3d 322, 328 (2d Cir. 2010) is inapposite because the Zetta-BAC
APAs' representative disclosure clauses did not disavow Fazal-Karim's authority to offer
bribes, take binding action, or act for BAC/BI. Id. (citing FAC Ex. 2-24 § 14.1).

Finally, the Trustee argues that Fazal-Karim could be an agent even if the APAs
described him as an "independent contractor." Id. (citing United States v. Thomas, 377
F.3d 232, 238 (2d Cir. 2004); Am. Bullion, Inc. v. Regal Assets, LLC, 2014 WL 6453783,
at *3 (C.D. Cal. Nov. 17, 2014)).

### c.  Reply

BAC/BI/LI reply that the Trustee does not contest that the Representative Agreements
defeat any actual or apparent agency claim. Reply at 19. BAC/BI/LI contend that in
each of the cases cited by the Trustee, a court refused to dismiss agency claims
because the parties' agreements were ambiguous. Id. at 20 (citing Harrah's Atl. City
Operating Co. v. Lamonica (In re JVJ Pharmacy Inc.), 630 B.R. 388, 403 (S.D.N.Y.
2021); Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *2 (S.D.N.Y. Mar. 19,
2009), aff'd sub nom., Samba Enters., Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir.
2010); Supreme Showroom, Inc. v. Branded Apparel Grp. LLC, 2018 WL 3148357, at *9
(S.D.N.Y. June 27, 2018)). Here, BAC/BI/LI assert, the Zetta-BAC APAs and
Representative Agreements contain clear and unambiguous agency disclaimers. Id.

BAC/BI/LI assert that the First and Second Kickbacks were outside of any relationship
between BAC/BI and Fazal-Karim because they occurred in connection with the sale of
Planes 1 and 10, which were sales of Jetcraft aircraft by Jetcraft. Id. at 21. They argue
that the Trustee's attempt to "lump" transactions together regardless of seller, aircraft
type, and financing structure is unavailing and conclusory. Id. BAC/BI/LI assert that
each aircraft transaction was a separate contract with an integration clause, no
reference to any other contracts, and none were contingent on the other transactions.
Id. BAC/BI/LI contend that even if they had worked with Jetcraft on a "package deal,"
Jetcraft would not be BAC/BI's agent because the FAC does not allege that BAC/BI had
any control over Jetcraft when it sold its own planes. Id. at 21-22. According to
BAC/BI/LI, allegations that BAC/BI had a "direct interest in Plane 1" are not sufficient to
show agency because "economic interest" is different from "control." Id. at 22 (citing
Morse Typewriter Co. v. Samanda Off. Commc'ns Ltd., 629 F. Supp. 1150, 1156 n.30
(S.D.N.Y. 1986); In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 607 (S.D.N.Y.
2005)).

### 2.  Analysis

Under New York law, an agency relationship results from a principal's "manifestation of consent" that the agent "shall act on [the principal's] behalf and subject to his control," and the agent consents to the arrangement.  Harrah's Atl. City Operating Co. v. Lamonica (In re JVJ Pharmacy Inc.), 630 B.R. 388, 402-03 (S.D.N.Y. 2021) (quoting Bigio v. Coca-Cola Co., 675 F.3d 163, 175 (2d Cir. 2012)).  An agent is "a party who acts on behalf of the principal with the latter's express, implied, or apparent authority." Butto v. Collecto Inc., 802 F. Supp. 2d 443, 448 (E.D.N.Y. 2011) (quoting Time Warner City Cable v. Adelphi Univ., 813 N.Y.S.2d 114, 116 (App. Div. 2006)).

Where an agreement purports to expressly address an agency relationship, courts will "look to the language of an agreement between parties to ascertain whether an agency relationship was created."  In re JVJ Pharmacy Inc., 630 B.R. at 403.  Courts have repeatedly found no agency relationship where an "[a]greement contains a clear and unambiguous disclaimer of a fiduciary relationship."  BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012); see also Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015) ("[T]he parties are bound by a contractual agreement that their relationship is not one of agency."); Butto v. Collecto Inc., 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011).  The realities of a contractual relationship between the parties, not the labels used, control whether an agency relationship was created.  In re JVJ Pharmacy Inc., 630 B.R. at 403; see also Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *8 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom., Samba Enters., Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010) (finding that no reasonable jury could find a contractual provision precluded the existence of an agency relationship).

For an agent to have apparent authority, the principal's "words or conduct," which are communicated to a third party, must "give rise to the appearance and belief that the agent possesses authority to enter into a transaction; an agent cannot, [through] his own acts, cloak himself with apparent authority."  1230 Park Assocs., LLC v N. Source, LLC, 852 N.Y.S.2d 92, 93 (App. Div. 2008).  Key to an apparent authority relationship is that a third party relied on the appearance of an agency relationship.  Greene v. Hellman, 412 N.E.2d 1301, 1306 (N.Y. 1980).

Here, the FAC alleges the following:

1) BAC/BI was liable for the misconduct of its agent, Fazal-Karim.  FAC ¶ 387.
2) Fazal-Karim and BAC/BI executed the Representative Agreements and the SRA that ostensibly governed their relationship, giving Fazal-Karim the ability to act and hold himself out as BAC/BI's agent.  Id. ¶¶ 389, 394.
3) Fazal-Karim, through FK Group, "held himself out as the exclusive representative of [BAC/BI] in Southeast Asia."  Id. ¶ 390.
4) The FK Group webpage identified Fazal-Karim as "BOMBARDIER'S EXCLUSIVE REPRESENTATIVE FOR SOUTHEAST ASIA" and contained a

40

    BAC/BI logo, the webpage's URL was http://www.fk-group.net/bombardier-representative, and upon information and belief, BAC/BI had been aware of this website since 2015. <u>Id.</u>

5) "Fazal-Karim represented [BAC/BI] in sophisticated negotiations involving, upon information and belief, billions of dollars in [BAC/BI] aircraft" and in "extraordinarily complex transactions" involving corporations and the world's wealthiest individuals. <u>Id.</u> ¶ 40.

6) Fazal-Karim negotiated sales of Planes 1-6 from BAC/BI to the Debtors. <u>Id.</u> ¶ 396.

7) Fazal-Karim sent an email regarding Plane 6 holding himself out as BAC/BI's "exclusive representative." <u>Id.</u> ¶ 397.

8) BAC/BI's employees relied on Fazal-Karim to handle matters with the Debtors and manage the relationship with Cassidy. <u>Id.</u> ¶¶ 395, 398.

9) Fazal-Karim was paid "handsome commissions" in exchange for his services to BAC/BI: he received commissions from BI/BAC regarding Planes 2-6 and 11, and he would have received additional commissions on Planes 8-9 and Planes 12-15, although it was unclear whether those commissions were paid because not all of the aircraft were delivered. <u>Id.</u> ¶ 399.

### a. Agency on a Per-Transaction or Global Basis

BAC/BI/LI argue that the Court should evaluate whether Fazal-Karim was BAC/BI's agent for each transaction and Fazal-Karim could not have been BAC/BI's agent when he sold aircraft for Jetcraft. Motion at 34-36. They argue that the FAC's lumping of several unrelated aircraft sales together is conclusory and unsupported by facts. <u>Id.</u> The Trustee responds that Fazal-Karim's actions can be imputed to BAC/BI because: 1) they had a direct interest in the sale of Plane 1; and 2) Fazal-Karim paid kickbacks in conjunction with simultaneous transactions, negotiated as part of package deals for Jetcraft and BAC/BI. Opposition at 35-36. BAC/BI/LI reply that each aircraft had its own APA with: 1) an integration clause; 2) no references to other contracts; and 3) no contingencies based on other aircraft purchases. Reply at 21.

A party authorized to act as an agent in one transaction is not necessarily authorized to act as an agent in another. <u>See</u> <u>Jackson v. Schron (In re Fundamental Long Term Care, Inc.)</u>, 873 F.3d 1325, 1342 (11th Cir. 2017) (holding that although a person "may have sometimes functioned as [the defendant's] agent, lawyer, or fiduciary in other contexts," the allegations were insufficient to demonstrate that they operated as an agent for the transaction at issue); <u>Bd. of Managers of the 411 E. 53rd Str. Condo. v. Perlbinder</u>, 2016 WL 1597761, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2016), <u>rev'd on other grounds</u>, 55 N.Y.S.3d 45 (App. Div. 2017) (finding that an agency relationship regarding one business did not mean there was an agency relationship related to another).

The Trustee highlights that:

41

1) The sales of Planes 1-6 were negotiated simultaneously and linked.  FAC ¶¶ 243-52.
2) The Second Kickback, which was paid as part of the Plane 10 transaction, caused the Debtors to buy Planes 12-15 and take delivery of Plane 3.  Id. ¶ 271.
3) The Plane 10 transaction closed on the same day that Cassidy executed the Planes 12-15 APAs, which Fazal-Karim negotiated for BAC/BI.  Id. ¶ 321.
4) The KM.xls spreadsheet, which the Trustee indicates shows improper payments from Fazal-Karim to Mattar regarding Planes 1-6 and 12-15, illegitimately increased the price of those aircraft.  Id. ¶¶ 290-304.

The Trustee does not, however, offer any authority to support his position that the Court should consider Fazal-Karim as BAC/BI/LI's agent across all transactions, particularly where, as here, BAC/BI and Fazal-Karim executed the APAs, related documents, and Representative Agreements on a plane-by-plane basis.  See FAC Exs. 2-2 at 1, 2-24 at 1, 2-31 at 1, 2-40 at 1, 2-53 at 1, 2-73 at 1, 2-82 at 1, 2-88 at 1, 2-93 at 1; Fishman 11/11/21 Decl. Exs. E at 1, F at 1, G at 1, H at 1, M at 1, 5, 9, 13.  The Court notes that each aircraft's APA (with the exception of Plane 6's APA between Wells Fargo Bank Northwest, National Association as "Seller" and Zetta Singapore as "Buyer") contained an integration clause specifying that the APA constituted the entire agreement between the parties.  FAC Exs. 2-2 § 9.4, 2-24 § 10.4, 2-31 § 10.4, 2-40 § 10.4, 2-53 § 10.4, 2-82 § 10.4, 2-88 § 10.4, 2-93 § 9.4; Fishman 11/11/21 Decl. Exs. E § 10.4, F § 10.4, G § 10.4, H § 10.4.  As a result, the Court considers the transactions for each aircraft to determine whether Fazal-Karim was BAC/BI's agent.

### i.  Plane 1

According to the FAC:

1) Zetta Singapore bought Plane 1 from Jetcoast, a Jetcraft subsidiary.  FAC ¶¶ 118, 120; FAC Ex. 2-2 at 1.
2) Zetta Singapore wired $4.555 million for Plane 1 directly to Jetcraft Corp.'s bank account.  FAC ¶¶ 124, 128.
3) Fazal-Karim agreed to cause Jetcraft to pay Cassidy the First Kickback fraudulently disguised to appear as if it was a part of Plane 1's purchase price as a payoff for agreeing to use Fazal-Karim to acquire all future aircraft from BAC/BI or Jetcraft and as an inducement to buy Plane 1 from Jetcoast and Planes 2-6 from BAC/BI.  Id. ¶ 241.

### 1.  Actual Authority

The FAC does not allege that BAC/BI/LI had any involvement in or control over Jetcraft regarding Plane 1's sale to Zetta Singapore.  On the contrary, BAC sold Plane 1 to

42

Jetcraft several months before Zetta Singapore bought that aircraft from Jetcoast.  FAC
Ex. 2-1 at 1.

The Trustee contends that BAC/BI had a direct financial interest in the sale of Plane 1
and they are liable for the First Kickback because:

1) BAC/BI sold Plane 1 to Jetcraft and its price was structured so that BAC/BI would
   receive a percentage of any return earned by Jetcraft if and when Jetcraft sold
   the Aircraft.  FAC ¶¶ 250, 388, 610, 627.
2) Fazal-Karim negotiated the combined transactions for Planes 1-6 directly on
   behalf of BAC/BI.  Id. ¶ 388.
3) Fazal-Karim was acting as BAC/BI's agent, when he directed Jetcraft's CFO to
   pay the First Kickback through Jetcraft Global.  Id. ¶¶ 610, 627.

The paragraphs alleging that Fazal-Karim was acting as BAC/BI's agent are conclusory
and are insufficient to withstand a 12(b)(6) motion.  Bell Atl. Corp. v. Twombly, 550 U.S.
544, 555 (2007).  The other allegations—that BAC/BI had a financial interest in the sale
of Plane 1 and Fazal-Karim negotiated the combined transactions for Planes 1-6 on
behalf of BAC/BI—do not show that Fazal-Karim and BAC/BI had an agency
relationship regarding Plane 1.  With an agency relationship, the "principal has the right
to control the conduct of the agent with respect to the matters entrusted to him."  In re
Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 607 (S.D.N.Y. 2005) (emphasis in
original) (quoting Restatement (Second) of Agency § 14 (Am. Law Inst. 1958)).  The
Trustee alleges no facts to show that BAC/BI could control Fazal-Karim's conduct
regarding Plane 1.

2.  Apparent Authority

The FAC alleges that Fazal-Karim held himself out as BAC/BI's exclusive representative
and was relied upon to "handle matters" with the Debtors and Cassidy.  FAC ¶¶ 390,
395, 398.  But these allegations are insufficient to establish an apparent authority
relationship.  The FAC contains no allegations that BAC/BI communicated anything to
Zetta Singapore that would give rise to the appearance and belief that Fazal-Karim sold
Plane 1 on BAC/BI's behalf.  Instead, the FAC explains that Zetta Singapore bought
Plane 1 from Jetcoast, a Jetcraft subsidiary.  FAC ¶¶ 118, 120; FAC Ex. 2-2 at 1.

ii.  Planes 2, 3, 4, and 5

The FAC alleges that:

1) At the same time Cassidy and Fazal-Karim were negotiating letters of intent
   regarding Plane 1, they were also negotiating letters of intent for Zetta Singapore
   to buy five to six additional aircraft from BAC/BI directly, culminating in Zetta

43

Singapore executing the APAs for Planes 2-5.  FAC ¶¶ 133-35; FAC Exs. 2-24 at 1, 2-31 at 1, 2-40 at 1, 2-53 at 1.

2) Fazal-Karim agreed to cause Jetcraft to pay Cassidy the First Kickback as an inducement to acquire Planes 2-6 from BAC/BI.  FAC ¶ 241.

3) Fazal-Karim received ███████ in commissions for each of Planes 2-5.  Id. ¶ 148.

### 1.  Actual Authority

It is undisputed that BI and Fazal-Karim executed the Representative Agreements regarding Planes 2-5, which provided:

> [Fazal-Karim] acknowledges and agrees that it is acting as an independent contractor and not as an agent of [BI], and that [Fazal-Karim] has no express or implied authority to bind or obligate [BI] in any manner whatsoever.  [Fazal-Karim] further agrees not to make any claims, warranties or representations pertaining to the Aircraft,[20] except as expressly authorized in writing by [BI].  The prices and other terms and conditions of the sale of the Aircraft, including the Aircraft warranty, shall be established and determined solely by [BI].

Fishman 11/11/21 Decl. Ex. M at 2, 6, 10, 14.  This "clear and unambiguous" language resembles contractual provisions that New York courts have determined were sufficient to disclaim agency relationships.  See Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015) (finding a disclaimer, which provided that "[n]either the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party," showed that there was no agency relationship);  BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012) (finding that where an agreement provided that none of the parties were "acting as a fiduciary or financial investment advisor for the Investor," the parties effectively disclaimed a fiduciary relationship);  Butto v. Collecto Inc., 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011) (ruling that where an agreement provided that "[Collecto] is acting solely as an independent contractor and not as an agent of any party," this disavowal of agency and control nullified an agency relationship).

The Trustee argues that the Court should look beyond the language of the Representative Agreements, to the practical functioning of the parties' relationship, which he alleges is more important than "boilerplate disclaimers."  Opposition at 36 (citing Harrah's Atl. City Operating Co. v. Lamonica (In re JVJ Pharmacy Inc.), 630 B.R.

---

[20] "Aircraft" is defined in each Representative Agreement as Planes 2, 3, 4, and 5, respectively.  Fishman 11/11/21 Decl. Ex. M at 1, 5, 9, 13.

44

388, 403 (S.D.N.Y. 2021); Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *8 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom., Samba Enters., Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010)).  In fact, the Trustee contends that under Supreme Showroom, Inc. v. Branded Apparel Group LLC, 2018 WL 3148357, at *9 (S.D.N.Y. June 27, 2018), the Representative Agreements' disclaimer supports rather than undercuts his argument.  Opposition at 37.  But, JVJ Pharmacy, Samba Enterprises, and Supreme Showroom are distinguishable from the facts here.

In Harrah's Atl. City Operating Co. v. Lamonica (In re JVJ Pharmacy Inc.), 630 B.R. 388 (S.D.N.Y. 2021), JVJ Pharmacy Inc. (JVJ) filed a voluntary chapter 11 case, which was converted to chapter 7 and Salvatore LaMonica (LaMonica) was appointed trustee.  Id. at 394.  LaMonica filed a § 548(a) complaint against Harrah's Atlantic City Operating Co. (Harrah's) alleging that JVJ's principal fraudulently transferred $859,040 to Harrah's (Transfer), and both Harrah's and LaMonica then moved for summary judgement.  Id. at 394, 396.  One of the determinative issues was whether Global Cash Access Inc. (Global), which authorized the Transfer based on its contract with Harrah's, was acting as Harrah's agent.  Id. at 393, 396-97.  The bankruptcy court found that Global acted as Harrah's agent regarding the Transfer.  Id. at 397.  The district court reversed, holding that there was a triable issue of fact regarding whether Global was Harrah's agent.  Id. at 407.  The contract between Global and Harrah's (G-H Agreement) provided that "[Global] is an independent contractor," forbid both parties from representing themselves as agents of the other, and forbid each from entering binding agreements on the other's behalf.  Id. at 403 (citing G-H Agreement ¶ 21.b).  Another provision of the G-H Agreement, however, provided that Harrah's had engaged Global to act as its agent to provide quasi-cash advance services.  Id. at 404 (citing G-H Agreement, Exh. B, ¶ 1).  The district court explained that the G-H Agreement did not expressly deny an agency relationship, but instead provided that Global was an independent contractor and that each party was forbidden from binding the other through express or implied authority.  Id. at 405.  According to the court, it had to look past that language, as well as the language regarding Harrah's engaging Global to act as its agent regarding quasi-cash advance services, to determine the actual character of the relationship between Harrah's and Global.  Id.

A similar situation was presented in Samba Enterprises, LLC v. iMesh, Inc., 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom., Samba Enterprises, Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010).  Samba Enterprises, LLC (Samba) and iMesh, Inc. (iMesh) executed an agreement (SiM Agreement), providing that Samba would: 1) bundle iMesh software in exchange for a commission; and 2) renegotiate an agreement with AskJeeves.com on iMesh's behalf.  Id. at *1.  After Samba executed an unauthorized side deal with Zango, Inc., a counterparty to one of iMesh's bundling agreements, iMesh terminated the SiM Agreement and refused to pay Samba's commission.  Id.  Samba sued, seeking recovery of the commission, and iMesh counterclaimed asserting that Samba breached its fiduciary duty to iMesh.  Id.

45

The district court found that the SiM Agreement created an agency relationship because: 1) it was called an "Agency Agreement," and provided that Samba was to act as iMesh's "nonexclusive agent," and 2) iMesh, in its sole discretion, could agree to enter a favorable deal, regardless of what Samba negotiated, suggesting that Samba was always at iMesh's "direction and control." Id. at *7.  Although Samba argued that the SiM Agreement provided that it only created an independent contractor relationship and contained a clause disclaiming an agency relationship, the district court found that the agency disclaimer was inconsistent with the rest the SiM Agreement, which indicated that Samba was engaged to act as iMesh's agent. Id. at *8.  Additionally, the district court relied on extrinsic evidence, an email in which James Schmidt, who owned 99% of Samba, identified Samba as iMesh's "software agent." Id. at *1, *8.  The court concluded that there was "compelling evidence that the parties intended to create an agency relationship [and] no reasonable jury could conclude that Samba was not iMesh's agent." Id. at *8.

In Supreme Showroom, Inc. v. Branded Apparel Group LLC, 2018 WL 3148357, at *2 (S.D.N.Y. June 27, 2018), Branded Apparel Group LLC (Branded) and Supreme Showroom, Inc. (Supreme) executed a Sales Representative Agreement (SB Agreement), which contained the following under the heading "NO AGENCY": "[Supreme] is an independent contractor and under no circumstances will [Supreme] commit [Branded] to the delivery of [Branded] products and accessories, purport to legally bind [Branded] in any matter, and/or hold [itself] out as an employee or agent with legal authority to bind [Branded]."  After Supreme began acting as a sales representative for Gant USA Corporation (Gant), another apparel company in the same territory covered by the SB Agreement, Branded terminated its relationship with Supreme. Id. at *3, *6.  Supreme sued Branded, alleging breach of contract and violation of Illinois state law, and Branded counterclaimed alleging breach of contract, breach of fiduciary duty of loyalty, and unjust enrichment. Id. at *6.  Both Supreme and Branded moved for partial summary judgement regarding several issues which turned on whether Supreme was Branded's agent during the period when it simultaneously represented Branded and Gant. Id. at *1, *8.  The district court determined that the SB Agreement did not clearly and unambiguously disclaim an agency relationship between Supreme and Branded, explaining that "[a]gents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf." Id. at *9, *11.  The court explained that the SB Agreement's "limitations on Supreme's authority reinforce[d] that Supreme was under Branded's 'direction and control,'" and found that the SB Agreement read as a whole, supported an agency relationship. Id. at *9 n.10.

The Representative Agreements at issue here differ substantially from the G-H Agreement, SiM Agreement, and SB Agreement.  First, unlike the G-H Agreement, the SiM Agreement, and the SB Agreement, the Trustee has not identified any conflicting

language in the Representative Agreements: they do not refer to Fazal-Karim as an "agent" and do not subject him to BAC/BI's control. Fishman 11/11/21 Decl. Ex. M at 2, 6, 10, 14. In fact, the Representative Agreements were very specific, indicating that Fazal-Karim was not acting as an agent of BI and he had "no express or implied authority to bind or obligate" BI in "any manner whatsoever." Id.

In the Opposition, the Trustee argues that the realities of the contractual relationship between BAC/BI and Fazal-Karim should control, and highlights the SRA which "ostensibly governed their relationship" and allegedly treated Fazal-Karim as an agent. Opposition at 36; FAC ¶¶ 389, 394. Although the SRA was not attached to the FAC, the FAC alleges that under the SRA, which was dated 7/1/16, Fazal-Karim:

1) Had the right to "acquire the right to market and sell" BAC/BI aircraft. Id. ¶ 394.a.
2) Was the "PREFERRED sales representative" for the territory. Id. ¶ 394.b.
3) Was required to comply with BAC/BI's Code of Ethics and Business Conduct. Id. ¶ 394.c.
4) Was authorized to use BAC/BI's and BAC/BI affiliates' trademark, trade name, sign, logo, symbol, and service marks. Id. ¶ 394.d.
5) Was forbidden from advertising information concerning BAC/BI's aircraft without prior written consent of BAC/BI. Id. ¶ 394.e.
6) Was required to prepare and maintain records for 5 years and grant BAC/BI the "right to access" and to "examine and audit these records and the systems and facilities they are stored in . . . ." Id. ¶¶ 394.f, 394.g.

There is a fundamental problem with the Trustee's reliance on the SRA regarding Planes 2-5. The SRA was dated 7/1/16, which was *after* 12/10/15, when the APAs for those aircraft were executed. FAC ¶ 389, Sch. 1. Assuming all of the allegations regarding the contents of the SRA were true, which the Court must when ruling on the Motion, the SRA is irrelevant to APAs that were executed more than 6 months before the SRA became effective.

Although the Trustee argues that the Court should consider extrinsic evidence—namely, the reality of the relationship between BAC/BI and Fazal-Karim—which he explains should override the language of the Representative Agreements, New York law permits courts to consider extrinsic evidence only if a contract is internally inconsistent. Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *8 n.5 (S.D.N.Y. Mar. 19, 2009) (citing Fed. Ins. Co. v. Ams. Ins. Co., 691 N.Y.S.2d 508, 512 (App. Div. 1999)). The Trustee has identified no internally-inconsistent language in the Representative Agreements.

The Representative Agreements' disclaimer, which stated that Fazal-Karim was not an agent of BI and had "no express or implied authority to bind or obligate [BI] in any manner whatsoever" is clearer and more explicit than the disclaimers at issue in Samba

47

Enterprises or JVJ Pharmacy, and more closely resembles cases where courts have found an agency disclaimer effective.  See, e.g., Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015) ("Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party."); Butto v. Collecto Inc., 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011) ("In providing any Services under this Agreement, [Collecto] is acting solely as an independent contractor and not as an agent of any other party.").

Finally, the Trustee argues that Fazal-Karim can be BAC/BI's agent even if a contract describes him as an "independent contractor."  Opposition at 37 (citing United States v. Thomas, 377 F.3d 232, 238 (2d Cir. 2004)).  Although that is true, the Court does not put much stock in or rely on the "independent contractor" label in the Representative Agreements.  Instead, the Court focuses on the entire disclaimer section of those agreements, with their clear, explicit language, which state that Fazal-Karim was not an agent of BI and "had no express or implied authority to bind or obligate [BI] in any manner whatsoever."  Fishman 11/11/21 Decl. Ex. M at 2, 6, 10, 14; see In re AAGS Holdings LLC, 608 B.R. 373, 378 (Bankr. S.D.N.Y. 2019) (quoting Bailey v. Fish & Neave, 868 N.E.2d 956, 959 (N.Y. 2007)) ("Where the dispute concerns a provision of the contract, the Court must consider the contract 'as a whole to ensure that undue emphasis is not placed upon particular words and phrases[.]'").

### 2.  Apparent Authority

To support his position that Fazal-Karim had apparent authority regarding Planes 2-5, the Trustee highlights the same allegations as he did regarding Plane 1, namely Fazal-Karim identifying himself as "[BAC/BI]'s exclusive representative" on his website with BAC/BI's awareness, and BAC/BI relying on Fazal-Karim to manage the relationship with Cassidy.  FAC ¶¶ 390, 395, 398.  While these facts might otherwise be sufficient to demonstrate apparent authority, a party cannot claim there was apparent authority when it knew or should have known that the agent was exceeding the scope of its authority.  Highland Cap. Mgmt. LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010).

Here, the Plane 2-5 APAs contained the following limitation:

> [Zetta Singapore] understands that [ ] Fazal-Karim may be appointed as a sales representative of [BAC] in connection with this transaction.  Whether or not said appointment is finally approved by [BAC], [ ] Fazal-Karim has no authority and will not have any authority to make any representations or warranties on behalf of [BAC] or to legally bind [BAC] under a contract for the sale of the subject Aircraft.

48

FAC Exs. 2-24 § 14.1; 2-31 § 14.1; 2-40 § 14.1; 2-53 § 14.1.  This disclaimer provided Zetta Singapore notice that Fazal-Karim could not make representations or warranties on BAC's behalf or legally bind it to contracts for Planes 2-5.

iii.  Plane 6

1.  Actual Authority

The FAC provides that:

1) Fazal-Karim negotiated the combined transactions for Planes 1-6 directly for BAC/BI.  FAC ¶ 388.
2) Fazal-Karim agreed to cause Jetcraft to pay Cassidy the First Kickback as an inducement to acquire Plane 6, among other aircraft.  Id. ¶ 241.
3) Cassidy worked with Li Qi[21] (Li) to buy Plane 6.  Id. ¶ 149.
4) Zetta Singapore paid BAC $47.3 million for Plane 6, using loan proceeds from Universal Leader Investment Limited (Universal Leader), but it did not receive title to the aircraft because it entered into a finance lease arrangement with Glove Assets.  Id. ¶ 153.
5) Without contradiction from BAC, in a 12/2/15 email regarding Plane 6, Fazal-Karim characterized himself as BAC's agent, stating "I am clearly [BAC's] 'exclusive representative,' in Singapore"; "we have done our job as [BAC/BI's] rep"; and indicating that he had "negotiated the transaction for [BAC/BI]."  Id. ¶ 397.
6) Fazal-Karim received a commission from BAC/BI for Plane 6.  Id. ¶ 154.

In both the Complaint and First Amended Complaint the Trustee filed in King v. Yuntian, he alleged that Glove Assets executed the Plane 6 APA to buy that aircraft from BAC/BI; Zetta Singapore then leased that aircraft from Glove Assets.  Yuntian AP Docket #1 ¶¶ 85-86; #232 ¶¶ 181-83.  The Trustee is bound by statements contained in the Yuntian complaints, which show that Glove Assets, not Zetta Singapore, bought Plane 6 from BAC.  Am. Title Ins. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).

The Trustee's remaining allegations—that Fazal-Karim negotiated the combined transactions for Planes 1-6 on behalf of BAC/BI, he held himself out as BAC/BI's "exclusive representative," and Fazal-Karim received a commission—do not demonstrate there was an agency relationship between Fazal-Karim and BAC regarding Plane 6.  As with Plane 1, the Trustee has not alleged sufficient facts to establish that BAC/BI had the right to control Fazal-Karim's conduct regarding this aircraft and the

---

[21] Li Qi is a businessman who became a Director of Zetta Singapore on 2/26/16.  FAC ¶ 29.  He also leased Planes 6 and 7 to the Debtors through Glove Assets and Universal Leader Investment Limited, entities he controlled.  Id. ¶¶ 29, 153, 157-58.

49

FAC's allegations regarding the SRA, which became effective after Plane 6's APA was signed on 12/8/15, are irrelevant.

### 2. Apparent Authority

The Trustee alleges that Fazal-Karim characterized himself as "[BAC/BI]'s exclusive representative in Singapore," and referred to himself as a "[BAC/BI's] rep" without being contradicted by BAC/BI. FAC ¶ 397. Unfortunately for the Trustee, these allegations do not support an apparent authority relationship, which is created by "words or conduct *of the principal*, communicated to a third party. . . an agent cannot, though his own acts, cloak himself with apparent authority." 1230 Park Assocs., LLC v N. Source, LLC, 852 N.Y.S.2d 92, 93 (App. Div. 2008) (emphasis added). Fazal-Karim's words, on their own, cannot create an apparent authority relationship, because the words or actions must be of the principal.

Although the FAC provides that BAC/BI did not contradict Fazal-Karim's 12/22/15 email in which he indicated that he was BAC's exclusive representative in Singapore, there are no allegations regarding who received that email, or whether there was any reliance upon it, which is require for apparent authority. Greene v. Hellman, 412 N.E.2d 1301, 1306 (N.Y. 1980).

### iv. Planes 8 and 9

### 1. Actual Authority

The FAC explains that:

1) Fazal-Karim negotiated the purchase orders for Planes 8 and 9 on behalf of BAC/BI "along with Mattar and Yu." FAC ¶ 388.
2) Zetta Singapore executed purchase orders for Plane 8 and 9, requiring Zetta to pay BAC directly. Id. ¶ 176; FAC Exs. 2-82 §§ 1.1, 2.1, 2-88 §§ 1.1, 2.1.
3) Fazal-Karim was entitled to a commission from BAC/BI for Planes 8 and 9, although it is unclear whether the commissions were paid because these aircraft were never delivered. FAC ¶ 179.

As with the other transactions, these allegations do not sufficiently allege that BAC/BI could control Fazal-Karim's conduct. In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 607 (S.D.N.Y. 2005). And, the FAC's allegations regarding the SRA do not alter this conclusion. The Plane 8 and 9 APAs were signed on 2/16/16, approximately four months before the effective date of the SRA. FAC ¶ 389; Sch. 1.

### 2. Apparent Authority

50

The APAs for Planes 8 and 9 contained the same disclaimer as the Plane 2-5 APAs indicating that Zetta Singapore understood that Fazal-Karim would "not have any authority to make any representations or warranties on behalf of [BAC] or to legally bind [BAC] under a contract for the sale of the subject Aircraft."  FAC Exs. 2-82 § 14.1; 2-88 § 14.1.  Therefore, Zetta Singapore was on notice that Fazal-Karim could not make statements on BAC's behalf or legally bind it under a contract for Planes 8 and 9.

v.   Plane 10

1.   Actual Authority

The FAC alleges that:

1) Fazal-Karim agreed to have Jetcraft pay Cassidy the Second Kickback disguised to look like it was a part of Plane 10's purchase price.  FAC ¶ 271.
2) Cassidy received the Second Kickback as part of Zetta Singapore's purchase of Plane 10 from Orion, a Jetcraft affiliate.  Id. ¶ 181.
3) Orion had bought Plane 10 from a third party in a deal financed by Element.  Id. ¶ 183.  Under the loan agreement, Orion had to make interest payments until that aircraft was sold.  Id.
4) Cassidy, on behalf of Zetta Singapore, executed an APA with Jetcraft Global and Orion for Plane 10, with Zetta USA agreeing to guarantee the operating lease and Element executing a loan agreement to finance Zetta Singapore's purchase of the aircraft.  FAC ¶ 188; FAC Ex. 2-93 at 1.

The FAC is devoid of any alleged connection between BAC/BI/LI and the sale of Plane 10 to Zetta Singapore, which is not surprising because Zetta Singapore bought that aircraft from Orion.  FAC ¶ 188.  Although the FAC alleges that the Second Kickback was paid as part of the Plane 10 transaction and was an inducement for Zetta Singapore to acquire Planes 12-15, there are no facts indicating that BAC/BI/LI exercised any control over Fazal-Karim regarding Plane 10.

2.   Apparent Authority

The FAC highlights the same allegations regarding apparent authority as the other planes, specifically, language on Fazal-Karim's website and how he handled matters with the Debtors.  FAC ¶¶ 390, 395, 398.  But the FAC contains no allegations that BAC/BI communicated anything to Zetta Singapore that would give rise to the appearance and belief that Fazal-Karim sold Plane 10 on BAC/BI's behalf.  In fact, there is no discernable connection between BAC/BI and Plane 10.  The Plane 10 APA was between Orion, Jetcraft, and Bank of Utah as "Seller" and Zetta Jet Global 6000-1 Limited as "Buyer."  FAC Ex. 2-93 at 1.

51

vi.  Planes 12-15

1.  Actual Authority

The FAC indicates that:

1) Zetta Singapore used $12.4 million from a refinancing of Planes 6 and 7 to make initial payments on Planes 12-15, only one of which was delivered.  FAC ¶¶ 220-21.
2) Fazal-Karim negotiated the sale of Planes 12-15 for BAC and was entitled to receive a total commission of approximately ███████  Id. ¶¶ 222-23, 399.
3) Fazal-Karim agreed to have Jetcraft pay Cassidy the Second Kickback as an inducement to buy Planes 12-15, among other aircraft.  Id. ¶ 271.

BAC/BI/LI hotly contest their involvement in Zetta Singapore's acquisition of Planes 12-15.  Motion at 24.  They argue that the APAs for Planes 12-15 show definitively that BAC sold the aircraft to Yuntian 4, not Zetta Singapore.  Fishman 11/11/21 Decl. Exs. E at 1, F at 1, G at 1, H at 1.  The Plane 12-15 APAs are incorporated by reference and show that Zetta Singapore did not buy Planes 12-15 from BAC/BI.

2.  Apparent Authority

As with the other Planes, the FAC contains general allegations regarding Fazal-Karim acting with apparent authority, but it does not allege that BAC/BI communicated anything to Zetta Singapore indicating that Fazal-Karim sold Planes 12-15 on BAC/BI's behalf.  FAC ¶¶ 390, 395, 398.

b.  Timing of the Challenge to Agency Allegations

Although the Trustee contends that it is too early to decide whether there was an agency relationship between Fazal-Karim and BAC/BI, the Court disagrees.  Where "the facts are insufficient to support a finding of agency or the facts are not in dispute, the question of agency can be resolved as a matter of law."  Samba Enters., LLC v. iMesh, Inc., 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom., Samba Enters., Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010).  The Court recognizes that when ruling on the Motion, it must construe the complaint in the light most favorable to the Trustee and accept all well-plead factual allegations as true.  Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1122 (9th Cir. 2008).  As analyzed above, here, questions of agency are not open to doubt, the FAC's allegations are insufficient, and

52

Case: 24-2703, 05/24/2024, DktEntry: 6.1, Page 179 of 276

Case 2:19-ap-01382-SK    Doc 383-3    Filed 06/23/22    Entered 06/23/22 14:23:50    Desc
Redacted Memorandum of Decision    Page 53 of 81

the Court finds that Fazal-Karim had neither actual nor apparent authority to act as BAC/BI's agent regarding Planes 1-6, 8-10, and 12-15.[22]

iii.   Count 1 – Aiding and Abetting Breach of Fiduciary Duty

Count 1's allegations regarding BAC/BI/LI indicate that:

1) Cassidy, as a director and officer, owed fiduciary duties of care, loyalty, and good faith to the Debtors. FAC ¶ 557.
2) Cassidy caused the Debtors to buy nine BAC/BI aircraft and enter into purchase agreements for six more even though it was economically impossible for the Debtors to service their debt. Id. ¶ 91.
3) Cassidy breached his fiduciary duty to the Debtors by failing to take meaningful steps to negotiate lower prices from BAC/BI. Id. ¶ 92.
4) Cassidy, as a director and officer of the Debtors, breached his fiduciary duties by taking kickbacks and bribes in exchange for inducing the Debtors to buy aircraft. Id. ¶ 558.
5) Fazal-Karim, Jetcraft Corp., Jetcoast, Jetcraft Global, Orion, and BAC/BI aided and abetted Cassidy's breach of fiduciary duty and corrupted the fiduciary relationship between Cassidy and the Debtors by directing Jetcraft Global to pay the First and Second Kickbacks. Id. ¶ 559.
6) BAC/BI aided and abetted Cassidy's breach of fiduciary duty and corrupted the fiduciary relationship between Cassidy and the Debtors by giving Cassidy the F1 Tickets and offering him the Sea-Doos as part of a quid pro quo to ensure Cassidy would take delivery of aircraft rather than cancel transactions, as well as cause Debtors to enter into additional transactions. Id. ¶ 560.
7) Fazal-Karim, FKG, FKP, and BAC/BI, through Fazal-Karim as their agent, as well as Yu and Mattar: a) knew of Cassidy's breaches of his fiduciary duties; b) had specific intent to facilitate Cassidy's wrongful conduct; c) provided substantial assistance and encouragement to Cassidy's breaches of his fiduciary duty; and d) were a substantial factor in causing Debtors harm because they paid or agreed to pay Cassidy commercial bribes and kickbacks in exchange for his agreement to buy planes and his agreement not to cancel existing contracts and deliveries. Id. ¶¶ 564-67.
8) The Debtors were damaged in an amount equal to the value of the First and Second Kickbacks and the Sea-Doos as well as by the difference between what the Debtors paid for the planes and what they were actually worth. Id. ¶¶ 568-69.

---

[22] In the BAC/BI/LI MTD Ruling, the Court found that Complaint sufficiently alleged that Fazal-Karim had: 1) actual authority to act on behalf of BAC/BI; and 2) apparent authority to act on behalf of BAC/BI. BAC/BI/LI MTD Ruling at 10-11, 12-13. No final decree or judgment has been entered and the law of the case doctrine does not prevent the Court from now finding that based on the allegations in the FAC, the Zetta-BAC APAs, which are attached to the FAC, as well as the Representative Agreements, which are incorporated by reference, there was no actual or apparent agency relationship between Fazal-Karim and BAC/BI. Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1042 (9th Cir. 2018).

Under New York law, aiding and abetting breach of fiduciary duty requires three
elements: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant
knowingly induced or participated in the breach, and (3) that plaintiff suffered damage
as a result of the breach."  Lesavoy v. Gattullo-Wilson, 170 F. App'x 721, 723 (2d Cir.
2006) (quoting Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (App. Div. 2003)).  To satisfy
the second element, the defendant must have actual knowledge of the breach of duty,
as opposed to mere constructive knowledge.  Baron v. Galasso, 921 N.Y.S.2d 100, 104
(App. Div. 2011).  Further, "knowing participation" in a breach of fiduciary duty requires
that the defendant provide "substantial assistance" to the violator of the fiduciary duty.
Kaufman, 760 N.Y.S.2d at 170.  Substantial assistance requires an affirmative act by
the defendant; inaction is only sufficient if the defendant owes a fiduciary duty to the
plaintiff.  Baron, 921 N.Y.S.2d at 104.

As analyzed above, Fazal-Karim was not BAC/BI's agent.  And, the FAC contains no
allegations that BAC/BI had any relationship with or control over Jetcraft.  Further, the
FAC makes clear that Jetcraft, not BAC/BI, paid Cassidy the First and Second
Kickbacks disguised to look like they were part of the price of Planes 1 and 10, which
the Debtors bought from Jetcoast and Orion, respectively.  FAC ¶¶ 188, 238, 241, 271.
Because the First and Second Kickbacks were paid by Jetcraft regarding aircraft that
BAC/BI had no involvement with, the Court finds that there are insufficient allegations
that BAC/BI aided and abetted Cassidy's breach of fiduciary duties regarding the First
and Second Kickbacks.  Therefore, the only remaining misconduct alleged regarding
Count 1 is that BAC/BI provided Cassidy with F1 Tickets and BAC/BI agreed to pay for
the Sea-Doos.

### 1.  F1 Tickets

BAC/BI/LI assert that the FAC does not detail whether the Debtors' other shareholders
knew about the F1 Tickets.  Motion at 30.  They argue that the FAC suggests that they
did know because the F1 Tickets were given to the "Zetta *team*" rather than Cassidy
personally.  Id. (emphasis in original) (citing FAC ¶ 313).  BAC/BI/LI claim that the FAC
is vague regarding who was on the emails in which Cassidy threatened to cancel orders
unless he received the F1 Tickets.  Id. at 30-31 (citing FAC ¶¶ 307-08, 310).  They
argue that Cassidy breached no duty by accepting the F1 Tickets because buying
BAC/BI aircraft was the Debtors' business plan, and the Debtors' shareholders agreed
to acquire the aircraft.  Id. at 31.

BAC/BI/LI contend that the FAC does not allege that providing F1 Tickets to Cassidy
was a knowing breach because it does not distinguish the F1 Tickets from ordinary
business entertainment.  Id.  They argue that the FAC does not plead facts that move
the claim that BAC/BI knowingly induced a breach from "possible" to "plausible."  Id.

54

BAC/BI/LI assert that the FAC does not plead that the F1 Tickets caused Cassidy's alleged breach of fiduciary duty.  Id.  They highlight that the F1 Tickets came 8 months after execution of the APAs for Planes 3, 4, and 5, and there are no facts pled linking the F1 Tickets to the purchase of Planes 12-15.  Id.  BAC/BI/LI argue that even though the FAC now pleads that the F1 Tickets were given so that Cassidy would not refuse delivery of Plane 3 and not cancel the APAs for Planes 4, 5, 8, and 9, Zetta Singapore could only terminate the APAs if BAC defaulted.  Id. at 31-32 (citing FAC ¶¶ 311, 313; Fishman 11/11/21 Decl. Exs. E §§ 4.1, 9.2, F §§ 4.1, 9.2, G §§ 4.1, 9.2, H §§ 4.1, 9.2). They claim that Planes 2, 3, 4, and 5 were assigned to CAVIC, which had the right to cancel transactions and receive any refunds of pre-delivery payments.  Id. at 32 (citing FAC Ex. 2-70 § 1; Fishman 11/11/21 Decl. Exs. I § 1, J § 1, K§ 1).  BAC/BI/LI conclude that the FAC does not allege a breach of fiduciary duty because there is no fiduciary duty to breach a company's contracts.  Id.

The Trustee responds that even though Mattar described the F1 Tickets as for the "Zetta team," the FAC pleads no facts suggesting that other Zetta Singapore shareholders knew about them.  Opposition at 31.  He highlights allegations that: 1) in an email, Cassidy, on his own, threatened to cancel orders and demanded the F1 Tickets; 2) Mattar only claimed the tickets were for the "Zetta team" after a different BAC/BI employee refused to provide Cassidy the tickets; 3) Cassidy did not copy any of the Debtors other shareholders on his email; and 4) the F1 Tickets (and Sea-Doos) were never disclosed to the other directors.  Id. (citing FAC ¶¶ 307-08, 310-13, 448, 593, 618).  The Trustee argues that the FAC alleges a quid pro quo because: 1) Cassidy demanded F1 Tickets eight days after threatening to cancel orders and the same day as he threatened to terminate negotiations for Planes 12-15; and 2) he threatened to cancel outstanding orders again 20 minutes after a BAC/BI employee refused to give him the F1 Tickets.  Id. (citing FAC ¶ 310).  The Trustee highlights that the next day, Mattar, with the intent to influence Cassidy not to cancel the "contracts," agreed to give Cassidy the F1 Tickets.  Id. (citing FAC ¶ 313-14).

The Trustee asserts that the BAC/BI's policies belie the notion that the F1 Tickets were ordinary entertainment because they advise to "avoid giving or receiving gifts or entertainment if these *might improperly influence* the recipient's judgment or *might be perceived to do so*."  Id. at 31-32 (emphasis in Opposition) (citing FAC ¶ 324).  He contends that Cal. Penal Code § 641.3 prohibits giving an employee any "thing of value" worth more than $250 in return for the employee "using or agreeing to use his or her position" to benefit the giving party, and it does not require a quid pro quo.  Id. at 32 (citing People v. Riley, 193 Cal. Rptr. 3d 218, 226-27 (Ct. App. 2015)).  The Trustee asserts that providing Cassidy entertainment valued at over $40,000 in response to Cassidy's quid pro quo demand is improper under that standard.  Id.

The Trustee contends that BAC/BI's arguments regarding causation are premature and insufficient to dismiss.  Id. (citing JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d

247, 256 (S.D.N.Y. 2005)).  He claims that pleading that the F1 Tickets were a bribe is sufficient to state a claim even if the Debtors cannot show harm outside of the amount of the bribe itself, and he alleges that the F1 Tickets directly harmed the Debtors.  Id. at 32-33 (citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 372 (S.D.N.Y. 2007)).  The Trustee asserts that the FAC pleads that the Debtors were damaged by the amount of the overpriced planes and he can succeed so long as he alleges that the Debtors would have received "a better value" absent Cassidy's breach of his fiduciary duty.  Id. at 33.

The Trustee concludes that, although the APAs did not have express termination for convenience provisions, they provided that BAC/BI's remedy for a breach was ██████████████████████████████████████████████████████████ ██████████████████████████ Id. (citing FAC ¶¶ 106, 311-12).  He notes that if the APAs had been cancelled, BAC/BI would have lost ████████████ in revenue and ████████████ in sales while they were in distress.  Id. (citing FAC ¶¶ 85, 321).  According to the Trustee, Planes 3-5 were assigned to CAVIC after the F1 Tickets (and Sea-Doos) were agreed to.  Id. at 33-34 (citing FAC ¶¶ 305-21).  He asserts that Cassidy could have "efficient[ly] breache[d]" the APAs, but instead he had an incentive to leverage threats into bribes for himself.  Id. at 34, 34 n.13 (citing FAC ¶ 312; Fred. Hsu Living Tr. v. ODN Holding Corp., 2017 WL 1437308, at *24 (Del. Ch. Apr. 24, 2017)).

BAC/BI/LI reply that providing sports tickets to the "Zetta team" could not have induced Cassidy to be disloyal to the Debtors.  Reply at 15.  They assert that the FAC presumes that the F1 Tickets were "improper influences" or part of a "dishonest stratagem" without identifying one case where client entertainment was improper.  Id. at 16.  BAC/BI/LI note that the Trustee's theory of liability has changed.  Id.  The Complaint alleged that the F1 Tickets induced Cassidy to buy Planes 2-5, but the FAC pleads that the F1 Tickets induced Cassidy not to breach existing contracts.  Id.  They contend that there is nothing wrongful about taking a client to a sports event and Cassidy's failure to breach the APAs did not violate any fiduciary duty.  Id.  BAC/BI/LI argue that the FAC does not allege that BAC/BI knew that Cassidy had a duty to breach the APAs or that Zetta Singapore was having financial difficulties.  Id.  They highlight that it is implausible that Cassidy, a one-third owner of the Debtors, destroyed his own company by staying in contracts—requiring the Debtors to pay $100 million above market price for aircraft—so that he could get F1 Tickets.  Id. at 16-17 (citing Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 999 n.7 (9th Cir. 2014)).

Regarding the F1 Tickets, the FAC alleges:

1) On 7/20/16 and 7/21/16, Cassidy sent Mattar and Yu, two Vice President of BAC/BI, emails threatening to cancel all orders and not take delivery of Plane 3. FAC ¶¶ 307-08.

56

2) On 7/28/16, Cassidy requested that BAC/BI provide him with the F1 Tickets, which were worth $43,890.  Id. ¶ 310.  A BAC/BI employee e-mailed Cassidy that another company could sell him tickets, and less than 20 minutes later, Cassidy sent an email to Mattar, Yu, and others stating: "As per my earlier e-mail. Proceed to Cancel the 4 x Globals."  Id.

3) Cassidy's demands were for a quid pro quo: give F1 Tickets or he would refuse to take delivery of Plane 3 and cancel the purchase agreements for Planes 4, 5, 8, and 9.  Id. ¶ 311.  Upon cancellation, BAC/BI's only recourse was to recover liquidated damages.  Id.

4) Had Cassidy cancelled the purchase agreements for Planes 4, 5, 8, and 9, refused delivery of Plane 3, and left BAC/BI with its contractual remedy to collect liquidated damages, the Debtors would have avoided ███████ in insurmountable aircraft financing obligations, and been entitled to a ███████ refund.  Id. ¶ 312.  As a result, BAC/BI could not ignore Cassidy's threat to take his business elsewhere unless he was given F1 Tickets.  Id.

5) On 7/30/16 Mattar acquiesced, and with the intent to influence Cassidy not to cancel the contracts, directed that the F1 Tickets were for the "Zetta team" and that the Debtors would not have to pay.  Id. ¶ 313.

6) BAC/BI provided the F1 Tickets as a commercial bribe in response to Cassidy's demands rather than as legitimate client entertainment.  Id. ¶ 314.

7) Cassidy used threats to cancel aircraft orders, not to receive price reductions for Zetta Singapore, but to get the F1 Tickets.  Id. ¶ 441.

8) BAC/BI aided and abetted Cassidy's breaches of fiduciary duty to the Debtors by giving Cassidy the F1 Tickets as part of a quid pro quo to ensure Cassidy would take delivery of planes rather than cancel the transactions, as well as cause the Debtors to enter additional transactions.  Id. ¶ 560.

In the BAC/BI/LI MTD Ruling, the Court dismissed Count I of the Complaint, which alleged aiding and abetting a breach of fiduciary duties regarding the F1 Tickets because: 1) it did not plausibly allege that the Debtors bought Planes 2-5 and 12-15 in return for the F1 Tickets; and 2) giving tickets to a sporting event could be an acceptable business practice and was an equally consistent alternative to the Trustee's theory of bribery.  BAC/BI/LI MTD Ruling at 16-19.

Although the FAC now alleges that the BAC/BI gave Cassidy the F1 Tickets so that he would take delivery and not cancel transactions for Planes 3-5, 8, and 9, the FAC does not meaningfully address the Court's findings about the F1 Tickets being equally consistent with ordinary business entertainment.  The FAC now pleads that the F1 Tickets were "a commercial bribe in response to Cassidy's demands" rather than legitimate client entertainment.  FAC ¶ 314.  But labeling the F1 Tickets as a "commercial bribe" rather than client entertainment is conclusory, and insufficient to withstand a Rule 12(b)(6) motion.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

57

The Court previously noted that under Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp. of Delaware, 805 F. Supp. 1277, 1289 (D.S.C. 1992), aff'd, 998 F.2d 1009 (Table), 1993 WL 241742 (4th Cir. July 6, 1993), allegations about entertaining customers and prospective customers were not sufficient to support a civil bribery claim. The Trustee does not address this case or offer any contrary caselaw.  Instead, he cites BAC/BI's Code of Conduct.  But, as the Court previously found, violation of a company's own corporate policy is not a basis for liability in federal court.  See Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1276-77 (9th Cir. 2017) (holding that even though a company's CEO and chairman violated the company's ethical code, the code was "inherently aspirational," and the company made no affirmative misrepresentation and was not liable for securities fraud based on the CEO's conduct).  The Trustee also cites the California Penal Code's definition of bribery and People v. Riley, 193 Cal. Rptr. 3d 218, 226-27 (Ct. App. 2015), a California criminal case, both of which are inapplicable in this civil case decided under New York law.

Considering the FAC's allegations in the light most favorable to the Trustee, the F1 Tickets are equally consistent with innocent client entertainment as they are with a "commercial bribe."  Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996, 998 (9th Cir. 2014) (holding that the plaintiff's allegation did not create a plausible entitlement to relief because, although the conduct alleged was consistent with the defendants' fraudulent intent, it did not exclude a "plausible and innocuous alternative explanation"); Sanchez v. Aviva Life & Annuity Co., 2009 WL 10694223, at *4 (E.D. Cal. Nov. 18, 2009) (recognizing that the complaint alleged a conspiracy and kickback scheme but holding that the allegations were insufficient because they were "equally consistent" with an insurance company giving commissions to its agent for policies sold).

In addition to problems identified in the BAC/BI/LI MTD Ruling regarding the F1 Tickets, which the FAC did not correct, new allegations in the FAC and attached documents demonstrate that Cassidy did not breach, and could not have breached, his fiduciary duty by threatening to cancel aircraft orders if he were not provided with the F1 Tickets. FAC ¶ 440-41.

Zetta Singapore's Memorandum of Association (MOA) required a majority vote of directors to enter into transactions.  FAC ¶ 31; see also FAC Ex. 2-37 at 26 (describing the procedure for setting a quorum of the board of directors).  According to the FAC, all transactions required the approval of a majority of Zetta Singapore's disinterested directors (Seagrim, Walter, and in some instances Li).[23]  FAC ¶¶ 34, 448.  The FAC also pleads that although Cassidy was in control of Zetta Singapore's financial operations, he did not have full control of Zetta Singapore—Seagrim was Zetta Singapore's Director of Operations and Walter was the Director of Sales.  Id. ¶¶ 27-28, 90.  The Trustee

---

[23] Li joined Zetta Singapore's board on 2/26/16.  FAC ¶ 29.

acknowledges that Cassidy was not solely in control of the Debtors, arguing that the Debtors' innocent insiders could have (and eventually did) stop Cassidy's fraud. Opposition at 30 n.11.

Based on the FAC's allegations and the MOA, Cassidy could not refuse delivery or cancel APAs without approval of the Debtors' disinterested board members. Notably, the FAC does not plead that disinterested directors' approval was required only to *enter* transactions, but rather for *all* transactions. FAC ¶ 34. Refusing delivery of Plane 3 and cancelling the APAs for Planes 4, 5, 8, and 9 would have had massive ramifications for the Debtors' finances: each APA provided that a breach would have resulted in ███████████████████████████████████████████ FAC Exs. 2-31 § 9.4, 2-40 § 9.4, 2-53 § 9.4, 2-82 § 9.4, 2-88 § 9.4. If the Debtors had breached all five agreements at once, it would have resulted in ████████████████████████ ██████████████████████.[24] It also would have contravened the very purpose of founding Zetta Singapore, which was to buy new aircraft for a luxury jet charter business. FAC ¶¶ 80-81. Given that the FAC pleads that *all transactions* required the approval of a majority of Zetta Singapore's disinterested directors, Cassidy could not have cancelled five APAs, an action of significant financial and business magnitude, without the approval of a majority of disinterested directors. Id. ¶ 34. Yet, the FAC does not allege that Cassidy sought board approval for cancelling any of the APAs, or even that the board was aware that Cassidy had threatened to cancel the APAs. Viewing the FAC's allegations in the light most favorable to the Trustee, it alleges that Cassidy breached his fiduciary duty by threatening to cancel and refuse delivery of aircraft, which was something that he did not have the authority to do.

### 2. Sea-Doos

BAC/BI/LI argue that not only do the FAC's Sea-Doos allegations share the same deficiencies as the F1 Tickets allegations, but they also have several additional problems. Motion at 32. BAC/BI/LI assert that the FAC does not allege what duty Cassidy breached regarding the Sea-Doos or asking Fazal-Karim and BAC/BI to pay for them. Id. They contend that the FAC does not allege that the Sea-Doos were hidden, highlighting that Phillipe Crevier (Crevier), a Zetta Singapore consultant, bought the Sea-Doos, and Benjamin Ng (Ng), a Zetta Singapore "Accounts" employee, prepared the invoice seeking reimbursement from Jetcraft. Id. (citing FAC ¶¶ 316, 319-20). They claim that the FAC's allegations are equally consistent with the Sea-Doos being a permitted business transaction as they are with a breach of fiduciary duty. Id. at 32-33. BAC/BI/LI assert that the FAC does not allege that BAC/BI had actual knowledge that Cassidy was doing anything improper because the Sea-Doos "appear[ed] to be a legitimate purchase by the Debtors." Id. at 33 (citing FAC ¶¶ 318).

---

[24] The FAC and FAC Exs. provide that the combined price for Planes 3-5, 8, and 9 was ████████████ FAC ¶ 344; FAC Exs. 2-56 § 2.1, 2-85 § 2.1, 2-91 § 2.1.

59

BAC/BI/LI also contend that the FAC does not show that they provided "substantial assistance" to Cassidy regarding the Sea-Doos because they did not buy, reimburse, or compensate anyone for them.  Id.  They assert that there are no allegations that BAC/BI reached any agreement regarding the Sea-Doos.  Id. (citing FAC ¶¶ 318, 335).

The Trustee responds that the Sea-Doos were a breach of Cassidy's fiduciary duty because they were bribes for his personal benefit structured to appear like legitimate transactions.  Opposition at 34 (citing FAC ¶¶ 306, 318, 593).  He claims that additional allegations included in the FAC show that BAC/BI provided "substantial assistance" to Cassidy: 1) Mattar, on behalf of BAC/BI, directed Cassidy to buy the Sea-Doos and authorized Fazal-Karim to accept and pay an invoice from Cassidy for them; 2) Mattar stated that he would "sort it out" with Fazal-Karim, and would determine how to divide the cost of the Sea-Doos between Jetcraft and BAC/BI; and 3) Fazal-Karim eventually paid for the Sea-Doos by providing Cassidy a credit on the Nyota.  Id. at 34-35 (citing FAC ¶¶ 305-09, 315-20, 326-40).

BAC/BI/LI reply that the allegations regarding the Sea-Doos have not changed from the Complaint and the Trustee failed to address their argument that BAC/BI did not have actual knowledge that the Sea-Doos purchase was a breach of fiduciary duty.  Reply at 17.  They note that Cassidy discussed buying the Sea-Doos openly and copied Crevier and Ng, two Zetta Singapore employees, on communications, suggesting that BAC/BI could not have known that Cassidy was using Zetta Singapore for his personal benefit.  Id.  BAC/BI/LI highlight that the FAC does not allege that they knew that the Sea-Doos were for Cassidy's personal use with the Dragon Pearl yacht.  Id. at 18.  They contend that Seagrim's and Walter's lack of knowledge regarding the Sea-Doos is equally consistent with a small, ordinary course transaction or their lack of involvement with the Debtors.  Id. at 17-18.

BAC/BI/LI conclude that the FAC is deficient for the same reasons as the Complaint: Fazal-Karim was not BAC/BI's agent and he gave a credit to Cassidy against the Nyota in his individual capacity.  Id. at 18.  Additionally, they claim that the FAC is muddled regarding BAC/BI's role with the Sea-Doos, which is insufficient under Rule 9(b).  Id. at 18-19.  BAC/BI/LI claim that the FAC is unclear whether BAC/BI was to buy and bill the Sea-Doos to Jetcraft or Zetta Singapore was buying them and billing them to Jetcraft.  Id. at 19 (citing FAC ¶¶ 317, 318, 335).  Finally, they assert that BAC/BI lacked actual knowledge that Cassidy was acting disloyal to the Debtors regarding the Sea-Doos.  Id.

The FAC alleges the following regarding the Sea-Doos:

1) BAC/BI agreed to pay Cassidy a "bribe" (the Sea-Doos), which was ultimately paid by Fazal-Karim through FKP as a quid pro quo in direct response to Cassidy's threats to cancel contracts worth more than ███████ to BAC/BI and

60

to ensure that Cassidy would enter into four additional contracts that BAC/BI valued at ▮▮▮▮▮▮▮.  FAC ¶ 305.

2) On 7/14/16, Cassidy e-mailed Mattar, Vice President of Sales for BAC/BI, that he needed two Sea-Doo jet skis, worth approximately $42,569, delivered to Gold Coast, Australia.  Id. ¶¶ 57, 306.  In May 2016, Maritimo Offshore Pty Ltd., which is located in Gold Coast, Australia, sold Cassidy a 70-foot yacht $3.4 million called the Dragon Pearl.  Id. ¶¶ 175, 306.

3) Approximately one week later, Cassidy sent Mattar and Yu two emails threatening to cancel all orders and not take delivery of Plane 3.  Id. ¶¶ 307-08.

4) On 7/22/16, Cassidy linked the Sea-Doos to his threats to cancel the contracts, emailing Mattar and Fazal-Karim, "Im [sic] not going to continue talking on all this rubbish, the ball is in your court.  On a side note, let me know on the Seadoo otherwise I need to order one shortly."  Id. ¶ 309.

5) On 7/28/16 Cassidy threatened to terminate negotiations with Minsheng[25] regarding Planes 12-15.  Id. ¶ 310.

6) Cassidy's demands were for a quid pro quo: give the Sea-Doos or he would refuse to take delivery of Plane 3 and cancel the purchase agreements for Planes 4, 5, 8, and 9.  Id. ¶ 311.  Upon cancellation, BAC/BI's only recourse was to recover liquidated damages.  Id.

7) Had Cassidy cancelled the purchase agreements for Planes 4, 5, 8, and 9, refused delivery of Plane 3, and left BAC/BI with its contractual remedy to collect liquidated damages, the Debtors would have avoided ▮▮▮▮▮▮▮ in insurmountable aircraft financing obligations, and been entitled to a ▮▮▮▮▮▮ refund.  Id. ¶ 312.  As a result, BAC/BI could not ignore Cassidy's threat to take his business elsewhere unless he was given Sea-Doos.  Id.

8) Cassidy emailed Fazal-Karim in August 2016 about the Sea-Doos, asked him to ensure that Mattar "takes care of this," and suggested that Mattar "give his credit card details and let Phillipe [Crevier] deal with it."  Id. ¶ 315.

9) Approximately two weeks later, Fazal-Karim e-mailed Mattar and Crevier, indicating that Crevier should order the Sea-Doos and send Fazal-Karim the invoice, and Fazal-Karim would "sort it out with [BAC/BI]."  Id. ¶ 316.

10) The next day, Cassidy told Crevier that Jetcraft would pay BAC/BI directly for the two Sea-Doos or a representative for Jetcraft "will pay for [Fazal-Karim]."  Id. ¶ 317.

11) On 9/14/16, Mattar, acting on behalf of BAC/BI, directed Cassidy to buy the Sea-Doos and authorized Fazal-Karim to accept and pay an invoice from Cassidy for the Sea-Doos.  Id. ¶ 318.  Mattar and Fazal-Karim would determine how to divide the cost between Jetcraft and BAC/BI.  Id.  Structuring the transaction this way would: a) make it appear to be a legitimate purchase by the Debtors; b) allow Mattar to reimburse Fazal-Karim in a separate transaction; and c) disguise the

---

[25] The FAC identifies "Minsheng" as Minsheng Financial Leasing Co., Ltd. and Minsheng Business Aviation Limited, aircraft financiers.  FAC ¶¶ 100, 107.

61

payment through the cloak of legitimate business.  Id.  The Debtors received no benefit from this transaction.  Id.

12) In September 2016, Ng sent Cassidy a $42,569 invoice addressed to Jetcraft for the Sea-Doos.  Id. ¶ 319.  Crevier then sent Fazal-Karim the invoice.  Id.  Two days later, Zetta Singapore bought the Sea-Doos and Crevier sent Mattar and Fazal-Karim a thank you email.  Id. ¶ 320.

13) Cassidy used threats to cancel aircraft orders, not to obtain price reductions for Zetta Singapore, but to get "the promise of Sea-Doos."  Id. ¶ 441.

The FAC alleges that Cassidy breached his fiduciary duty to the Debtors by threatening to refuse delivery of Plane 3 and cancel the Plane 4, 5, 8, and 9 APAs in return for "the promise of Sea-Doos."  Id. ¶¶ 440-41.  For the same reasons as explained above, Cassidy did not have the unilateral ability to refuse delivery of aircraft or cancel transactions and on that basis, he could not have breached his fiduciary duty to the Debtors regarding the Sea-Doos.

Additionally, even if the FAC had adequately pled that Cassidy breached his fiduciary duties to the Debtors regarding the Sea-Doos, it does not allege that BAC/BI substantially assisted his breach.  The FAC pleads that Mattar emailed Cassidy and Crevier: "Having spoken to [Fazal-Karim], we can do the following, buy and bill back to Jetcraft, and I shall sort it out with [Fazal-Karim]."  Id. ¶ 318.  While the Trustee asserts that Fazal-Karim was acting as BAC/BI's agent in accepting and paying Cassidy's invoice for the Sea-Doos, as explained above, Fazal-Karim was not BAC/BI's agent.  Therefore, the credit Fazal-Karim gave Cassidy against the Nyota cannot be imputed to BAC/BI.

At best, the FAC pleads that Mattar indicated that Cassidy should buy the Sea-Doos and he would "sort it out" with Fazal-Karim.  FAC ¶ 318.  This is far from the "affirmative act" required to show that BAC/BI provided "substantial assistance" to Cassidy in a breach of his fiduciary duty.  Baron v. Galasso, 921 N.Y.S.2d 100, 104 (App. Div. 2011).

Finally, there are no allegations that the Sea-Doos had any connection to Planes 12-15.  The FAC indicates that on 7/28/16, Cassidy threatened to terminate negotiations with Minsheng regarding Planes 12-15 and Cassidy executed the Plane 12-15 APAs less than 10 days after Mattar directed him to buy the Sea-Doos.  FAC ¶¶ 310, 318, 321, 441.  The FAC, however, does not plead that Planes 12-15 were part of a "quid pro quo"—as it does regarding Planes 3-5, 8, and 9.  Nor could it: BAC sold those aircraft to Yuntian 4, not the Debtors.  Fishman 11/11/21 Decl. Exs. E at 1, F at 1, G at 1, H at 1.  Viewing the FAC's allegations in the light most favorable to the Trustee, the temporal proximity of different threats to different aircraft alone is not enough to show that the Sea-Doos had any connection to Planes 12-15.

The FAC does not adequately plead that Cassidy breached his fiduciary duty or that BAC/BI substantially assisted his breach. As a result, Count 1 of the FAC does not state a claim regarding the Sea-Doos.

### iv. Count 2 – Conspiracy

Count 2 alleges that BAC/BI, Fazal-Karim, FKG, FKP, and Jetcraft conspired to: 1) aid and abet Cassidy's breach of fiduciary duty; 2) pay Cassidy bribes and kickbacks; 3) defraud the Debtors; and 4) commit other tortious acts, as indicated in Counts 1, 3-7, and 26-29.[26] FAC ¶ 574. Specifically, the FAC indicates that BAC/BI "agreed to participate in the conspiracy through [their] agent Fazal-Karim." Id. ¶ 576. During the 4/27/22 Hearing, the Trustee argued that the conspiracy was to get Cassidy to use a "single source" for all of his aircraft purchases and was entered into at the National Business Aircraft Association (NBAA) conference. See FAC ¶ 251 (providing Cassidy and Fazal-Karim had agreed on the First Kickback before the agreements for Planes 1-6 were executed and no later than the NBAA conference in November 2015); ¶ 252 (indicating that in December 2015, Chad Anderson, Jetcraft Corp.'s President, sent Fazal-Karim a spreadsheet entitled "Zetta Jet Lease Overview & Analysis.xlsx" that included a column "Outline of Deal Discussed at NBAA"); ¶ 457 (stating that Cassidy agreed to purchase aircraft exclusively through Fazal-Karim's company Jetcraft Corp. and its affiliates or from BAC/BI with Fazal-Karim acting as BAC/BI's agent).

Counts 2 hinges on BAC/BI "agree[ing] to participate in the conspiracy through [their] agent Fazal-Karim." FAC ¶ 576. As analyzed above, the Court finds that FAC does not allege an actual or apparent agency relationship between BAC/BI and Fazal-Karim regarding any aircraft. Therefore, Count 2 must be dismissed because, viewing the facts in the light most favorable to the Trustee, it cannot state a claim on which relief can be granted.

### v. Count 3 – California UCL

Count 3 alleges that BAC/BI engaged in commercial bribery and violated California's Unfair Competition Law (UCL) by giving Cassidy the F1 Tickets and agreeing to pay for the Sea-Doos in return for Cassidy causing the Debtors to accept delivery of Planes 3-5, 8, and 9. FAC ¶¶ 305-321; 584-85; 588. It also alleges that Fazal-Karim, as BAC/BI's agent, directed Jetcraft's CFO to pay Cassidy the First and Second Kickbacks. Id. ¶¶ 587, 598. Because New York law applies, Count 3 must be dismissed. Cont'l Airlines, Inc. v. Mundo Travel Corp., 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (holding that a "valid choice-of-law provision selecting another state's law is grounds to dismiss" a California UCL claim). Additionally, the allegations regarding the First and Second Kickback must independently be dismissed because, as analyzed above,

---

[26] Counts 26-29 were intentionally omitted from the FAC. See FAC at 146-47.

Fazal-Karim did not have actual or apparent authority to act as BAC/BI's agent regarding any aircraft.

### vi.   Count 6 – Fraudulent Misrepresentation

Count 6 alleges that Fazal-Karim fraudulently misrepresented material facts that the First and Second Kickback were made in return for "services" while he was acting as BAC/BI's agent.  FAC ¶¶ 600, 610.  Counts 6 must be dismissed for two reasons.  First, it is premised on Fazal-Karim acting as BAC/BI's agent regarding the sale of Planes 1 and 10, but those aircraft were sold by Jetcoast and Orion respectively, not BAC/BI.  Id. ¶¶ 120, 181, 610.  Second, as analyzed above, there was neither an actual nor apparent agency relationship between BAC/BI and Fazal-Karim.

### vii.   Count 7 – Fraudulent Concealment

Count 7 of the FAC alleges that BAC/BI (and Fazal-Karim) concealed material facts from the Debtors regarding the First and Second Kickbacks, the F1 Tickets, and the Sea-Doos so that Cassidy "would induce the Debtors to acquire aircraft from" BAC/BI (and Fazal-Karim).  FAC ¶ 625.[27]  The FAC also alleges that Cassidy threatened to refuse delivery of Plane 3 and cancel the Plane 4, 5, 8, and 9 APAs unless he were provided the F1 Tickets or Sea-Doos.  FAC ¶¶ 309-312.

BAC/BI/LI assert that the FAC does not show they had any disclosure duty.  Motion at 44.  They claim that, while there is a duty not to pay bribes, there is no separate duty to disclose bribes.  Id.  BAC/BI/LI argue that if the law were otherwise, then every tort claim would give rise to a fraudulent concealment claim, which is not true.  Id. (citing Zumpano v. Quinn, 849 N.E.2d 926, 929-30 (N.Y. 2006)).  BAC/BI/LI argue that Count 7 also fails to state a claim because BAC/BI and Zetta Singapore did not have a fiduciary relationship.  Id. at 44-45 (citing Transnat'l Mgmt. Sys. II, LLC v. Carcione, 2016 WL 7077040, at *3 (S.D.N.Y. Dec. 5, 2016).  They contend that the FAC does not support the "special facts" doctrine because the F1 Tickets were provided to the "Zetta team" and the Sea-Doos were discussed with Zetta Singapore employees and the information was not particularly within the knowledge of BAC/BI.  Id.

The Trustee responds that at the pleading stage, it is improper for BAC/BI to dispute whether the F1 Tickets and Sea-Doos were particularly within their knowledge. Opposition at 44 (citing Milbeck v. TrueCar, Inc., 2019 WL 476004, at *1 (C.D. Cal. Feb. 5, 2019)).  He asserts that the FAC pleads that Zetta Singapore's disinterested directors did not know about the Sea-Doos and F1 Tickets and Mattar's reference to the "Zetta team" was a self-serving comment to conceal that the F1 Tickets were bribes.  Id. (citing FAC ¶¶ 313, 634).  The Trustee claims that Zetta Singapore's board was unaware of

---

[27]  Because the Court has determined that Fazal-Karim was not BAC/BI's agent, it only summarizes the FAC's allegations and the parties' arguments regarding the F1 Tickets and Sea-Doos.

64

the Sea-Doos, which were to be delivered to Australia, where Cassidy's yacht was docked. Id. (citing FAC ¶ 306).

BAC/BI/LI reply that the Trustee misconstrues the "special facts" doctrine that usually involves deficiencies in goods known only to a seller about which a buyer could not learn through ordinary diligence. Id. at 26-27 (citing Wang v. Tesla, Inc., 2021 WL 3023088, at *4 (E.D.N.Y. July 16, 2021)).  They contend that in those situations, the special facts doctrine requires disclosure of the product limitations if non-disclosure would render the transaction inherently unfair.  Id. at 27.  BAC/BI/LI assert that the "special facts" doctrine does not create a duty to confess to torts, which would give rise to "an infinite number of claims."  Id. (citing Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 445 (S.D.N.Y. 2014), aff'd, 579 F. App'x 7 (2d Cir. 2014); Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 566 (S.D.N.Y. 2013)).  BAC/BI/LI allege that the special facts doctrine does not apply because Cassidy's fraud was discoverable by Seagrim and Walter, "uninterested directors" who gave control of the Debtors' key functions to Cassidy and failed to hold any formal board meetings until after Cassidy's scheme was completed.  Id. at 27-28.

Under New York law, a claim for fraudulent concealment has six elements: 1) a duty to disclose material facts; 2) knowledge of material facts by a party bound to make such disclosures; 3) failure to discharge a duty to disclose; 4) scienter; 5) reliance; and 6) damages."  De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013).  BAC/BI/LI primarily contest that they had a duty to disclose material facts to the Debtors.  A duty to disclose only arises where there is a fiduciary relationship between the parties or under the "special facts" doctrine, where "one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."  Jana L. v. W. 129th St. Realty Corp., 802 N.Y.S.2d 132, 134 (App. Div. 2005).

Here the FAC pleads that BAC/BI "intentionally concealed or suppressed" the First and Second Kickbacks, F1 Tickets, and Sea-Doos.  FAC ¶ 633.  As analyzed above, Fazal-Karim was not BAC/BI's agent and the First and Second Kickbacks were paid by Jetcraft Global to Cassidy for Planes 1 and 10, which were sold by Jetcraft, with no participation from BAC/BI.  See Id. ¶¶ 118-30; 181-99, 258, 275.  BAC/BI was not involved in these payments or in the Plane 1 or 10 transactions.  As a result, the Court focuses on Count 7's allegations regarding the F1 Tickets and Sea-Doos.

The FAC alleges that:

1) BAC/BI paid a $43,890 "bribe" to Cassidy (the F1 Tickets) and agreed to pay a $42,569 "bribe" (the Sea-Doos) that Fazal-Karim later paid, to ensure that the Debtors would take delivery of Planes 2-4, 8, and 9,[28] rather than terminate those

---

[28] The FAC is internally inconsistent.  In a section titled, "The F1 Ticket Bribe and the Sea-Doos," it alleges that Cassidy demanded a quid pro quo of the Sea-Doos and F1 Tickets or he "would refuse to

agreements, and so that BAC would receive more than ▮▮▮▮▮ in additional payments rather than having to refund ▮▮▮▮▮ in prepayments, as well as enter additional agreements to buy Planes 12-15.[29] Id. ¶ 628.

2) BAC/BI exclusively knew and intentionally concealed or suppressed that they were giving the F1 Tickets and Sea-Doos to the Debtors to take delivery of Planes 3-5, 8, and 9. Id. ¶¶ 625, 631, 633.

3) The Debtors' uninterested directors and management were "unaware of these facts and would not have entered into the transactions or accepted delivery of the [p]lanes if they had known the concealed or suppressed facts." Id. ¶¶ 634-35.

Because the FAC does not indicate that BAC/BI and the Debtors were in a fiduciary relationship,[30] it can only state a claim for fraudulent concealment if it meets the requirements of the "special facts" doctrine.  To state a claim under the "special facts" doctrine, a plaintiff must allege: 1) one party has superior knowledge of certain information; 2) that information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge.  Wang v. Tesla, Inc., 2021 WL 3023088, at *4 (E.D.N.Y. Jul. 16, 2021) (citing Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 155 (2d. Cir. 1995)).

The FAC adequately pleads the first element of the special facts doctrine, that BAC/BI had superior knowledge of the F1 Tickets and Sea-Doos:

1) Mattar gave the F1 Tickets to the "Zetta team" and directed that the Debtors would not have to pay for them.  FAC ¶ 313.

2) Mattar told Cassidy to buy the Sea-Doos and authorized Fazal-Karim to accept and pay an invoice from Cassidy.  Id. at 318.

3) The Debtors' disinterested directors did not know about the F1 Tickets or Sea-Doos.  Id. ¶¶ 634-35.

The FAC must also allege that information about the F1 Tickets and Sea-Doos was not readily available to the Debtors' disinterested directors.  Although the Trustee highlights the allegations that the Debtors' disinterested directors did not know about the F1 Tickets and Sea-Doos, this is not enough: the FAC must plead that the F1 Tickets and

---

[29] As analyzed above, Zetta Singapore did not buy Planes 12-15 from BAC/BI.

[30] Nor could it.  An arms-length business relationship "does not give rise to a fiduciary obligation," and "no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."  Wang v. Tesla, Inc., 2021 WL 3023088, at *4 (E.D.N.Y. Jul. 16, 2021) (quoting In re Refco Sec. Litig., 759 F. Supp. 2d 301, 323 (S.D.N.Y. 2010); Off. Comm. of Unsecured Creditors v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.), 276 F.3d 123, 130 (2d Cir. 2002)).

The footnote text that begins: take delivery of Plane 3 and cancel the purchase agreements for Planes 4, 5, 8[,] and 9."  FAC ¶ 311.  In contrast, in Count 7, the FAC indicates that BAC/BI paid for the F1 Tickets and agreed to pay for the Sea-Doos, to ensure that the Debtors would take delivery of Planes 2-4, 8, and 9.  Id. ¶ 628.

Sea-Doos were not discoverable through "exercise[s] of ordinary intelligence."  Jana L. v. W. 129th St. Realty Corp., 802 N.Y.S.2d 132, 135 (App. Div. 2005).  Regarding the Sea-Doos, the FAC falls short: it makes clear that at least two Zetta Singapore employees, Crevier and Ng, were aware that Zetta Singapore was buying the Sea-Doos, which would be billed to Jetcraft Corp.  FAC ¶¶ 319-20.  Because Crevier and Ng learned of the Sea-Doos within the scope of their employment, their knowledge is imputed to Zetta Singapore.  See New York v. United Parcel Serv., Inc., 253 F.Supp.3d 583, 669 (S.D.N.Y. 2017) (quoting Apollo Fuel Oil v. United States, 195 F.3d 74, 76 (2d Cir. 1999)).  Further, a corporate director exercising ordinary oversight of the Debtors' procurement practices and personnel could have discovered the Sea-Doo purchase.

The FAC, however, does not sufficiently allege the third element of the "special facts" doctrine, that BAC/BI knew that the Debtors were acting on the basis of mistaken knowledge.  In fact, there are no allegations that *BAC/BI knew* that the Debtors' independent directors would have cancelled transactions for multi-million-dollar aircraft necessary for Debtors' business, and incurred significant liquidated damages, if they had been aware of the F1 Tickets and Sea-Doos.  This omission is fatal to Count 7 under the "special facts" doctrine.

### e.  Extraterritoriality of Counts 12-19, 31, and 32

Counts 12-19 and 31-32 were brought under 11 U.S.C. §§ 547, 548, and 550 (Bankruptcy Claims).  Counts 12-17, 31 and 32 seek avoidance and recovery of actual intent and constructive fraudulent transfers.  Counts 18 and 19 seek avoidance and recovery of "US Preference Transfers."

BAC/BI/LI contend that the Bankruptcy Claims fail as a matter of law and must be dismissed because the transfers originated from Zetta Singapore's Singapore bank account.  Motion at 48 (citing FAC ¶¶ 775, 786, Sch. 4).  They note that these transfers originated outside the United States, are extraterritorial, and cannot be recovered because the focus of the Bankruptcy Code's avoidance provisions is on the initial transfer, even if the transfer was sent to a US bank account.  Id. at 48-49 (citing "Court's Memorandum of Decision on: 1) 'Motion to Dismiss Counts II, III, VI, VII, IX, X, XI, XII, and XV of Adversary Complaint,' . . ." (Yuntian MTD Ruling); Yuntian AP Docket #175 at 33-35).

The Trustee responds that the FAC alleges that the claims seeking to avoid and recover the Plane 2-5 transfers are domestic applications of §§ 547 and 548 for four reasons.  Opposition at 47.  First, he alleges that the focus of § 548 is the "initial transfer that depletes the property that *would have become property of the estate*."  Id. (emphasis in original).  The Trustee contends that property of the estate includes property "wherever located" and the funds in Zetta Singapore's account as well as "proceeds transferred to [BAC/BI]" would have been property of the estate if they had not been transferred to

BAC/BI.  Id.  Second, he alleges that the payments for Planes 2-6 were made to BAC's Texas Bank of America account.  Id. at 48 (citing FAC ¶¶ 54, 153, 524.h, 525, 532, Sch. 4).  He contends that the preference transfers at issue in Counts 18 and 19 were made to BAC and Learjet, another domestic corporation.  Id. (citing FAC ¶¶ 56, 489, 496).  He claims that the heart of a § 548 claim is receipt of the transferred funds in American bank accounts because that is "precisely the conduct" he is targeting and seeking to avoid.  Id. (quoting Off. Comm. of Unsecured Creditors v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)), 575 B.R. 229, 239 (Bankr. S.D.N.Y. 2017)).  The Trustee contends that courts interpreting "transfers" in other federal statutory contexts hold that use of US banks is domestic conduct.  Id. (citing United States v. Ho, 984 F.3d 191, 205 (2d Cir. 2020); United States v. Daccarett, 6 F.3d 37, 54 (2d Cir. 1993); United States v. Prevezon Holdings, Ltd., 251 F. Supp. 3d 684, 692 (S.D.N.Y. 2017)).

Third, the Trustee alleges that "significant portions" of the payments originated from Zetta USA's California bank accounts.  Id.  According to the Trustee, Zetta USA sent $1.4 million to Zetta Singapore, which Zetta Singapore then used to pay part of the initial deposits on Planes 1-6.  Id. (citing FAC ¶ 94).  And, he asserts that the "Debtors also used funds originating in the US from Zetta USA's revenue-generating flights."  Id. (citing FAC ¶¶ 82, 112).  Fourth, the Trustee contends that the transactions were entered into in the US and all obligations were incurred in the US.  Id. at 48-49 (citing FAC ¶¶ 56, 133-34, 139-42, 150, 166-69, 173, 251, 527-28, 533-34).

In the Reply, BAC/BI/LI assert that US law "does not reach transfers made by overseas parties from overseas accounts," and Counts 12-19, 31, and 32 must be dismissed. Reply at 33.  BAC/BI/LI argue that the Trustee ignores contrary holdings by this Court on indistinguishable facts and the weight of authority that only the origin of the transfer is relevant.  Id. (citing "Court's Memorandum of Decision on: '(A) Notice of Motion and Motion to Dismiss Counts IX and XV . . .'"  (EDC MTD Ruling), Yuntian AP Docket #173 at 15; Yuntian MTD Ruling at 23-24; LaMonica v. CEVA Grp. Plc (In re CIL Ltd.), 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.), 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017); Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re Sherwood Invs. Overseas Ltd.), 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016)).

According to BAC/BI/LI, the Trustee's positions, that: 1) funds from Zetta Singapore's Singapore account would have become property of the estate; 2) payments were made to US bank accounts; and 3) contracts were entered into and payment obligations were incurred in the US, are irrelevant.  Id. at 33-34 (citing Yuntian MTD Ruling at 36; EDC MTD Ruling at 17; "Court's Memorandum of Decision on: 'Motion to Dismiss Counts I, II, VI, V, VIII, XIII, XIV, & XV . . .'" (Universal Leader MTD Ruling), Yuntian AP Docket #174 at 36-38; "Court's Memorandum of Decision on: 1) 'Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X . . .'" (Universal Leader Second MTD Ruling), Yuntian AP Docket

68

#314 at 25). BAC/BI/LI discount the Trustee's reference to FAC ¶ 94 to substantiate his argument that "significant portions" of the payments originated from California, noting that it is directly contradicted by the FAC Sch. 4, which shows that payments for Planes 2-4 were made from a Singapore account. Reply at 34.

Because neither party spends more than a few pages on the extraterritoriality analysis, the Court limits its analysis of the issues to those necessary to resolve the Motion. The Court has previously analyzed the extraterritoriality issue in detail. EDC MTD Ruling at 5-18; Universal Leader MTD Ruling at 7-42; Yuntian MTD Ruling at 8-38; Universal Leader Second MTD Ruling at 13-36.

> i. The Presumption Against the Extraterritorial Application of Federal Law

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 335 (2016). The question is not whether a court thinks "Congress would have wanted" a statute to apply to foreign conduct "if it had thought of the situation before the court" but whether Congress has "affirmatively and unmistakably instructed that the statute will do so." Id. "When a statute gives no clear indication of an extraterritorial application, it has none." Id. (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255 (2010)).

The Supreme Court has announced a two-step framework for analyzing extraterritoriality issues. First, courts analyze whether "the presumption against extraterritoriality has been rebutted—that is whether the statute provides a clear, affirmative indication that it applies extraterritorially." Id. at 337. Second, courts examine a statute's "focus" to determine whether the case involves a domestic application. Id. at 337-38. If the relevant conduct occurred in the US, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the relevant conduct occurred in a foreign country, then the case involves an impermissible extraterritorial application even though some conduct occurred in the US. Id. at 337.

Although it is true that a defendant who moves for dismissal under Rule 12(b)(6) has the burden of proof, a plaintiff seeking to overcome the presumption against extraterritoriality has a "heavy burden" of showing that: 1) a statute applies abroad; or 2) the case involves domestic application of a statute. Maxwell Commc'n Corp. plc v. Societe General plc (In re Maxwell Commc'n Corp. plc), 186 B.R. 807, 819-21 (S.D.N.Y. 1995) (indicating that the bankruptcy court did not err in granting a Rule 12(b)(6) motion because plaintiffs had not met their "heavy burden" of showing that Congress unmistakably intended § 547 to apply abroad); see also, Doe v. Tapang, 2019 WL 3576995, at *7 (N.D. Cal. Aug. 6, 2019) (granting a Rule 12(b)(6) motion to dismiss

69

RICO conspiracy claims because plaintiffs had not met their burden to overcome the presumption against extraterritoriality by establishing a domestic injury); Off. Comm. of Unsecured Creditors v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)), 575 B.R. 229, 242 (Bankr. S.D.N.Y. 2017) (indicating that when ruling on motions to dismiss, the party asserting that a statute applies extraterritorially has the burden).

ii.  The Language of the Statutes – 11 U.S.C §§ 547, 548, and 550

Title 11 United States Code § 547(b) provides that a trustee may "avoid any transfer of an interest of the debtor in property" to or for the benefit of a creditor, for or on account of an antecedent debt, made within 90 days before the petition date, while the debtor was insolvent, and which enables the creditor to receive more than it would if the case were a chapter 7, the transfer had not been made, and the creditor received payment under the Bankruptcy Code.

Title 11 United States Code § 548(a)(1) provides that a trustee may avoid any transfer of "an interest of the debtor in property" made or incurred by the debtor within two years of the petition date if the debtor: A) acted with the intent to hinder, delay or defraud, or B) received less than reasonably equivalent value and: i) was insolvent on the date of the transfer or became insolvent because of the transfer; ii) was engaged in business or about to engage in business for which any property remaining was an unreasonably small capital; or iii) intended to incur or believed that it would incur debts beyond its ability to repay.

Title 11 United States Code § 550 provides that if a transfer is avoided under §§ 547 or 548, the trustee may recover for the benefit of the estate the property transferred.

Neither BAC/BI/LI nor the Trustee mention whether §§ 547, 548, and 550 provide a clear, affirmative indication that they apply extraterritorially.  The Supreme Court and Ninth Circuit have not addressed that issue and there is disagreement among the lower courts.  This Court has held, however, in line with the majority of courts that have addressed the issue, that they do not.[31]  See Yuntian MTD Ruling at 12-15; Barclay v. Swiss Fin. Corp. (In re Bankr. Est. of Midland Euro Exch. Inc.), 347 B.R. 708, 720 (Bankr. C.D. Cal. 2006) (holding that § 548 does not have extraterritorial application); Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re Sherwood Invs. Overseas Ltd.), 2016 WL 5719450, *11-12 (M.D. Fla. Sept. 30, 2016) (same); Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC, 513 B.R. 222, 232 (S.D.N.Y. 2014), rev'd on other grounds, 917 F.3d 85 (2d Cir. 2019), cert. denied 140 S. Ct. 2824 (2020) (finding that section 550(a) does not apply extraterritorially); Maxwell Commc'n Corp.

---

[31] The cases that address extraterritoriality often do not distinguish between §§ 547 and 548 because the relevant language is the same in both statutes.  Off. Comm. of Unsecured Creditors v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)), 575 B.R. 229, 244 n.6 (Bankr. S.D.N.Y. 2017) (noting that both §§ 547 and 548 allow a trustee to "avoid any transfer of an interest of the debtor in property").

70

plc v. Societe General plc (In re Maxwell Commc'n Corp. plc), 186 B.R. 807, 820-21 (S.D.N.Y. 1995) (declining to apply § 547 extraterritorially); LaMonica v. CEVA Grp. Plc (In re CIL Ltd.), 582 B.R. 46, 92-93 (Bankr. S.D.N.Y. 2018) (holding that §§ 548 and 550 do not have extraterritorial application); Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.), 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (declining to apply § 547 extraterritorially); but see French v. Liebmann (In re French), 440 F.3d 145, 152 (4th Cir. 2006) (applying § 548 extraterritorially); Emerald Cap. Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liquidating Corp.), 572 B.R. 117,126 (Bankr. D. Del. 2017) (same); Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), 543 B.R. 127, 155 (Bankr. S.D.N.Y. 2016) (same).

### iii.  The Statutes' "Focus"

Both BAC/BI/LI and the Trustee concentrate their argument on the "focus" of §§ 547, 548, and 550.  Recent Supreme Court decisions have analyzed the "focus" of statutes to determine whether a case involves domestic or foreign application of statutes.  RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325 (2016); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010).

Morrison involved National Australia Bank Limited (National), whose "ordinary shares" were traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any American exchange.  Morrison, 561 U.S. at 251.  In 1998, National bought Florida mortgage-servicing company HomeSide Lending, Inc. (HomeSide) and until 2001, National touted the success of HomeSide's business.  Id. at 251-52.  After Australian citizens Russell Leslie Owen (Owen) and Brian and Geraldine Silverlock (Silverlocks) bought National shares, National announced that it was writing down the value of HomeSide's assets by more than $2 billion.  Id. at 252.  Owen and the Silverlocks sued National and HomeSide in the District Court for the Southern District of New York for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, seeking to represent a class of foreign purchasers of National's ordinary shares.  Id. at 252-53.  National and HomeSide moved to dismiss for failure to state a claim under Rule 12(b)(6) and lack of subject matter jurisdiction under Rule 12(b)(1).  Id. at 253.  The district court dismissed under Rule 12(b)(1), finding that it had no jurisdiction because the acts in the US were "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad."  Id.  The Second Circuit affirmed because "[t]he acts performed in the [US] did not 'compris[e] the heart of the alleged fraud.'"  Id.

The Supreme Court affirmed, although it noted that the extraterritorial reach of § 10(b) is a merits question, not a subject matter jurisdiction question.  Id. at 253-54, 273.  The Court then indicated that it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the [US]."  Id. at 255 (citations and internal quotation marks omitted).

71

After holding that the Exchange Act contained no affirmative indication that § 10(b) applied extraterritorially, the Supreme Court focused on Owen's and the Silverlocks' argument that Florida was where HomeSide and its executives engaged in the deceptive conduct and where HomeSide executives made misleading public statements.  Id. at 265-66.  The Supreme Court held that these American contacts were insufficient to displace the presumption against extraterritoriality because "it is a rare case of extraterritorial application that lacks *all* contact with the territory of the [US]." Id. at 266 (emphasis in original).  The Court continued that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." Id. (emphasis in original).

The Supreme Court highlighted that the "focus" of the Exchange Act is the purchase and sale of securities in the US, not where the deception occurred.  Id.  Because National's ordinary shares were not listed on a domestic exchange, and all aspects of the purchases occurred outside the US, the Supreme Court stated that the case should have been dismissed under 12(b)(6), based on failure to state a claim.  Id. at 273.

According to the Supreme Court, the two tests that the Second Circuit had developed for determining whether conduct was foreign or domestic in the context of § 10(b)—an "effects test" that was premised on an effect on American securities markets and a "conduct test" that was premised on wrongful conduct in the US—were inappropriate. Id. at 257-61.  The Supreme Court reasoned that the "results of judicial-speculation-made law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality" because instead of guessing "anew in each case," the presumption can be applied in all cases, which preserves a stable background against which Congress can legislate with predictable effects.  Id. at 261.

In Nabisco, RJR Nabisco, Inc. (RJR) and other unspecified parties allegedly participated in a global money-laundering scheme involving the illegal sale of drugs and cigarettes in various countries.  RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 332 (2016).  The European Community and 26 of its member states sued RJR in the Eastern District of New York for civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), and RJR moved to dismiss the complaint, arguing that RICO does not apply to racketeering activity occurring outside US territory or to foreign enterprises.  Id. at 332-33.  The district court agreed with RJR and dismissed the RICO claims as impermissibly extraterritorial, but the Second Circuit reinstated those claims, concluding that Congress had clearly communicated its intent that RICO applied to extraterritorial conduct.  Id. at 333-34.  The Supreme Court granted certiorari because the lower courts disagreed regarding RICO's extraterritorial application.  Id. at 335.

The Supreme Court stated that to determine whether a case involves a domestic application of a statute, courts must look to the "focus" of the statute.  Id. at 337.

72

According to the Court, "[i]f the conduct relevant to the statute's focus occurred in the [US], then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in [US] territory." Id.

The Court noted that "when a statute provides for some extraterritorial application the presumption against extraterritoriality operates to limit that provision to its terms." Id. at 339 (quoting Morrison, 561 U.S. at 265).  The Court held that the complaint did not impermissibly allege extraterritorial violations of the RICO Act because the pattern of racketeering activity involved predicate offenses that were either committed in the US or in a foreign country in violation of a predicate statute that applied extraterritorially. Id. at 344.  Section 1964(c), however, required that a civil RICO plaintiff allege and prove a domestic injury, recovery was not available for foreign injuries, and the European Community and the member states had stipulated to waive their claims for domestic injuries, so the Court held that the RICO claims had to be dismissed. Id. at 354-55.

Most recently, the Supreme Court expanded on the "focus" of a statute by indicating that it is the "object of its solicitude," which can include the conduct that it "seeks to regulate" and the parties and interests it "seeks to protect" or vindicate. WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (cleaned up) (quoting Morrison, 561 U.S. at 267).

To determine the conduct that is relevant to the analysis, the Court must consider the "focus" of the avoidance and recovery provisions (§§ 547, 548, and 550), which a majority of courts that have addressed the issue have determined is "the initial transfer that depletes the property that would have become property of the estate." LaMonica v. CEVA Grp. PLC (In re CIL Ltd.), 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); see also In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 98 (2d Cir. 2019), cert. denied 140 S. Ct. 2824 (2020) (indicating that both §§ 548 and 550 regulate a debtor's initial transfer); Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.), 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (concluding that the focus of § 547 is the initial transfer); Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re Sherwood Investments Overseas Ltd., Inc.), 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the transfers sought to be avoided, not the parties' relationship or locus." (emphasis in original)).

Although the Trustee argues that the transfers he seeks to avoid and recover in Counts 12-19, 31, and 32 are domestic, the Court finds his position unpersuasive.  First, the Trustee's contention that the focus of § 548 is the "initial transfer that depletes the property that would have become property of the estate," is an incorrect statement of

73

the law.  Section 548 provides that the Trustee may avoid any transfer "of an interest of the debtor in property or any obligation . . . incurred by the debtor that was made or incurred within 2 years" before a bankruptcy case is filed.  Contrary to the Trustee's position the statute does not address property that "would have become property of the estate."  11 U.S.C. § 548(a)(1).  The Trustee is correct that § 541 defines property of the estate broadly, as "wherever located and by whomever held," but he is not seeking avoidance of the transfers under that section of the Bankruptcy Code, nor could he.

Second, as the Court previously held, the focus of the avoidance statutes is the initial transfer.  As relevant to the Motion, all of the transfers at issue were made from a foreign entity's foreign bank account: Zetta Singapore, a Singaporean entity, made the transfers from its Singapore bank account.  See FAC Sch. 4; In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 98 (2d Cir. 2019), cert. denied, 140 S. Ct. 2824 (2020); LaMonica v. CEVA Grp. PLC (In re CIL Ltd.), 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.), 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017); Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re Sherwood Invs. Overseas Ltd.), 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016).  The fact that money, which originated from a foreign company's foreign bank account (Zetta Singapore's Singapore bank account) was transferred to a domestic entity or into a US bank account (BAC's Bank of America account in Texas) is irrelevant to the analysis. CIL, 582 B.R. at 93; Picard, 917 F.3d at 98; Ampal-Am. Isr., 562 B.R. at 613.

The fact that the transfers were in US dollars, as noted by Sch. 4, does not alter the analysis: the denomination of payments generally has no bearing on whether transactions are foreign or domestic.  See Banco Safra S.A. – Cayman Is. Branch v. Samarco Mineração S.A., 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019) (holding that the currency used does not necessarily have any bearing on whether a purchase or sale is domestic, and US dollars can be used anywhere); see also Maxwell Commc'n Corp. plc v. Societe General plc (In re Maxwell Commc'n Corp. plc), 186 B.R. 807, 817-18 (S.D.N.Y. 1995) (concluding that the transfers were foreign despite the payment in US dollars).

Further, use of US correspondent banks, which are referenced in Sch. 4, does not transmute a foreign transaction into a domestic one.  See In re Maxwell Commc'n, 186 B.R. at 817 n.5 (explaining that the use of a US-based intermediary bank account did not make a foreign transfer domestic). A correspondent bank is a "bank that acts as an agent for another bank in a geographical area to which the other bank does not have direct access . . . ." Bank, Black's Law Dictionary (11th ed. 2019).  This case is readily distinguishable from Off. Comm. of Unsecured Creditors v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c)), 575 B.R. 229, 233-34 (Bankr. S.D.N.Y. 2017), where the transferor sent money from its own account in New York to correspondent accounts in New York maintained by the transferees (or the transferees' banks).  In contrast, here,

74

Zetta Singapore, a foreign entity, sent money from its foreign bank account in Singapore, through a US correspondent bank account.  FAC Sch. 4.  Finally, the Trustee's citation to cases addressing civil forfeiture, whose "focus" is the "transportation or transfer of property," and a criminal case involving money laundering under 18 U.S.C. § 1956, which makes it illegal to "transport[], transmit[], or transfer[] . . . funds . . . to a place in the [US] from or through a place outside the [US]," is unavailing.

The Trustee's third argument requires little discussion.  He asserts, and the FAC indicates, that Zetta USA sent Zetta Singapore millions of dollars in charter revenue that Zetta Singapore then used to pay deposits, down payments, and debt service, including $1.4 million that Zetta Singapore used to pay for part of the deposits on Plane 1-6.  Opposition at 48; FAC ¶ 94.  But, the Trustee has not presented any authority that the inflow of money to a foreign entity's foreign bank account from which a transfer is made is relevant to the § 548(a)(1) analysis.

Finally, the Trustee's position that transactions were entered into in the US and all obligations were incurred in the US is unpersuasive.  As explained above, the focus of the Bankruptcy Code's avoidance and recovery provisions is the initial fraudulent transfer of property.  The occurrence of closings in the US, dealings with US-based counterparties and professionals, registration with the FAA, and delivery of aircraft in the US are all peripheral to this focus because they do not pertain to the transfers at issue, which the Trustee seeks to avoid.  See Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re Sherwood Invs. Overseas Ltd., Inc.), 2016 WL 5719450, at *11 (M.D. Fla. Sept. 30, 2016) (finding that the debtor-in-possession (DIP) failed to overcome the presumption against extraterritoriality where its dealings with Royal Bank of Scotland N.V. (RBS), a Netherlands-based transferee, had, at most, a "tangential connection" with the US, even though the DIP's principal and his RBS trader had "several conversations" in New York, and the "minimal contacts" with the US did not carry "sufficient force" to displace the presumption against extraterritoriality); LaMonica v. CEVA Grp. Plc (In re CIL Ltd.), 582 B.R. 46, 96 (Bankr. S.D.N.Y. 2018) (stating that a foreign transferor retained professionals outside the US, but even if the relevant transfer had been negotiated and documented by professionals in the US, it would not have been enough to make the transfer a domestic transaction); Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.), 562 B.R. 601, 613-14 (Bankr. S.D.N.Y. 2017) (holding that where legal services had some US connections—a company's stock was traded on the NASDAQ, and an attorney performed legal work regarding SEC and NASDAQ filings—it did not result in the transactions being domestic); Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), 543 B.R. 127, 150-51 & n.91 (Bankr. S.D.N.Y. 2016) (acknowledging that the foreign transferor and foreign transferee were probably in New York when they approved the shareholder distributions at issue, but indicating that under Morrison, the court must target its inquiry on the "focus" of congressional concern, and the connection to the US was not sufficiently strong for the transfer to be considered domestic).

75

      f.   Count 20 – Violation of the Automatic Stay

The FAC contains a section titled "Allegations Relating to Stay Violations," which provides that:

1) The Trustee brings a claim against BAC for violations of the automatic stay under 11 U.S.C. § 362.  FAC ¶ 500.
2) Zetta Singapore and BAC were parties to executory contracts, which required BAC to provide services regarding existing warranties on aircraft, including BAC/BI Smart Parts Preferred Agreements (Smart Part Agreements) with varying terms, the longest of which extended through 2022.  Id. ¶ 506.  These agreements were executory contracts under 11 U.S.C. § 365 because performance remained outstanding by both parties.  Id.
3) Zetta USA was lessee of a BAC/BI aircraft (Scout Aircraft), and its leasehold interest was property of the estate, which was in BAC's possession on 12/5/17.  Id. ¶¶ 507-08.  Before the Petition Date, BAC was doing spot work on, and then ceased work on, the Scout Aircraft.  Id. ¶ 507.  BAC refused to "recommence work on the Scout Aircraft during the Chapter 11 cases."  Id.  The Smart Parts Agreement for the Scout Aircraft (Scout SP Agreement) was an executory contract and BAC was required to perform under that agreement during the Chapter 11 cases.  Id. ¶ 508.  BAC's refusal to perform under the Scout SP Agreement violated the automatic stay" and constituted an unlawful interference with Zetta USA's leasehold interest.  Id.

Count 20 is titled "Violation of the Automatic Stay, 11 U.S.C. § 362" and alleges the following:

1) Since the Debtors filed the Petitions, there has been a stay "prohibiting any entity from obtaining possession of, interfere with, or exercising control over, the Debtors' property, including . . . any interests in executory contracts and unexpired leases, and any attempt to retain possession of property of the estates absent relief from the automatic stay."  FAC ¶ 797.
2) BAC refused to perform under the Scout SP Agreement, which was an illegal, unilateral ceasing of performance under an executory contract in violation of 11 U.S.C. § 365 and constituted direct interference with Zetta Singapore's leasehold interest in the Aircraft Lease.  BAC's actions were in clear violation of the automatic stay under 11 U.S.C. § 362(a)(3).  Id. ¶ 799.
3) Zetta Singapore has been damaged by BAC's willful violations of the stay.  The Trustee and the estates are also entitled to attorneys' fees the Trustee incurred in enforcing the automatic stay.  Id. ¶ 800.

BAC/BI/LI argue that Count 20 should be dismissed because the Trustee is not an individual injured by any willful violation of the stay entitled to damages and he lacks standing to recover damages for a stay violation.  Motion at 58 (citing Havelock v. Taxel (In re Pace), 67 F.3d 187, 193 (9th Cir. 1995); Johnston Env't Corp. v. Knight (In re Goodman), 991 F.2d 613, 619 (9th Cir. 1993); Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 184-87 (2d Cir. 1990)).  The Trustee responds that even if he cannot proceed on his stay violation claim, the FAC's allegations support a breach of contract claim because no "technical form is required."  Opposition at 59.  Alternatively, he requests leave to replead that claim.  Id.  BAC/BI/LI reply that the Trustee does not challenge dismissal of Count 20 or argue that the FAC sufficiently pleads contempt under § 105(a).  Reply at 41.  BAC/BI/LI contend that the Trustee "implies some limit" on their ability to challenge Count 20 because they did not move to dismiss its analogue in the Complaint.  Id.  They highlight that the Trustee seeks leave to replead the stay-violation claim as a breach of contract claim based on the same post-petition conduct.  Id.  According to BAC/BI/LI leave to amend should be denied because:

1) There is no meaningful distinction between a post-petition breach of contract claim for damages and a violation of the automatic stay claim for damages under § 362(k); and
2) The Trustee cites no authority to support a post-petition breach claim for rejected executory contracts, which are deemed materially breached upon a bankruptcy filing, relieving the non-debtor from continuing performance obligations.  Id. at 41-42.

Title 11 U.S.C. § 362(k)(1) provides that "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  For purposes of § 362(k)(1), "'individual' means an individual, and not a corporation or other artificial entity."  Johnston Env't Corp. v. Knight (In re Goodman), 991 F.2d 613, 619 (9th Cir. 1993); see also Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 184-87 (2d Cir. 1990) (holding that a bankruptcy court may impose sanctions only for violating a stay as to debtors who are natural persons).[32]  A bankruptcy trustee is not an "individual" for these purposes "because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, *viz.*, the bankruptcy estate, and not by the trustee as a natural person."  Havelock v. Taxel (In re Pace), 67 F.3d 187, 193 (9th Cir. 1995).  Therefore, the Trustee's claim for violation of the automatic stay must be dismissed.

---

[32] Both Goodman and Chateaugay analyzed § 362(h).  BAPCPA amended former § 362(h) and redesignated that provision as § 362(k).  Gecker v. Gierczyk (In re Glenn), 379 B.R. 760, 761 n.1 (Bankr. N.D. Ill. 2007).

77

Seeking to avoid this result, the Trustee claims that Count 20 alleges a breach of
contract claim and, if the Court disagrees, he requests leave to amend that claim.
Opposition at 58-59.  The Trustee's position is unavailing.  The Trustee's assertion that
Count 20 advances a breach of contract claim appears to be based on BAC's purported
post-petition refusal to comply with the Scout SP Agreement while the Debtors' cases
were in chapter 11.  But it is undisputed that the Trustee rejected the Smart Parts
Agreement.  BK Docket #s 498 Ex. A at 6; 581 at 2.

Section 365(a) provides a debtor the option to assume or reject any executory contract.
Under § 365(g)(1), rejection of an executory contract "constitutes a breach," which
results in the counterparty, here, BAC, having a claim against the estate for damages
resulting from the Debtors' non-performance.  Mission Prod. Holdings, Inc. v.
Tepnology, LLC, 139 S. Ct. 1652, 1658 (2019).  The Bankruptcy Code provides that a
breach of an executory contract occurs "immediately before the date of the filing of the
petition."  11 U.S.C. § 365(g)(1).  Because the Trustee rejected the Smarts Part
Agreement, the breach of that agreement occurred before the Petition Date and the
Debtors can have no valid contract claim for post-petition damages regarding that
purported breach.

### g.  Count 25 – Disallowance of Claims

BAC/BI/LI argue that Count 25, which was brought under § 502(d) must be dismissed
because the FAC does not successfully plead an avoidance claim.  Motion at 58.  The
Trustee counters that the FAC states "several tort and bankruptcy claims" and
consequently, a valid disallowance claim.  Opposition at 59.  In the Reply, BAC/BI/LI
repeat the same arguments they made in the Motion.  Reply at 42.

Title 11 U.S.C. § 502(d) provides as follows:

> [T]he court shall disallow any claim of any entity from which property is
> recoverable under section . . . 550 . . . of this title or that is a transferee of
> a transfer avoidable under section . . . 547 [or] 548 . . . of this title, unless
> such entity or transferee has paid the amount, or turned over any such
> property, for which such entity or transferee is liable under section . . . 550
> . . . of this title.

Disallowance under § 502(d) requires a judicial determination that a claimant is liable.
Beskrone v. OpenGate Cap. Grp. (In re PennySaver USA Publ'g, LLC), 587 B.R. 445,
468 (Bankr. D. Del. 2018); see also McCarthy v. 88 La Gorce, LLC (In re El-Atari), 2012
WL 404947, at *6 (Bankr. E.D. Va. Feb. 8, 2012) (indicating that § 502(d) is limited to a
setoff of the Bankruptcy Code's turnover and avoidance claims); Off. Comm. of
Unsecured Creditors v. Bechtle (In re Labrum & Doak, LLP), 237 B.R. 275, 309 (Bankr.

E.D. Pa. 1999) (providing that by its terms, § 502(d) is limited in its effect to claimants subject to avoidance orders under § 548).

As analyzed above, the Motion is granted regarding Counts 12-19, 31, and 32, which seek avoidance and recovery under §§ 547, 548, and 550.  Therefore, it is also granted regarding Count 25.

> h.  Jury Trial

When the Trustee filed the FAC, he also filed a "Demand for Jury Trial."  Jetcraft AP Docket #266.  BAC/BI/LI argue that because the Trustee previously consented to a bench trial, he cannot now withdraw that consent, and he has waived any right to a jury trial.  Motion at 16 n.3 (citing Lutz v. Glendale Union High Sch., 403 F.3d 1061, 1066 (9th Cir. 2005)).  In the Opposition, the Trustee does not address his right to a jury trial, nor did BAC/BI/LI discuss it in the Reply.

Whether the Trustee is entitled to a jury trial is not currently before the Court.  As a result, the Court declines to address the issue at this time.  See Clark v. City of Seattle, 899 F.3d 802, 808 (9th Cir. 2018) (quoting Thomas v. Anchorage Equal Rts. Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000)) ("Article III of the Constitution empowers us to adjudicate only 'live cases or controversies,' not 'to issue advisory opinions [or] to declare rights in hypothetical cases.'").

> i.  Leave to Amend

BAC/BI/LI assert that the Court should dismiss the FAC with prejudice.  Motion at 2-3, 58.  The Trustee notes that the Court previously ruled in his favor regarding agency issues, the application of California law, and in pari delicto, and requests that leave to amend be granted if the Court "now reverses course" because the Trustee "has not had a chance to replead them previously."  Opposition at 59.  BAC/BI/LI reply that after two-and-one-half years and three complaints, the Trustee has not been able to assert a viable claim against them, and they contend that further amendment cannot fix the FAC's deficiencies.  Reply at 42.

Federal Rule of Bankruptcy Procedure 7015 provides that Rule 15 of the FRCP applies to supplemental and amended pleadings in bankruptcy cases.  Rule 15(a)(2) indicates that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."

Courts have the discretion to grant or deny leave to amend a complaint.  Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996).  "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities."  United States v. Webb, 655 F.2d

79

977, 979 (9th Cir. 1981).  Consequently, the policy to grant leave to amend is applied
with "extreme liberality."  Id.  Although, if a court has previously granted leave to amend,
the court's "discretion in deciding subsequent motions to amend is 'particularly broad.'"
Chodos v. W. Publ'g Co., Inc., 292 F.3d 992, 1003 (9th Cir. 2002) (citing Griggs v. Pace
Am. Grp., Inc., 170 F.3d 877, 879 (9th Cir. 1999)).

Parties seeking leave to amend have the initial burden to show a legitimate reason for
seeking amendment.  See Safeco Ins. Co. of Am. v. Sw. Eng'g, Inc., 2009 WL
10672414, at *2 (C.D. Cal. Apr. 16, 2009); Advanced Cardiovascular Sys., Inc. v.
Scimed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997).  Assuming the
movant meets that burden, the burden then shifts to the party opposing amendment to
show that leave to amend is not warranted based on:

1) Bad faith;
2) Undue delay;
3) Prejudice to the opposing party;
4) Futility of amendment; or
5) Whether the plaintiff has previously amended the complaint.

In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 738 (9th Cir. 2013);
see also Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist., 2020
WL 5775174, at *2 (C.D. Cal. July 8, 2020) (indicating that the party opposing
amendment bears the burden of showing prejudice, unfair delay, bad faith, or futility of
amendment).  "The court has the discretion to determine whether the presence of any of
these elements justifies refusal of a request to amend the pleading."  Advanced
Cardiovascular Sys., 989 F. Supp. at 1241.

Of the factors courts analyze when adjudicating motions for leave to amend, the
potential for prejudice to the opposing party "carries the greatest weight."  Reed v.
Dynamic Pet Prods., 2016 WL 4491597, at *1 (S.D. Cal. Jan. 5, 2016).  The opposing
party has the burden of establishing prejudice.  DCD Programs, Ltd. v. Leighton, 833
F.2d 183, 187 (9th Cir. 1987).  Absent prejudice or a strong showing of any of the
remaining factors, "there exists a presumption under Rule 15(a) in favor of granting
leave to amend."  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir.
2003) (emphasis in original).

"Futility of amendment can, by itself, justify the denial of a motion for leave to
amend."  Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995).  "For an amendment to
be futile, it must appear on its face that it is not actionable."  Coble v. Derosia, 2011 WL
444961, at *4 (E.D. Cal. Feb. 8, 2011).

The Court previously dismissed all counts in the Complaint against BAC/BI/LI and
granted the Trustee leave to amend all but one count, which alleged unjust enrichment.

80

Although the FAC added hundreds of new paragraphs and attached thousands of pages of documents, the Court again finds that none of the counts brought against BAC/BI/LI are viable.

The Trustee has the burden of demonstrating a legitimate reason for amendment.  The Trustee argues that the Court previously held that Fazal-Karim was acting as BAC's agent, California rather than New York law applied, and the *in pari delicto* defense was inapplicable.  Opposition at 59.  He contends that if the Court were to "reverse course" on those rulings, he should be granted leave to amend regarding those issues (as well as Count 20) because he has not "had a chance to replead them previously."  Id.

The Court's prior rulings regarding agency and California law were based solely on the allegations in the Complaint.  Now, considering the Zetta-BAC APAs and the Representative Agreements, which are attached to and incorporated by reference into the FAC, it is clear that Fazal-Karim was not BAC/BI's agent, New York law applies, and repleading the agency allegations and applicable law would be futile.  This is especially true because the Trustee did not challenge the authenticity of these documents.  Further, because the Court finds that none of the Tort Claims survive a 12(b)(6) motion, it was unnecessary for the Court to address the *in pari delicto* defense.  All of the transfers implicated by Counts 12-19, 31, and 32 are extraterritorial and not actionable under §§ 547, 548, or 550.  And, Count 25's claim for disallowance depends on the Trustee avoiding the transfers alleged in Counts 12-19, 31, and 32.  Finally, the Trustee lacks standing to assert Count 20, in which he seeks damages based on a violation of the automatic stay.

It would also be prejudicial to BAC/BI/LI if leave to amend were granted.  After the Complaint was dismissed, the Trustee filed a motion to consolidate this adversary proceeding with the CAVIC AP, which was legally unsound and the Court denied. Jetcraft AP Docket #s 153, 193.  The Trustee then filed a motion to amend, which the Court denied.  Jetcraft AP Docket #263.  In addition to being forced to respond to the FAC, BAC/BI/LI were forced to respond to the motions to consolidate and to amend, both of which were not well-taken efforts to combine this AP with the CAVIC AP.  These facts convince the Court that further amendment would only subject BAC/BI/LI to additional unnecessary costs without any prospect of the Trustee's success.

IV.    Conclusion

As analyzed above, Counts 1-3, 6, 7, 12-20, 25, 31, and 32 are dismissed without leave to amend.  Pursuant to LBR 9021-1(b)(1)(B), BAC/BI/LI must serve and lodge a proposed order via LOU within 7 days of the filing of this memorandum of decision.

# EXHIBIT D

```
 1                  UNITED STATES BANKRUPTCY COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3                            --oOo--

 4  In Re:                      )  Case No. 2:17-bk-21386-SK
                                )
 5  ZETTA JET USA, INC.,        )  Chapter 7
                                )
 6          Debtor.             )  Los Angeles, California
    _____ )  Monday, August 29, 2022
 7                              )  9:00 a.m.
                                )
 8  KING,                       )  Adv. No. 2:19-ap-01382-SK
                                )
 9          Plaintiff,          )
                                )
10      vs.                     )
                                )
11  JETCRAFT CORPORATION, et. al, )
                                )
12          Defendants.         )
    _____ )
13
```

```
14                              HRG RE ENTRY FOR FINAL
                                JUDGMENT PURSUANT TO FRCP
15                              54(B), APPLICABLE BY FRBP 7054

16                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE SANDRA KLEIN
17             UNITED STATES BANKRUPTCY JUDGE

18  APPEARANCES:

19  For the Bombardier Entities:  CAROLINA A. FORNOS, ESQ.
                                  ANDREW M. TROOP, ESQ.
20                                Pillsbury, Winthrop, Shaw
                                    & Pittman, LLP
21                                31 West 52nd Street
                                  New York, New York 10019
22                                (212) 858-1000

23


24

    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.
```

```
                                                                        ii

 1   APPEARANCES:  (cont'd.)

 2   For the Chapter 7 Trustee:      JOSEPH A. ROSELIUS, ESQ.
                                     JEFFREY S. TOROSIAN, ESQ.
 3                                   JOHN K. LYONS, ESQ.
                                     DLA Piper, LLP
 4                                   444 West Lake Street
                                     Suite 900
 5                                   Chicago, Illinois 60606
                                     (312) 368-4000
 6

 7   Court Recorder:                 Shemainee Carranza
                                     United States Bankruptcy Court
 8                                   Edward R. Roybal Federal
                                        Building
 9                                   255 East Temple Street
                                     Los Angeles, California 90012
10

11   Transcriber:                    Briggs Reporting Company, Inc.
                                     9711 Cactus Street
12                                   Suite B
                                     Lakeside, California 92040
13                                   (310) 410-4151

14

15

16

17

18

19

20

21

22

23

24

25
```

*Briggs Reporting Company, Inc.*

1

1    LOS ANGELES, CALIFORNIA  MONDAY, AUGUST 29, 2022 9:00 AM

2                          --oOo--

3       (Call to order of the Court.)

4          THE COURT:  Good morning.  This is Judge Klein,

5    and even though we're not in the courtroom, today is an

6    official court hearing, and everyone is expected to treat it

7    like they would if they were in court.

8          The audio of today's hearing is being recorded, so

9    each time you speak, and each time you speak after someone

10   else has spoken, please identify yourself so that the record

11   is clear.

12         Turning to the one and only matter on calendar,

13   this is Bombardier's motion for entry of a final judgment

14   under Rule 54(b).  I'll call the parties in the order I see

15   them on my screen.

16         Ms. Fornos.

17         MS. FORNOS:  Good morning, your Honor.  Carolina

18   Fornos of Pillsbury Winthrop on behalf of the Bombardier

19   entities.

20         THE COURT:  Good morning.

21         I see Mr. Roselius.

22         MR. ROSELIUS:  Good morning, your Honor.  Joe

23   Roselius on behalf of the plaintiffs.

24         THE COURT:  Good morning.  You cut out a little

25   bit, Mr. Roselius, and if you're going to be arguing, we'll

2

1  have to make sure the connection is better.

2          Mr. Torosian.

3          MR. TOROSIAN:  Good morning, your Honor.  Jeff

4  Torosian for the Trustee, and you're right.  Mr. Roselius

5  will be arguing today.

6          THE COURT:  Thank you.

7          Mr. Lyons.

8          MR. LYONS:  Yes.  John Lyons on behalf of the

9  Chapter 7 Trustee, and Mr. Roselius will be arguing.

10          THE COURT:  All right.  And Mr. Troop.

11          MR. TROOP:  Good morning, your Honor.  Andrew

12  Troop for the Bombardier entities, and Ms. Fornos will be

13  handling today's hearing, since we did such a good job

14  sharing time at the last one.

15          THE COURT:  All right.  So we're here on -- it's

16  Bombardier's motion.  I issued the order in terms of each

17  side would have 15 minutes to argue.

18          Ms. Fornos, it's your motion, so you're the

19  movant.  You can go first.  Would you like to reserve any

20  time?

21          MS. FORNOS:  Yes, your Honor.  I would like to

22  reserve about seven minutes.

23          THE COURT:  Okay.  Great.  So we will then put on

24  the clock eight minutes for your initial argument, and you

25  are welcome to start whenever you are ready.

3

1          MS. FORNOS:  Thank you, your Honor, and good

2    morning to everyone.

3          As the Court is aware, the Bombardier entities

4    seek entry of a final order pursuant to Rule 54(b) precisely

5    for the reason that Rule 54(b) was created.  It is simply

6    unfair to make a defendant against whom no viable claims

7    have been asserted to sit by in limbo for years while claims

8    against other defendants remain to be resolved.  Rule 54(b)

9    is a mechanism that allows the Court to exercise its

10   discretion to allow for the just and speedy resolution of

11   this action against Bombardier.

12         Now, in this case in particular, your Honor, the

13   Trustee is now in its third try, after all these years, to

14   state viable claims against the remaining defendants, and

15   that, of course, will result in more motion practice, more

16   motions to dismiss, summary judgment, possibly a trial.

17   There's simply no just reason for Bombardier to have to wait

18   on the sidelines all that time.

19         So, upon the application of a Rule 54(b) motion,

20   which is made applicable to the Bankruptcy Court pursuant to

21   Rule 7054, the Court may enter a judgment in favor of

22   Bombardier if it determines two things, one, that there's

23   finality, and, two, that there's no just reason for delay.

24         Now, in this case, your Honor, the Trustee does

25   not challenge finality, and that's because the claims

4

1 against Bombardier have been dismissed with prejudice, and

2 with respect to delay, the Trustee also doesn't challenge

3 that delay will result in prejudice, because Bombardier will

4 have to sit by, potentially, for years, against a case

5 against (sic) Jetcraft proceeds, and we note that, as of

6 today, there is not even a revised second amended complaint

7 on file against Jetcraft.

8         So the only remaining argument that exists that

9 has been set forth by the Trustee in opposition to this

10 motion is that the remaining claims involve the same facts

11 and circumstances -- and that's a direct quote -- same facts

12 and circumstances as the dismissed claims, such that entry

13 of a final judgment in favor of Bombardier presents a risk

14 of piecemeal appeals, but the standard is not overlapping

15 facts and circumstances.  Of course there's going to be

16 overlapping facts and circumstances in a case where it is

17 alleged that the conduct of one defendant should bind

18 another.

19         The Ninth Circuit has recognized that

20 certification is proper even in the presence of facts that

21 overlap with remaining claims.  There's nothing in the rule

22 that says that Rule 54(b) claims have to be completely

23 separate and independent from the remaining claims.

24 Instead, what the Ninth Circuit has articulated, what the

25 Supreme Court has said, is that the analysis that the Court

5

1  must perform is one about the interrelationship of claims,

2  and whether that interrelationship is likely to cause an

3  appellate court to discuss the same issue or to address the

4  same issue twice.

5          Now, here, as we've submitted in our papers, your

6  Honor, the answer is no.  The answer is no because the

7  claims against Bombardier were dismissed for reasons

8  specific to Bombardier.

9          I would also note that the Ninth Circuit, in Wood

10 in particular, cited by the Trustee, has made clear that

11 Rule 54(b) is also appropriate when a case is complex and

12 there's an important issue that cuts across a number of

13 claims, and that's what we have here.

14         We have both a situation where claims against

15 Bombardier have been dismissed for issues specific to

16 Bombardier, such as the lack of agency.  As the Court knows,

17 all of the claims against Bombardier have been dismissed for

18 issues specific to Bombardier, such as the lack of agency.

19 As the Court knows better than anyone else, all of the tort

20 claims were dismissed against Bombardier due to a lack of

21 agency, and the Trustee cannot possibly dispute that that

22 dismissal, on those reasons, is separate from any of the

23 remaining claims, and they cannot possibly be raised on

24 appeal later that may flow from the remaining claims against

25 the Jetcraft defendants.

6

1        The same holds true for the application of New

2   York law, because the Court considered the aircraft purchase

3   agreements that are unique to Bombardier, and it's based on

4   that review that the Court concluded that New York law

5   applies to the tort claims.  Similarly, the Court concluded

6   that there's no direct actionable conduct specific to

7   Bombardier.  That's the F1 tickets and the jet skis and the

8   Sea-Doos that the Court has heard plenty about.  Those are

9   issues specific to Bombardier.

10        Now, the Court also dismissed transfers that were

11   specific to Bombardier because of an extraterritoriality

12   ruling, and the issue of whether avoidance of actions are

13   barred if the transfer initiated outside of the United

14   States was extraterritorial is an important legal issue that

15   does cut across various claims but should not wait to be

16   resolved.

17        We also note, your Honor, that it's important to

18   note that the standard of review that an appellate court may

19   eventually consider will be different now versus later.  The

20   issues that are going to potentially be appealed by the

21   Trustee are going to be whether or not viable claims have

22   been stated against Bombardier.  Later on, potentially years

23   from now, we may have a situation where claims get dismissed

24   against the remaining defendants, and the remaining claims

25   get dismissed on summary judgment or resolved at trial, and

*Briggs Reporting Company, Inc.*

188

7

1  the appellate review will be different.  The standard will

2  be different.  Accordingly, your Honor, 54(b) certification

3  is proper in this case.

4        Now, there is one point that we would like to

5  address, which we actually agree with the Trustee, and this

6  is the only one, which is that entry of Rule 54(b) is not

7  one that can be resolved by stipulation, and it's not one

8  that the parties can just simply agree.

9        It does require the Court to perform an analysis

10  of finality and undue delay to ensure that there's no

11  duplicate appeals, or risk of duplicate appeals, and these

12  have been addressed in our briefs, and our now-proposed

13  order, and are being addressed today, but once the Court

14  issues these rulings, those findings are reviewed for an

15  abuse of discretion.  It's not de novo, as set forth by the

16  Trustee.  It is abuse of discretion, because it's the Court

17  that is deemed to know the most about the claims in this

18  case and the defendants in this case, and to appropriately

19  adjudicate what should be appealed now.

20        Accordingly, your Honor, we'd respectfully request

21  that the Court enter final judgment in favor of Bombardier.

22        THE COURT:  Thank you, Ms. Fornos.

23        Mr. Roselius.

24        MR. ROSELIUS:  Thank you, your Honor.  As a

25  general rule, all claims against all parties must be finally

8

1  decided before any party can take an appeal on any claim.

2  That rule arises out of the appellate court's historic

3  opposition to piecemeal appeals, because they prefer instead

4  a single unitary appellate disposition of all claims

5  (indiscernible).

6         Rule 54(b) is an exception to that general rule

7  that permits a trial court to enter a partial judgment on a

8  final decision disposing of one or more claims or one or

9  more parties in (indiscernible).

10        THE COURT:  Mr. Roselius, your voice is cutting

11 out a little, so please, I don't know, get closer to the

12 microphone.  I want to make sure that the record is clear.

13        MR. ROSELIUS:  Your Honor, let me try -- is that

14 better?

15        THE COURT:  Yes.

16        MR. ROSELIUS:  Okay.  But Rule 54(b) is limited.

17 It does not matter that Bombardier wants finality or wants

18 an appeal now.  It does not matter that the Trustee wants to

19 appeal now.  Stipulations, agreements, the parties being

20 aligned is not enough.  Instead, the Court must determine

21 that the claims against Bombardier and the claims against

22 Jetcraft, both the remaining claims, anything that's in the

23 amended complaint, but also the dismissed claims as well,

24 are not legally or factually similar enough, don't have the

25 overlap, that would prevent the Rule 54(b) certification.

9

1    This case does not meet that standard, and because

2    the appellate courts will review the key determination de

3    novo, the juridical concerns, even if this Court decides

4    that there is no overlap, the District Court and the Ninth

5    Circuit are going to look at that de novo, and can overturn

6    the Rule 54(b) judgment.

7    The problem, and the primary reason why the

8    Trustee opposes this, is because those courts, appellate

9    courts, often wait to decide these issues after all the

10   briefs are in, after argument, and without reaching the

11   merits of the appeal.  So an erroneous decision now could

12   waste years of litigation and hundreds of thousands of

13   dollars in attorney's fees to the Trustee and for

14   Bombardier, to no end.

15   This case is not an unusual situation.  Bombardier

16   is not in an unusual position.  District Courts and

17   Bankruptcy Courts around this country dismiss claims or

18   parties from cases every day, and they do not enter Rule

19   54(b) certifications and partial final judgments in those

20   situations.  Those cases, like this one, must wait for a

21   single appeal.  This Court should deny the motion, and avoid

22   the risk of wasting time and money.

23   Bombardier's motion is incorrect on a number of

24   grounds and for a number of reasons, but there's three

25   primary reasons.  First, under clear, binding Ninth Circuit

10

1 precedent, the similarity of factual issues, not just legal

2 issues, can prevent entry of a Rule 54(b) judgment.  Instead

3 of dealing with this precedent, for example, in <u>Wood</u>,

4 Bombardier distorts it or ignores it.

5        Second, the dismissed claims against Bombardier

6 have obvious legal and factual overlap with the claims

7 against Jetcraft, and, again, it's not an overlap with just

8 the remaining claims, and it's not an overlap after trial.

9 It's also an overlap with claims that have been dismissed,

10 and those claims are going to have to be appealed

11 separately, the same facts, the same legal issues, the same

12 procedural posture.

13        Third, Bombardier faces no prejudice, little or no

14 prejudice, if this motion is denied.  The claims against it

15 have been dismissed with prejudice.  It will certainly be

16 following this case no matter the outcome of this motion,

17 and, as I've previously mentioned, in hundreds, thousands of

18 similar cases, defendants who have been dismissed out of the

19 case have to wait for a final judgment in the case to

20 appeal.

21        By contrast, there is potential prejudice to the

22 Trustee and to the Jetcraft defendants, and I use that term

23 to mean essentially all of the remaining defendants, both

24 the prejudice of having to waste time and money on appeals

25 for the Trustee, but also the prejudice to Jetcraft, where

11

1  they could be facing a situation where there's an appellate

2  court that's ruling on the same facts and issues, and they

3  are not able to be heard in that case.

4         Just to be clear, your Honor, Bombardier has the

5  burden to establish all of these things.  So, to the extent

6  the Trustee supposedly conceded prejudice, Bombardier still

7  has to meet its burden.  It's not enough to just say that

8  the Trustee did not oppose on these specific issues, so the

9  Court should enter a Rule 54(b) certification.

10        Again, Bombardier misunderstands the standard for

11 a Rule 54(b) judgment.  First, the Court has to consider

12 whether the final judgment now will result in piecemeal

13 appeals, what they call the "juridical concerns."

14        Second, the Court must consider the equities,

15 delay, prejudice, et cetera.  Both prongs support the

16 Trustee.  On the first, Bombardier's motion risks piecemeal

17 appeal under the standards of binding Ninth Circuit

18 precedent.  The key question in this case is factual

19 overlap, and if you look at the Wood case, I think that's

20 abundantly clear.

21        Wood talks about, at page 883, whether there are

22 related issues in remaining claims that are based on

23 interlocking facts in a routine case that will likely lead

24 to successive appeals, and again on page 882, they talk

25 about the greater the overlap, the greater the chance that

12

1  the appellate court will have to revisit the same facts, not

2  just the same issues, but the same facts, in the successive

3  appeal.

4          As the Ninth Circuit explained, we cannot afford

5  the luxury of reviewing the same set of facts in a routine

6  case more than once without a seriously important reason,

7  and the same is true for Bankruptcy Courts, and that's

8  precisely what we have here, the same facts at issue.  It's

9  not about the grounds that Bombardier was dismissed on, and

10 that makes sense, because a focus on the rulings -- focusing

11 on the rulings, rather than the claims, would make little

12 sense, because the appellate court can affirm the dismissal

13 of a complaint on any ground supported by the record.

14         So the mere fact that this Court determined that

15 agency was the key issue does not mean that that's the only

16 issue that's on appeal, nor could the Court enter a Rule

17 54(b) certification and final judgment that was somehow

18 limited to agency, because then Bombardier would not be able

19 to raise other issues, and that doesn't make any sense, and

20 the Trustee would not be able to raise other issues.

21         I mean, put another way, any time one defendant is

22 dismissed from a claim, but another defendant is not, that

23 means that the reasons for the dismissal necessarily are on

24 grounds specific to the dismissed defendant.  If that were

25 not the case, then both defendants would have been

13

1  dismissed, and this is not a case like the Arroyo Hotel

2  (phonetic) case, where there was a specific separate issue.

3          Here the same issues, the same agency issues,

4  overlap with the claims against Jetcraft.  The same conduct

5  of Fazal-Karim is going to be at issue with respect to both

6  Bombardier and the Jetcraft defendants, and that's before

7  you get into things like the 17200 claims, and the actual or

8  constructive fraud, setting aside the extraterritoriality

9  issues, but it's not just about separate transfers, because

10 the Trustee's theories of actual fraud involve things like

11 the Ponzi scheme presumption, which cuts across the claims

12 against Bombardier and the claims against the Jetcraft

13 defendants.

14         In addition, some of the things, some of the facts

15 that are going to be at issue in the remaining claims

16 directly implicate Bombardier, not just agency issues,

17 things like the KN.xls (phonetic) spreadsheet that was sent

18 from Fazal-Karim to Mattar (phonetic).  Bombardier admits in

19 its motion that there was direct conduct alleged against

20 Bombardier relating to the F1 tickets and the Sea-Doos, and

21 there's conduct, particularly with respect to the Sea-Doos,

22 that goes directly against Fazal-Karim as well.

23         That transaction is not limited to Bombardier

24 versus the Jetcraft defendants.  It involves both.  The

25 complaint alleges a single over-arching bribery scheme.  The

14

1  complaint deals with issues about whether Jetcraft bribed

2  Cassidy to purchase overpriced planes, not just planes one

3  and 10, but also the planes that were purchased directly

4  from Bombardier.

5         Another one is the conspiracy.  That is going to

6  be an issue in any appeal brought by the Trustee related to

7  Bombardier, and with respect to the Jetcraft defendants,

8  because, although we understand that the Court read our

9  complaint differently, that claim involved a conspiracy

10 between Bombardier, Jetcraft, and Cassidy.  That is going to

11 be a part of the remaining case at some level, and

12 ultimately a second appeal.

13        So, as I said, because of all these factual and

14 legal overlaps on both claims, facts, all of these issues,

15 we could be in a situation where there is an appeal, where

16 Jetcraft is not able to be heard, and the appellate courts

17 are deciding issues that will be heard in an appeal, a

18 subsequent appeal relating to Jetcraft, and just to be

19 clear, because some of these claims were dismissed out,

20 whether the Jetcraft case ultimately goes to a trial, that

21 can still be part of the appeal in the same procedural

22 posture as the current appeal against Bombardier, for

23 example, with respect to the 17200 claim.  That can be part

24 of the same appeal, in the same procedural posture, anything

25 that was dismissed.

15

1          Another fundamental misunderstanding that the

2   Trustee sees in Bombardier's brief is in the reply.

3   Bombardier argues that the Court dismissed for failure to

4   state a legal claim based on agency, but that ignores that

5   there is also claim for conspiracy, and so, if you look at

6   cases -- and not all of these were cited in the Trustee's

7   opposition, because this is an issue that was primarily

8   raised in their reply, but like Sprint Solutions, Inc. v.

9   Liao, 2014 --

10          THE COURT:  Sorry.  I was just going to ask you

11   for what that cite is, Mr. Roselius.

12          MR. ROSELIUS:  Of course, your Honor.  2014

13   Westlaw 1250, 8591, and that's from the Southern District of

14   California, November 26, 2014.  That talks about how all

15   four named defendants are alleged to have participated in

16   any conspiracy.

17          An appeal by any one defendant would therefore

18   likely raise factual and legal issues common to all

19   defendants, and so a partial summary -- a partial judgment

20   would give rise to the risk of successive appeals on the

21   same or similar issues.

22          Then, similarly, in Sigal, S-I-G-A-L, v. County of

23   Los Angeles, which is 2018 Westlaw 613, 1147, from the

24   Central District of California, January 26, 2018, that

25   one -- and again quoting:

16

1              "Plaintiff's conspiracy claim was

2              alleged against several defendants,

3              including other private actors.

4              The dismissed conspiracy claim is

5              therefore intertwined with the

6              conspiracy claim against the remaining

7              defendants."

8         All of this kind of goes back to a fundamental

9  issue with Bombardier's reply.  That is, the risk of

10 piecemeal appeals here is not based on the fact that --

11 well, let me say that differently.  The reply fundamentally

12 misunderstands that a claim cannot be dismissed piecemeal,

13 nor are factual allegations stricken from a complaint under

14 Rule 12(b)(6).

15        So the issue is not the specific -- that there's a

16 dismissal with respect to specific conduct.  The claims are

17 dismissed, and if you look at the case law -- and I

18 apologize because there are several cases here -- Bilek,

19 B-I-L-E-K -- that's from the Seventh Circuit, 8 Fed.4th

20 581 -- talks about Rule 12(b)(6) doesn't permit piecemeal

21 dismissal of parts of claims.  Braden v. Wal-Mart, 588 F.3d

22 585, Eighth Circuit:

23             "Under 12(b)(6), the complaint should be

24             read as a whole, not piece by piece to

25             determine whether each allegation, in

17

1          isolation, is plausible."

2          Spice Jazz, that's a case from the Southern

3   District of California, 2020 Westlaw 6565, 268:

4          "A motion to dismiss under Rule 12(b)(6)

5          doesn't permit piecemeal dismissals of

6          parts of claims.  The question at this

7          stage is simply whether the complaint

8          includes factual allegations that state

9          a plausible claim for relief."

10          THE COURT:  Mr. Roselius, you have about a minute

11   left.

12          MR. ROSELIUS:  And so, in addition to that, your

13   Honor, the issue is not whether the claims against

14   Bombardier were dismissed based on agency, because that's

15   now how the dismissal works, and Bombardier also makes a

16   fundamental mistake of focusing on the remaining claims at

17   the expense of the claims that were dismissed, for example,

18   the Sea-Doo/Nyota bribe, which involved both Fazal-Karim and

19   Mattar.  So any appeal will necessarily have to address that

20   twice.

21          With respect to the equities, the equities favor

22   denying the motion because there's little prejudice here.

23   Bombardier has been dismissed with prejudice.  It's not

24   subject to a judgment accruing interest.  An immediate

25   appeal is not going to increase the likelihood of settlement

18

1  between the Trustee and Bombardier or the Trustee and the

2  Jetcraft defendants.  It's not going to simplify the

3  remaining claims or eliminate the need for a trial, and the

4  parties are not part of some other proceeding like a state

5  court proceeding, where the res judicata effect of finality

6  would affect that other proceeding.

7          So, in short, this not an unusual case.  It's not

8  unfair to Bombardier.  This happens every day, all over the

9  country.  Unfortunately, this case does not meet the

10 standards for a Rule 54(b) certification.  Bombardier and

11 the Trustee  must wait until this entire adversary

12 proceeding reaches a final judgment as to all claims and all

13 parties.  The Court should deny the motion.

14         THE COURT:  Thank you, Mr. Roselius.

15         Ms. Fornos, Mr. Roselius went over just a tad,

16 about a minute, so, if you need an extra minute, you're

17 welcome to take that.  I believe you have seven minutes left

18 that you requested, or maybe a little bit more.

19         MS. FORNOS:  Thank you, your Honor.  I can address

20 the points in the seven minutes that remain.

21         THE COURT:  Perfect.

22         MS. FORNOS:  They really distill down to three

23 issues.  The first one is -- I'm just going to quote Wood

24 directly, because I think that's the simplest way to resolve

25 the issue.  At page 882, the Ninth Circuit said:

19

1            "We do not mean to suggest that claims

2            with overlapping facts are foreclosed

3            from being separate for purposes of Rule

4            54(b).  Certainly they are not.  Both

5            the Supreme Court and our court have

6            upheld certification on one or more

7            claims despite the presence of facts

8            that overlap remaining claims."

9        _Wood_ was very clear, and yes, it applied a de novo

10 standard on appeal, but that's only because the District

11 Court did not make a ruling.  It did not make a finding

12 related to finality and undue delay.

13        Second, your Honor, this is not a case like _Wood_,

14 and I want to come back to this because the issue in _Wood_

15 involved the certification of a constructive discharge claim

16 against the same party versus leaving intact the state and

17 federal discrimination claims that were part and parcel of

18 the constructive discharge.  That is a very different

19 scenario than what we have here.

20        This is not a simple, run-of-the-mill complex --

21 simple breach-of-contract case.  It's a very complex case,

22 and it is one where, for five years, our client has had to

23 defend outrageous allegations of bribery, of intentional

24 conduct, fraud, that any company would want to eliminate as

25 soon as possible, and obtain finality, particularly

20

1  Bombardier, a publicly traded company that has an interest

2  in defending its reputation against these allegations, which

3  have been dismissed multiple times by this Court and will

4  continue to be absolutely fought by this company on appeal,

5  if the Trustee decides, erroneously, in our view, to appeal

6  this Court's decision.

7        In any event, the last point that I want to make,

8  your Honor, here is, the prejudice to Bombardier is

9  distinct, but the issue that the Trustee wants to frame, the

10  factual issues that the Trustee wants to focus on, such as

11  whether there was a bribe or whether there was a conspiracy,

12  this is the mark.  That's not the standard on appeal.  The

13  issue for appeal is whether the Trustee has plausibly pled

14  any viable claim, and the Court has already determined that

15  it did not vis-a-vis Bombardier, and that's why entry at

16  this time is appropriate in favor of Bombardier, so that, if

17  the Trustee wants to appeal, it can do so.

18        Your Honor, we respectfully submit that this is

19  the case where Rule 54(b) is perfect for.  Otherwise, if one

20  were to take the Trustee's view, there is no such thing as a

21  54(b) certification, and that's just not what the advisory

22  rule, and what the rules, and what the Supreme Court, and

23  what the Ninth Circuit has said.

24        The whole point of this rule is to avoid, quote,

25  "possible injustice of a delay in judgment," and that's what

21

1  Bombardier is facing every day, that it cannot bring this

2  case to a close.  Accordingly, your Honor, we respectfully

3  request entry of Rule 54(b).  Thank you.

4       THE COURT:  Thank you.

5       All right.  So I'm going to do something a little

6  different today.  I'm not going to issue a written ruling.

7  I am actually going to rule from the bench.  I need a little

8  bit of time to go back and look at the briefs, as well as

9  the citations that Mr. Roselius has provided.

10      Many of those, Mr. Roselius, I don't believe were

11 provided in the Trustee's opposition.  That was quite brief.

12 My recollection was it was about five pages or so.  But I

13 will look at the cases.

14      It's now 9:30.  I will take a 45-minute recess,

15 and we'll reconvene at 10:15.  So we'll be off the record

16 until 10:15, and then I will issue my ruling.  There will

17 not be any further argument.  Argument has concluded.

18      Probably best for everybody to sign off and sign

19 back on, so you can sign back on about 10:10.  So we'll be

20 off the record until 10:15.  Thank you.

21      MR. ROSELIUS:  Thank you, your Honor.

22      MS. FORNOS:  Thank you, your Honor.

23   (Proceedings recessed briefly.)

24      THE COURT:  Good morning again.  All right.  I'm

25 ready to rule on the motion that was argued earlier and that

22

1  was briefed previously.

2        So before the Court is a motion for entry of final

3  judgment pursuant to Rule of Civil Procedure 54(b), brought

4  by Bombardier Aerospace Corp., Bombardier, Inc., and

5  Learjet.  I'm going to refer to all three defendants as

6  "Bombardier" or "BAC."  Jonathan D. King, in his capacity as

7  a Chapter 7 Trustee of Zetta Jet USA, Inc., and Zetta Jet

8  PTE, together "the Debtors," filed an opposition, and BAC

9  filed a reply.

10        The facts are well known.  I'll just state them

11  briefly.  On September 15th, 2017, Zetta USA and Zetta

12  Singapore filed Chapter 11 petitions.  Mr. King was

13  appointed at the Chapter 11 Trustee, and after the cases

14  were converted, he was appointed as the Chapter 7 Trustee.

15        On September 13th, 2019, the Trustee filed an

16  adversary complaint against multiple defendants, which

17  alleged that the defendants -- excuse me -- that Zetta

18  Singapore was formed and run by a con artist, Geoffrey

19  Cassidy, who, over a two-year period, the defendants held,

20  obtained 10,000,000 from kickbacks, bribes, and

21  embezzlement, while saddling the Debtors with almost half a

22  billion in unsustainable debt incurred by purchasing

23  overpriced aircraft in a down market.

24        The complaint contained the following causes of

25  action against BAC:  aiding and abetting breach of fiduciary

23

1  duty, civil conspiracy, a violation of California Business

2  and Professions Code 17200, unjust enrichment, constructive

3  trust, avoidance and recovery of fraudulent transfers and

4  obligations -- avoidance and recovery of fraudulent

5  transfers and obligations -- avoidance and recovery of U.S.

6  preference transfers -- there were two of those claims --

7  and disallowance.

8         The Court granted a motion to dismiss all of the

9  causes of action against BAC, dismissing with leave to amend

10 all counts except for count four for unjust enrichment.  The

11 Trustee moved to consolidate this adversary proceeding with

12 the King v. Jetcraft adversary proceeding, which is 19-1147.

13 The Court denied that motion to consolidate.  The Trustee

14 filed a motion for leave to amend this adversary complaint,

15 seeking to add claims and parties, which the Court denied.

16        A little more than a year ago, the Trustee filed

17 the first amended complaint, which contained the following

18 causes of action against BAC:  count one, aiding and

19 abetting, breach of fiduciary duty; count two, civil

20 conspiracy; count three, Cal Business and Professions Code

21 17200 and Cal Penal Code 641(c); count six, fraudulent

22 misrepresentation; count seven, fraudulent concealment,

23 nondisclosure.

24        Counts 12 through 19, those were avoidance and

25 recovery of actual intent fraudulent transfer, and

24

1  constructive fraudulent transfer regarding claims two

2  through five.  Those were counts 12 through 15, and 16 and

3  17 were regarding claim six.  Counts 18 and 19 were

4  avoidance and recovery of U.S. preference transfer.

5          Count 20 was violation of the automatic stay.

6  Count 25 was disallowance of claims, and count 31 was

7  avoidance and recovery of actual intent fraudulent transfer

8  of claim six, and count 32 was avoidance and recovery

9  constructive fraudulent transfer of claim six.

10         BAC moved to dismiss the first amended complaint,

11 and in June of this year, the Court dismissed all counts

12 against BAC without leave to amend.  FK and Jetcraft Asia

13 moved to dismiss the first amended complaint, and on 6/24,

14 the Court ruled as follows.

15         Count one was dismissed without leave to amend

16 regarding the two Sea-Doo jet skis and the misappropriation

17 of Debtor's resources regarding the Nyota 121 Super Yacht.

18 That count was not dismissed regarding a $500,000 payment

19 disguised to look like part of plane one's purchase price,

20 which was called the "first kickback," and a $500,000

21 payment disguised to look like part of plane 10's purchase

22 price.  That was called the "second kickback."

23         Leave to amend was granted regarding allegations

24 that all aircraft were overpriced, and this is all regarding

25 Fazal-Karim, FK, and FKP.  Count two was dismissed with

25

1 leave to amend, including that all aircraft were overpriced.

2 Count three was dismissed without leave to amend.  Count six

3 was dismissed without leave to amend regarding the first

4 kickback, was not dismissed regarding the second kickback,

5 and leave to amend was granted regarding allegations that

6 all aircraft were overpriced, and count seven was dismissed

7 without leave to amend.

8        In terms of the Jetcraft, Jetcraft Global,

9 Jetcoast, and Orion motion to dismiss, the Court ruled as

10 follows.  Count eight was dismissed without leave to amend.

11 Count nine was dismissed without leave to amend regarding

12 the 37.8-million-dollar transfer from Element, the

13 2.775-million transfer from Zetta Jet Singapore, and the

14 1.78-million transfer from Zetta Singapore.  It was not

15 dismissed regarding the $1,000,000 transfer from Zetta USA.

16 Count 10 was dismissed without leave to amend.  Count 11 was

17 dismissed without leave to amend.  Count 24 was not

18 dismissed, and count 25 was not dismissed.

19        In terms of the legal standard for the motion that

20 we're here for today, Federal Rule of Civil -- excuse me --

21 Federal Rule of Bankruptcy Procedure 7054 provides that

22 Federal Rule of Civil Procedure, F.R.C.P., 54(b) applies in

23 adversary proceedings.  Under F.R.C.P. 54(b), when an action

24 presents more than one claim for relief, or when multiple

25 parties are involved, the Court may direct entry of a final

26

1  judgment as to one or more, but fewer than all claims or

2  parties only if the Court expressly determines that there is

3  no just reason for delay.

4        To certify a judgment under F.R.C.P. 54, courts

5  must first determine that the judgment is final, which means

6  the decision must be an ultimate disposition of an

7  individual claim entered in the course of a multiple-claim

8  action.  That's Curtiss-Wright, 446 U.S. 1, 1980.

9        Second, a court must determine whether, in the

10  Court's sound discretion, there is any just reason for

11  delay.  According to the Supreme Court, courts must consider

12  judicial administrative interests and the equities involved.

13        In the Ninth Circuit, courts are guided by two

14  considerations, the interrelationships of the claims and

15  whether or not they will lead to piecemeal appeals, and an

16  assessment of the equities.  When deciding whether to grant

17  an F.R.C.P. 54(b) certification, courts should be pragmatic

18  and focus on severability and efficient judicial

19  administration.

20        In terms of arguments, the first issue argued was

21  the standard of review on appeal.  As an initial matter, the

22  Trustee highlights the standard of review on appeal, and

23  argues that parties cannot stipulate to a Rule 54(b)

24  judgment because a court must make specific findings setting

25  forth the reasons for its orders.

27

1        He argues that appellate courts evaluate such

2   factors as the interrelationship of the claims, de novo, and

3   have a duty to review, sua sponte.  He cites <u>Sheehan</u>, 812

4   F.2d 465, Ninth Circuit, 1987, and <u>Noel v. Hall</u>, 568 F.3d

5   743, Ninth Circuit, as well as <u>Wood</u>, which was argued by

6   both sides this morning.  <u>Wood</u> is 422 F.3d 873, Ninth

7   Circuit, 2005.

8        The Trustee contends that if the District Court or

9   Ninth Circuit disagree with the propriety of a Rule 54(b)

10  judgment, the parties will have wasted time and money on a

11  premature appeal.

12       BAC replies that Rule 54(b) certifications are

13  only reviewed de novo if a court does not explain its

14  decision, and if the Court specifies the bases for its

15  decision, then the Court's discretion will be accorded great

16  deference.

17       BAC cites <u>Consol. Rail Corporation v. Fore River</u>

18  <u>Railway Company</u>, 861 F.2d 322, First Circuit, 1988.  They

19  argue that the Trustee's reliance on <u>Wood</u> and <u>Jewel</u>, 810

20  F.3d 622, Ninth Circuit, 2015, is misplaced because the

21  trial courts there did not make any factual findings.

22       BAC argues that they have demonstrated that there

23  is sufficient reason for a Rule 54(b) judgment, and the

24  Court can make findings and enter a judgment that would be

25  reviewed only for abuse of discretion.

28

1    The Court need not spend much time determining the

2 proper standard of review of this Court's ruling, because

3 that is an issue for the District Court and, ultimately, the

4 Ninth Circuit.  The Court observes that under existing Ninth

5 Circuit precedent, its consideration of such factors as the

6 interrelationship of the claims to prevent piecemeal appeals

7 is reviewed de novo, but the Court's assessment of the

8 equities is reviewed with substantial deference, and Rule

9 54(b) certifications will only be reversed if the Court's

10 conclusions are clearly erroneous.

11    Turning to the factors that courts consider in

12 terms of a final judgment, BAC argues that the Court

13 dismissed all claims against them with prejudice, and the

14 second BAC motion to dismiss ruling is a final judgment in

15 their favor on all claims.  The Trustee did not address this

16 issue in the opposition or in argument.  In the reply, BAC

17 asserts that Trustee has conceded that the second BAC motion

18 to dismiss ruling is final.  It's undisputed that the Court

19 dismissed all claims against BAC in the first amended

20 complaint without leave to amend.  This constitutes a final

21 order because all claims against BAC were dismissed with

22 prejudice.  That's Mililani Group, Inc. v. O'Reilly Auto,

23 621 F. App'x 436, Ninth Circuit, 2015.

24    Turning to the next factor, just reason for delay,

25 in terms of the interrelationship of claims, BAC asserts

29

1  that the dismissal of the claims with prejudice against them

2  was based on unique grounds that are inapplicable to the

3  claims against the remaining defendants, quoting Arroyo

4  Hotel, 216 U.S. District Lexis 2548, Central District Cal,

5  January 7th, 2016.

6        BAC highlights that the basis for dismissing each

7  claim brought against them were particular to them.  Count

8  one was dismissed because the FAC failed to plausibly allege

9  that when Jetcraft paid bribes to Cassidy, Jetcraft was

10 BAC's agent.

11       Counts two and six were dismissed based on the

12 Court's finding that Fazal-Karim was not acting as their

13 agent.  Count three was dismissed based on the New York

14 choice of law clause in the aircraft purchase agreements

15 between BAC and Zetta Singapore, which were unique to BAC.

16       Count seven's allegations regarding five tickets

17 to a Formula event and the Sea-Doos were specific to BAC.

18 Counts three and seven were dismissed with prejudice

19 regarding all parties, so those claims do not remain to be

20 adjudicated.

21       Counts 12 through 19, 25, 31, and 32, which were

22 identified as the bankruptcy claims, involve different

23 transfers against BAC than were alleged against either FK or

24 Jetcraft, and count 20, for violation of the automatic stay,

25 was brought only against them.

30

1       BAC also asserts that an appellate court would not

2   have to revisit issues decided in the second BAC motion to

3   dismiss ruling after the remaining tort claims against FK

4   and Jetcraft are resolved, because the allegations

5   underlying those claims are specific to FK's and Jetcraft's

6   conduct.

7       BAC highlights that although the Court granted FK

8   leave to amend the civil conspiracy count, which is count

9   two, the Court's dismissal of count two against BAC with

10  prejudice does not implicate the conspiracy claim against FK

11  and Jetcraft because the Trustee could not plead that

12  Fazal-Karim was BAC's agent.

13      BAC asserts that the only remaining claim that

14  could parallel count two is the claim for fraudulent

15  misrepresentation.  That's count six, which did not involve

16  them.  They contend that the Court made no findings about

17  overpriced aircrafts in the BAC's second motion to dismiss

18  ruling, and allegations that the aircraft were overpriced

19  would not be implicated in an appeal of the BAC's second

20  motion to dismiss ruling.  BAC argues that the three

21  remaining bankruptcy claims, counts nine, 24, and 25,

22  against Jetcraft, address different transactions in which

23  they were not involved.

24      The Trustee responds that the guiding principle is

25  that a similarity of legal or factual issues will weight

31

1  heavily against entry of a judgment under Rule 54, citing

2  Wood and Jewel.  He argues that the claims remaining against

3  Jetcraft and FK involve the same factual questions as the

4  dismissed claims against BAC, including whether, one,

5  Jetcraft bribed Cassidy to buy overpriced airplanes; two,

6  Jetcraft conspired with Cassidy and BAC; three, Cassidy

7  acted with actual or constructive fraudulent intent in

8  making transfers; and, four, Fazal-Karim was BAC's apparent

9  or ostensible agent for the claim one through six

10  transactions.

11       The Trustee contends that the motion incorrectly

12  focuses on the grounds for dismissal rather than the

13  overlapping facts and legal issues involving BAC, FK, and

14  Jetcraft.  He argues that the Court should focus on the

15  facts, rather than the rulings, because the appellate court

16  can affirm the dismissal of a complaint on any ground

17  supported by the record.

18       The Trustee discounts BAC's reliance on Arroyo

19  because the facts in that case were unique, and no court has

20  ever relied on it for the proposition it is cited for.  The

21  Trustee asserts there is a significant risk of duplication

22  and piecemeal appeals if the motion is granted and a Rule

23  54(b) judgment is entered now.

24       He argues there would inevitably be a second set

25  of appeals regarding count one for aiding and abetting,

32

1   regarding the Nyota and Sea-Doo bribe, count three, for

2   violating California's unfair competition law, count six,

3   for fraudulent misrepresentation, count seven, for

4   fraudulent concealment, nondisclosure, and counts eight

5   through 17, 31, and 32 for actual intent fraudulent

6   transfer, and constructive fraudulent transfer.

7          BAC replies that the Trustee misstates the legal

8   standard, which is whether an appellate court would have to

9   decide the same issues more than once, even if there were

10  subsequent appeals, and BAC cites Wood for that proposition.

11  They argue that overlapping facts do not defeat a Rule 54(b)

12  certification, and it would be rare for a case with many

13  defendants to not have overlapping facts.  BAC contends that

14  here there is minimal risk of piecemeal appeals of the same

15  legal issues because the claims against them were all

16  dismissed for reasons specific to them.

17          BAC asserts that, contrary to the Trustee's

18  argument, other cases, in addition to Arroyo, hold that a

19  Rule 54(b) judgment is proper when dismissal is based on

20  grounds not applicable to the other parties.  They cite

21  Maxwell, a Southern District of California case from 2010,

22  and Shames, a 2008 case from the Southern District.  They

23  argue that the Trustee conflates overlapping facts and

24  circumstances with the risk of an appellate court reviewing

25  the same issue more than once.

33

1        BAC highlights that the claims against them, which

2   were based on whether Jetcraft bribed Cassidy to purchase

3   overpriced claims, were dismissed because the FAC did not

4   allege that Fazal-Karim or Jetcraft were acting as BAC's

5   agent.  They contend that the Court found that the plane

6   transactions were entered to on a plane-by-plane basis and

7   should not be lumped together.

8        They note that count two, civil conspiracy, was

9   dismissed against them based on a theory of agency, which

10  does not affect the remaining defendants or claims.  They

11  highlight that claims regarding the F1 tickets and Sea-Doos

12  will not result in piecemeal review because those claims

13  were dismissed against all parties.  Additionally, BAC

14  contends that count three, for violating the UCL, was

15  dismissed against them because New York law applied.

16       Regarding the bankruptcy claims, BAC asserts that

17  the dismissal of those claims based on extraterritoriality

18  was specific to the transfers made to them.  They argue

19  there is no risk of piecemeal appeals.  According to BAC, an

20  appeal of the second BAC motion to dismiss ruling will

21  review the sufficiency of the allegations in the FAC de

22  novo, but an appeal by the remaining defendants after a

23  summary judgment or trial on a full evidentiary record will

24  be reviewed for abuse of discretion regarding any material

25  issue of fact.

*Briggs Reporting Company, Inc.*

34

1          Finally, BAC contends that FAC -- excuse me.

2    Finally, BAC contends that Fazal-Karim's words and actions

3    involving the first kickback creates no risk of overlapping

4    facts and circumstances, because count one was dismissed

5    with prejudice based on an agency theory.

6          They highlight that under <u>Pakootas</u> -- I'm not sure

7    I'm saying that correctly -- a 2018 Ninth Circuit case, some

8    overlap between the dismissed claims and remaining claims is

9    insufficient to prevent entry of a separate judgment

10   analysis.

11         The Court must determine whether the claims

12   dismissed in the second BAC motion to dismiss ruling, which

13   are the subject of this motion, are sufficiently divisible

14   from the other claims, so that the case would not inevitably

15   come back to an appellate court on the same set of facts.

16   That's <u>Gonzalez v. U.S. Human Rights Network</u>, a 2021 case

17   from the District of Arizona, quoting <u>Jewel</u>.

18         The mere fact that claims share common facts does

19   not preclude the entry of partial final judgment as to one

20   or more of those claims.  That's <u>SkinMedicaa v. Histogen</u>,

21   869 F.Supp.2d 1176, Southern District of Cal.  As a result,

22   the Ninth Circuit has upheld Rule 54 certifications when

23   resolving the claims would, quote, "streamline the ensuing

24   litigation."  That's <u>Noel v. Hall</u>, 568 F.3d 743, Ninth

25   Circuit, 2015.

35

1        Where a claim is dismissed based on unique grounds

2   that are not applicable to the claims against the remaining

3   defendants, Rule 54 certification is proper.  That's Arroyo

4   Hotel, 2016 case from the Central District of California.

5        The Trustee argues that a similarity of legal or

6   factual issues will weigh heavily against entry of a

7   judgment under Rule 54, quoting Wood.  The Trustee

8   selectively quotes Wood, and the Court finds that the

9   Trustee's reliance on Wood for this proposition is

10  misplaced.

11       In Wood, Deborah Wood brought discrimination

12  claims against her former employer, GCC Bend.  GCC's

13  president, John Gross, made comments about wanting a younger

14  sales force, criticized older employers (sic), and gave

15  older salespeople more challenging budget goals.  Gross also

16  micromanaged Wood, embarrassed her in front of other

17  employees, and demoted her from director of sales to

18  national sales manager.

19       After meeting with Wood and encouraging her to

20  resign, Gross called Wood at home when she was out sick to

21  tell her that he had hired a new director of sales who was

22  young, energetic, a runner, and highly qualified.  Wood

23  believed that the company could not afford to keep both her

24  and the new director of sales on the payroll, and Gross was

25  intent on forcing her to resign.

36

1        Wood brought claims against GCC for age

2   discrimination and retaliation for opposition to age

3   discrimination, in violation of the Age Discrimination in

4   Employment Act, 29 U.S.C. 625.  The second claim was age

5   discrimination and retaliation for opposition to age

6   discrimination, in violation of Oregon State Age

7   Discrimination Statute, and for a wrongful constructive

8   discharge under Oregon common law.

9        GCC moved for summary judgment, which was granted

10  in part by the District Court, which found that Wood was not

11  constructively discharged, and denied in part, finding there

12  was a triable issue regarding Wood's theory that her

13  demotion was based on age discrimination.  Wood moved for a

14  Rule 54 certification on the constructive discharge claim

15  under the ADEA and Oregon statutory and common law, and to

16  stay the remaining proceeding.

17       The District Court granted the motion, reasoning

18  that Wood's claim for constructive discharge was a distinct

19  claim, and her discrimination and retaliation claims under

20  the ADEA and its state law counterpart, to the extent they

21  were based on a theory of constructive discharge, were,

22  quote, "closely related, factually and legally, to the

23  common-law constructive discharge claim," and the pragmatic

24  approach was to grant certification on her statutory claims

25  as well as on her common-law claim.

37

1    The Ninth Circuit reversed, explaining that in an

2  uncomplicated case such as Wood's, granting a Rule 54(b)

3  certification should not be routine.  The Ninth Circuit

4  noted that the constructive discharge claim and the demotion

5  claim were not separable and relied on the exact same facts.

6    The Ninth Circuit stated that Rule 54(b)

7  certification can be upheld where there is a factual overlap

8  if, quote, "the case is complex, and there is an important

9  or controlling legal issue that cuts across a number of

10 claims," end quote, but the Ninth Circuit explained that

11 Wood's case was not complex, and the claims on appeal and

12 remaining to be adjudicated involved factual issues that

13 were entirely overlapping.  The Ninth Circuit concluded

14 that, quote:

15        "In these circumstances, the guiding

16        principle is that a similarity of legal

17        or factual issues will weigh heavily

18        against entry of judgment under Rule

19        54(b)."

20    This case is dramatically different from Wood

21 because of its complexity.  The FAC includes 32 counts, some

22 of which were intentionally omitted under state tort law and

23 federal bankruptcy law.  It also includes 11 defendants, and

24 complex agency, choice of law, and extraterritoriality

25 issue, among others.  The Trustee has repeatedly stated

38

1   that, quote:

2           "The Jetcraft adversary involves highly

3           complex fraud, avoidance claims, and

4           other claims against Bombardier,

5           Fazal-Karim, and a number of his

6           affiliates, including Jetcraft

7           Corporation and related defendants."

8           That's the Zetta Jet USA Docket Number 1852, as

9   well as the Zetta Jet USA Docket Number 1729, as well as

10  other pleadings.

11          Additionally, the Court notes that issues

12  regarding choice of law, agency, and extraterritoriality of

13  bankruptcy claims are controlling issues that affect

14  multiple defendants and claims.  It's undisputed that the

15  Court may issue a Rule 54 certification to carve out the

16  threshold issues that will streamline litigation.  That's

17  <u>Continental Airlines</u>, 819 F.2d 1519, Ninth Circuit, 1987.

18          The New York choice of law clauses in the APAs

19  between BAC and Zetta Singapore are exactly the kind of

20  threshold issues highlighted in <u>Continental Airliens</u>,

21  because they impact the dismissal of counts one, two, three,

22  six, and seven against BAC.

23          Further, a Rule 54(b) certification is also

24  permissible where a judgment disposes of all claims against

25  one defendant, even if there are claims remaining against

39

1 other defendants.  That's Noel, as well as Sheehan.

2        The agency relationship, or lack thereof, between

3 BAC and Fazal-Karim is a dispositive issue for counts one,

4 two, three, six, and seven regarding BAC, and count two

5 regarding FK.

6        The extraterritorial application of the Bankruptcy

7 Code was the basis for dismissing counts 12 through 19, 31,

8 and 32 against BAC, dismissing all transfers alleged in

9 count eight through 11, other than a $1,000,000 transfer

10 from Zetta USA against Jetcraft Corp., Jetcraft Global,

11 Jetcoast, and Orion, and dismissing a related adversary

12 proceeding against Universal Leader, Glove Assets, and Truly

13 Great Global, which is now on appeal.

14        Finally, as noted by the Ninth Circuit,

15 certification may make further litigation unnecessary

16 between the remaining defendants because it may facilitate

17 settlement of the remaining claims against Jetcraft and FK,

18 and may well aid in the expeditious decision of those claims

19 if not settled.  That's Alcan Aluminum Corp., 689 F.2d 815,

20 Ninth Circuit, 1982.

21        The Trustee discounts Arroyo, arguing that no

22 other case has cited it for the proposition that a Rule 54

23 certification is permissible where dismissal is based on

24 unique grounds inapplicable to the other defendants.  The

25 Trustee's argument is unpersuasive.

40

1          Other courts have granted Rule 54(b)

2    certifications where claims against one defendant were

3    dismissed for reasons inapplicable to their co-defendants.

4    That's Maxwell v. County of San Diego, a 2010 Southern

5    District of California case, as well as Shames, a 2008

6    Southern District of California case.  Here, as discussed

7    below, each claim against BAC was dismissed for reasons

8    specific to them.

9          In terms of count one, aiding and abetting breach

10   of fiduciary duty, count one's allegations regarding BAC

11   indicated that Cassidy, as director and officer, owed

12   fiduciary duties of care, loyalty, and good faith to the

13   Debtors.

14         Cassidy caused the Debtors to buy nine BAC

15   aircraft and enter into purchase agreements for six more,

16   even though it was economically impossible for the Debtors

17   to service their debt.

18         Cassidy breached his fiduciary duty to the Debtors

19   by failing to take meaningful steps to negotiate lower

20   prices from BAC.  Cassidy, as a director and officer of the

21   Debtors, breached his fiduciary duties by taking kickbacks

22   and bribes in exchange for inducing the Debtors to buy

23   aircraft.

24         Fazal-Karim, Jetcraft Corp., Jetcoast, Jetcraft

25   Global, Orion, and BAC aided and abetted Cassidy's breach of

*Briggs Reporting Company, Inc.*

41

1  his fiduciary duty, and corrupted the fiduciary relationship

2  by directing Jetcraft Global to pay the first and second

3  kickbacks.

4        BAC aided and abetted Cassidy's breach of

5  fiduciary duty and corrupted the fiduciary relationship by

6  giving Cassidy the F1 tickets and offering him the Sea-Doos

7  as part of a quid pro quo to ensure that Cassidy would take

8  delivery of the aircraft, rather than cancel transactions,

9  as well as caused Debtors to enter into additional

10  transactions.

11        Fazal-Karim, FKG, FKP, and BAC, through

12  Fazal-Karim as their agent, as well as two BAC vice

13  presidents of sales, Yu (phonetic) and Mattar, knew of

14  Cassidy's breach of his fiduciary duties, had specific

15  intent to facilitate his wrongful conduct, provided

16  substantial assistance and encouragement to Cassidy's

17  breaches of his fiduciary duties, and were a substantial

18  factor in causing Debtors harm, because they paid or agreed

19  to pay commercial bribes and kickbacks in exchange for

20  Cassidy's agreement to buy planes and his agreement to not

21  cancel existing contracts and deliveries.

22        The FAC also alleges that the Debtors were damaged

23  regarding the value of the first and second kickbacks and

24  the Sea-Doos, as well as by the difference between what the

25  Debtors paid and what the planes were actually worth.

42

1       The Court dismissed count one regarding BAC for

2   five reasons.  Neither Fazal-Karim nor Jetcraft were BAC's

3   agents in the first and second kickbacks, were paid by

4   Jetcraft.  The FAC allegations regarding the F1 tickets were

5   equally consistent with innocent client entertainment as

6   they were with a commercial bribe.

7       Cassidy did not have the ability to unilaterally

8   cancel aircraft transactions, which he threatened to do, in

9   return for the F1 tickets and Sea-Doos.  Even if the FAC had

10  adequately alleged that Cassidy breached his fiduciary

11  duties regarding the Sea-Doos, it did not allege that BAC

12  provided any substantial assistance to Cassidy regarding the

13  Sea-Doos, and, finally, the FAC did not allege that the

14  Sea-Doos had any connection to planes 12 through 15.

15      In terms of the first and second kickback, the

16  Trustee argues that whether Jetcraft bribed Cassidy with the

17  first and second kickbacks to buy overprice aircraft was an

18  overlapping factual issue affecting BAC, Jetcraft, and FK.

19  The Trustee's position is unavailing.

20      The FAC alleged that Fazal-Karim and Jetcraft were

21  directly involved in the first and second kickbacks.  In

22  contrast, BAC was only alleged to be involved in those

23  kickbacks through Fazal-Karim, who the FAC alleged was

24  acting as their agent.  The Court dismissed count one

25  against BAC regarding the first and second kickback because

43

1  the FAC did not allege sufficient facts establishing an

2  agency relationship between BAC and Fazal-Karim.  As a

3  result, the legal and factual issues for dismissal of the

4  first and second kickback allegations against BAC were

5  unique to them.

6          In terms of the F1 tickets, BAC, BILA (phonetic)

7  were the only defendants implicated by the FAC's allegations

8  regarding the F1 tickets.  The Court analyzed BAC's direct

9  actions, finding them equally consistent with innocent

10 client entertainment.  In other words, the Court relied on

11 distinct factual issues applicable only to BAC regarding the

12 dismissal of the count one allegations regarding the F1

13 tickets.

14         In terms of the Sea-Doos, dismissal of count one

15 against BAC regarding the Sea-Doos was premised on the FAC's

16 failure to allege that BAC provided any substantial

17 assistance to Cassidy to breach his fiduciary duty.  In

18 reaching this conclusion, the Court analyzed statements made

19 and actions taken by BAC, rather than any other defendant.

20         The Court recognizes that some of its findings

21 regarding dismissal of the Sea-Doo allegations against BAC

22 from count one overlap with the reasons the Court dismissed

23 count one's Sea-Doo allegations against FK.

24         In both the second BAC motion to dismiss ruling

25 and the second FK motion to dismiss ruling, the Court noted

44

1  that Cassidy did not have the ability to breach his

2  fiduciary duties because he could not unilaterally cancel

3  aircraft transactions for planes four, five, eight, and

4  nine, and there were no allegations that the Sea-Doos had a

5  connection to planes 12 through 15, because those aircraft

6  were sold to UTN4 Leasing Company (phonetic), not the

7  Debtors, and there was nothing linking the Sea-Doos to those

8  aircraft.  These overlaps, however, are not an impediment to

9  the Court granting the motion.

10         As an initial matter, Cassidy's inability to

11  unilaterally cancel aircraft transactions and the lack of

12  connection between planes 12 through 15 and the Sea-Doos

13  were alternative holdings in both the second BAC motion to

14  dismiss ruling and the second FK motion to dismiss ruling.

15         Second, the Sea-Doo allegations in count one were

16  dismissed for independent reasons specific to BAC and FK,

17  respectively.  As mentioned above, the Sea-Doo allegations

18  were dismissed regarding BAC because the FAC did not allege

19  that BAC provided substantial assistance to Cassidy when he

20  breached his fiduciary duties.

21         In contrast, the Sea-Doo allegations were

22  dismissed against FK because, one, the FAC's allegations

23  were conclusory and insufficient regarding the Sea-Doos

24  being a bribe, two, the timing of a credit Fazal-Karim gave

25  Cassidy against the Nyota Yacht to pay for the Sea-Doos made

45

1  it implausible that the Sea-Doo credit was a bribe, and,

2  three, Zetta Singapore, through an employee and consultant,

3  was aware of the Sea-Doos but did not object.

4       Additionally, even if that were not the case,

5  partially overlapping facts are not foreclosed from being

6  separate for purposes of Rule 54.  That's <u>Pakootas</u>, 905 F.3d

7  565, Ninth Circuit, 2018, quoting <u>Wood</u>.  In fact, claims can

8  be properly certified under Rule 54 if they streamline the

9  ensuing litigation.

10       Here granting the motion would undoubtedly

11  streamline litigation, because the Court's alternative

12  holdings regarding Cassidy being unable to unilaterally

13  cancel aircraft transactions, and the lack of connection

14  between the Sea-Doos and the plane 12 through 15

15  transactions, apply to FK as well.

16       Turning to count two, civil conspiracy, that count

17  alleged that BAC, FK, and Jetcraft conspired to aid and abet

18  Cassidy's breach of fiduciary duty, pay Cassidy bribes and

19  kickbacks, defraud the Debtors, and commit other tortious

20  acts as indicated in counts one, three to seven, and 26 to

21  29.  The Court dismissed count two against BAC because it

22  hinged on the existence of an agency relationship between

23  BAC and Fazal-Karim, and the Court found that Fazal-Karim

24  was not BAC's agent, based upon the allegations in the

25  complaint.

46

1      The Court notes that count two was also dismissed,

2  regarding FK, in part because the FAC did not sufficiently

3  allege an agency relationship between Fazal-Karim and BAC,

4  but this does not prevent a Rule 54 certification, for two

5  reasons.

6      First, the dismissal of count two against FK was

7  not based entirely on the same factual and legal issues as

8  dismissal of count two in the second BAC motion to dismiss

9  ruling.  In the second FK motion to dismiss ruling, the

10 Court highlighted other grounds for dismissal, including the

11 intracorporate conspiracy doctrine.

12     FK could not conspire with FKG, FKP, and/or

13 Jetcraft because FK had control over those entities, and,

14 therefore, he could not conspire with them, and California

15 law has no cause of action for conspiracy to aid and abet

16 breach of fiduciary duty.  In other words, count two against

17 BAC and count two against FK did not involve factual issues

18 that overlap entirely, as was the case in Wood.

19     Second, a Rule 54(b) certification would

20 streamline future litigation, and there is an important or

21 controlling legal issue that cuts across a number of claims.

22 Here the question of whether Fazal-Karim was acting as BAC's

23 agent affects all the tort claims against BAC, as well as

24 count two against Fazal-Karim.  Because agency is an

25 important dispositive issue that will streamline

47

1  adjudication of count two against FK, the Court finds that

2  Rule 54 certification is appropriate regarding that count.

3        Count three, California UCL.  Count three alleges

4  that BAC engaged in commercial bribery and violated the UCL

5  by giving Cassidy the F1 tickets and agreeing to pay for the

6  Sea-Doos in return for Cassidy causing the Debtors to accept

7  delivery of planes three to five, eight, and nine.  It also

8  alleges that Fazal-Karim, as BAC's agent, directed

9  Jetcraft's CFO to pay Cassidy the first and second kickbacks

10       The Court dismissed count three regarding BAC

11  because plane two to five, eight, and nine APAs (phonetic)

12  executed by Zetta Singapore and BAC contained New York

13  choice of law clauses, which were grounds for dismissal of

14  the UCL claim against BAC, and Fazal-Karim did not have

15  actual or apparent authority to act as BAC's agent regarding

16  any aircraft.

17       These reasons for dismissing count three against

18  BAC were unique to BAC, whose APAs were the only ones

19  containing New York choice of law clauses, and BAC were only

20  alleged to be involved in giving the first and second

21  kickbacks to Cassidy through an agency relationship with

22  Fazal-Karim.  Regarding count three, the failure to allege

23  an agency relationship between Fazal-Karim and BAC only

24  applied to BAC, and provided an independent basis for

25  dismissing count three against BAC regarding the kickbacks.

48

1       Count six, fraudulent misrepresentation.  Count

2  six alleged that Fazal-Karim, Jetcraft, Jetcraft Global, and

3  Orion fraudulently misrepresented material facts, that the

4  first and second kickbacks were made in return for services

5  while he was acting as BAC's agent.

6       Count six was dismissed because, one, it was

7  premised on Fazal-Karim acting as BAC's agent regarding the

8  sale of plane one and 10, but those aircraft were sold by

9  Jetcoast and Orion, respectively, not BAC, and, two,

10  Fazal-Karim was not BAC's agent.

11       Count six alleged that the remaining defendants

12  made direct misrepresentations to Zetta Singapore, but the

13  Court found that BAC was only implicated based on an alleged

14  agency relationship with Fazal-Karim.  As a result, the

15  reasons for dismissal of count six were unique to BAC.

16       Count seven.  The FAC alleged that BAC and

17  Fazal-Karim concealed material facts from the Debtors

18  regarding the first and second kickbacks, the F1 tickets,

19  and the Sea-Doos so that Cassidy would induce the Debtors to

20  acquire aircraft from BAC and Fazal-Karim.

21       Count seven was dismissed for the following

22  reasons.  One, regarding the first and second kickbacks,

23  Fazal-Karim was not BAC's agent.  Two, the Sea-Doos were

24  discoverable by a corporate director of Zetta director

25  exercising ordinary oversight, and, three, the FAC did not

49

1  allege that BAC knew that the Debtors would have canceled

2  transactions for multi-million-dollar aircraft if they had

3  been aware of the F1 tickets and Sea-Doos.

4       The Court's dismissal of count seven against BAC

5  was legally and factually unique from the dismissal of count

6  seven against the other defendants for several reasons.

7  First, the Court applied New York law to the claim against

8  BAC, which is substantively different from California law,

9  which applied to the other defendants.  Second, count seven

10 was dismissed against BAC based on lack of agency between

11 BAC and Fazal-Karim, which was unique to BAC.

12      Finally, whether BAC knew that the Debtors would

13 not have bought aircraft if they knew about the F1 tickets

14 and Sea-Doos applied only to BAC.  On this basis, dismissal

15 of count seven against BAC was based on unique grounds that

16 were inapplicable to the remaining defendants.

17      Counts 12 through 19, 31, and 32, fraudulent

18 transfer and preference.  Counts 12 through 19, 21, and 32

19 were brought under Sections 547, 48, and 550.  Counts 12

20 through 17, 31, and 32 sought avoidance and recovery of

21 actual intent and constructive fraudulent transfers.

22      Counts 18 and 19 sought avoidance and recovery of,

23 quote, "U.S. preference transfers."  The transfers the

24 Trustee sought to avoid in those counts were counts 12 and

25 13, involving planes two to five, and the transfers were

50

1  from Universal Leader, on behalf of Zetta, to BAC.

2          Counts 12 through 13, planes two and three -- I'm

3  sorry.  For the first one, counts 12 and 13, planes two to

4  five, the date was 12/4, 2015.  The amount was a million

5  dollars from Universal Leader, on behalf of Zetta Singapore,

6  to BAC.  Counts 12 and 13, the transaction involved planes

7  two and three.  The date was 2/16/16.  The amount was

8  $10,000,000 from Zetta Singapore to BAC.  Counts 12 and 13,

9  planes two and three, the date was 3/8, 2016, another

10 $10,000,000 from Zetta Singapore to BAC.  Counts 12 and 13,

11 plane four, the date is 3/28/16, 1.2 million from Zetta

12 Singapore to BAC.

13          Counts 12 and 13, plane four, the date was

14 6/30/16.  The amount was 2.4 million, from Zetta Singapore.

15 Counts 12 and 13, plane four, the date is 3/28/17.  The

16 amount is 3.091 million from Zetta Singapore to BAC.  Counts

17 12 and 13, plane four, date is 6/27/17.  Amount is 3.262

18 million, from Zetta Singapore to BAC.

19          Counts 14 and 15, planes two to five, dates were

20 not provided.  The amount was 120,000,000 from Zetta

21 Singapore via Cavock (phonetic) to BAC.  Counts 16, 17, 31,

22 and 32, plane six, date is 12/10, 2015, 46.3 million from

23 Zetta Singapore to BAC.  Counts 16, 17, 31, and 32, plane

24 six, date is 12/28/15, 1,000,000 from Zetta Singapore to

25 BAC.

51

1        Count 18, the date is within 90 days before the

2   petition date.  The amount is 3.262 million, from Zetta

3   Singapore to BAC.  And count 19 is within 90 days before the

4   petition date, and the amount is 1.142 million, from Zetta

5   Singapore to Lee (sic).

6        The Court dismissed counts 12 through 19 and 31 to

7   32 -- hold on.  It's not Lee.  It's actually Learjet.  I

8   misspoke.  It's to Learjet in count 19.  The Court dismissed

9   counts 12 through 19 and 31 to 21 against BAC because each

10  transfer was from a foreign entity's foreign bank account

11  and required an impermissible extraterritorial application

12  of the Bankruptcy Code.

13       The Trustee argues that whether the Court

14  correctly decided the FAC's fraudulent transfer claims

15  against Jetcraft would also inevitably be appealed, forcing

16  an appellate court to decide the same legal issues, based on

17  the same facts.  He asserts that whether Cassidy acted with

18  fraudulent intent when he made each of the transfers to BAC

19  and Jetcraft was an overlapping factual issue against the

20  defendants.  He contends that -- excuse me.

21       Counts eight, nine, 10, and 11 were brought under

22  548 and 550 against Jetcraft, and were dismissed, in full or

23  in part, based on extraterritoriality, but those counts

24  involve completely different transfers, regarding different

25  aircraft, than did counts 12 through 17 and 31 to 32 against

52

1 BAC.

2       So the counts against Jetcraft were eight and

3 nine, involving plane one.  The date was 12/10/15.  The

4 amount is 2.775 from Zetta Singapore to Jetcraft Corp., from

5 Element, on behalf of Zetta Singapore, to -- excuse me --

6 from Zetta Singapore to Jet Corp (phonetic).

7       Count eight and nine, plane one, the date is

8 12/30, 2015, 37.8 million from Element on behalf of Zetta

9 Singapore to Jetcoast.  Count eight and nine, plane one,

10 January 5, 2016, 1.78 million from Zetta Singapore to

11 Jetcraft.

12       Counts 10 and 11, plane 10, date is 9/22/16.  The

13 amount is 49.5 million from Element, on behalf of Zetta

14 Singapore, to Orion.

15       Because the factual circumstances regarding the

16 transfers to BAC and the transfers to Jetcraft are totally

17 different, there is no risk that the case would return to an

18 appellate court on the same set of facts.  That's <u>Jewel</u>, 810

19 F.3d 622.

20       Further, as noted, Rule 54 certification is also

21 appropriate where it would streamline litigation or could

22 facilitate settlement.  Here, the extraterritoriality of

23 bankruptcy claims is an issue impacting claims against BAC,

24 Jetcraft, and Universal Leader.  As a result, Rule 54

25 certification could expedite the resolution of the legal

53

1  issues involving extraterritoriality of bankruptcy claims

2  and facilitate settlement between the various parties.

3       Count 20, violation of the automatic stay.  Count

4  20 alleged that BAC violated the automatic stay under 11

5  U.S.C. 362 by ceasing performance under an executory

6  contract.  The Court dismissed count 20 because the Trustee

7  cannot recover damages for violation of the automatic stay

8  under 362(k)(1), and, because BAC was the only defendant

9  named in count 20, dismissal was on unique grounds,

10  applicable only to BAC.

11       Count 25, disallowance of claims.  Count 25

12  alleged that because BAC, FK, and Jetcraft were entities

13  from home, property was recoverable under 542 or 550, or

14  transferees of transfers that are avoidable under 547 or

15  548.  Any claims advanced by them must be disallowed under

16  502(d).  The Court dismissed count 25 against BAC because it

17  dismissed counts 12 through 19, and 31 and 32 were dismissed

18  based on facts unique to BAC.

19       I realized when I was going down the list, in

20  terms of avoidance and recovery, I did not list counts 31

21  and 32, but those were avoidance and recovery of actual

22  intent fraudulent transfers, and, again, those counts were

23  dismissed for facts that were unique to BAC.

24       Turning to the equities, BAC contends that failure

25  to certify the second BAC motion to dismiss ruling creates a

54

1   risk of duplicative litigation because the Trustee would not

2   be able to appeal the Court's finding regarding agency until

3   after the conclusion of a potential trial with FK and

4   Jetcraft.

5          They argue that if the Trustee were to prevail on

6   appeal against BAC, and if the Trustee could successfully

7   plead claims against all defendants and survive dispositive

8   motions, the trial against FK and Jetcraft would be largely

9   duplicative of a later trial against BAC, because the agency

10  theory of liability entirely hinges on the alleged role of

11  Fazal-Karim.

12         According to BAC, both trials would require

13  testimony from the same witnesses and presentation of the

14  same evidence regarding Fazal-Karim.  BAC argued that

15  immediately certifying the decision, the ruling against BAC,

16  would allow the agency issue to be resolved before the trial

17  against FK and Jetcraft, and would avoid the risk of

18  duplicative trials and inconsistent rulings.

19         BAC contends that a Rule 54(b) certification is

20  appropriate because agency and extraterritoriality, which

21  the Court decided in the BAC's second motion to dismiss

22  ruling, involved controlling legal issues.  They argue that

23  the certification of these narrow but important issues

24  ensures they are promptly and finally decided.  BAC asserts

25  that they will be prejudiced if the Court does not enter a

55

1  final judgment, because they would be forced to wait years

2  until the claims against Jetcraft and FK are resolved.

3        They contend that because the remaining claims may

4  not be resolved for a while, it is prudent for any appellate

5  review to take place as soon as practicable, in order to

6  avoid prejudice to any party.  They highlight that they have

7  been litigating this adversary proceeding for over three

8  years, and would have to await the Trustee re-pleading the

9  remaining claims against FK and Jetcraft, the remaining

10  defendants filing answers, discovery commencing, before all

11  claims in the adversary proceeding are finally resolved.

12  They argue that delay threatens the availability and

13  memories of witnesses.

14        BAC also explains that the BAC's second motion to

15  dismiss ruling turns on the wording of their agency

16  disclaimers and choice of law clauses, and the outcome may

17  impact how those clauses are drafted in the future.  The

18  Trustee did not address this issue in the opposition.  BAC

19  replied that the Trustee does not contest that they would be

20  prejudice if the motion were denied.  They assert that

21  disposition of the remaining claims against FK and Jetcraft

22  cannot impact the Court's decision in the second BAC motion

23  to dismiss rulings.

24        Trial courts are entrusted with weighing and

25  balancing the equities, may explore all facets of a case,

56

1 and must determine the appropriate time when each final

2 decision in a multi-claim action is ready for appeal.

3 That's <u>Curtiss-Wright</u> and <u>Jewel</u>.  In making this

4 determination, courts have considered the prejudice that

5 could result from the delay of entry of judgment.

6        Here BAC argues that they would be prejudiced by

7 being forced to wait years while the Trustee litigates the

8 remaining claims with FK and Jetcraft.  The Trustee did not

9 respond to BAC's argument, which was raised in the motion.

10 During oral argument, Mr. Roselius did mention prejudice,

11 and he said there wouldn't be any prejudice, but, again, the

12 Trustee had an opportunity to respond to this argument,

13 which was raised in the motion, and the Court may treat the

14 Trustee's failure to address BAC's argument as conceding

15 that point.  Additionally, the Court notes that the Trustee

16 admits that he would prefer appeal now, and that was in the

17 opposition.

18        So, in conclusion, the Court finds that the

19 judgment against BAC is final, and after considering the

20 interrelationship of the claims and the equities, the Court

21 finds that there is no just reason for delay.  Therefore,

22 the motion is granted, and I'll ask that Ms. Fornos, on

23 behalf of BAC, serve and lodge a proposed order within seven

24        MR. ROSELIUS:  Yes, your Honor.

25        THE COURT:  Ms. Fornos, is there anything further?

57

1          MS. FORNOS:  Your Honor, one small issue.  Rule

2   54(b) also provides that after entry of judgment, there is

3   14 days for a party to file a motion for attorney's fees and

4   costs.  We would respectfully request that that time period

5   be extended until 30 days after the District Court affirms

6   the Court's decision.  I think that would be in the interest

7   of all parties, and certainly judicial efficiency.

8          THE COURT:  Mr. Roselius?

9          MR. TOROSIAN:  Your Honor, I can --

10          MR. ROSELIUS:  I'm going to defer to Mr. Torosian.

11          MR. TOROSIAN:  Yes, that's usually what happens.

12   Thank you, your Honor.  Jeff Torosian for the Trustee.  I

13   don't understand the basis for the request for attorney's

14   fees.  This is the first we're hearing of this.  The period

15   may have already expired, based on your Court's (sic) order.

16          So I'm happy to consider this, if Ms. Fornos wants

17   to, after this hearing, discuss this with us and get back to

18   us, but right now the Trustee certainly can't stipulate to

19   something that's not properly before the Court or hasn't

20   been mentioned to us in the past.

21          THE COURT:  Ms. Fornos?

22          MS. FORNOS:  Yes, your Honor.  Your Honor, this is

23   provided by rule.  The time has not expired.  It's 14 days

24   after entry of judgment.  Now that the Court has provided

25   that entry is appropriate, the 14 days would start to run.

58

1      I am happy to call Mr. Torosian and have this

2  discussion, but the idea would just simply be to extend that

3  time frame for 30 days after the appellate court, the

4  District Court, rules and affirms this Court's decision, and

5  it would be efficient if we could just put that in the

6  order, and that's why I'm raising it now, but I can

7  certainly discuss it with Mr. Torosian, and if the Trustee

8  agrees, we can certainly, with the Court's permission, add

9  it to the order.

10      THE COURT:  All right.

11      MR. TOROSIAN:  Can I be heard again, your Honor?

12  Jeff Torosian for the Trustee.  It doesn't belong in the

13  order if it wasn't asked for in the motion, and this is

14  different than the way Men Shing (phonetic), or the UL

15  defendants, did this in the related case.  They actually

16  filed their motion for fees, which was done on a complete

17  different basis, related to contracts that they had with us,

18  with the Trustee.

19      I don't believe that's what Bombardier would be

20  suggesting.  I don't know what their basis is for fees.

21  But, in the UL case, a motion was brought, and then parties

22  discussed it, and there was a stipulation to -- or I think

23  your Honor actually ordered it, that that be put off until

24  after the appeal.  This is the first we're hearing of it.

25  It was not mentioned in the motion.  I'm happy to consider

59

1  it, but it shouldn't be part of this order.  It should be

2  part of a separate stipulation, if, in fact, we get to a

3  stipulation, or they could bring a separate motion.

4         THE COURT:  Okay.  So, Mr. Torosian, just to clear

5  up the record, the parties briefed it, and then the Court

6  chose to defer until after the District Court ruled on the

7  judgment that the Court entered, because I felt it would be

8  inefficient to make an order about whether or not a

9  defendant was eligible to receive fees if the District Court

10 disagreed with me and reversed.

11        So that will be the same situation here.  I will

12 not rule on it until after the District Court rules on an

13 appeal, if any, but, in terms of how we get there, Ms.

14 Fornos, I do agree with Mr. Torosian that it wasn't raised

15 in the motion.

16        I think, if you two can actually speak with one

17 another and come to an agreement, I think it's in

18 everybody's best interests, because the Trustee won't incur

19 additional fees in opposing it, Bombardier won't incur

20 additional fees in drafting it now, but, if you can't agree,

21 then we'll have to brief that issue.  But, at least right

22 now, the only thing I'm ruling on is the Rule 54 motion, and

23 it's granted.

24        So I do encourage the parties to try to work this

25 one out.  I think it's in everybody's best interests to not

60

1  have to brief something that may be unnecessary at this

2  juncture.  But, if we can't work it out, then we'll just go

3  through the briefing process, and then the Court will defer

4  ruling until after the District Court renders its opinion on

5  an appeal, if any.

6           MR. TOROSIAN:  Understood, your Honor.  Again,

7  Jeff Torosian for the Trustee.  We're not trying to be

8  difficult, but we just -- you know, I don't -- I am not the

9  Trustee.  I just speak for the Trustee.  So I can't just

10 stipulate on the fly to things that are mentioned the first

11 time at a hearing.

12          I would just ask, your Honor -- we haven't had

13 this problem with Ms. Fornos or with the Bombardier

14 defendants, but we have had this problem with the UL

15 defendants.  If we can be assured of being provided a draft

16 of the order prior to it being submitted to the Court, we'd

17 appreciate it.

18          THE COURT:  Okay.  Ms. Fornos?

19          MS. FORNOS:  Yes, your Honor, of course.  I'm

20 happy to discuss the issue of the fees with Mr. Torosian,

21 and certainly provide a draft order.  And just for

22 clarification, is it a draft order and judgment for the

23 Court's consideration?

24          THE COURT:  I think it's better to do the order

25 granting the motion, and then a separate judgment, because

*Briggs Reporting Company, Inc.*

61

1  the judgment would refer back to the ruling, and the order

2  is only on this motion, just to keep the docket very clear.

3          MS. FORNOS:  Certainly, your Honor, and we will

4  provide it in --

5          THE COURT:  And the order on the motion should be

6  basically "For the reasons stated on the record, the Court

7  granted the motion."  It should be very brief.  According to

8  the federal rules, that's what we need in terms of the

9  order, and then the judgment also, I believe, should be very

10 brief, but I'll defer to you on how you want to draft that.

11         MS. FORNOS:  Thank you, your Honor.  We'll

12 coordinate with the Trustee.

13         THE COURT:  Thank you.

14         Anything further, Mr. Torosian?

15         MR. TOROSIAN:  Your Honor, just a question.  Is

16 your Honor going to put on the record -- other than just

17 speaking it on the record today, the ruling you just made,

18 is that going to be part of a written record?

19         THE COURT:  No.  It's on the record now, so you'll

20 be able to view that on the transcript.

21         MR. TOROSIAN:  Okay.  Wonderful.  Thank you, your

22 Honor.

23         THE COURT:  Okay.  And, Mr. Roselius, you were the

24 arguer, so I didn't want to leave you out.

25         MR. ROSELIUS:  Nothing further, your Honor.

*Briggs Reporting Company, Inc.*

62

1          THE COURT:  Okay.  And Mr. Troop, you have your

2    video on.

3          MR. TROOP:  I did, your Honor.  I was trying to

4    get Ms. Fornos' attention on the procedural issue that she

5    raised, and just in case she didn't, that is, order and

6    judgment, right, issue, and just in case I wasn't able to do

7    so, I thought I'd pop my face on the screen, but thank you.

8          THE COURT:  All right.  Thank you.

9          All right.  Thank you, Counsel.  Thank you for the

10   briefing, thank you for the argument, and we don't have any

11   other matters scheduled in this adversary proceeding

12   regarding Bombardier.

13         We have other matters on calendar regarding the

14   other -- FK and Jetcraft, and right now I don't have those

15   dates before me, but I believe sometime in October,

16   possibly, but I could be wrong about that.  I'm going off of

17   memory.

18         MR. TOROSIAN:  Your Honor, Jeff Torosian for the

19   Trustee.  Just to highlight, we do have the mediation

20   scheduled with those remaining defendants in late September.

21   So I just wanted to alert you about it.  They're not before

22   the Court right now, although they were certainly welcome to

23   attend, but I just wanted to let you know that that is in

24   process.

25         THE COURT:  All right.  Thank you, Mr. Torosian,

63

1  and thank you, Ms. Fornos, Mr. Roselius, and Mr. Troop.

2          MR. TROOP:  Thank you, your Honor.  Have a good

3  day.

4          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

5          THE COURT:  Thank you.  That concludes hearings

6  for today.  Off the record.

7      (Proceedings concluded.)

8

9      I certify that the foregoing is a correct

10 transcript from the electronic sound recording of the

11 proceedings in the above-entitled matter.

12 /s/ Holly Steinhauer          9-1-22
   Transcriber                    Date
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   Claire K. Wu (CA Bar No. 295966)
2  725 South Figueroa Street, 36th Floor
   Los Angeles, CA 90017-5524
3  Telephone:   213-488-3655
   Facsimile:   213-629-1033
4
   Eric Fishman (admitted *pro hac vice*)
5  Andrew M. Troop (admitted *pro hac vice*)
   Carolina A. Fornos (admitted *pro hac vice*)
6  31 West 52nd Street
   New York, NY 10019-6131
7  Telephone:   212-858-1000
   Facsimile:   212-858-1500
8
   *Attorneys for Bombardier Aerospace Corporation,*
9  *Bombardier, Inc., and Learjet, Inc.*

**FILED & ENTERED**

**SEP 07 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY may       DEPUTY CLERK

10                **IN THE UNITED STATES BANKRUPTCY COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

11  In re

12  ZETTA JET USA, INC., a California corporation,

13        Debtor and Debtor in Possession.

14  In re

15  ZETTA JET PTE Ltd., a Singaporean corporation,

16        Debtor and Debtor in Possession.

17  JONATHAN D. KING, solely in his capacity as
    Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta
18  Jet PTE, Ltd.,

19        Plaintiff,

20        v.

21  JETCRAFT CORPORATION, JETCRAFT
    GLOBAL, INC., JETCOAST 5000-5 LLC, ORION
22  AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA
    LIMITED, FK GROUP LTD, FK PARTNERS
23  LIMITED, JAHID FAZAL-KARIM,
    BOMBARDIER AEROSPACE CORPORATION,
    BOMBARDIER, INC., and LEARJET, INC.,

24        Defendants.

25

Lead Case No.: 2:17-bk-21386-SK

Jointly administered with

2:17-bk-21387-SK

(Zetta Jet PTE Ltd.,
a Singaporean corporation)

Chapter 7 Cases

**Adv. Proc. No. 2:19-ap-01382-SK**

**ORDER GRANTING MOTION FOR
ENTRY OF FINAL JUDGMENT
PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 54(b),
APPLICABLE BY FEDERAL RULE
OF BANKRUPTCY PROCEDURE 7054**

Date:      August 29, 2022
Time:      9:00 a.m.
Place:     Courtroom 1575
           255 East Temple Street
           Los Angeles, CA 90012

4892-6455-9146.v1

1    On July 21, 2022, Bombardier Aerospace Corporation, Bombardier, Inc., and Learjet, Inc.

2    ("BAC/BI/LI") filed a "Notice of Motion and Motion for Entry of Final Judgment Pursuant to

3    Federal Rule of Civil Procedure 54(b), Applicable by Federal Rule of Bankruptcy Procedure

4    7054." *See* Dkt. No. 416 ("Rule 54(b) Motion").    The Court held a hearing on the Rule 54(b)

5    Motion at the above-captioned date and time.  Appearances were as noted on the record.

6    For the reasons set forth on the record, which are incorporated herein as the Court's

7    findings of fact and conclusions of law, **IT IS HEREBY ORDERED** that the Rule 54(b) Motion

8    is **GRANTED**, and a Final Judgment in favor of BAC/BI/LI dismissing all claims against them in

9    this adversary proceeding shall be entered separately.

10    ###

11

12

13

14

15

16

17

18

19

20    Date: September 7, 2022

21    Sandra R. Klein
      United States Bankruptcy Judge

22

23

24

25

2

4892-6455-9146.v1

248